UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-6228-CIV-SEITZ/GARBER

HUGH HODGE,

     Plaintiff,

vs.

TIMOTHY M. CHURCH,
THOMAS REED, et al.,

     Defendants.

_____/



NIGHT BOX
FILED

JAN 16 2001

CLERK, USDC / SDFL / MIA

### DEFENDANTS, PATRICK HART, DAVID WHEELER AND CITY OF FORT LAUDERDALE'S, MOTION FOR SUMMARY JUDGMENT, CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS AND INCORPORATED MEMORANDUM OF LAW

Defendants, PATRICK HART ("HART"), DAVID WHEELER ("WHEELER") and CITY OF FORT LAUDERDALE ("CITY"), by and through their undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.5, respectfully request the Court render an Order granting summary judgment in their favor and against Plaintiff, HUGH HODGE ("HODGE"). In support thereof, HART, WHEELER and CITY state as follows:

#### Introduction

This case arises out of the arrest of HODGE on or about September 6, 1998 for stealing an automobile and fleeing from the police.[1] While fleeing from the police, HODGE crashed the stolen

---

[1]     HODGE pled guilty to: (1) possession of cocaine; (2) grand theft; (3) possession of drug paraphernalia; (4) driving with a suspended license; and (5) resisting arrest without violence. See Broward Circuit Court Status Sheet, dated October 20, 1998 (appended as Attachment 9).

automobile into a chain-linked fence, escaped and fled on foot, and ultimately proceeded to hide from the police in and/or behind shrubbery. K-9 units were called to assist in finding the fleeing HODGE. HODGE was shortly located and warned that a K-9 dog would be released if he did not come out of the shrubbery and surrender. After repeated warnings, HODGE refused to surrender and the Hallandale Police K-9 dog was released upon HODGE by the Hallandale Police K-9 Officer. HODGE incessantly refused to surrender and fought with the police dog. Ultimately, the K-9 dog was able to apprehend HODGE and HODGE was placed under arrest and transported to Broward General Medical Center for treatment.

As a result, Plaintiff has filed a ten (10) count Complaint alleging 42 U.S.C. § 1983 violations (excessive force) against Officer Timothy M. Church ("CHURCH") (Count One), Officer Thomas Reed ("REED") (Count Two), HART (Count Three) and WHEELER (Count Four). Plaintiff also alleges battery claims against all said police officers (Counts Five through Eight) and asserts claims of negligence against the CITY and the City of Hallandale (Counts Nine and Ten). However, as HART, WHEELER and the CITY's Motion demonstrates:

*One*, Plaintiff's claim of negligence against the CITY is barred by § 768.28, Fla.Stat.;

*Two*, because the undisputed record reveals that WHEELER was at his home at the time of HODGE's apprehension and arrest, HODGE's claims against WHEELER fail as a matter of law; and

*Three*, because the undisputed record reveals that HART was not involved in the physical apprehension and arrest of HODGE or even within the presence of HODGE during his apprehension and arrest, HODGE's claims against HART fail as a matter of law.

Consequently, HART, WHEELER and the CITY's Motion for Summary Judgment should be granted in its entirety.

ADORNO & ZEDER, P.A.
888 SOUTHEAST 3RD AVENUE, SUITE 500 • FORT LAUDERDALE, FLORIDA 33335-9002 • TELEPHONE (954)523-5885 • TELEFAX (954) 760-9531

## Concise Statement of Undisputed Material Facts

On or about September 6, 1998, Hugh Hodge stole a 1990 Blue Honda Civic from a private residence at 2616 Middle River Drive in Fort Lauderdale. Deposition of HODGE, at 6 (a copy of HODGE's deposition is appended as Attachment 1); Fort Lauderdale Police Incident Report, Officer Hart, at 2 (a copy of HART's Incident Report is appended as Attachment 2). As a result, a BOLO (Be On the Look Out) was issued for the aforementioned stolen Honda and described the suspect driving the vehicle as a white male with the name of Hugh Hodge. Attachment 2, at 2; Sworn Affidavit of HART, at ¶ 4 (a copy of HART's Sworn Affidavit is appended as Attachment 3). HART received the BOLO on the stolen Honda and the suspect while on routine patrol. Attachment 2, at 2; Attachment 3, at ¶ 4. Shortly thereafter, HART observed the stolen Honda traveling southbound on NW 7th avenue and advised Fort Lauderdale Police dispatch to confirm the vehicle's license plate number. Attachment 2, at 2; Attachment 3, at ¶ 5. Dispatch confirmed the license plate number and that the vehicle was stolen. Attachment 2, at 2; Attachment 3, at ¶ 5. HART requested back-up. Attachment 2, at 2; Attachment 3, at ¶ 6.

Once back-up arrived, HART attempted to make a felony stop with his vehicle by putting on his lights and siren. Attachment 2, at 2; Attachment 3, at ¶ 7. HODGE did not stop but instead accelerated in an attempt to escape capture. Attachment 1, at 7; Attachment 2, at 2; Attachment 3, at ¶ 8. While trying to negotiate a turn, HODGE drove the stolen vehicle into a chain linked fence which was located on a private residence. Attachment 1, at 7; Attachment 2, at 2; Attachment 3, at ¶ 8. HODGE then exited the vehicle, failed to obey HART's commands to stop and fled on foot to find a place to hide. Attachment 1, at 7-8; Attachment 2, at 2; Attachment 3, at ¶ 9. HODGE ran over the fence that was behind the yard into which he had crashed the stolen vehicle and went into the backyard of another house. Attachment 1, at 8. HODGE proceeded to the front of that house and hid in some shrubbery. Attachment 1, at 8.

While HODGE was fleeing on foot, HART established a perimeter in the area and requested a K-9 Unit to respond to the scene. Attachment 2, at 2; Attachment 3, at ¶ 10. HART remained at the perimeter he established while waiting for the K-9 Unit to arrive. Attachment 3, at ¶ 10. REED, a K-9 officer from the Fort Lauderdale Police Department and Officer Timothy Church , a K-9 officer from the Hallandale Police Department, along with Officer Church's K-9 dog, Gero, responded to the scene. Attachment 2, at 2; Attachment 3, at ¶ 11; Hallandale Police Department Incident Report (a copy of Hallandale's Incident Report is appended as Attachment 4). Upon their arrival, HART provided the officers with a description of the suspect who fled on foot and pointed to the last place HART had seen him. Attachment 2, at 2; Attachment 3, at ¶ 12; Attachment 4; REED K-9 Supplement to Incident Report (a copy of the K-9 Supplement Report is appended as Attachment 5).

Officer Church of the Hallandale Police K-9 Unit deployed his K-9 dog, Gero, in the same location that HART had last seen HODGE flee. Attachment 4; Attachment 5, at 1. Although HODGE was aware that the K-9 officers, along with Gero, arrived in the area where HODGE was hiding, HODGE continued to hide. Attachment 1, at 12-13. Officer Church illuminated some bushes with his flashlight and could see HODGE hiding. Attachment 4. Officer Church gave two loud and clear announcements that he was a Hallandale Police K-9 officer and that HODGE was under arrest. Attachment 4; Attachment 5, at 1. Officer Church commanded HODGE to expose his hands and come out from his place of hiding. Attachment 4; Attachment 5, at 1. After Officer Church's first announcement to HODGE, Officer Church waited for a response but did not receive one. Attachment 4; Attachment 5, at 1. Officer Church once again identified himself as a Hallandale Police K-9 officer and advised HODGE that if he did not come out of the shrubbery, Officer Church would release Gero, his K-9 dog, to take him into custody. Attachment 4; Attachment 5, at 1. Officer Church did not receive a response to his repeated demands and therefore deployed Gero. Attachment

4; Attachment 5, at 1.

Gero went into the bushes and contacted HODGE in the right bicep and began pulling HODGE out of his place of hiding behind and/or within the shrubbery. Attachment 4; Attachment 5, at 1. When Gero made contact with HODGE, HODGE became very violent and began to fight with Gero. Attachment 4; Attachment 5, at 1. HODGE eventually got loose from Gero's hold. Attachment 4; Attachment 5, at 1. As soon as HODGE broke free from Gero, Gero re-contacted HODGE in the buttocks and continued to pull HODGE from under the shrubbery. Attachment 4; Attachment 5, at 1. While HODGE was fighting and resisting Gero, REED and Officer Church were yelling instructions for HODGE to stop fighting and striking Gero and to place his hands behind his back. Attachment 4; Attachment 5, at 1. Once the struggle was over, HODGE was handcuffed by REED. Attachment 4; Attachment 5, at 1. HODGE was taken into custody and Fort Lauderdale Police Officers Shields and Smith transported HODGE to Broward General Medical Center for treatment of his injuries. Attachment 2, at Supplement, 1.

During the entire time of HODGE's apprehension, HART stayed at the perimeter he had previously established. Attachment 2, at 2; Attachment 3, at ¶ 13. While HART was still at the established perimeter, HART was informed of HODGE's capture and apprehension via his police radio. Attachment 2, at 2; Attachment 3, at ¶ 13. HART only left the perimeter after HODGE had been transported to the hospital. Attachment 2, at 2; Attachment 3, at ¶ 14.

WHEELER, as sergeant in charge of the Fort Lauderdale K-9 Unit, received a telephone call at his home from a Fort Lauderdale Police officer on the scene HODGE's apprehension, informing WHEELER that a K-9 Unit was involved in a use-of-force incident. Sworn Affidavit of David Wheeler, at ¶ 4 (a copy of WHEELER's Sworn Affidavit is appended as Attachment 6). WHEELER proceeded to the scene of the apprehension and arrest of HODGE to conduct an investigation. Attachment 4; Attachment 5, at 1; Attachment 6, at ¶ 5. When WHEELER arrived at the scene,

HODGE had already been transported to Broward General Medical Center for medical treatment. Attachment 6, at ¶ 5. Shortly after his arrival, REED walked WHEELER through the scene and events of that evening regarding the use of force by Officer Church's K-9 dog, Gero. Attachment 6, at ¶ 6. WHEELER took photographs of the post-apprehension scene including the stolen vehicle. Attachment 4; Attachment 5, at 1; Attachment 6, at ¶ 6. WHEELER's first contact with HODGE was upon WHEELER's arrival at Broward General Medical Center where HODGE was being treated for his injuries. Attachment 6, at ¶ 7.

HART proceeded to Broward General Medical Center and found HODGE in the emergency room. Attachment 3, at ¶ 15. HART remained with HODGE at the hospital for approximately three or four hours until HODGE received a medical clearance. Attachment 3, at ¶ 15. Upon his arrival at the hospital, WHEELER introduced himself to HODGE and asked him some questions regarding the events of that night. Attachment 6, at ¶ 8. HODGE voluntarily informed WHEELER that he had stolen a vehicle and was fleeing from the police officers. Attachment 6, at ¶ 9. HODGE also admitted to WHEELER that he not only saw the K-9 officers but also heard their commands to come out and give himself up. Attachment 6, at ¶ 9. HODGE further admitted that he fought with the Hallandale K-9 dog, Gero. Attachment 6, at ¶ 9. Once HODGE was medically cleared, HART transported HODGE to the Fort Lauderdale jail, read him his Miranda rights and placed him under arrest. Attachment 2, at 2; Attachment 3, at ¶ 16.

HART and WHEELER were neither involved in the physical apprehension of HODGE nor even in the presence of HODGE during his apprehension and placement into custody by REED and Officer Church. Attachment 3, at ¶ 17; Attachment 6, at ¶ 10. HART and WHEELER did not make any physical contact with HODGE either before or after his apprehension at the scene. Attachment 3, at ¶ 18; Attachment 6, at ¶ 11. HODGE testifies and alleges that REED, HART, WHEELER and Officer Church, acted maliciously and in bad faith and in willful and wanton disregard for his life

and safety. Attachment 1, at 58. HODGE further admits that on the night in question, he had been

drinking and was addicted to drugs, namely, cocaine. Attachment 1, at 5 and 9-10.

### Memorandum of Law

**A.    Applicable legal standards for granting a motion for summary judgment**

Rule 56(b) of the Federal Rules of Civil Procedure provides, in relevant part, that:

A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

Fed.R.Civ.P. 56(b).  In ruling on a motion for summary judgment, a court must review all facts and

inferences in a light most favorable to the non-moving parties.  It must consider all facts before it,

and not merely those alleged by the non-moving parties.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 255 (1986). "Summary judgment is appropriate where, after viewing the evidence in the light

most favorable to the non-moving party, there is no genuine issue of material fact and the moving

party is entitled to judgment as a matter of law." Kirby v. Siegelman, 195 F.3d 1285, 1289 (11th Cir.

1999).  Appropriately, *"[a] mere 'scintilla' of evidence supporting the opposing party's position*

*will not suffice*; there must be a sufficient showing that the jury could reasonably find for that party."

Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (emphasis added). As  this  Court  has

recognized, "[w]here . . . the non-moving party 'has failed to make a sufficient showing on an

essential element of [his] case with respect to which [he] has the burden of proof,' summary

judgment is appropriate." See Order Granting Motion for Summary Judgment, Rowe v. City of Fort

Lauderdale, Case No. 97-6832-Civ-Seitz, (S.D. Fla. 2000) (quoting Celotex Corp. v. Catrett, 477

U.S. 317, 323 (1986)) (a copy of the Order Granting Motion for Summary Judgment is appended

as Attachment 7).

**B.    Plaintiff's claim of negligence against the CITY is barred by § 768.28, Fla.Stat.**

Under Florida Statute § 768.28, the state and its agencies have waived their sovereign

immunity for tort liability, subject to the limitations of the Act. More specifically:

> Actions at law against the state or any of its agencies or subdivisions to recover damages in tort for money damages against the state or its agencies or subdivisions for injury or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of the employee's office or employment under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of this state, may be prosecuted subject to the limitations specified in this act.

§ 768.28(1), Fla. Stat. However, the act clearly limits the state's waiver of immunity as follows:

> No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

§ 768.28(9)(a). More importantly, the statute's broad scope is further limited in that:

> ***The state or its subdivisions shall not be liable in tort for the acts or omissions of an officer***, employee, or agent committed while acting outside the course and scope of her or his employment or ***committed in bad faith or with malicious purpose or in any manner exhibiting wanton and willful disregard of human rights, safety, or property.***

Id. (emphasis added). A plain reading of § 768.28 reveals that if a plaintiff pleads and the record demonstrates that plaintiff advances his case under the theory that an officer's acts were malicious and/or in wanton or willful disregard of human rights, safety, or property, the state or any of its agencies, including the Sheriff, cannot be held liable.

In the case at bar, both HODGE's Complaint and deposition testimony allege that HART, WHEELER and REED acted maliciously and in bad faith and in willful and wanton disregard for HODGE's life and safety. See Attachment 1, at 58; Complaint, at ¶¶ 24, 29, 34, 39, 44, 49, 57, 60, 63, 73 and 75 (a copy of HODGE's Complaint is appended as Attachment 8). HODGE's Complaint repeatedly characterizes HART, WHEELER and REED's actions toward HODGE as "savage." Id. Therefore, because HODGE alleges and advances his case on the theory that the actions of HART, WHEELER and REED were committed "in bad faith or with malicious purpose or in any manner

exhibiting wanton and willful disregard of human rights, safety, or property," the CITY, as a municipal corporation, cannot be liable in tort for the actions of HART, WHEELER and REED, as mandated by § 768.28(9)(a), Fla.Stat. Consequently, as a matter of law, summary judgment should be granted in favor of the CITY.

**C.**      **WHEELER is entitled to summary judgment because he was not at the scene of the apprehension and placement into custody of HODGE**

In Count Four and Eight of HODGE's Complaint, HODGE alleges that "*upon information and belief,* several police officers including the Defendant, *DAVID WHEELER, kicked the Plaintiff and hit him repeatedly with flashlights and/or batons* while the Plaintiff was lying in this position and then *dragged* the Plaintiff into the street where *they continued to kick and beat him.*" Attachment 8, at ¶ 44 (emphasis added). HODGE also alleges that "DAVID WHEELER did nothing to stop the attack by Officer CHURCH's canine "Gero" on the Plaintiff *and in fact instigated and encouraged the attack.*" Id. at ¶ 43.

Despite HODGE's allegations which are merely asserted "upon information and belief," the record evidence in this matter is abundantly clear that WHEELER was never at the scene of HODGE's apprehension and placement into custody until well after HODGE had been transported to the hospital for treatment of his injuries. See Attachment 6, at ¶¶ 4 and 5. WHEELER only proceeded to the scene after the events alleged by HODGE to conduct a post-apprehension investigation on the K-9 use of force. See Attachment 4; Attachment 5, at 1; Attachment 6, at ¶ 6. In fact, WHEELER's first contact with HODGE was upon WHEELER's arrival at Broward General Medical Center where HODGE was being treated for his injuries. See Attachment 6, at ¶ 7. WHEELER had been at his home during HODGE's apprehension and placement into custody. Id. at ¶ 4.

HODGE has presented no credible evidence to support his claims that WHEELER savagely

ADORNO & ZEDER, P.A.
888 SOUTHEAST 3RD AVENUE, SUITE 500 • FORT LAUDERDALE, FLORIDA 33335-9002 • TELEPHONE (954)523-5885 • TELEFAX (954) 760-9531

attacked HODGE by kicking and repeatedly hitting HODGE with flashlights and batons. Notably, HODGE had failed to provide "even a scintilla" of evidence that WHEELER was even at the scene of his apprehension and placement into custody. Consequently, HODGE's allegations against WHEELER remain unsupported and the abundant evidence that establishes WHEELER was not even present during HODGE's apprehension remains uncontroverted. As such, there exists no genuine issue as to any material fact, namely, that WHEELER was involved in HODGE's apprehension in any manner, and summary judgment should be granted, as a matter of law, in favor of WHEELER and against HODGE. ·

**D.    HART is entitled to summary judgment because he was neither involved nor in the presence of HODGE during his apprehension and placement into custody**

HODGE also alleges that HART "did nothing to stop the attack by Officer Church's canine "Gero" on the Plaintiff and in fact instigated and encouraged the attack." See Attachment 8, at ¶ 33. Furthermore, HODGE alleges that HART, again "upon information and belief . . . kicked the Plaintiff and hit him repeatedly with flashlights and/or batons while the Plaintiff was lying in this position and then dragged the Plaintiff into the street where they continued to kick and beat him." Id. at ¶ 35.

The record evidence in this matter is equally unambiguous in establishing that once HART attempted to affect a felony stop of HODGE, and HODGE exited the stolen vehicle and fled on foot, HART remained by the stolen vehicle and set-up a perimeter while waiting for back-up police units to arrive. See Attachment 2, at 2; Attachment 3, at ¶ 10. HART remained at that perimeter he had established during the entire time that REED and Officer Church searched, located, apprehended and placed HODGE in custody. Id.; Attachment 3, at ¶ 13. In fact, HART heard of HODGE's apprehension and placement into custody by way of police radio. Id. HART did not even leave the perimeter until after HODGE had been taken to Broward General Medical Center. Id.; Attachment

3, at ¶ 14. The record clearly demonstrates that HART was no where near HODGE when he was apprehended and taken into custody by REED and Officer Church. Once in custody, HART did not see HODGE until HART proceeded to Broward General Medical Center. See Attachment 3, at ¶ 15.

Again, HODGE has presented no credible evidence to support his claims that HART savagely attacked HODGE by kicking and repeatedly hitting HODGE with flashlights and batons. Consequently, HODGE's allegations against HART remain unsupported and the abundant evidence that establishes HART was at the established perimeter near the stolen vehicle and no where in the presence of HODGE during HODGE's apprehension, remains uncontroverted. As such, there exists no genuine issue as to any material fact, namely, that HART was involved in HODGE's physical apprehension at the scene in any manner, and summary judgment should be granted, as a matter of law, in favor of HART and against HODGE.

## **CONCLUSION**

Based on the authority cited and the arguments presented, HART, WHEELER and the CITY respectfully request the Court grant summary judgment on all counts of HODGE's Complaint in their favor; to award costs; to make this order final and appealable; and any other relief this Court deems equitable and just.

ADORNO & ZEDER, P.A.
888 SOUTHEAST 3RD AVENUE, SUITE 500 • FORT LAUDERDALE, FLORIDA 33335-9002 • TELEPHONE (954)523-5885 • TELEFAX (954) 760-9531

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via

regular U.S. Mail this __16th__ day of January, 2001, to GORDON S. DANIELS, ESQUIRE, 4300

N. University Drive, #B-200, Fort Lauderdale, FL 33351 and MARK GOLDSTEIN, ESQUIRE, City

Attorneys' Office, City of Hallandale, 400 South Federal Highway, Hallandale, FL 33099.

ADORNO & ZEDER, P.A.
Attorneys for Defendants, Reed,
    Hart, Wheeler and City of
    Fort Lauderdale
888 S.E. Third Avenue, # 500
Fort Lauderdale, FL 33335-9002
Telephone:    (954) 523-5885
Facsimile:    (954) 760-9531

By: _____
    DIETER K. GUNTHER
    Florida Bar No.: 094456
    ALAIN E. BOILEAU
    Florida Bar No.: 0148598

AEB/L.MEMLAW/156470/012435.0104

I 2
ADORNO & ZEDER, P.A.
888 SOUTHEAST 3RD AVENUE, SUITE 500 • FORT LAUDERDALE, FLORIDA 33335-9002 • TELEPHONE (954)523-5885 • TELEFAX (954) 760-9531



RECYCLED PAPER

# THE CIRCUIT/COUNTY COURT, IN AND FOR BROWARD COUNTY, FLORIDA

**FAILURE TO PAY FINE BY THE BELOW DATE MAY RESULT IN A WARRANT FOR YOUR ARREST AND/OR THE SUSPENSION OF YOUR DRIVER'S LICENSE AND DELINQUENCY FEES IMPOSED.**

DATE _10-20-98_

CASE NO. _98-18292GF20_   ARREST NO. _FLBG10544_   AKA _____   _GREG HODGE_   VAC _____

DEFENDANT _Hugh Hodge_

AGENCY _____

## COURT STATUS

- ☐ CHANGE OF PLEA
- ☐ TRIAL
- ☐ JURY
- ☐ COURT
- ☐ PLED GUILTY  _I-V_
- ☐ PLED NOLO

- ☐ WITHHELD
- ☐ ADJ. GUILTY  _I-V_
- ☐ NOLLE PROSEQUI
- ☐ DISMISSED
- ☐ PUBLIC DEFENDER FEE

- ROR/ROB/SURETY SUMMONS/CASH BOND
- TRUST FUND / HOURS COMM. SERVICE
- ASSESSMENT EACH COUNT
- ☐ VC EACH COUNT
- ☐ ACQUITTED
- ☐ PUBLIC DEFENDER ASSESSMENT

☐ MAGISTRATE
☐ ARRAIGNMENT
☐ SENTENCING
☐ 1ST. V.O.
☐ FINAL V.O.

## CHARGE(S)

I - _Resisting_

II - _Assault Fight_

III - _Read During Force_

IV - _During while the during line_

V - _Read w/o civil_

I + II - _7 Dis in BCS w/c for 45 Days 1/5_

_He Adjournment_

_ceurt /20-05928 clk 16_

_Restitution is Resolved_

DISP 597

JUDGE  _Ilene Dalze_

SHERIFF'S COPY

BY _Ilene N. Dalze_   (DEPUTY CLERK)

| COUNT | FINE | CJC | EMTF | CDC | SN1 |
|---|---|---|---|---|---|
| | | | DUI USE ONLY | | |
| | | PROBATION WITH SPECIAL CONDITIONS | | | |

LICENSE SUSP.   EVALUATION

COMMUNITY SERVICE HOURS   DAYS IMMOBILIZATION   WORK PERMIT

| COUNT(S) _III-V_ | | TIME SERVED _45_ | DAYS |
|---|---|---|---|
| $ FINE | COURT COST | 5%  VC | CJC  SN1 |
| $ FINE | COURT COST | 5%  VC | CJC  SN1 |
| $ FINE | COURT COST | 5%  VC | CJC  SN1 |
| PLUS $ | FINE | 5%  VC | CJC  SN1 |

DEFERRAL FEE TO: _____

**A EXHIBIT 2**
Deponent _H. Hodge_
11-7-00
Date _____  Rptr. _____
www.uscourt.com





UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA,
FORT LAUDERDALE DIVISION

HUGH HODGE,

    Plaintiff,

vs.

TIMOTHY M. CHURCH, THOMAS REED,
PATRICK HART, DAVID WHEELER, CITY
OF FORT LAUDERDALE, and CITY OF
HALLANDALE

    Defendants.

_____/

CASE NO.:   **CIV - SEITZ**

HON. **00 - 6228**

**MAGISTRATE JUDGE
GARBER**

## COMPLAINT

COMES NOW, Plaintiff, HUGH HODGE, by and through his undersigned attorney, and sues the Defendants, TIMOTHY M. CHURCH, THOMAS REED, PATRICK HART, and DAVID WHEELER and alleges:

### ALLEGATIONS COMMON TO ALL COUNTS

### THE PARTIES

1.  The Plaintiff, HUGH HODGE, is a resident of Broward County, Florida, and is otherwise *sui juris*.

2.  At all times material hereto, the Defendant, TIMOTHY M. CHURCH, was a police officer employed by the City of Hallandale, a political subdivision of Broward County and the State of Florida.

3.  At all times material hereto, the Defendant, THOMAS REED, was a police officer

employed by the City of Fort Lauderdale, a political subdivision of Broward County and the State of Florida.

4.   At all times material hereto, the Defendant, PATRICK HART, was a police officer employed by the City of Fort Lauderdale, a political subdivision of Broward County and the State of Florida.

5.   At all times material hereto, the Defendant, DAVID WHEELER, was a police officer employed by the City of Fort Lauderdale, a political subdivision of Broward County and the State of Florida.

## JURISDICTION

6.   Jurisdiction is proper in this Court as the causes of action in Counts One through Four are brought pursuant to 42 U.S.C. § 1983 as those counts allege violation of the United States Constitution, and the cause of action arose in this District.  This Court has pendent jurisdiction over the state law claims in Counts Five through Ten.

## VENUE

7.   Venue in this Court is proper by virtue of 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the causes of action occurred in this District, and the Defendants all reside in this District.

## COUNT ONE

**(Plaintiff v. TIMOTHY M. CHURCH, in his individual capacity - Violation of the United States Constitution, brought through 42 U.S.C. § 1983)**

8.  On or about September 6, 1998 officers employed by the City of Fort Lauderdale Police Department and the City of Hallandale Police Department, including the Defendant, TIMOTHY M. CHURCH, engaged in the pursuit and apprehension of the Plaintiff.

9.  The Defendant, TIMOTHY M. CHURCH, is a "K-9" officer, whose canine

"Gero" is a dog trained by TIMOTHY M. CHURCH and/or other officers of the Hallandale

Police Department, to assist in the apprehension of suspects and when ordered to do so, to bite

said suspects.

10. Plaintiff was apprehended in the yard of a home located at 1513 N.W. 15th Court in

the City of Fort Lauderdale.

11. Upon information and belief, following the apprehension of the Plaintiff, officers of

the Fort Lauderdale and Hallandale Police Departments, including the Defendant, TIMOTHY M.

CHURCH, placed the Plaintiff in custody, forcing him to lie face down on the ground and

handcuffing his hands behind his back.

12. Following their placing the Plaintiff in this position, the Plaintiff did not struggle, nor

was he resisting arrest, nor engaging in any verbal abuse of the arresting officers.

13. Upon information and belief, despite this fact, one police officer who is the

Defendant, TIMOTHY M. CHURCH, ordered his canine to savagely attack the Plaintiff while

the Plaintiff was lying prone, face down upon the ground with his hands handcuffed behind his

back. The canine complied with his handler's instructions, savagely biting the Plaintiff in the

back of his leg and on his buttocks.

14. Upon information and belief, several police officers, including the Defendant,

TIMOTHY M. CHURCH, kicked the Plaintiff and hit him repeatedly with flashlights and/or

batons while the Plaintiff was lying in this position and then dragged the Plaintiff into the street

where they continued to kick and beat him.

15. Plaintiff suffered such substantial and immediate loss of blood from the attack by the

Defendant, TIMOTHY M. CHURCH's canine "Gero" and from the beating that officers at the

scene called for an ambulance, but then decided that they could not wait until the ambulance

arrived and they drove him directly to Broward General Medical Center.

16. At all material times, TIMOTHY M. CHURCH acted in a manner that violated clearly established constitutional rights of which a reasonable police officer would have known.

17. The Fourth Amendment to the United States Constitution affords the Plaintiff and all individuals the right to be free, in their person, from illegal searches and seizures. These constitutional protections apply when the Plaintiff is incarcerated or otherwise in the custody of the State or its municipal subdivisions.

18. TIMOTHY M. CHURCH, in his individual capacity, violated the Plaintiff's constitutional rights under the Fourth Amendment to the United States Constitution.

19. As a direct and proximate result of the savage attack perpetrated upon him by the Defendant, TIMOTHY M. CHURCH, the Plaintiff suffered severe injuries to his body, necessitating medical and surgical treatment, and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, the expense of hospitalization, medical and nursing care and treatment, loss of earnings and the loss of ability to earn money. These losses are continuing and on-going in nature and the Plaintiff will continue to suffer these losses in the future.

20. 42 U.S.C. § 1983 affords the plaintiff punitive damages, the costs of bringing this action and attorneys' fees.

21. The Plaintiff has been forced to retain the undersigned attorneys and to pay them a reasonable sum for prosecuting this case.

WHEREFORE, Plaintiff, HUGH HODGE, demands judgment against the Defendant, TIMOTHY M. CHURCH, in his individual capacity, for all compensatory and punitive damages, together with the costs of this action, attorneys' fees, and such further relief the Court

deems just under the circumstances.

## COUNT TWO

**(Plaintiff v. THOMAS REED, in his individual capacity - Violation of the United States Constitution, brought through 42 U.S.C. § 1983)**

22. Plaintiff, HUGH HODGE, hereby realleges and incorporates by reference paragraphs one (1) through and including twenty-one (21), and further alleges:

23. THOMAS REED did nothing to stop the attack by Officer CHURCH's canine "Gero" on the Plaintiff and in fact instigated and encouraged the attack.

24. Upon information and belief, several police officers including the Defendant, THOMAS REED, kicked the Plaintiff and hit him repeatedly with flashlights and/or batons while the Plaintiff was lying in this position and then dragged the Plaintiff into the street where they continued to kick and beat him.

25. Plaintiff suffered such substantial and immediate loss of blood from the attack by the Defendant, TIMOTHY M. CHURCH's, partner "Gero," that officers at the scene called for an ambulance, but then decided that they could not wait until the ambulance arrived and they drove him directly to Broward General Medical Center.

26. At all material times, the Defendant, THOMAS REED acted in a manner that violated clearly established constitutional rights of which a reasonable police officer would have known.

27. The Fourth Amendment to the United States Constitution affords the Plaintiff and all individuals the right to be free, in their person, from illegal searches and seizures. These constitutional protections apply when the Plaintiff is incarcerated or otherwise in the custody of the State or its municipal subdivisions.

28. THOMAS REED, in his individual capacity, violated the Plaintiff's constitutional rights under the Fourth Amendment to the United States Constitution.

29. As a direct and proximate result of the savage attack perpetrated upon him by the Defendant, THOMAS REED, the Plaintiff suffered severe injuries to his body, necessitating medical and surgical treatment, and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, the expense of hospitalization, medical and nursing care and treatment, loss of earnings and the loss of ability to earn money. These losses are continuing and on-going in nature and the Plaintiff will continue to suffer these losses in the future.

30. 42 U.S.C. § 1983 affords the plaintiff punitive damages, the costs of bringing this action and attorneys' fees.

31. The Plaintiff has been forced to retain the undersigned attorneys and to pay them a reasonable sum for prosecuting this case.

WHEREFORE, Plaintiff, HUGH HODGE, demands judgment against the Defendant, THOMAS REED for all compensatory and punitive damages, together with the costs of this action, attorneys' fees, and such further relief the Court deems just under the circumstances.

## COUNT THREE

### (Plaintiff v. PATRICK HART, in his individual capacity - Violation of the United States Constitution, brought through 42 U.S.C. § 1983)

32. Plaintiff, HUGH HODGE, hereby realleges and incorporates by reference paragraphs one (1) through and including twenty-one (21), and further alleges:

33. PATRICK HART did nothing to stop the attack by Officer CHURCH's canine "Gero" on the Plaintiff and in fact instigated and encouraged the attack.

34. Several police officers, including, upon information and belief, the Defendant, PATRICK HART, kicked the Plaintiff and hit him repeatedly with flashlights and/or batons while the Plaintiff was lying in this position and then dragged the Plaintiff into the street where they continued to kick and beat him.

35. Plaintiff suffered such substantial and immediate loss of blood from the attack by the Defendant, TIMOTHY M. CHURCH's, canine "Gero," that officers at the scene called for an ambulance, but then decided that they could not wait until the ambulance arrived and they drove him directly to Broward General Medical Center.

36. At all material times, the Defendant, PATRICK HART, acted in a manner that violated clearly established constitutional rights of which a reasonable police officer would have known.

37. The Fourth Amendment to the United States Constitution affords the Plaintiff and all individuals the right to be free, in their person, from illegal searches and seizures. These constitutional protections apply when the Plaintiff is incarcerated or otherwise in the custody of the State or its municipal subdivisions.

38. PATRICK HART, in his individual capacity, violated the Plaintiff's constitutional rights under the Fourth Amendment to the United States Constitution.

39. As a direct and proximate result of the savage attack perpetrated upon him by the Defendant, PATRICK HART, the Plaintiff suffered severe injuries to his body, necessitating medical and surgical treatment, and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, the expense of hospitalization, medical and nursing care and treatment, loss of earnings and the loss of ability to earn money. These losses are continuing and on-going in nature and the Plaintiff will continue to suffer these losses in the

future.

40. 42 U.S.C. § 1983 affords the plaintiff punitive damages, the costs of bringing this action and attorneys' fees.

41. The Plaintiff has been forced to retain the undersigned attorneys and to pay them a reasonable sum for prosecuting this case.

WHEREFORE, Plaintiff, HUGH HODGE, demands judgment against the Defendant, PATRICK HART, in his individual capacity, from all compensatory and punitive damages, together with the costs of this action, attorneys' fees, and such further relief the Court deems just under the circumstances.

## COUNT FOUR

### (Plaintiff v. DAVID WHEELER, in his individual capacity - Violation of the United States Constitution, brought through 42 U.S.C. § 1983)

42. Plaintiff, HUGH HODGE, hereby realleges and incorporates by reference paragraphs one (1) through and including twenty-one (21), and further alleges:

43. DAVID WHEELER did nothing to stop the attack by Officer CHURCH's canine "Gero" on the Plaintiff and in fact instigated and encouraged the attack.

44. Upon information and belief, several police officers including the Defendant, DAVID WHEELER, kicked the Plaintiff and hit him repeatedly with flashlights and/or batons while the Plaintiff was lying in this position and then dragged the Plaintiff into the street where they continued to kick and beat him.

45. Plaintiff suffered such substantial and immediate loss of blood from the attack by the Defendant, TIMOTHY M. CHURCH's, canine "Gero," that officers at the scene called for an ambulance, but then decided that they could not wait until the ambulance arrived and they drove

him directly to Broward General Medical Center.

46. At all material times, the Defendant, DAVID WHEELER, acted in a manner that violated clearly established constitutional rights of which a reasonable police officer would have known.

47. The Fourth Amendment to the United States Constitution affords the Plaintiff and all individuals the right to be free, in their person, from illegal searches and seizures. These constitutional protections apply when the Plaintiff is incarcerated or otherwise in the custody of the State or its municipal subdivisions.

48. DAVID WHEELER, in his individual capacity, violated the Plaintiff's constitutional rights under the Fourth Amendment to the United States Constitution.

49. As a direct and proximate result of the savage attack perpetrated upon him by the Defendant, DAVID WHEELER, the Plaintiff suffered severe injuries to his body, necessitating medical and surgical treatment, and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, the expense of hospitalization, medical and nursing care and treatment, loss of earnings and the loss of ability to earn money. These losses are continuing and on-going in nature and the Plaintiff will continue to suffer these losses in the future.

50. 42 U.S.C. § 1983 affords the plaintiff punitive damages, the costs of bringing this action and attorneys' fees.

51. The Plaintiff has been forced to retain the undersigned attorneys and to pay them a reasonable sum for prosecuting this case.

WHEREFORE, Plaintiff, HUGH HODGE, demands judgment against the Defendant, DAVID WHEELER, in his individual capacity, for all compensatory and punitive damages,

together with the costs of this action, attorneys' fees, and such further relief the Court deems just under the circumstances.

## COUNT FIVE

### (Plaintiff v. TIMOTHY M. CHURCH - Battery)

52. Paragraphs 8 through 15 are repeated, realleged and re-avered, as if fully set forth herein.

53. The actions of the Defendant, TIMOTHY M. CHURCH, as aforesaid, constitute a battery upon the person of the Plaintiff.

54. As a direct and proximate result of the savage attack perpetrated upon him by the Defendant, TIMOTHY M. CHURCH, the Plaintiff suffered severe injuries to his body, necessitating medical and surgical treatment, and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, the expense of hospitalization, medical and nursing care and treatment, loss of earnings and the loss of ability to earn money. These losses are continuing and on-going in nature and the Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff, HUGH HODGE, demands judgment against the Defendant, TIMOTHY M. CHURCH for all compensatory damages, together with the costs of this action and such further relief the Court deems just under the circumstances.

## COUNT SIX

### (Plaintiff v. THOMAS REED - Battery)

55. Paragraphs 23 through 25 are repeated, realleged and re-avered, as if fully set forth herein.

56. The actions of the Defendant, THOMAS REED, as aforesaid, constitute a battery

upon the person of the Plaintiff.

57. As a direct and proximate result of the savage attack perpetrated upon him by the Defendant, THOMAS REED, the Plaintiff suffered severe injuries to his body, necessitating medical and surgical treatment, and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, the expense of hospitalization, medical and nursing care and treatment, loss of earnings and the loss of ability to earn money. These losses are continuing and on-going in nature and the Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff, HUGH HODGE, demands judgment against the Defendant, THOMAS REED for all compensatory damages, together with the costs of this action and such further relief the Court deems just under the circumstances.

## COUNT SEVEN

### (Plaintiff v. PATRICK HART - Battery)

58. Paragraphs 33 through 35 are repeated, realleged and re-averred, as if fully set forth herein.

59. The actions of the Defendant, PATRICK HART, as aforesaid, constitute a battery upon the person of the Plaintiff.

60. As a direct and proximate result of the savage attack perpetrated upon him by the Defendant, PATRICK HART, the Plaintiff suffered severe injuries to his body, necessitating medical and surgical treatment, and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, the expense of hospitalization, medical and nursing care and treatment, loss of earnings and the loss of ability to earn money. These losses

are continuing and on-going in nature and the Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff, HUGH HODGE, demands judgment against the Defendant, PATRICK HART, together with the costs of this action and such further relief the Court deems just under the circumstances.

## COUNT EIGHT

### (Plaintiff v. DAVID WHEELER - Battery)

61. Paragraphs 43 through 45 are repeated, realleged and re-averred, as if fully set forth herein.

62. The actions of the Defendant, PATRICK WHEELER, as aforesaid, constitute a battery upon the person of the Plaintiff.

63. As a direct and proximate result of the savage attack perpetrated upon him by the Defendant, PATRICK WHEELER, the Plaintiff suffered severe injuries to his body, necessitating medical and surgical treatment, and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, the expense of hospitalization, medical and nursing care and treatment, loss of earnings and the loss of ability to earn money. These losses are continuing and on-going in nature and the Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff, HUGH HODGE, demands judgment against the Defendant, PATRICK WHEELER for all compensatory damages, together with the costs of this action and such further relief the Court deems just under the circumstances.

## COUNT NINE

### (Plaintiff v. City of Fort Lauderdale - Negligence)

64. (a) The Defendant, CITY OF FORT LAUDERDALE POLICE, is a political subdivision of the State of Florida.

(b) The Police Department of the CITY OF FORT LAUDERDALE is a law enforcement agency responsible for responding to, investigating, apprehending, and arresting persons who commit or are alleged to have committed criminal acts within the geographic boundaries of the CITY OF FORT LAUDERDALE, Florida.

(c) At all times material hereto, said Police Department of the CITY OF FORT LAUDERDALE was under the control, direction and supervision of the duly elected or appointed officials and/or administrators of the CITY OF FORT LAUDERDALE.

65. Paragraphs 2 through 5 are repeated, realleged and re-avered as if fully set forth herein.

66. On or about September 6, 1998, police officers employed by the CITY OF FORT LAUDERDALE, including, THOMAS REED, PATRICK HART and DAVID WHEELER engaged in the pursuit and apprehension of the Plaintiff.

67. Plaintiff was apprehended in the yard of a home located at 1513 N.W. 15th Court in the City of Fort Lauderdale.

68. Upon information and belief, following the apprehension of the Plaintiff, officers of the Fort Lauderdale Police Department, including THOMAS REED, PATRICK HART and DAVID WHEELER, placed the Plaintiff in custody, forcing him to lie face down on the ground and handcuffing his hands behind his back.

69. At all material times, all of the police officers employed by the City of Fort Lauderdale, were acting within the scope of their employment duties, and in furtherance of the objectives of their employer, the City of Fort Lauderdale.

70. Following their placing the Plaintiff in this position, the Plaintiff did not struggle, nor was he resisting arrest, nor engaging in any verbal abuse of the arresting officers.

71. Despite this fact, one police officer, who, upon information and belief, is the co-Defendant, TIMOTHY M. CHURCH, an officer employed by the co-Defendant, CITY OF HALLANDALE, ordered his canine to savagely attack the Plaintiff while the Plaintiff was lying prone, face down upon the ground with his hands handcuffed behind his back. The canine complied with his handler's instructions, savagely biting the Plaintiff in the back of his leg and on his buttocks.

72. THOMAS REED, PATRICK HART and DAVID WHEELER, did nothing to stop the attack by Officer CHURCH's canine "Gero"on the Plaintiff and in fact instigated and encouraged the attack.

73. Upon information and belief, several police officers including the co-Defendants, THOMAS REED, PATRICK HART and DAVID WHEELER, kicked the Plaintiff and hit him repeatedly with flashlights and/or batons while the Plaintiff was lying in this position and then dragged the Plaintiff into the street where they continued to kick and beat him.

74. Plaintiff suffered such substantial and immediate loss of blood from the attack by the co-Defendant, TIMOTHY M. CHURCH's, partner "Gero," that officers at the scene called for an ambulance, but then decided that they could not wait until the ambulance arrived and they drove him directly to Broward General Medical Center.

75. As a direct and proximate result of the savage attack perpetrated upon him at the instigation of the police officers employed by the City of Fort Lauderdale, as aforesaid, the Plaintiff suffered severe injuries to his legs and buttocks, necessitating medical and surgical treatment, and resulting pain and suffering, disability, disfigurement, mental anguish, loss of

capacity for the enjoyment of life, the expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition. These losses are continuing and on-going in nature and the Plaintiff will continue to suffer these losses in the future.

76.    (a) The City of Fort Lauderdale is vicariously liable for the actions of its police officers who organized, perpetrated and continued the savage attack upon the Plaintiff and has waived sovereign immunity for this suit subject to the limitations of Section 768.28, Florida Statutes.

(b) The statutory notice required by 768.28(6)(a), Florida Statutes, was provided to the Defendant more than six months prior to the filing of this suit and all other conditions precedent to the filing of this suit have been met.

WHEREFORE, Plaintiff, HUGH HODGE, demands judgment against the Defendant, CITY OF FORT LAUDERDALE in accordance with Section 768.28, Florida Statutes, together with the costs of this action together with any such further relief the Court deems just under the circumstances.

**COUNT TEN**

**(Plaintiff vs. City of Hallandale - Negligence)**

77.    (a) The Defendant, CITY OF HALLANDALE, is a political subdivision of the State of Florida.

(b) The Police Department of the CITY OF HALLANDALE is a law enforcement agency responsible for responding to, investigating, apprehending, and arresting persons who commit or are alleged to have committed criminal acts within the geographic boundaries of the CITY OF HALLANDALE, Florida.

(c)    At all times material hereto, said Police Department of the CITY OF

HALLANDALE was under the control, direction and supervision of the duly elected or

appointed officials and/or administrators of the CITY OF HALLANDALE.

78.    Paragraphs 2 through 5 are repeated, realleged and re-avered as if fully set forth

herein.

79.    On or about September 6, 1998, police officers employed by the CITY OF

HALLANDALE, including, TIMOTHY M. CHURCH, engaged in the pursuit and apprehension

of the Plaintiff.

80.    Plaintiff was apprehended in the yard of a home located at 1513 N.W. 15th Court in

the City of Fort Lauderdale.

81.    Upon information and belief, following the apprehension of the Plaintiff, officers of

the Fort Hallandale , including TIMOTHY M. CHURCH, placed the Plaintiff in custody, forcing

him to lie face down on the ground and handcuffing his hands behind his back.

82.    At all material times, all of the police officers employed by the City of Hallandale,

were acting within the scope of their employment duties, and in furtherance of the objectives of

their employer, the CITY OF HALLANDALE.

83.    Following their placing the Plaintiff in this position, the Plaintiff did not struggle, nor

was he resisting arrest, nor engaging in any verbal abuse of the arresting officers.

84.    Despite this fact, one police officer, who, upon information and belief, is the co-

Defendant, TIMOTHY M. CHURCH, ordered his canine partner to savagely attack the Plaintiff

while the Plaintiff was lying prone, face down upon the ground with his hands handcuffed behind

his back.  The canine officer complied with his handler's instructions, savagely biting the

Plaintiff in the back of his leg and on his buttocks.

85. TIMOTHY M. CHURCH, did nothing to stop the attack by Officer CHURCH's partner "Gero"on the Plaintiff and in fact instigated and encouraged the attack.

86. Several police officers, including, upon information and belief, the co-Defendant, THOMAS REED, kicked the Plaintiff and hit him repeatedly with flashlights and/or batons while the Plaintiff was lying in this position and then dragged the Plaintiff into the street where they continued to kick and beat him.

87. Plaintiff suffered such substantial and immediate loss of blood from the attack by the co-Defendant, TIMOTHY M. CHURCH's, canine "Gero," that officers at the scene called for an ambulance, but then decided that they could not wait until the ambulance arrived and they drove him directly to Broward General Medical Center.

88. As a direct and proximate result of the savage attack perpetrated upon him at the instigation of the police officers employed by the CITY OF HALLANDALE, as aforesaid, the Plaintiff suffered severe injuries to his legs and buttocks, necessitating medical and surgical treatment, and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, the expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition. These losses are continuing and on-going in nature and the Plaintiff will continue to suffer these losses in the future.

89. (a) The CITY OF HALLANDALE is vicariously liable for the actions of its police officers who organized, perpetrated and continued the savage attack upon the Plaintiff and has waived sovereign immunity for this suit subject to the limitations of Section 768.28, Florida Statutes.

(b) The statutory notice required by Section 768.28(6)(a), Florida Statutes, was

provided to the Defendant more than six months prior to the filing of this suit and all other conditions precedent to the filing of this suit have been met.

WHEREFORE, Plaintiff, HUGH HODGE, demands judgment against the Defendant, CITY OF HALLANDALE in accordance with Section 768.28, Florida Statutes , together with the costs of this action together with any such further relief the Court deems just under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

DANIELS & DANIELS
Attorneys At Law, P.A.
Attorneys for Plaintiff
4300 North University Drive
Suite B-200
Fort Lauderdale, Florida 33351
Telephone: (954) 572-7100
    Fax: (954) 572-0667

By: _____
    GORDON S. DANIELS, ESQ.
    Florida Bar No. 350648



RECYCLED PAPER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 97-6832-CIV-SEITZ



FILED by ___ D.C.

AUG 1 5 2000

CLARENCE MADDOX
CLER.: U.S. DIST. CT.
S.D. OF FLA. MIAMI

ROBERT R. ROWE,

      Plaintiff,

v.

CITY OF FORT LAUDERDALE, et al.,

      Defendants.

_____/

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court upon Defendant Joel Lazarus's Motion for Final Summary Judgment [D.E. No. 208].

## BACKGROUND

This is an action for, *inter alia*, conspiracy and malicious prosecution brought under 42 U.S.C. § 1983, arising out of the prosecution of Plaintiff for capital sexual battery on a minor. Specifically, in 1984, Plaintiff Robert Rowe was convicted on four counts of sexual battery of his natural daughter and sentenced to life imprisonment. Subsequently, in 1994, the conviction was overturned based upon ineffective assistance of counsel. See Rowe v. Schreiber, 139 F.3d 1381, 1383 (11th Cir. 1998); Rowe v. City of Fort Lauderdale, 8 F. Supp. 2d 1369, 1371 (S.D. Fa. 1998). Plaintiff then brought the instant action against the City of Fort Lauderdale, the Florida Department of Children and Family Services, the State Attorney's Office for the 17th Judicial Circuit, various public officials, his ex-wife, and Joel Lazarus, the Assistant State Attorney who prosecuted Plaintiff.

In his Second Amended Complaint, Plaintiff asserts that Defendant Lazarus initiated the prosecution of Plaintiff without probable cause (Count IV), and that he conspired with certain police officers and Plaintiff's ex-wife to maliciously prosecute the Plaintiff (Count III) and obtain his unlawful conviction (Count V), all in violation of his constitutional rights. Defendant Lazarus now

AUG 1 6 2000

seeks summary judgment on these claims, asserting absolute and qualified immunity, collateral estoppel, and failure to state a claim for malicious prosecution and conspiracy.

## ANALYSIS

1.    Conspiracy Claim (Count III).

In order to prevail on a claim for conspiracy, Plaintiff must establish that there is or was an agreement between two or more individuals to act in furtherance of the objective of the conspiracy. McKenzie v. Doctor's Hospital of Hollywood, Inc., 765 F. Supp. 1504, 1507 (S.D. Fla. 1991), aff'd, 974 F.2d 1347 (11th Cir. 1992). The Plaintiff "must show that the parties reached an understanding to deny the plaintiff his or her rights and prove an actionable wrong to support the conspiracy." Bailey v. Board of County Comm'rs, 956 F.2d 1112, 1122 (11th Cir. 1992)(internal quotations omitted), cert. denied, 506 U.S. 832 (1992).

In the instant case, no evidence has been presented to establish any "agreement" between Defendant Lazarus and any other person to conduct an illegal search and seizure, to commence criminal proceedings against Plaintiff without probable cause, or to fail to collect, document and preserve critical evidence. Here, Plaintiff has only proffered a scintilla of evidence tending to show that one of the investigating officers (a co-Defendant in this case) presented conflicting testimony as to which room in Plaintiff's apartment a particular piece of evidence was found. Plaintiff also presents testimony by Defendant Lazarus in an attempt to establish that errors were made during the prosecution of Plaintiff's case. By innuendo, Plaintiff attempts to link the foregoing evidence in an effort to raise the alleged wrongful conduct to the level of a constitutional conspiracy. Even if such innuendo were sufficient to establish a constitutional conspiracy, however, the law is clear that "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). Hence, the Court finds that Plaintiff's conspiracy claim (Count III) fails as a matter of law.

2. Malicious Prosecution Claims (Counts IV and V).

In order to recover on a claim of malicious prosecution, the Plaintiff must prove six separate elements: (1) the commencement or continuation of an original civil or criminal judicial proceeding; (2) its legal causation by the present Defendant against the Plaintiff; (3) its bona fide termination in favor of the Plaintiff; (4) the absence of probable cause for such prosecution; (5) the presence of malice; and (6) damages. *Bass v. Commercial Credit Corp.*, 317 F.2d 910, 910 (5th Cir. 1963); *Scozari v. Barone*, 546 So.2d 750, 751 (Fla. 3d DCA 1989). Plaintiff's inability to prove any one of these six elements will defeat the cause of action for malicious prosecution. *Scozari*, 546 So.2d at 751. As to the fourth element (which is at issue here), the existence or nonexistence of probable cause is a question of law for the Court to determine. *Id. See also City of Pensacola v. Owens*, 369 So.2d 328, 329-30 (Fla. 1979).

In this case, the Court finds that the statements of the victim and her mother provided probable cause for the arrest and, subsequently, the prosecution of the Plaintiff. Where, as here, the non-moving party "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," summary judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court's holding in this regard is further supported by the undisputed fact that a grand jury returned an indictment against Plaintiff. Indeed, in an action for malicious prosecution, a grand jury indictment is generally held to be prima facie evidence of probable cause to initiate prosecution. *Rowe v. Zellner*, 352 F.2d 974, 976 (5th Cir. 1965); *Ware v. United States*, 971 F. Supp. 1442, 1463 (M.D. Fla. 1997). Hence, the Court shall grant summary judgment in Defendant Lazarus's favor on Counts IV and V as well.

3. Prosecutorial Immunity.

In any event, Defendant Lazarus is immune from suit. Specifically, to the extent Lazarus was performing prosecutorial functions, such as the initiation and pursuit of a criminal prosecution and including "'acts undertaken . . . in preparing for the initiation of judicial proceedings or for trial, and

3

which occur in the course of his role as an advocate for the State,'" he is entitled to absolute immunity. *Jones v. Cannon*, 174 F.3d 1271, 1281 (11th Cir. 1999)(quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). To the extent that Lazarus was engaged in administrative or investigative conduct, the Court finds that he is entitled to qualified immunity. *See Id.* (and cases cited therein); *Kadiver v. Stone*, 804 F.2d 635, 637 (11th Cir. 1986). Indeed, it is Plaintiff's burden to show that, given the information known by Lazarus at the time of the alleged wrongful conduct, his conduct was objectively unreasonable in light of clearly established law. *Johnson v. Clifton*, 74 F.3d 1087, 1091 (11th Cir.), *cert. denied*, 117 S. Ct. 51 (1996); *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983). An official's actions are objectively unreasonable only when no official of reasonable competence could have made the same choice in similar circumstances. *Malley v. Briggs*, 475 U.S. 335, 340-41 (1986). Here, the Court finds that Plaintiff has not met this burden.

## CONCLUSION

Accordingly, it is hereby

ORDERED that Defendant Joel Lazarus's Motion for Final Summary Judgment [D.E. No. 208] is GRANTED. Final summary judgment in favor of Defendant Lazarus and against Plaintiff shall be entered under separate order pursuant to *Fed. R. Civ. P.* 58.

DONE AND ORDERED in Miami, Florida, this 14th day of August, 2000.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:    Dieter K. Gunther, Esq.
       Kenneth Kavanaugh, Esq.
       Bohdan Neswiacheny, Esq.
       Maxine S. Ryan, Esq.



RECYCLED PAPER



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-6228-CIV-SEITZ/GARBER

HUGH HODGE,

     Plaintiff,

vs.

TIMOTHY M. CHURCH,
THOMAS REED, et al.,

     Defendants.

_____/

## SWORN AFFIDAVIT OF DAVID WHEELER

STATE OF FLORIDA    )
                    ) SS:
COUNTY OF BROWARD  )

**BEFORE ME** the undersigned authority personally appeared DAVID WHEELER, and after being duly sworn, deposes and states as follows:

1.     I am over the age of eighteen (18) and otherwise *sui juris* and am physically and mentally competent to make this affidavit.

2.     I make this affidavit based on my personal knowledge of the contents hereof.

3.     I am and at all times material was a sergeant with the City of Fort Lauderdale Police Department. At the time of the incident at issue in this matter, I was the sergeant in charge of the City of Fort Lauderdale Police Department K-9 Unit.

4.     On or about September 6, 1998, I received a telephone call at home from an officer on the scene of the apprehension of Hugh Hodge informing me that a K-9 unit was involved in a use-of-force incident.

Affidavit of David Wheeler
Case No. 00-6228-Civ-Seitz/Garber

5.      I proceeded to the scene of the arrest to conduct an investigation. When I arrived at the scene, the suspect, Hugh Hodge, had already been transported to Broward General Medical Center for medical treatment.

6.      Shortly upon my arrival at the scene, Officer Thomas Reed walked me through the scene and events of that evening regarding the use of force by Officer Church's K-9, Gero.  I proceeded to take photographs of the scene and the stolen vehicle.

7.      My first contact with Hugh Hodge was upon my arrival at Broward General Medical Center where he was receiving medical treatment for his injuries.

8.      I introduced myself to Hugh Hodge and proceeded to ask him some questions about what had occurred that evening.

9.      Hugh Hodge voluntarily informed me that he had stolen a vehicle and was fleeing from the police officers. He also admitted to me that he not only saw the K-9 officers but also heard their commands to come out and give himself up.  Hugh Hodge also admitted to fighting with the K-9, Gero.

10.      At no time was I involved in the physical apprehension of Hugh Hodge or even in the presence of Hugh Hodge during his apprehension and placement into custody.

11.      I did not make any physical contact with Hugh Hodge either before or after his apprehension and arrest.

12.      I did not partake in, or have any knowledge of any alleged beating of Hugh Hodge.

13.      I declare the facts stated in this affidavit are true and accurate.

2

Affidavit of David Wheeler
Case No. 00-6228-Civ-Seitz/Garber

**FURTHER AFFIANT SAYETH NAUGHT**

_(signature)_

DAVID WHEELER

The foregoing affidavit was sworn to before me on this 13th day of January, 2001, in

Broward County, Florida, by DAVID WHEELER, who is personally known to me or who produced

_____N/A_____ as identification.

Notary Stamp:

_(signature)_

Notary Public Signature

C. E. CONNELL
MY COMMISSION # CC 630086
EXPIRES: April 4, 2001
Bonded Thru Notary Public Underwriters

Colleen E. Connell

Print Name

3





RECYCLED PAPER

| Date 9-6-98 | Case Title AUTO THEFT REC | Time 0400 |

On Sept. 6, 1998 this uniform K-9 Officer responded to 1513 NW 15 CT. in reference to a bailout of a stolen vehicle. While en route a perimeter was set up and manned by patrol.

Upon arrival, I met with Officer Hart. He advised me that he attempted to stop a 1990 Honda Civic, blue in color, the vehicle failed to stop and crashed in a fence at 1513 NW 15 CT. Officer Hart confirmed that the vehicle had just been stolen and provided a description of the driver that fled on foot. He advised that the driver was a white male in his late 20's or early 30's, wearing a white T-shirt and blue shorts. Officer Hart pointed to the last place he had seen the fleeing auto thief.

Officer T. Church of the Hallandale Police K-9 Unit deployed K-9 Gero in the same location that Officer Hart had last seen the fleeing culprit. K-9 Gero immediately located the track of the culprit. The track proceeded Northbound through the front and backyard of the residence at 1513 NW 15 CT. and then went West into the backyard of the adjacent residence. Once in that backyard the track went back Northbound into the backyard of the residence of 1516 NW 15 PL. As the track made a Westbound turn around the front of the residence and approached the Northwest corner, Officer Church illuminated the bushes on the corner of the house. Once the bushes were illuminated, I could see the culprit attempting to conceal himself. The white male fit the description of the auto theft culprit. Officer Church gave two loud and clear announcements. He first advised that he was a Hallandale Police K-9 Officer and that the culprit was under arrest. He advised him to expose his hands and come out from his place of hiding. After his first announcement Officer Church waited for a response but did not receive one. He once again identified himself as a Hallandale Police K-9 Officer and advised the culprit if he did not come out he would release his police K-9 to take him into custody. Again Officer Church waited for a response but did not receive one. He then deployed his K-9 partner to take the culprit into custody.

Once K-9 Gero went into the bushes he contacted the culprit in the right bicep and began to pull him out of his place of hiding. The culprit became very violent and began to fight with K-9 Gero. Due to the violent and combative nature of the culprit, he was able to get loose from K-9 Gero's hold. As soon as the culprit broke free, K-9 Gero immediately went in and re-contacted the culprit in the Buttocks. K-9 Gero continued to pull the culprit from his place of hiding.

| Report Contains K-9 Supp | | | | Related Report Number(s) | | |
| Officer(s) Reporting T. K. REED | | | | I.D. Number 1198 | Unit K-9 99 | Date 9-6-98 |
| Officer Reviewed (if Applicable) | I.D. Number | Routed To | Referred To | Assigned To | By | Date |

| Case Status | Clearance Type 1. Arrest  3. Unfounded 2. Exceptional | A-Adult J-Juvenile | Date Cleared | Arrest Number | Number Arrested |
| Exception Type 1. Extradition Declined | 2. Arrest on Primary Offense Secondary Offenses Without Prosecution | 3. Death of Offender 4. V/W Refused to Cooperate | 5. Prosecution Declined 6. Juvenile/No Custody | OBTS Number - | Page 1  1 of 2 |

FORM Z-561 New 8/9 (Back)

| Date: 9·6·98 | Case Title: Autotheft (REC) | Time: 0400 |
|---|---|---|

As Gero was pulling the culprit out and as the culprit was pulling to get away, the pants that he was wearing began to tear. K-9 Gero again readjusted in the buttock. It should be noted that during this violent struggle this Officer along with Officer Church were yelling instruction for the culprit to stop fighting and striking the police dog and to place his hands behind his back. Once the culprit stopped his violent struggle and placed his hands behind his back, he was handcuffed by this Officer, and Officer Church remover K-9 Gero.

While I was performing a search incident to arrest on the auto theft, I located a Crack pipe in the culprit's right front pocket. The pipe was valtox tested positive and turned over to Officer Hart.

Sgt. Wheeler responded to the seen and took pictures of the vehicle and the location where the culprit was taken into custody. The culprit, who was positively ID'ed by Officer Hart, was transported to Broward General Hospital. He was treated and taken to F.L.P.D. Jail.

| Report Contains | | | | | | Related Report Number(s) | | |
|---|---|---|---|---|---|---|---|---|
| K 9 SUPP | | | | | | | | |
| Officer(s) Reporting T.K. REED | | | | | I.D. Number 1198 | Unit K·9 44 | Date 9·6·98 | |
| Officer Reviewing (if Applicable) | I.D. Number | Routed To | Returned To | Assigned To | | By | Date | |
| Case Status | Clearance Type 1. Arrest  3. Unfounded  1  2. Exceptional | A-Adult J-Juvenile  1 | Date Cleared | Arrest Number | | Number Arrested | | |
| Exception Type 1. Extradition    Declined | 2. Arrest on Primary Offense Secondary Offense  Without Prosecution | 3. Death of Offender 4. V/W Refused to | 5. Prosecution Declined 6. Juvenile/No Custody Cooperate  1 | CFBB Number | | – | Page 2   1 of 12 | |

FORM Z-561 New 8/9  (Back)



RECYCLED PAPER



```
                              Crimes Management System              Page:   1
Progrm: CMS301                   Incident Report
```
----------------------------------------------------------------------

Case No.: 1-98-030939 HALLANDALE POLICE DEPARTMENT

Date of Occurrence.: 9/06/98 thru  9/06/98 Time of Occur.:  4:00 thru  4:00
Date of Report . ..:  9/06/98               Time of Report:  4:00

```
Day of the Week...: SUNDAY                  Microfilm/Roll#: AS400
Common Name.......:
Incident Location.: 1513 NW 15 CT
Incident Cty/ST/PR: FT. LAUDERDALE     FL          ZIP: 33301
County............:                                ARREST
Location Type.....: PARKING LOT/GARAGE             4
Beat Assignment...: 3 (59)                         MAP REF..: SE
District..........: Patrol
ZONE/DIV         : SOUTHEAST
Department Classif: ASSIST OTHER AGENCY
Reporting Officer.: TIMOTHY M CHURCH
 CASE STATUS......: BY ARREST - ADULT              Date:   9/06/98
Alcohol Related...: YES
Drugs Related.....: YES
```

*************** V E R I F I C A T I O N   I N F O R M A T I O N *****************
RPT OFFICER REVIEW: 9/06/98  Employee: TIMOTHY M CHURCH
SUPERVISORY REVIEW: 9/08/98  Employee: JAMIE WATKINS
CLERICAL ENTRY....: 9/14/98  Employee: DORIS TIRADO

************ C A S E   M A N A G E M E N T   I N F O R M A T I O N *************

Case Disposition.: BY ARREST - ADULT                    ARREST    Date:  9/06/98
Case Forwarded To:

                              ASSIGNMENT HISTORY

    DATE ASSIGNED..:  9/09/98
    DEPARTMENT UNIT: POLICE RECORDS                  PRIORITY:
    SUPERVISOR.....: MARK TARR
    INVESTIGATOR...:                                 PRIORITY:

****************** V E H I C L E   I N F O R M A T I O N ********************

       SUSPECT                      V E H I C L E   #   1
    UCR PROPERTY.:
 STATE VEH. TYPE.: AUTO                          Year: 1990
 Make.: HONDA            Model: CIVIC            Permit#:
 Style: 4D/SEDAN         Color: BLUE        /  BLUE
 LICENSE#.: TTY84C           ST: FL   Country....:
 VIN/ENG#.: 1HGED4660LA003929
 Vehicle Damaged Code:
 Damaged/Stolen Value:     $6,000.     Disposit'n: TOWED BY CITY CONTRACTEE
 Insured (Y/N).......: UNKNOWN         Insured By: UNKNOWN
 Controlling Officer.:
 Veh Feature/Oddity..:
 Keys in Vehicle.....:             Vehicle Locked:
 Lein Holder.........:

Date/Time: 3/07/00 13:20:09

Case 0:00-cv-06228-PAS   Document 64   Entered on FLSD Docket 01/17/2001   Page 48 of 142

Crimes Management System                    Page:    2
Progrm: CMS301                Incident Report
---------------------------------------------------------------------------
Case No.: 1-98-030939 HALLANDALE POLICE DEPARTMENT          (Continued)

Stolen Location.....:
       City/ST/PR...:
NCIC #.......:                    STATE.:
NCIC ENT DATE:                    NCIC CAN DATE:
Misc. ID #...:
Recovered By.:
Recovery Loc.:                              Date:
   City/ST/PR:                              Time:  0:00
                                           $Value:      $0.

Recovery Code:
Owner Notifd.:            By Whom:

******************** P E R S O N   I N F O R M A T I O N ********************

     PERSON REPORTING             INFORMATION  #   1
Name: TIMOTHY CHURCH                     DOB.:
Addr: 400 S FEDERAL HWY                  SSN.: 000000000
City: HALLANDALE       ST: FL   ZIP: 33009   Phn#:
POB.:                  ST:      Country:
Empl: HALLANDALE POLICE DEPT.            Bus#: 954/457-1400
Occp: POLICE OFFICER/K9
Race.......: WHITE                Sex.: MALE
Ethnic Org.: WHITE
OL #.......:              DL ST:    Country:
Age........:                              Misc#:
Height.....: 000 FT./IN.
Weight.....:     LBS

     SUSPECT                     INFORMATION  #   1
Name: HUGH HODGE                         DOB.: 10/21/1966
Addr: 999 W PROSPECT RD                  SSN.: 251273810
City: FT. LAUDERDALE   ST: FL   ZIP: 33301   Phn#:
POB.:                  ST:      Country:
Empl:                                    Bus#:
Occp:
Race.......: WHITE                Sex.: MALE
Ethnic Org.: WHITE
OL #.......:              DL ST:    Country:
Min. Height: 600 FT./IN.  Weight: 210 LBS   Misc#:
Max. Height: 600 FT./IN.  Weight: 210 LBS
Min. Age...: 31 Max: 31

***************** ADDITIONAL SUSPECT INFORMATION  #   1 *****************
Hair Color..:                Length.:
Hair Style..:
Eye Color...:                Glasses:
Complexion..:                Fl.Hair:
Build.......:                Teeth..:
Speech/Voice:
Clothing....- Hat..:            Shirt:
              Coat.:            Pants:

Crimes Management System                    Page:     3
Incident Report

Case No.: 1-98-030939 HALLANDALE POLICE DEPARTMENT              (Continued)

```
                Shoes:
Body Marks#1:                          Marks#2:
     Marks#3:                          Marks#4:
Hand Use....:                          NCIC #:
Caution/Haz.:                          Weapon.:
STATE #.....:                          ID #...:
STATUS...... STILL SUSPECT             Arrest#:
Marital stat:                          FBI#...:
```

```
     OTHER PERSON                      INFORMATION  #   1
Name: THOMAS REED                              DOB.:
Addr: 1300 W BROWARD BLV                       SSN.: 000000000
City: FT. LAUDERDALE      ST: FL   ZIP: 33301  Phn#:
POB.:                     ST:       Country:
Empl: FT. LAUDERDALE POLICE DEPT.              Bus#: 954/761-5700
Occp: POLICE OFFICER/K9
Race.......: WHITE                     Sex.: MALE
Ethnic Org.: WHITE
OL #.......:                  DL ST:   Country:
Age........:                                   Misc#:
Height.....: 000 FT./IN.
Weight.....:      LBS
```

```
     OTHER PERSON                      INFORMATION  #   2
Name: PATRICK HART                             DOB.:
Addr: 1300 W BROWARD BLV                       SSN.: 000000000
City: FT. LAUDERDALE      ST: FL   ZIP: 33301  Phn#:
POB.:                     ST:       Country:
Empl: FT. LAUDERDALE POLICE DEPT.              Bus#: 954/761-5700
Occp: POLICE OFFICER
Race.......: WHITE                     Sex.: MALE
Ethnic Org.: WHITE
OL #.......:                  DL ST:   Country:
Age........:                                   Misc#:
Height.....: 000 FT./IN.
Weight.....:      LBS
```

```
     OTHER PERSON                      INFORMATION  #   3
Name: DAVID WHEELER                            DOB.:
Addr: 1300 W BROWARD BLV                       SSN.: 000000000
City: FT. LAUDERDALE      ST: FL   ZIP: 33301  Phn#:
POB.:                     ST:       Country:
Empl: FT. LAUDERDALE POLICE DEPT.              Bus#: 954/761-5700
Occp: POLICE SERGEANT/K9
Race.......: WHITE                     Sex.: MALE
Ethnic Org.: WHITE
OL #.......:                  DL ST:   Country:
Age........:                                   Misc#:
Height.....: 000 FT./IN.
Weight.....:      LBS
```

```
     OTHER PERSON                      INFORMATION  #   4
```

Program: CMS3C1

Crimes Management System
Incident Report

Page: 4

Case No.: 1-98-030939 HALLANDALE POLICE DEPARTMENT          (Continued)

Busn: FT LAUDERDALE POLICE DEPT
Addr: 1300 W BROWARD BLV
City: FT LAUDERDALE          ST: FL   ZIP: 33301

Misc#:
SSN.: 000000000
Phn#: 954/765-5700
Bus#: 954/000-0000

************************ N A R R A T I V E   # 1 ************************

Original Report          Reported By: CHURCH, TIMOTHY M.          9/08/98
                         Entered By.: CHURCH, TIMOTHY M.          9/08/98
                         Reviewed By: WATKINS, JAMIE             9/08/98

ON SEPTEMBER 6, 1998 I WAS TRAINING WITH THE FORT LAUDERDALE
POLICE DEPARTMENT K9 UNIT, WHEN THEY WERE REQUESTED IN REFERENCE TO A
BAILOUT FROM A STOLEN VEHICLE.  I RESPONDED TO 1513 NW 15 COURT ALONG
WITH FT. LAUDERDALE K9 OFFICER REED.  WHILE WE WERE ENROUTE A
PERIMETER WAS SET UP AND MANNED BY UNIFORMED PATROL, IN MARKED POLICE
VEHICLES WITH THEIR OVERHEAD EMERGENCY LIGHTS ILLUMINATED.
    UPON ARRIVAL I OBSERVED A 1990 BLUE HONDA CIVIC (FL REG.#TTY84C)
IN THE YARD AT THE LISTED LOCATION AND THE VEHICLE HAD CRASHED INTO A
FENCE ON THE PROPERTY.  MYSELF AND OFFICER REED MET WITH OFFICER
HART, WHO SAID THAT A WHITE MALE CULPRIT, WEARING A WHITE SHIRT AND
SHORTS HAD BAILED OUT OF THE VEHICLE AND WAS LAST SEEN RUNNING NORTH
BOUND THROUGH THE YARD.  OFFICER HART SAID THAT HE HAD STAYED AT THIS
POSITION AND THAT NO ONE ELSE HAD GONE THROUGH THIS AREA.
    I THEN DEPLOYED MY K-9 PARTNER GERO AND HE ALERTED TO FRESH HUMAN
SCENT AT THE AREA OF THE DRIVER'S DOOR AND INITIATED A TRACK
NORTHBOUND THROUGH THE YARD.  THE TRACK CONTINUED NORTH AND AND THEN
WEST THROUGH A FENCE AND INTO ANOTHER YARD.  THE TRACK THEN CONTINUED
NORTH AND THEN TOOK A NORTHWESTERLY TURN AROUND A HOUSE AT 1516 NW 15
PLACE.  THE TRACK CONTINUED WEST AND AS WE CONTINUED TO THE NORTHWEST
CORNER OF THE HOUSE GERO BEGAN TO ALERT TO THE INCREASING AMOUNT OF
FRESH HUMAN SCENT.  I ILLUMINATED THE THE BUSH AREA ON THE NORTHWEST
CORNER OF THE HOUSE WITH MY 35,000 CANDLEPOWER STREAMLIGHT SLX-20
FLASHLIGHT.  I THEN OBSERVED A WHITE MALE ATTEMPTING TO CONCEAL
HIMSELF AND HIS HANDS IN THE BUSHES, FACING IN A NORTHWEST
DIRECTION.  THE WHITE MALE MATCHED THE DESCRIPTION OF THE CULPRIT.  I
THEN IDENTIFIED MYSELF AS A POLICE OFFICER WITH THE HALLANDALE POLICE
DEPARTMENT K9 UNIT, THAT HE WAS UNDER ARREST, TO COME OUT OF HIS
PLACE OF HIDING AND TO EXPOSE HIS HANDS OR I WOULD RELEASE MY
PARTNER.  I RECEIVED NO PHYSICAL OR VERBAL RESPONSE FROM THE
CULPRIT.  I AGAIN IDENTIFIED MYSELF AS A POLICE OFFICER WITH THE
HALLANDALE POLICE DEPARTMENT K9 UNIT, THAT HE WAS UNDER ARREST AND TO
COME OUT OF HIS PLACE OF HIDING AND TO EXPOSE HIS HANDS OR I WOULD
RELEASE MY PARTNER.  AGAIN I RECEIVED NO PHYSICAL OR VERBAL RESPONSE
THAT THE CULPRIT WAS COMING OUT SO I COMMANDED K-9 GERO TO TAKE THE
CULPRIT INTO CUSTODY.
    GERO ENTERED THE BUSHES AND MADE CONTACT WITH THE CULPRIT IN THE
RIGHT BICEP AREA.  THE CULPRIT THEN BECAME COMBATIVE WITH GERO.  AS
GERO WAS ATTEMPTING TO PULL HIM FROM THE BUSHES, THE CULPRIT PULLED
HIS ARM AWAY FROM GERO AND GERO RECONTACTED IN THE BUTTOCKS AND
CONTINUED TO PULL THE CULPRIT FROM THE BUSHES, AS THE CULPRIT
CONTINUED TO FIGHT WITH GERO.  AS GERO WAS PULLING THE CULPRIT OUT

Case No.: 1-98-030939 HALLANDALE POLICE DEPARTMENT              (Continued)

HIS CLOTHING RIPPED AND GERO AGAIN CONTACTED HIM IN THE BUTTOCKS.
THE CULPRIT CONTINUED TO STRUGGLE WITH GERO BY SWINGING HIS ARMS AND
LEGS VIOLENTLY.  THIS WHOLE TIME MYSELF AND OFFICER REED WERE
COMMANDING THE CULPRIT TO PLACE HIS HANDS BEHIND HIS BACK AND TO STOP
RESISTING THE K9.  AT ONE POINT I STRUCK THE CULPRIT IN THE BACK AND
ARM WITH MY FLASH LIGHT TO TRY AND GET HIM TO STOP FIGHTING GERO, AS
HE WAS GRABBING AT GERO AND REFUSING TO PLACE HIS HANDS BEHIND HIS
BACK.  WE GAVE SEVERAL COMMANDS THROUGHOUT THIS ENTIRE TIME UNTIL
FINALLY THE CULPRIT STOPPED RESISTING AND PLACED HIS HANDS BEHIND HIS
BACK.  AT THIS TIME THE CULPRIT WAS TAKEN INTO CUSTODY AND GERO WAS
REMOVED FROM HIM.
    THE CULPRIT WAS IDENTIFIED BY OFFICER HART, AND THEN TRANSPORTED
TO BROWARD GENERAL HOSPITAL FOR TREATMENT.  THE CULPRIT WAS CHARGED
BY FT. LAUDERDALE POLICE WITH AUTO THEFT, RESISTING A LAW ENFORCEMENT
OFFICER WITHOUT VIOLENCE, POSSESSION OF COCAINE, POSSESSION OF DRUG
PARAPHERNALIA, FELONY VANDALISM AND TRAFFIC OFFENSES.
    FT. LAUDERDALE K9 SGT. WHEELER RESPONDED FOR THE POST
APPREHENSION REVIEW.  PHOTOGRAPHS OF THE APPREHENSION SCENE, AND THE
CULPRIT WERE TAKEN BY SGT. WHEELER.  THE CULPRIT RECEIVED A
LACERATION TO HIS RIGHT BICEP, LEFT BUTTOCKS AND A PUNCTURE TO HIS
BUTTOCKS.  SEE FT. LAUDERDALE POLICE CASE#98-139628.


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

RECYCLED PAPER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-6228-CIV-SEITZ/GARBER

HUGH HODGE,

        Plaintiff,

vs.

TIMOTHY M. CHURCH,
THOMAS REED, et al.,

        Defendants.
_____/

## SWORN AFFIDAVIT OF PATRICK HART

STATE OF FLORIDA     )
                    ) SS:
COUNTY OF BROWARD  )

    **BEFORE ME** the undersigned authority personally appeared PATRICK HART, and after being duly sworn, deposes and states as follows:

    1.    I am over the age of eighteen (18) and otherwise *sui juris* and am physically and mentally competent to make this affidavit.

    2.    I make this affidavit based on my personal knowledge of the contents hereof.

    3.    I am and at all times material was employed as a police officer with the City of Fort Lauderdale.

    4.    On or about September 6, 1998, I was on routine patrol when I heard a BOLO (Be On the Look Out) in reference to a 1990 Blue Honda Civic being stolen from 2616 Middle River Drive, in Fort Lauderdale. The suspect was described as a white male with the name of Hugh Hodge.

    5.    While on routine patrol, I observed a 1990 Blue Honda Civic and advised dispatch to verify the license plate to ensure that this was the suspect vehicle. Dispatch confirmed the license

Affidavit of Patrick Hart
Case No. 00-6228-Civ-Seitz/Garber

plate and that the vehicle had been reported stolen.

6.       Because dispatch had confirmed that this was the stolen vehicle which was the subject

of the earlier BOLO, I immediately requested for back-up before attempting to make a felony stop.

7.       Once back-up units arrived, I attempted to make a felony stop with my police vehicle

by putting on my lights and siren.

8.       The suspect driving the vehicle, later confirmed to be Hugh Hodge, did not stop but

instead accelerated in an attempt to escape.  The suspect and the vehicle continued to flee from me

until the suspect turned a corner and drove the vehicle into a chain-linked fence located on a private

residence.

9.       Hugh Hodge then exited the vehicle, failed to obey my commands to stop and fled on

foot.

10.      Once the suspect began fleeing on foot, I established a perimeter in the area and

requested a K-9 Unit to respond to the scene.  I remained at the perimeter while waiting for the K-9

unit to arrive.

11.      Officer Thomas Reed, a K-9 officer from the Fort Lauderdale Police Department and

Officer Timothy Church,  a K-9 officer from the Hallandale Police Department, along with Officer

Church's K-9, Gero, responded to the scene.

12.      Once Officer Reed and Officer Church arrived, I provided them with a description of

the suspect who fled on foot and pointed to the last place I had seen him.

13.      Approximately 5 to 15 minutes later, having remained at the perimeter this entire time,

I heard via my radio that the suspect, Hugh Hodge, had been apprehended and taken into custody.

14.      During the time that Hugh Hodge was found, apprehended and taken into custody,

Affidavit of Patrick Hart
Case No. 00-6228-Civ-Seitz/Garber

I remained at the perimeter I had previously established.  I remained at the perimeter until after Hugh Hodge was taken to Broward General Medical Center.

15.    I proceeded to Broward General Medical Center where Hugh Hodge was taken for medical treatment and found him in the in the emergency room.  I remained with Hugh Hodge at the hospital until he received a medical clearance approximately three or four hours later.

16.    Once Hugh Hodge was medically cleared by Broward Medical Center, I transported him to the Fort Lauderdale jail where I read him his Miranda rights and placed him under arrest.

17.    At no time was I involved in the physical apprehension of Hugh Hodge or even in the presence of Hugh Hodge during his apprehension and placement into custody.

18.    I did not make any physical contact with Hugh Hodge either before or after his apprehension at the scene.

19.    I did not partake in, or have any knowledge of any alleged beating of Hugh Hodge.

20.    I declare the facts stated in this affidavit are true and accurate.

**FURTHER AFFIANT SAYETH NAUGHT**

_____
PATRICK HART

The foregoing affidavit was sworn to before me on this ____12th____ day of January, 2001, in Broward County, Florida, by PATRICK HART, who is personally known to me or who produced _____N/A_____ as identification.

_____
Notary Public Signature

Notary Stamp:

Colleen E. Connell
Print Name

C. E. CONNELL
MY COMMISSION # CC 630088
EXPIRES: April 4, 2001
Bonded Thru Notary Public Underwriters

3



RECYCLED PAPER

# FORT LAUDERDALE POLICE DEPARTMENT
## OFFENSE INCIDENT REPORT

8056

| Reported: Day | Date | Time (mil) | Related Report Number(s) |
|---|---|---|---|
| Sun | 9-6-98 | 0600 | |

| Incident Type | | Incident: Date | | From | Day | Date | Time (mil) |
|---|---|---|---|---|---|---|---|
| 1 Felony 3 Misdemeanor 5 Ordinance 2 Traffic Felony 4 Traffic Misdemeanor | | Sun | 9-6-98 | 0332 | To | | |

Type / Description: **Auto Theft (Rec.)**  A-Attempted C-Committed **C**  Special ENF

| Hate Crime | Crime Against Elderly | Gang Related |
|---|---|---|
| Y O N **X** | Y O N **X** | Y O N **X** |

**EVENT DATA**

| Incident Location (Street, Apt. Number) | City | Zip | Zone |
|---|---|---|---|
| 1513 NW 15 CT | Ft Lauderdale | | **208** |

| Business Name/Area Identifier | Called In | Forced Entry | Occupancy | CCN |
|---|---|---|---|---|
| | ☐ YES ☒ NO By | 0 N/A 2 No 1 Yes **O** | 0 N/A 1 Occupied 2 Unoccupied 3 Abandoned | **FO** |

Location Type:
01 Residence-Single 05 Convenience Store 09 Supermarket 13 Bank/Financial Inst 17 Gov't/Public Bldg. 21 Airport 25 Parking Lot/Garage 29 Motor Vehicle
02 Apartment/Condo 06 Gas Station 10 Dept./Discount Store 14 Commercial/Office Bldg. 18 School/University 22 Bus/Rail Terminal 26 Highway/Roadway 30 Other Mobile
03 Residence-Other 07 Liquor Store 11 Specialty Store 15 Industrial/Mfg 19 Jail/Prison 23 Construction Site 27 Park/Woodlands/Field 99 Other
04 Hotel/Motel 08 Bar/Nightclub 12 Drug Store/Hospital 16 Storage 20 Religious Bldg. 24 Other Structure 28 Lake/Waterway

| # Offenses | # Victims | # Offenders | # Prem. Ent. | # Veh. Stolen | Type Weapon | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **2** | **2** | **01** | | **01** | 00 N/A 02 Rifle 01 Handgun 04 Firearm | 02 Rifle 03 Shotgun 05 Knife/Cutting Instrument | 06 Hands/Fists/Feet 07 Poison 08 Blunt Object | 10 Fire/Incendiary 11 Threat/Intimidation 12 Simulated Weapon | 14 Rifle 88 Unknown 99 Other **O** |

**CODES**

V/W Code: V-Victim P-Proprietor W-Witness Z-Other C-Reporting Person

| Victim Type | Race | Sex | Residence Type | Residence Status | Extent of Injury |
|---|---|---|---|---|---|
| 0 N/A 4 Business 1 Juvenile 5 Government 2 LE Officer 6 Church 3 Adult 9 Other | N-N/A I-American Indian W-White O-Oriental/Asian B-Black U-Unknown | N-N/A M-Male F-Female U-Unknown | 0 N/A 3 Florida 1 City 4 Out-of-State 2 County | 0 N/A 2 Full Year 1 Part Year 3 Non-Resident | 0 None 1 Minor 2 Serious 3 Fatal |

Injury Type:
00 N/A 03 Laceration 07 Loss of Teeth Victim Relationship to Offender 06 Parent 10 Step-Child 14 Teacher 17 Friend 21 Employer
01 Gunshot 04 Unconscious 08 Burns 00 N/A 04 Sibling 07 Brother/Sister 11 In-Law 18 Child of Boy/Girl 22 Landlord/Tenant
02 Stabbed 05 Broken Bones 09 Abrasions/Bruises 01 Spouse 05 Ex-Spouse 08 Child 12 Other Family 18 Child of Boy/Girl Friend 23 Acquaintance
06 Poss. Internal Injury 02 Common Law 03 Stranger 09 Co-Habitant 09 Step-Parent 13 Student 16 Boy/Girl Friend Friend 20 Employee 99 Other Known 19 Sitter/Day Care

**VICTIM/WITNESS**

| V/W Code | V-Type | Name (Last, First, Middle) | Residence Phone |
|---|---|---|---|
| V | 3 | Viola, Michael | (954) 785-3338 |

| Address (Street, Apt. Number) | | City | State | Zip | Business Phone |
|---|---|---|---|---|---|
| 601 Pine Dr #210 | | Pompano Bch FL | | | ( ) |

Other Contact Info. (Time Available, Interpreter, etc.): Josephine Viola (Registered owner + Michael's mother)

| Race | Sex | Date of Birth or Age | If Victim Type 1, 2 or 3 | Res. Type | Res. Status | Extent of Injury | Injury Type(s) | Relationship | Domestic Violence |
|---|---|---|---|---|---|---|---|---|---|
| W | M | 01-31-51 col 7 | | | | 00 | | 99 | ☐ YES ☐ NO |

**VICTIM/WITNESS**

| V/W Code | V-Type | Name (Last, First, Middle) | Residence Phone |
|---|---|---|---|
| V | 3 | Singleton, Jerome | (954) 525-3936 |

| Address (Street, Apt. Number) | | City | State | Zip | Business Phone |
|---|---|---|---|---|---|
| 1513 NW 15 CT | | Ft Lauderdale FL | | 33311 | ( ) |

Other Contact Info. (Time Available, Interpreter, etc.):

| Race | Sex | Date of Birth or Age | If Victim Type 1, 2 or 3 | Res. Type | Res. Status | Extent of Injury | Injury Type(s) | Relationship | Domestic Violence |
|---|---|---|---|---|---|---|---|---|---|
| B | M | 05-05-54 | | 1 | | 0 | 05 | 02 | ☐ YES ☐ NO |

**SUSPECT**

| Suspect Code | Code | Juvenile | Name (Last, First, Middle) |
|---|---|---|---|
| S-Suspect E-Escapee A-Arrestee Z-Other | **A** | | Hodge, Hugh |

| Maiden Name | Nickname/Street Name | Place of Birth | Residence Phone |
|---|---|---|---|
| | | Miami FL | (954) 776-8036 |

| Last Known Address (Street, Apt. Number) | City | State | Zip | Business Phone |
|---|---|---|---|---|
| 999 W Prospect Rd | Ft Lauderdale FL | | 33311 | ( ) |

| Occupation | Employer/School | Address | Social Security Number |
|---|---|---|---|
| | | | 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 |

| Driver's License State/Number | Immigration and Naturalization Number | Other I.D. Number | FL/OBTS Number (Arrested) | FCIC/NCIC |
|---|---|---|---|---|
| None | | | | ☐ YES ☐ NO |

Clothing (Describe): Hugh Lt Hand,   Scars/Marks/Tattoos (Location/Describe): C ABC Lt Ankle, R Bx 1 Lt Shoe

| Race | Sex | Date of Birth or Age | Height | Weight | Eye Color | Hair Color | Other |
|---|---|---|---|---|---|---|---|
| W | M | 02-16-16 | 6'0 | 190 | BRN | BRN | |

**SUSPECT INFO. UNKNOWN**

| Hair Lgth/Type | Hair Style | Complexion | Build | Teeth | Facial Hair | Speech | Voice | Appearance | Unique I.D. |
|---|---|---|---|---|---|---|---|---|---|
| 03 | 09 | 06 | 03 | 01 | 10 | 08 | 05 | 06 | 04 |

| 01 Unk | 01 Unk | 01 Unk | 01 Unk | 01 Unk | 01 Unk | 01 Unk | 01 Unk | 01 Unk | 01 Unk |
|---|---|---|---|---|---|---|---|---|---|
| 02 Bald | 02 Afro/Nat | 02 Acne | 02 Thin | 02 Missing | 02 Clean Shaven | 02 Accent | 02 Disguised | 02 Dirty | 02 Prostitute |
| 03 Short | 03 Braided | 03 Dark | 03 Medium | 03 Rotten | 03 Full Beard | 03 High Pitch | 03 Disguise | 03 Disguise | 03 Birth Mark |
| 04 Shoulder | 04 Bun | 04 Freckled | 04 Large | 04 Gold | 04 Fu Manchu | 04 Low Pitch | 04 High Pitch | 04 Military | 04 Tattoo(s) |
| 05 Shoulder | 05 Greasy | 05 Light | 05 Muscular | 05 Jeweled | 05 Goatee | 05 Offensive | 05 Medium | 05 Military | 05 Scars |
| 06 Long | 06 Crew Cut | 06 Medium | 99 Other | 06 Lower Lip | 06 Whisper | 06 Monotone | 06 Unkempt | 06 Earrings |
| 07 Coarse | 07 Ponytail | 07 Pocked | | 07 Mustache | 07 Rapid | 07 Monotone | 07 Unusual Odor | 07 Phy. Imp. |
| 08 Fine | 08 Receding | 08 Ruddy | | 08 None/Fuzz | 08 Slow | 08 Nasal | 08 Wet Groomed | 08 Transvestite |
| 09 Thick | 09 Straight | 09 Tanned | | 09 Sideburns | 09 Stutters | 09 Pleasant | 09 Pres. Glasses | |
| 10 Thinning | 10 Wavy/Curly | 99 Other | | 10 Unshaven | 10 Talkative | 10 Raspy | 10 Sun Glasses | |
| 11 Receding | 11 Wig | | | 99 Other | 11 Profane | 11 Soft | 99 Other | |
| 99 Other | 12 Plaited | | | | 99 Other | 99 Other | | |
| | 99 Other | | | | | | | |

Unique I.D.:
☐ DUI — 1 Offense, 2 Arrest
☐ Juvenile
☐ Original, Supplement

**ADMINISTRATIVE**

| Officer(s) Reporting | I.D. Number(s) | Unit | Date |
|---|---|---|---|
| Hart | 1338 | 1C202 | 9-6-98 |

| Officer Reviewing (If Applicable) | I.D. Number | Routed To | Referred To | Assigned To | By | Date |
|---|---|---|---|---|---|---|
| Sgt Blaze | | | | | | |

| Case Status | Clearance Type | | A-Adult J-Juvenile | Date Cleared | Arrest Number |
|---|---|---|---|---|---|
| | 1 Arrest 2 Exceptional | 3 Unfounded | | | 98-10944 |

| Exception Type | | | | | OBTS Number | Page | Page |
|---|---|---|---|---|---|---|---|
| 1 Extradition Declined | 2 Arrest on Primary Offense Secondary Offense Without Prosecution | 3 Death of Offender 4 V/W Refused to Cooperate | 5 Prosecution Declined 6 Juvenile/No Custody | | | **1** | of |

| Number Arrested |
|---|

FORM Z 496 Rev 12/91

# FORT LAUDERDALE POLICE DEPARTMENT
## SUPPLEMENT PAGE 1

| Original Date Reported | Case Title |
|---|---|
| 09.06.98 | Auto theft (Rec.) |

| Reported Day | Date | Time (mil) | Related Report Numbers |
|---|---|---|---|
| Sun | 09.06.98 | 0332 | 98.3.09.139 |

| Incident Type: 1 Felony 2 Traffic Felony | 3 Misdemeanor 4 Traffic 5 Misdemeanor | 5 Ordinance 9 Other |
|---|---|---|

## OFFENSE CHANGED TO  ☒ N/A

| OFFENSE #1 | Type | Title | A-Attempted C-Committed | Statute Violation Number | Municipal Ordinance |
|---|---|---|---|---|---|
| OFFENSE #2 | Type | Title | A-Attempted C-Committed | Statute Violation Number | Municipal Ordinance |

| Incident Location (Street, Apt. Number) | City | Zip | Rept. Area | Zone |
|---|---|---|---|---|
| 1513 NW 15 CT | Ft. Lauderdale | | | |

advised he did not give anyone permission to damage his fence. He also stated it was against his will and he wishes to prosecute. Singleton signed the affidavit of complaint and advised the damage would cost between $1,200.⁰⁰ - 1,500.⁰⁰ dollars to repair. 16206 (Ofc. Shields 1305 and Ofc. Smith 1305) transported the def to BRH for treatment of injuries. Ofc. Reed advised that when the def was taken into custody a search revealed a 4" clear glass tube commonly used for smoking crack cocaine. The tube (pipe) valtox test positive for the presence of cocaine. The tube and pictures of the vandalism were placed into evidence.

After the subject was released from the hospital I read him his miranda rights and the def refused to talk to me. I contacted the victim Michael Viola. Mr. Viola advised the subject took his vehicle without consent, against his will, and he does wish to prosecute. I then performed a check on Teletype for any active capias and a DL check. No active capias and no valid DL on file with the State of Florida. The def was TOT to FLPD Jail and the vehicle was towed to Mac's.

Ofc. G. Ferri Lima 1329 took the original report for the stolen car and advised that the victim Michael Viola did sign the affidavit of complaint. I forwarded the report to Auto theft.

The def is charged with: 1. Auto theft FSS 812.04
  2. Vandalism (Felony) FSS 806.13
  3. Possession Cocaine FSS 893.13
  4. Possession Drug Paraphernalia FSS 893.147
  5. Resisting Arrest without Violence FSS 843.02
  6. No Driver's License FSS 322.03(1) Citation # 662553-Z

| Report Contains | | Related Report Number(s) |
|---|---|---|

| Officer(s) Reporting | | I.D. Number(s) | Unit | Date |
|---|---|---|---|---|
| HART | | 1328 | 1C202 | 9.6.98 |

| Officer Reviewing (If Applicable) | I.D. Number | Router To | Referred To | Assigned To | By | Date |
|---|---|---|---|---|---|---|

| Case Status | Clearance Type 1 Arrest 2 Exceptional 3 Unfounded | A-Adult J-Juvenile | Data Cleared | Arrest Number | Number Arrested |
|---|---|---|---|---|---|
| | | | | | 1 |

| Exception Type 1 Extradition Declined | 2 Arrest on Primary Offense Secondary Offense Without Prosecution | 3 Death of Offender 4 V/W Refused to Cooperate | 5 Prosecution Declined 6 Juvenile/No Custody | OBTS Number | Page | Page |
|---|---|---|---|---|---|---|

FORM Z-248A Rev 6/88

# FORT LAUDERDALE POLICE DEPARTMENT
## VEHICLE REPORT

OK ☐ Original

Related Report Numbers: 9 8 1 1 3 9 1 6 1 2 8
9 8 3 0 9 3 9

| ADM CODES | Original Date Reported 0 9 0 6 9 8 | Case Reference Auto theft (Rec) | | | |
|---|---|---|---|---|---|

| Person Code | Status Code | Damage Code | Type | Recovery Location | Recovery Code |
|---|---|---|---|---|---|
| V-Victim  R-Recovered | 1 Stolen | 0 N/A | 4 Stripped Theft | 1 Auto | 6 Trailer | 1 Family Residence | 5 Park/Playground | Stolen / Recovered |
| S-Suspect  Missing | 2 Recovered | 1 Arson | From | 2 Truck/Van | 7 Boat | 2 Apt. Complex | 6 Shopping Mall | |
| M-Missing  Z-Other | 3 Stolen and | 2 Criminal Mischief | 5 Other | 3 Motorcycle | 8 Aircraft | 3 Housing Project | 7 Woods | 1 Local  Local |
| A-Arrestee | Recovered | 3 During Other | | 4 Camper/RV | 9 Other | 4 Commercial/ | 8 Water | 2 Local  Local |
| E Escapee | 4 Seized | Offense | | 5 Bus | | Industrial | 9 Other | 1 Other  Local |
| | 5 Suspicious | | | | | | | |

| Pers. Code V | Veh. # 1 | Status 3 | Damage 3 | Type 3 | Year 90 | Make Honda | Model Civic | Style 4DR |
|---|---|---|---|---|---|---|---|---|

| Tag. Reg./Doc. # TTV 84C | Reg. State FL | Reg. Year 98 | Decal Number 0968353 | Tag Type |
|---|---|---|---|---|

VIN/Hull/FAA: 1 H G E D 4 6 6 0 L A 0 0 3 9 2 9        Estimated Value $ _____ 00

| Condition ☐ 1 Window Closed  ☐ 2 Locked  ☒ 3 Keys in Ignition | Insurance Company | Lien Holder |
|---|---|---|

Color (Top/Bottom): Blue        Description (Identifying Characteristics, Noticeable Damage, Interior Color, etc.): FRONT END DAMAGE

| Vessel Name | Length | Hull Material | Propulsion | Boat Type |
|---|---|---|---|---|

| VEHICLE/VESSEL | Recovery Address/Geographic Indicator | Date Recovered | Value Recovered $ _____ 00 |
|---|---|---|---|

| Recovery Loc. 1 | Recovery Code 1 | Original Reporting Agency FLPD | Report Number SAME | Hold Y-Yes N-No  N | Reason/Authority |
|---|---|---|---|---|---|

| Method of Theft | Components Stripped | |
|---|---|---|
| ☒ 0 N/A  ☐ 2 Tow Truck  ☐ 4 Steering  ☐ 6 Ignition Punch | ☐ 0 N/A  ☐ 2 Tires/Wheels  ☐ 4 Battery  ☐ 6 Transmission  ☐ 8 Major Body Parts  ☐ 10 Other - Specify | |
| ☐ 1 Keys  ☐ 3 Hot Wire  Column  ☐ 8 Unknown | ☐ 1 VIN Plate  ☐ 3 Radio/CB  ☐ 5 Interior  ☐ 7 Engine Parts  ☐ 9 Tag/Decal Stolen | |

| Towed By Mac's | Storage Location Mac's | FCIC/NCIC  ☒ YES  ☐ NO |
|---|---|---|

---

| ADM CODES | Original Date Reported | Case Reference |
|---|---|---|

| Person Code | Status Code | Damage Code | Type | Recovery Location |
|---|---|---|---|---|
| V-Victim  R-Recovered | 4. Suspicious | 0. N/A  9. Other | 1. Auto  6. Trailer | 1 Family Residence  5. Park/Playground |
| S-Suspect  Missing | | 1. Arson | 2. Truck/Van  7. Boat | 2 Apt. Complex  6. Shopping Mall |
| M-Missing  Z-Other | | 2. Criminal Mischief | 3. Motorcycle  8. Aircraft | 3 Housing Project  7. Woods |
| A-Arrestee | | 3. During Other | 4. Camper/RV  9. Other | 4 Commercial/  8. Water |
| E-Escapee | | Offense | 5. Bus | Industrial  9. Other |

| Pers. Code | Veh. # | Status | Damage | Type | Year | Make | Model | Style |
|---|---|---|---|---|---|---|---|---|

| Tag. Reg./Doc. # | Reg. State | Reg. Year | Decal Number | Tag Type |
|---|---|---|---|---|

VIN/Hull/FAA: _____        Estimated Value $ _____ 00

| Condition ☐ 1 Window Closed  ☐ 2 Locked  ☐ 3 Keys in Ignition | Insurance Company | Lien Holder |
|---|---|---|

Color (Top/Bottom): _____        Description (Identifying Characteristics, Noticeable Damage, Interior Color, etc.)

| Vessel Name | Length | Hull Material | Propulsion | Boat Type |
|---|---|---|---|---|

| VEHICLE/VESSEL - OTHER THAN AUTO THEFT | Recovery Address/Geographic Indicator | Date Recovered | Value Recovered $ _____ 00 |
|---|---|---|---|

| Original Reporting Agency | Report Number | Hold Y-Yes N-No | Reason/Authority |
|---|---|---|---|

| Towed By | Storage Location | FCIC/NCIC  ☐ YES  ☐ NO |
|---|---|---|

---

| ADMINISTRATIVE | Officer(s) Reporting HART | ID. Number(s) 1338 | Unit 1C-202 | Date 9-6-98 |
|---|---|---|---|---|
| | Officer Reviewing (If Applicable) | ID. Number | Routed To | Referred To | Assigned To | By | Date |

Page ____ of ____

FORM Z-499   Rev 9/88 (Back)

**OFFENSE:** Auto Theft (Recovered)

**DATE:** 04-06-98   **DAY:** Sun.

**MAKE/MODEL:** Honda Civic   **LIC:** TTY-94C   **STATE:** FL   **YEAR:** 1998   **COLOR(S):** Blue

**LOCATION:** 1513 NW 15th Ct.

**UNIT:** 10202   **ZONE:** 208   **RA:**

**VIN:** 1HGED4660LAC038539

## VEHICLE

**UNUSUAL ACCESSORIES:**

**OTHER PROPERTY:**

2   3   4

**EVIDENCE (ITEMS RETAINED BY POLICE):**

**GENERAL CONDITION OF VEHICLE:** Poor

**KEY WITH VEHICLE:** ☑ Y ☐ N

**TOWED BY:** Macs   **HOLD**

**TOWED TO:** Macs

**REASON FOR TOW:** Recovered Stolen Auto

**HOLD:** ☐ DET DIV ☐ VICE ☐ PATROL ☐ O.J.

**NAME OF PERSON ARRESTED (IF ANY):** Hugh Hodge

**REGISTERED OWNER OF VEHICLE:** Josephine Viola

**ADDRESS:**

**OJ OR NBR:**

**REASON FOR ARREST:** 999 W Prospect Rd #210 Pompano Bch, FL

**OFFICE AUTH HOLD:**   **REASON FOR HOLD:**

**PERSON REPORTING EVENT:** Ofc. P. Hart

**ADDRESS:** 1300 W. Broward Blvd.

**PHONE:** 954-761-5700

## NARRATIVE

Lrge Bags of Clothing, Box of white rags

**OFFICER MAKING INVENTORY:** Ofc. P. Hart   **CCN:** 1325

**WITNESS:**

**DATE & TIME:** 04-06-98

**INVESTIGATOR:** Ofc. P. Hart   **CCN:** 1325

**TOW DRIVER:** 139

**HOLD RELEASED BY:**   **DATE & TIME:**

**VEHICLE CLAIMED BY:**

**ADDRESS:**   **PHONE:**   **DATE & TIME:**

**OWNER REQUEST PVT TOW:**

SIGN RELEASE OF RESPONSIBILITY

FORM 2 1013 Rev. 7 93.1(0M)   WHITE - Records,   CANARY - Towing Copy

98-1340028



RECYCLED PAPER



1

2                    UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF FLORIDA

3                            CASE NO. 00-6228-CIV-SEITZ/GARBER

4       HUGH HODGE,

5                  Plaintiff,                    **ORIGINAL**

6       vs.

7       TIMOTHY M. CHURCH, THOMAS REED

8       PATRICK HART, DAVID WHEELER, CITY
        OF FORT LAUDERDALE, and CITY OF

9       HALLANDALE,

10                 Defendants.
        _____/

11
        APPEARANCES:

12
        DANIELS & DANIELS, P.A.

13      BY:   GORDON S. DANIELS, ESQ.
        Appearing on behalf of the Plaintiff

14
        OFFICE OF THE CITY ATTORNEY

15      BY:   MARK GOLDSTEIN, ESQ.
        Appearing on behalf of Defendants Church & Hallandale

16
        ADORNO & ZEDER, P.A.

17      BY:   DIETER K. GUNTHER, ESQ.
        Appearing on behalf of Defendants Reed, Hart, Wheeler

18      & Fort Lauderdale

19                            Pompano Beach, Florida
                              November 7th, 2000

20                            3:50 o'clock p.m.

21

22                            DEPOSITION

23                                 OF

24                            HUGH HODGE

25                    - - - - - - - -

1       Deposition of Hugh Hodge, taken by the

2    Defendant, for purposes of discovery and for use as

3    evidence in the above entitled cause, pursuant to

4    notice heretofore filed, before Lynn Cantin,

5    Registered Merit Reporter and Notary Public in and

6    for the State of Florida at Large, at 1351 Northwest

7    27th Avenue, Pompano Beach, Florida.

8

9

10                    I N D E X

11   DIRECT EXAMINATION   (By Mr. Gunther)          3

12   CROSS-EXAMINATION   (By Mr. Goldstein)         58

13   REDIRECT EXAMINATION   (By Mr. Gunther)        69

14

15        DEFENDANT'S EXHIBITS FOR IDENTIFICATION

16   1 - Interrogatories -                          46

17   2 - Disposition Sheet -                        70

18

19

20

21

22

23

24

25

1    Thereupon:

2                          HUGH HODGE

3    having been first duly sworn to testify under oath

4    in the above entitled cause, testified as follows:

5                     DIRECT EXAMINATION

6         Q.    (By Mr. Gunther)  My name is Gunther, I

7    represent Officer Reed, Hart, Sergeant Wheeler, and

8    the City of Fort Lauderdale.

9              I'm going to ask you some questions.  If

10   you don't understand my questions, please stop me; I

11   want to find out what happened to you, why it

12   happened, and what your version of the events is,

13   okay?

14        A.    Okay.

15        Q.    If you would answer each question audibly

16   with a "yes" or a "no" or whatever the answer may be,

17   we'd appreciate that, and then when I get through,

18   the attorney for the City of Hallandale and Officer

19   Church is going to ask you some questions, and then,

20   if your lawyer wants to ask you some questions, have

21   at it, okay?

22        A.    Okay.

23        Q.    All right, sir.  Your name for the record?

24        A.    Hugh Hodge.

25        Q.    And are you known by any other names?

```
 1          A.    Greg Hodge, alias.

 2          Q.    Do you have any other aliases?

 3          A.    No.

 4          Q.    Okay.  What is your Social Security number?

 5          A.    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.

 6          Q.    Okay.  And we're taking this deposition at

 7    the Conte Detention Facility in Broward County, is

 8    that correct?

 9          A.    Yes.

10          Q.    And you are an inmate here, is that

11    correct?

12          A.    Yes.

13          Q.    What is your scheduled release time?

14          A.    The 24th of December this year.

15          Q.    This year?

16          A.    2000.

17          Q.    All right, sir.  And we're here mainly to

18    talk about an arrest of yours, and we're going to be

19    talking about other things as well, but about an

20    incident and the arrest taking place, either

21    September 6th or 7th, in 1998, in Fort Lauderdale; do

22    you remember that?

23          A.    Yes, I do.

24          Q.    Okay.  First of all, how old are you?

25          A.    Thirty-four.
```

1      Q.    Okay.  And how many times would you say

2    you've been convicted of a felony before,

3    approximately?

4      A.    Six, seven.

5      Q.    Okay.  During the past 10 years?

6      A.    My whole life.

7      Q.    Your whole life?

8      A.    Yeah.

9      Q.    Okay.  Do any of those felonies have to do

10   with perjury, not telling the truth, that sort of

11   thing?

12     A.    Never.

13     Q.    Okay.  At the time of this September of

14   1998 arrest, were you on probation for any other

15   matters?

16     A.    No, I wasn't --

17     Q.    Okay.

18     A.    -- at that time.

19     Q.    At that time?

20     A.    No.

21     Q.    Okay.  And were you suffering from any

22   dependence on drugs, like crack cocaine or anything

23   of that nature?

24     A.    Yes, I was.

25     Q.    Okay.  And how are you doing with that now?

1    I assume you haven't had any?

2        A.    Right.  Right now, I'm in the drug program

3    here at this facility.

4        Q.    And how are you doing?

5        A.    I'm doing real well.

6        Q.    Okay.  Do you remember the incidents

7    leading up to your arrest that night in September of

8    1998?

9        A.    Yes, I do.

10       Q.    Okay.  Had you stolen a car that evening?

11       A.    Yes.

12       Q.    And by the way, you were charged with a

13   series of offenses, including stealing a car, eluding

14   the police, resisting, et cetera; did you plead to

15   those charges?

16       A.    Yes, I did.

17       Q.    Okay.  So, your only claim or claims then

18   is involved in the amount of force used during your

19   arrest, would that be a correct statement?

20       A.    Yes.

21       Q.    Okay.  Let's talk about the events leading

22   up to your arrest.  You were driving a car that

23   didn't belong to you and you didn't have a right to

24   drive it, correct?

25       A.    Right.

```
 1        Q.   Did you, at any time that night or early

 2   morning hours, whenever it happened, become aware

 3   that the police were behind you?

 4        A.   While I was in the car?

 5        Q.   Yes, sir.

 6        A.   Yes, I did.

 7        Q.   And were you trying to get away from them,

 8   so to speak?

 9        A.   Yes, I was.

10        Q.   Okay.  And can you tell me what you did to

11   try to elude them?

12        A.   I sped up.

13        Q.   Okay.  Was anybody in the car with you?

14        A.   No.

15        Q.   Okay.  Do you know about where you were

16   when you noticed the police and started speeding up?

17        A.   At that time, I was new to this area and I

18   have no idea where I was.

19        Q.   Okay.  You ended up hitting a fence or

20   something like that, didn't you?

21        A.   Yeah, when I stopped the car.

22        Q.   Right.  And do you know where that was?

23        A.   No.

24        Q.   Okay.  Did you then get out of the car?

25        A.   Yes, I did.
```

```
 1          Q.   And was the police near you, behind you?

 2          A.   No.

 3          Q.   What -- did you start running and try to

 4     find a place to hide?

 5          A.   Yes, I did.

 6          Q.   Where did you hide?

 7          A.   I ran behind the house that I hit the

 8     fence, I ran -- I jumped over the fence behind that

 9     yard and I came into the backyard of the - of another

10     house, and I went around to the front of the house

11     and hid in some shrubbery.

12          Q.   Okay.

13          A.   Behind some shrubbery.

14          Q.   Okay.  And up to finding your hiding place,

15     were you aware of any police --

16          a.   No.

17          Q.   -- in your immediate vicinity?

18          A.   No.

19          Q.   But they had followed you before with their

20     lights on, right?

21          A.   Yeah.

22          Q.   Okay.  All right.  How long do you think

23     you were in the shrubs before something else

24     happened?

25          A.   Around five minutes.
```

```
 1          Q.   Okay.  You were not familiar with that
 2     area, were you?
 3          A.   No.
 4          Q.   Do you remember what you were wearing that
 5     night or that morning?
 6          A.   Yes, I do.
 7          Q.   What was that?
 8          A.   I was wearing a pair of cutoff jeans
 9     shorts, bluejeans shorts, and I believe it was a
10     white shirt.
11          Q.   How about did you have any shoes on?
12          A.   Yes, I had some sandals on.
13          Q.   Okay.  Now, before -- do you have any idea
14     what time of day or night it was when you ended up in
15     that bush?
16          A.   It was around 1:00 A.M.
17          Q.   Okay.  Now, let's go back about six or
18     seven hours up to that point in time; did you have
19     any drugs that evening?
20          A.   No, I didn't.
21          Q.   Did you have anything to drink that
22     evening?
23          A.   Yes, I did.
24          Q.   And what did you have to drink?
25          A.   A beer.
```

 1          Q.    Just a beer?

 2          A.    No, I had approximately three beers.

 3          Q.    I'm sorry?

 4          A.    Approximately three beers.

 5          Q.    Okay.  And did you have anything else

 6    besides the three beers that would affect your --

 7          A.    No.

 8          Q.    -- ability to remember your reasoning or

 9    anything of that nature?

10          A.    No.

11          Q.    Okay.  All right.  So, you're in the bushes

12    or in the - in the shrubs for about five minutes,

13    what do you hear next or what do you see next?

14          A.    I noticed there was a - at the far end of

15    the - the yard that I was -- okay, I was in the

16    shrubbery by the - I think it was a -- where they

17    drove up their car to the house, and at the far end

18    of that property, of that house, I noticed the K-9

19    officer with a couple other police, Fort Lauderdale

20    Police officers.

21          Q.    Okay.  And which K-9 officer was that, do

22    you know who the K-9 officer was that you noticed?

23          A.    He was from Hallandale.

24          Q.    How do you know that?

25          A.    From the reports.

```
 1          Q.    Okay.  So, I mean, that night you couldn't
 2   tell any difference about the uniform or anything of
 3   that nature, could you?
 4          A.    No.
 5          Q.    All right.  Now, had you ever been arrested
 6   by the use of K-9s before?
 7          A.    No.
 8          Q.    In your earlier life before this particular
 9   morning, had you talked to other inmates, either in
10   prison or out of prison, who had been arrested by
11   K-9s?
12          A.    No.
13          Q.    Had you had any clue what it involves when
14   a police dog is used to arrest you, either by having
15   conversations with inmates, fellow criminals, seeing
16   police shows?
17          A.    Yeah.
18          Q.    Anything?  What did you think was involved?
19                MR. DANIELS:  Let me just object to the
20          form.
21                MR. GUNTHER:  Sure.
22                MR. DANIELS:  Go ahead.
23                THE WITNESS:  How they used the dog?
24          Q.    (By Mr. Gunther)  Yeah.
25          A.    They use the dog if you're not cooperating,
```

```
 1    to my knowledge, if you're not giving yourself up.
 2         Q.   Okay.  What happens to you if you don't
 3    give yourself up?
 4         A.   They put the dog on you.
 5         Q.   Okay.  And that dog bites you or grabs
 6    ahold of you, correct?
 7         A.   If they're ordered to.
 8         Q.   They have to order it?
 9         A.   To my knowledge.
10         Q.   To your knowledge.  Okay.  Did you think
11    the dog was supposed to sniff you out and then start
12    barking or something like that?  I just want to know
13    what your personal thoughts, if any, were concerning
14    the use of police dogs in your career.
15         A.   They are used for that.
16         Q.   Okay.  All right.  So, you're sitting in
17    the bushes and you see police - a police car or
18    police cars?
19         A.   I didn't say cars, I saw them standing on
20    the property.
21         Q.   Okay.  And how many police officers did you
22    see?
23         A.   There was a -- the one with the K-9, and
24    there was two other Fort Lauderdale police officers.
25         Q.   Did they have dogs as well?
```

```
 1        A.    No.

 2        Q.    So, one dog and three officers?

 3        A.    Uh-huh.

 4        Q.    "Yes"?

 5        A.    Yes.

 6        Q.    And they're about how far away from you?

 7        A.    I'd say around 30 feet.

 8        Q.    Can you hear them?

 9        A.    Yes.

10        Q.    And what were they saying?

11        A.    I heard voices, I couldn't tell you what

12   they were saying.

13        Q.    Okay.  All right.  What happened next?

14        A.    I heard -- actually, I saw a Fort

15   Lauderdale Police officer running up to the three

16   officers and I heard him, like he was en route to

17   them, running, he said, he's got to be in this area

18   somewhere.

19        Q.    Okay.

20        A.    I heard that.

21        Q.    You heard that.  And what did you do

22   knowing there were three or four police officers,

23   police dog within 30 feet of you?

24        A.    I stayed right where I was.

25        Q.    Okay.  Tried to hide?
```

1     A.   I was hiding.

2     Q.   Okay.  What happened next?

3     A.   They started walking towards me.

4     Q.   Okay.  Up until that time, did you ever

5  hear anything said by these police officers like,

6  give yourself up, we're going to turn the dog loose?

7     A.   No.

8     Q.   Nothing.  Was the dog on a leash --

9     A.   Yes.

10    Q.   -- when they were walking towards you?

11    A.   Yes.

12    Q.   Okay.  What happened when they walked

13 towards you?

14    A.   I immediately stood up and put my hands in

15 the air.

16    Q.   Okay.

17    A.   And let them know my position.

18    Q.   All right.  So, were you facing them?

19    A.   I was facing them, yes.

20    Q.   Were you next to a house like?

21    A.   Yes.

22    Q.   And in that bush?

23    A.   Uh-huh.

24    Q.   Okay.  Now, what were the lighting

25 conditions like in that area where you were, was

1    there like a streetlight out there?

2        A.    There was a street – there was a

3    streetlight out on the street, the light on the house

4    wasn't on.

5        Q.    Did you have any problems seeing the police

6    officers or the dog?

7        A.    No.

8        Q.    Okay.  Now, did you startle those police

9    officers when you came out of that bush and raised

10   your hands?

11       A.    I don't know, you'd have to ask them.

12       Q.    Okay.  Well, I'm asking you for your

13   perception of what they looked like.

14       A.    I don't – I don't know.

15       Q.    Okay.  Did you raise your hands --

16       A.    Yes, I did.

17       Q.    -- over your head?

18       A.    Yeah.

19       Q.    And what did you say?

20       A.    I said, I'm here.

21       Q.    Okay.  And what happened then?

22       A.    At that time, one of the officers ran up to

23   me and grabbed me by my wrist and slammed me to the

24   ground.

25       Q.    Which officer was that?

```
 1         A.    That was a Fort Lauderdale.

 2         Q.    Do you know which one?

 3         A.    Names?

 4         Q.    Yes.

 5         A.    No.

 6         Q.    Okay.  Can you tell me what he looked like?

 7         A.    Yeah, he had dark hair and a mustache.

 8         Q.    Okay.  So, he grabbed your left arm or

 9   right arm?

10         A.    No, right arm.

11         Q.    Right arm?

12         A.    Yeah.

13         Q.    And pushed you to the ground?

14         A.    Yeah.

15         Q.    Okay.  Did you go down?

16         A.    Yeah.

17         Q.    What happened next?

18         A.    Then they all surrounded me and started

19   kicking me, and I immediately put my hands to the

20   side of my face, and I was -- actually, I was laying

21   flat down on the ground, my hands went to my face to

22   protect my face; then they kept kicking me in my ribs

23   and my legs, my back, and then they started hitting

24   me with their metal flashlights, and after that --

25         Q.    All right.  How many officers were hitting
```

```
 1    you?

 2         A.   I believe there was more than those - those

 3    four officers at that time, I believe that I - I

 4    heard more officers running up.

 5         Q.   Okay.  Who were the four officers?  Church,

 6    the Hallandale officer?

 7         A.   Yes.

 8         Q.   And the Fort Lauderdale officers?

 9         A.   Yes.

10         Q.   Reed?

11         A.   Uh-huh.

12         Q.   I think Hart you said?

13         A.   Yes.

14         Q.   And David Wheeler?

15         A.   I don't know that name.

16         Q.   Well, you've sued three officers and said

17    they violated your civil rights; now, I want to

18    make sure who they were --

19         A.   Uh-huh.

20         Q.   -- the four officers; so, what did they -

21    what did David Wheeler do to you?

22         A.   He was involved in kicking me.

23         Q.   He was involved in kicking you?

24         A.   Yes.

25         Q.   You're sure about that?
```

```
 1         A.    No, I'm not sure about that, I know that he
 2    was there, but I can't positively say that Wheeler
 3    kicked me.
 4         Q.    Can you positively say that Wheeler touched
 5    you?
 6         A.    No.
 7         Q.    Okay.  How about Patrick Hart?
 8         A.    Yes.
 9         Q.    What did he do to you?
10         A.    He was kicking me.
11         Q.    He was kicking you?
12         A.    And hitting me in the back with his baton.
13         Q.    With his baton?
14         A.    Or flashlight, metal flashlight.
15         Q.    Well, which was it?
16         A.    Flashlight.
17         Q.    Okay.  And you were lying face down?
18         A.    Yes, I was.
19         Q.    How do you know it was Hart that was
20    hitting you with his flashlight?
21         A.    He was the one that pulled me down
22    originally, and then he started kicking me, and then,
23    I put my hands on the side of my face.
24         Q.    Okay.
25         A.    And then after they were beating me for a
```

1    while, one - the K-9 officer grabbed my arm from this

2    side of my face, picked it up, and put the dog on -

3    on this arm, which caused this injury here, and at

4    that time --

5         Q.    Hold on --

6         A.    -- I saw them, I saw them hitting me with

7    the - with their flashlights 'cause I had looked up.

8         Q.    So, if I get this, you're looking up, and

9    at the point you're looking up, the K-9 officer puts

10   the dog on your arm?

11        A.    Yes.

12        Q.    And the other people are hitting you with

13   flashlights?

14        A.    Yeah.

15        Q.    More than one flashlight --

16        A.    Yeah.

17        Q.    -- okay, while this dog is chewing on your

18   arm, is that correct?

19        A.    Yeah.

20        Q.    Now, he doesn't bite them, he only bites

21   you, is that correct?

22        A.    He doesn't bite the officer?

23        Q.    He doesn't bite the police, does he?

24        A.    No.

25        Q.    Because they're setting a dog loose on you

```
 1   while their hands are beating you in the vicinity of

 2   where the dog is, right?

 3        A.   Uh-huh.

 4        Q.   Is that what you're telling me?

 5        A.   That's right.

 6        Q.   Okay.

 7        A.   They were on this side of me and the dog

 8   was on this side of me.

 9        Q.   Okay.  And that - that dog was Mr. Church's

10   dog, if you know?

11        A.   Yes.

12        Q.   Did he have his name on it or how do you

13   know that was Church's dog?

14        A.   He had Church on his -- right here

15   (indicating).

16        Q.   The dog did?

17        A.   No, the officer did.

18        Q.   You were able to see that that night?

19        A.   Yes.

20        Q.   Okay.  All right.  Now, what else happened

21   to you once the dog was on your arm, the other guys

22   are still --

23        A.   The dog wasn't on my arm long after that,

24   Church handcuffed me behind my back, and they - they

25   were still beating me after that, they continued on
```

```
 1   beating me, and then --

 2        Q.   How many minutes would you think they were

 3   beating you?

 4        A.   I think the whole incident was around 20

 5   minutes.

 6        Q.   So, you were being continuously beaten?

 7        A.   Yes.

 8        Q.   With flashlights, kicked with boots?

 9        A.   Yes.

10        Q.   Were those hard boots or tennis shoes-type

11   boots?

12        A.   I think both.

13        Q.   Okay.  And you're also being bitten by a

14   dog on your arm, correct?

15        A.   Uh-huh.

16        Q.   "Yes"?

17        A.   Yes.

18        Q.   And then, you were handcuffed, correct?

19        A.   Uh-huh.

20        Q.   Yes?

21        A.   Yes.

22        Q.   And what happened after that?

23        A.   They were kicking me and beating me in the

24   back of my legs and my hip area with their boots and

25   with their metal flashlight.
```

```
 1          Q.   Anybody say anything during this time,

 2    during this - during the beating?

 3          A.   Yes, one of the officers, I distinctly

 4    remember, he said you could have killed somebody

 5    during the time that they were beating me.

 6          Q.   You could have killed someone?

 7          A.   Yeah.

 8          Q.   While you were laying there or while you

 9    were driving?

10          A.   I assumed he meant while I was driving.

11          Q.   Okay.

12          A.   'Cause I don't know how I could kill

13    somebody while I'm being beaten.

14          Q.   So, the whole beating then took about 20

15    minutes, is that correct?

16          A.   I'd say around 20 minutes.

17          Q.   Around 20 minutes.  Okay.  Do you have any

18    witnesses to this besides yourself and the police

19    officers?

20          A.   Yes, there was a man that was in the house

21    next to - next to where I was being beaten.

22          Q.   Okay.  And who is that?

23          A.   His name is Joe Mayadeane.

24          Q.   Okay.  And have you ever talked to Joe?

25          A.   Never.
```

```
 1            Q.    Okay.   Have any investigators or any

 2       persons on your behalf talked to Joe?

 3            A.    Yes.

 4            Q.    And what did they tell you Joe said he saw?

 5            A.    I never spoke to the investigators.

 6            Q.    So, you don't know what he told them?

 7            A.    Yes, yes, I do know.

 8            Q.    How do you know if you never spoke to them?

 9            A.    I saw a report.

10                 MR. DANIELS:   Okay.   I'm going to have

11            to -- as far as attorney/client privilege, I'm

12            just going to make that objection as to --

13                 MR. GUNTHER:   Okay.

14                 MR. DANIELS:   -- anything that I said to

15            him or any of my investigators said to him.

16            Q.    (By Mr. Gunther)   Well, let me ask you

17       this; is this a report or a statement that you saw of

18       Joe Mayadeane?

19                 MR. DANIELS:   You can answer that question.

20                 THE WITNESS:   It was a report.

21            Q.    (By Mr. Gunther)   And who was the report

22       by?

23            A.    The investigator that spoke with him.

24            Q.    And who was the investigator retained by?

25            A.    I don't really know that.
```

```
 1        Q.   Was it the public defender?

 2        A.   I don't know the answer to that question.

 3             MR. DANIELS:  If you - if you want, I'll

 4        answer that if you --

 5             MR. GUNTHER:  Yeah, if you don't mind.

 6             MR. DANIELS:  He was retained by me, by my

 7        officer.

 8             MR. GUNTHER:  It's not a statement, it's in

 9        a report.

10             MR. DANIELS:  He didn't give us a written

11        statement and he didn't give us a recorded

12        statement.

13        Q.   (By Mr. Gunther)  Okay.  Do you know of

14   any other witnesses to this incident?

15        A.   No.

16        Q.   Okay.  After being bit in the arm and then

17   being kicked and beaten as you said you were for 20

18   minutes, what else, if anything, happened to you?

19        A.   Well, Mayadeane came out of his home, I

20   heard him say, What's going on?  And I looked up and

21   the police officers took their guns out of their

22   holsters, pointed it at Mr. Mayadeane, and said, Get

23   your mother-fucking ass out of here back in your

24   house.

25        Q.   Okay.  Who said that?
```

```
 1        A.    Church, Hart and -- I don't know the -- I

 2   don't remember the other guy's name.

 3        Q.    Well, we have Church, Hart, and Reed and

 4   Wheeler?

 5        A.    I believe Church is the one, Church is the

 6   one that said, Get your mother-fucking ass back in

 7   the house.  All of them pulled their guns.

 8        Q.    Okay.  Had the guns been pulled at any time

 9   before?

10        A.    No.

11        Q.    So, what you're telling me is four guns

12   were pulled on Mr. Mayadeane?

13        A.    Yes.

14        Q.    And it's not a chorus of "Get your mother

15   fucking ass into the house," but just one person

16   saying it?

17        A.    Yes, just one person.

18        Q.    Okay.  And that was Officer Church?

19        A.    Yeah.

20        Q.    Okay.  I take it Mr. Mayadeane went back

21   into his house?

22        A.    Yes, he did.

23        Q.    Okay.  And what happened then?

24        A.    At that time, they put the dog on - on my

25   buttocks and I - I was yelling at the officers, I was
```

```
 1    actually begging them to - to stop beating me, and I

 2    heard the - my shorts rip, the dog was taking off of

 3    me, and I turned around, Church reach down to - to

 4    the waistline of my pants.

 5        Q.   Yeah.

 6        A.   And he ripped my pants off of me actually

 7    to my knees, my pants and underwear came down

 8    together, then they put the dog on me again.

 9        Q.   Okay.  And so, you're handcuffed, lying

10    face down, is that what you're telling me or --

11        A.   Yeah.

12        Q.   -- or am I assuming that, yes?

13        A.   (Witness nods head.)

14        Q.   "Yes"?

15        A.   Yes.

16        Q.   Where are the other officers standing at

17    that point in time?

18        A.   Next to me.

19        Q.   Okay.  Now, did Mr. Mayadeane see this?

20        A.   I don't recall.

21        Q.   Okay.  Where did the dog bite you?

22        A.   On my butt.

23        Q.   Okay.  Anywhere else?

24        A.   No.

25        Q.   In other words, on your leg or anything -
```

1    anywhere on your thigh?

2        A.    No.

3        Q.    So, the only place you were bitten then

4    that night was on your right arm above your elbow,

5    like on your - like on your bicep area, I think you

6    showed it, I'm just trying to remember, is that

7    correct, near the bicep, and then on your butt, and

8    we have pictures of that.  Okay.

9            MR. DANIELS:  You have to answer "yes" or

10        "no."

11        Q.    (By Mr. Gunther)  Is that correct?

12        A.    Yes.

13        Q.    Okay.  Now, were you still being beaten --

14        A.    No.

15        Q.    -- as he turns the dog on your butt?

16        A.    No.  Once he pulled my shorts down, he

17    stopped beating me.

18        Q.    Okay.  Make sure I have this right; you're

19    in handcuffs, lying face down on the ground?

20        A.    Yes.

21        Q.    And then Church pulls your pants and

22    undershorts down?

23        A.    Yeah.

24        Q.    And then sicced the dog on you?

25        A.    Yes.

```
 1          Q.    How many times do you think the dog bit you
 2    in the buttock area?
 3          A.    Several areas on my butt, he kept taking
 4    the dog off of me and putting him back on.
 5          Q.    How do you know that?
 6          A.    Because I turned around and I saw him and I
 7    begged him to stop.
 8          Q.    In other words, was the dog on a leash?
 9          A.    Yes, and he had the leash in his hand.
10          Q.    Okay.  Was the dog always on a leash that
11    evening?
12          A.    Yes.
13          Q.    Do you know how long that leash was?
14          A.    It was a very short leash.
15          Q.    And when you say "short," can you tell me
16    what you mean by short?
17          A.    Around (indicating) --
18          Q.    About three or four feet?
19          A.    Yes.
20          Q.    No more than that?
21          A.    No, it wasn't more than that, it was a
22    short leash.
23          Q.    At any time that evening, did you see
24    another police dog?
25          A.    I don't recall, no.
```

```
 1        Q.   Okay.  How long do you think that biting of

 2   your behind took?

 3        A.   It felt like forever, but I couldn't tell

 4   you.

 5        Q.   Okay.  You couldn't -- okay, that's fine,

 6   fair enough.

 7             So, after you asked him not to do that

 8   anymore, after the six or seven bites, what happened

 9   next?

10        A.   They dragged me out to the street.

11        Q.   Who is "they" and how did they drag you?

12        A.   They grabbed my arms, one on each arm, and

13   dragged me.

14        Q.   Okay.  And who was on each arm?

15        A.   I believe they were both Fort Lauderdale

16   police officers, I believe the - it's Hart and

17   Wheeler.

18        Q.   Do you know what Wheeler looks like?

19        A.   I think he has dark brown hair.  I don't --

20   I couldn't tell you how tall he is, how many pounds

21   he is, stuff like that.

22        Q.   And I think you've described Reed, have

23   you?

24        A.   Hart.

25        Q.   Hart.  Have you described Reed to me yet?
```

1      A.    No.

2      Q.    Can you describe him?

3      A.    I can't recall.

4      Q.    Okay.

5      A.    Right now.

6      Q.    How about Church, can you describe him?

7      A.    Yeah.  He - he's a - he's a pretty big guy.

8      Q.    Okay.  What's that, 6' 1", 2", 3"?

9      A.    I was on the ground.

10     Q.    Okay.  White guy?

11     A.    I couldn't tell you their height or

12  their -- I mean, I really wasn't concerned about that

13  at the time, I was concerned for my life.

14     Q.    How tall are you?

15     A.    I'm six foot.

16     Q.    And at that time, about how much did you

17  weigh?

18     A.    Around 190, 200.

19     Q.    How about now, what do you weigh now?

20     A.    245.

21     Q.    Now, where did they take you after they

22  grabbed you, was that by your upper arm?

23     A.    Yes.

24     Q.    Where did they take you?

25     A.    He dragged me out to the street.

1     Q.    And what happened in the street?

2     A.    I heard them on the radios calling for an

3  ambulance 'cause my arm was bleeding pretty bad.

4     Q.    Okay.  And did EMS come?

5     A.    No, they - one of them said that it was -

6  it was Hart that said we can't wait for them, we have

7  to take him now, 'cause I was bleeding pretty bad.

8  So, they threw me in the back of Hart's police car

9  and they took me to Broward.

10    Q.    Did they take any pictures of you out

11 there?

12    A.    At the hospital?

13    Q.    Either at the hospital --

14    A.    At the hospital they did.

15    Q.    At the hospital they did?

16    A.    Yes.

17    Q.    And who took the pictures, do you know?

18    A.    It was a detective sergeant, I don't

19 remember his name.

20    Q.    It wasn't Wheeler, was it?

21    A.    No, he wasn't even at the scene to my

22 knowledge.

23    Q.    The detective sergeant wasn't at the scene?

24    A.    No.

25    Q.    Correct?

```
 1        A.    Correct.

 2        Q.    Wheeler was at the scene?

 3        A.    Yes.

 4        Q.    Okay.  In whose police car did you go, I

 5   think you went to Broward, didn't you?

 6        A.    Broward General.

 7        Q.    Okay.  Do you know whose car you went in?

 8        A.    Hart.

 9        Q.    Did he say anything to you on the way?

10        A.    Yes.

11        Q.    What did he say?

12        A.    He told me that -- don't sue us 'cause we

13   didn't have the dog, we didn't have the K-9.

14        Q.    He just said "Don't sue us"?

15        A.    That's exactly what he told me.

16        Q.    Okay.  And he was serious about that?

17        A.    Why would he say that to me?

18        Q.    I don't know.

19        A.    That's what he said.

20        Q.    Okay.  Did he say anything else to you on

21   the ride to the hospital?

22        A.    I kept asking him to please go a little

23   faster 'cause I - I felt myself getting weaker, I

24   just -- I thought I was going to die that night, and

25   they just -- they kept telling me to relax.
```

1      Q.   Who else was in the car?

2      A.   I don't -- there was another officer, it

3   wasn't - I don't recall his name.

4      Q.   Who was driving?

5      A.   Hart was driving.

6      Q.   Was that a K-9 car that he was in?

7      A.   No, it wasn't, he was in a Fort Lauderdale

8   car.

9      Q.   Well, was there a dog in the back?

10     A.   No.

11     Q.   How long do you think it took him to get

12   you from where you were to Broward General?

13     A.   Say probably 15, 10 minutes.

14     Q.   Okay.  And were you treated once you got to

15   the hospital?

16     A.   Yes, I was.

17     Q.   And what was the treatment, what did the

18   treatment consist of?

19     A.   They cleaned the wounds out and sewed my

20   arm up.

21     Q.   How about on your buttocks?

22     A.   They cleaned those wounds.

23     Q.   Did they sew?

24     A.   No.

25     Q.   Okay.  And those were the only wounds you

```
 1    had on your arm and your buttocks from the dog,

 2    correct?

 3         A.   Right.

 4         Q.   How about from all that beating, kicking

 5    and getting hit with flashlights, did you have any

 6    wounds from that?

 7         A.   Yeah, the - the pictures show them.

 8         Q.   Okay.  When were those pictures taken?

 9         A.   They were taken by that detective sergeant

10    in the hospital.

11         Q.   Okay.

12         A.   He says that my back was pretty beat up.

13         Q.   Okay.  But were those wounds on your back

14    treated in any fashion?

15         A.   No.

16         Q.   Okay.  Were you given any blood

17    transfusions?

18         A.   They may have wiped it off; other than

19    that, nothing else.

20         Q.   Okay.

21         A.   No blood transfusion, no.

22         Q.   Okay.  Were you given any blood tests at

23    the hospital?  In other words, did they check what

24    you had in your bloodstream?

25         A.   To my knowledge, no.
```

1      Q.   Okay.  And what happened to you, how long

2  do you think you were in the hospital?

3      A.   Probably a couple hours.

4      Q.   And who was with you the entire time?

5      A.   Hart and Wheeler and the detective; he came

6  later, though.

7      Q.   Okay.

8      A.   Actually, there was a – there was probably

9  ten police officers there.

10      Q.   Okay.  How about Church, did you see him at

11  the hospital?

12      A.   Yes, he was there.

13      Q.   The dog, too?

14      A.   I didn't see the dog.

15      Q.   Okay.  Did any of them say anything to you

16  at the hospital, Church, Wheeler, Hart, Reed?

17      A.   No.

18      MR. DANIELS:  Or the dog.  No, just

19      kidding.

20      Q.   (By Mr. Gunther)  Did anybody say anything

21  to you?

22      A.   I'm trying to recall, the detective, he

23  introduced himself to me, and he said that he was

24  going to take pictures of me and that's it.  That's

25  all that was said to me.

```
 1          Q.   Okay.  And did he take your statement or
 2    anything of that nature?
 3          A.   No.
 4          Q.   Okay.  Had you injured yourself in any way
 5    during that evening before or during the car ride or
 6    getting from the car after you hit the fence into
 7    those bushes?
 8          A.   No.
 9          Q.   Okay.  After spending the time you said you
10    spent at the hospital, where were you taken?
11          A.   I was put in the police car, and they took
12    me to Broward jail, county jail.
13          Q.   County or city jail?
14          A.   County jail, Hart read me my Miranda rights
15    and asked me if I wanted to give him a statement
16    about what happened, and I told him no.
17          Q.   Now, you told us earlier that you were hit
18    in the face as well, right?
19          A.   No.
20          Q.   You weren't kicked in the face?
21          A.   I never said that.
22          Q.   You never said that?
23          A.   I never said that.
24          Q.   You just covered your face?
25          A.   Right.
```

```
 1          Q.   Why did you do that?

 2          A.   My first reaction was to cover my face, to

 3   protect my face.

 4          Q.   So, you were never hit in the face --

 5          A.   No.

 6          Q.   -- or about the head?

 7          A.   No.

 8          Q.   Okay.  Just in your ribs and back?

 9          A.   Uh-huh.

10          Q.   Correct?

11          A.   Correct.

12          Q.   And bitten where you told us, right?

13          A.   Yes.

14          Q.   Okay.  Now, what happened to you in jail?

15          A.   I was put in the infirmary, they cleaned my

16   wounds every day, infection set in; so, I was in the

17   infirmary for like three to four weeks.

18          Q.   Was that up here in Pompano or down in the

19   main jail?

20          A.   No, the main jail.

21          Q.   Okay.

22          A.   The main jail.

23          Q.   And you were treated by the nurses and

24   doctors on staff there?

25          A.   Yes.
```

```
 1          Q.   Okay.  And when did you plead to the

 2    charges that you were arrested for, how long after

 3    the arrest?

 4          A.   It was around a month, a month and-a-half.

 5          Q.   Okay.  And what was the sentence that you

 6    got?

 7          A.   I received seven months.

 8          Q.   And that's not what you're serving now, is

 9    that correct?

10          A.   No.

11          Q.   All right.  Did you actually serve that

12    seven months or did you get out early?

13          A.   No, I did five months.

14          Q.   You did five out of seven months?

15          A.   Yes.

16          Q.   Okay.  So, that gets you, if the arrest

17    took place in what, September --

18          A.   I was released February 1st of '99.

19          Q.   All right.  And let me ask you, in

20    September of 1998, around the area around the time of

21    this arrest, did you have a job of any kind?

22          A.   Yes, I was working, sandblasting.

23          Q.   Okay.  Who were you working with or for --

24          A.   Supreme Sandblasting.

25          Q.   And where is that company located?
```

```
1          A.    He works out of his house, he has his
2    office in his home.
3          Q.    Okay.  And who is the guy that owns it?
4          A.    His name is Mark.
5          Q.    What?
6          A.    His name is Mark.
7          Q.    Mark what?
8          A.    I don't remember his last name.
9          Q.    Did you get paid in cash?
10         A.    Yes.
11         Q.    Okay.  So, I take it no taxes or Social
12   Security was taken out?
13         A.    No.
14         Q.    Have you filed any tax returns in the last
15   four or five years?
16         A.    Yes.
17         Q.    When was the last time?
18         A.    Last year.
19         Q.    That would be for the tax year of 1998, if
20   you filed it in 1999.
21         A.    No, I filed it this year for '99.
22         Q.    For '99.  Okay.  And how much income did
23   you show you earned in 1999?
24         A.    I don't recall, I cannot tell you without
25   the - without the form in front of me, I couldn't
```

1    tell you.

2         Q.    Are you making any claim for any lost - any

3    lost wages or earning capacity in this case?

4         A.    In this case.

5         Q.    Yes, are you saying you can't work or --

6         A.    Yes.

7         Q.    Okay.  Why not?

8         A.    'Cause I have permanent damage in this arm.

9         Q.    In the right arm?

10        A.    Yes, I do.

11        Q.    What is your permanent damage there?

12        A.    I -- after lifting - sandblasting requires

13   a lot of strength.

14        Q.    Uh-huh.

15        A.    And after sandblasting to say I - I

16   normally blasted for ten hours a day, after four to

17   five hours, my arm goes out for the rest of that day,

18   it causes a lot of pain up in this area.

19        Q.    Did you see any doctor outside of jail?

20        A.    No, I didn't see anybody, no.

21        Q.    So, I take it once you got out in February

22   of 1999, you went back - tried to go back to work?

23        A.    Yes.

24        Q.    And that's when you worked for Supreme

25   Sandblasting?

```
 1          A.    No, I worked for Supreme in September.

 2          Q.    Okay.  Who did you work for once you got

 3   out of jail in February of 1999?

 4          A.    Acme Sandblasting.

 5          Q.    Okay.  And where is Acme located?

 6          A.    Hialeah.

 7          Q.    Okay.

 8          A.    I went there for a couple weeks, I couldn't

 9   cut it, I couldn't hack it.

10          Q.    And who was in charge there?

11          A.    Gary.

12          Q.    Gary.  Does he have a last name that you

13   know?

14          A.    I don't recall his last name.

15          Q.    Okay.  And where in Hialeah is that?

16          A.    It's off the Palmetto and 122nd Avenue.

17          Q.    Okay.  And did you try to do something else

18   after trying your stint at sandblasting?

19          A.    Yes, I did, I went to work at Mobil Gas

20   Station on Sample Road and Military Trail.

21          Q.    Okay.  And who did you work for and how

22   long did that job last?

23          A.    That job lasted two months, Craig was my

24   manager.

25          Q.    Okay.
```

```
1        A.   I quit the job because I got a better job
2   at J.C. Penney's at Coral Square Mall.
3        Q.   And what did you do for J.C. Penney?
4        A.   I was in men's apparel, sales associate.
5        Q.   Okay.  All right.  Let me ask you the Acme
6   Sandblasting, what was your hourly rate there?
7        A.   $10 an hour.
8        Q.   Okay.  And how about at J.C. Penney's?
9        A.   $7.48.
10        Q.   Okay.  And how about where you worked
11   before at sandblasting?
12        A.   The same thing, $10.
13        Q.   $10.  Is that about the going rate for
14   sandblasting?
15        A.   Approximately, yes.
16        Q.   What happened to your job at J.C. Penney's?
17        A.   I started missing too many days and they
18   let me go.
19        Q.   Why were you missing days?
20        A.   I started using drugs again.
21        Q.   Okay.  And where did your drug use lead you
22   to get re-arrested, is that what happened to you?
23        A.   Yes.
24        Q.   And what did you get arrested for?
25        A.   This time, I was arrested for possession of
```

```
 1    cocaine, which it was a pipe that had residue in it,
 2    grand theft, DUI, driving under suspension.
 3         Q.   Is that your own car you were driving?
 4         A.   No, it was my girlfriend's car.
 5         Q.   But you had permission to drive that car?
 6         A.   Sure.
 7         Q.   Who was your girlfriend at the time?
 8         A.   Elizabeth Flynn.
 9         Q.   Flynn?
10         A.   F-L-Y-N-N.
11         Q.   And is she still your girlfriend?
12         A.   No.
13         Q.   About when was that arrest time-wise?
14         A.   I believe that was this year.
15         Q.   Okay.  It was in 2000?
16         A.   Yeah, in '98, I wasn't arrested -- I mean,
17    '99, I'm sorry.
18         Q.   Okay.  What did you do after you lost your
19    job at J.C. Penney's, did you go back to work?
20         A.   Yeah, I worked - I got a job at Dillards,
21    and I was still using drugs at that time, so that
22    didn't - I was - that didn't last that long.
23         Q.   Didn't they test you there?
24         A.   No.  Okay.  In between these two times, I
25    was put on probation for the charges that I mentioned
```

1    earlier, in between those two jobs at J.C. Penney's

2    and the Dillards.

3         Q.    Okay.  You were put on probation for

4    possession and a few other things, DUI?

5         A.    Right.

6         Q.    When did that take place?

7         A.    That was --

8         Q.    The actual --

9         A.    I believe it was April of this year.

10        Q.    Were you ever put on probation for the 1998

11   arrest involving the dog?

12        A.    No.

13        Q.    Okay.  So, you just served your time?

14        A.    Right.

15        Q.    And that was it.  Okay.

16              So in '99, you got out in February if I'm

17   correct?

18        A.    Uh-huh.

19        Q.    Out of Broward County Jail, correct?

20        A.    Stockade.

21        Q.    Stockade.  All right.  And you didn't go

22   back to being confined until when?

23        A.    Until -- until February.

24        Q.    Of this year?

25        A.    Right.  I believe I was arrested in January

```
 1    for driving under suspension, I was only in jail

 2    probably a couple of hours, I bonded out.

 3         Q.   But then, did they violate - were you on

 4    probation?

 5         A.   No, I wasn't on probation at that time,

 6    because those charges started in February, and I

 7    bonded out on those charges.

 8         Q.   Okay.  Now, who were you arrested by since

 9    the arrest in '98, was it mostly BSO?

10         A.   This time, Fort Lauderdale, BSO arrested me

11    for driving under suspension, FHP got me for driving

12    under suspension, that's it; oh, Hollywood got me for

13    driving under suspension.

14         Q.   Did you have a mustache the night you were

15    arrested by Fort Lauderdale?

16         A.   Yes.

17         Q.   Okay.  I sent you a bunch of written

18    questions which you were going to answer under oath

19    and I have these answers signed by you, take - take a

20    look at those, and I don't - I don't want to go over

21    each and every one with you, but is that your

22    signature and is that the document that you signed?

23         A.   Yes.

24         Q.   Okay.  And those were answered under oath,

25    as it says?
```

```
1            A.    Yes.

2            Q.    You swore to tell the truth?

3            A.    Yes.

4                  (Whereupon, the document referred to was

5            marked Defendant's Exhibit No. 1 for

6            Identification.)

7            Q.    Okay.  I've got the questions here, I'm

8     sure you just didn't make up answers in the middle of

9     the night, you had questions to match those with.

10    Okay.  So other than this Joe Mayadeane,

11    M-A-Y-A-D-E-A-N-E, you have no other witnesses other

12    than the police officer and yourself on the incident

13    of September of '98; is that correct?

14           A.    Yes.

15           Q.    And I'm - I'm reading your answers to

16    interrogatories for the arrest that we're involved

17    with?

18           A.    Uh-huh.

19           Q.    In September of '98 that was for grand

20    theft of a car, possession of drugs, resisting arrest

21    without violence; convicted, received seven months in

22    jail but served five months, no fine, correct?

23           A.    Correct.

24           Q.    All right.  Then the next arrest I have

25    is -- well, it's really not the next arrest, but it
```

1    looks like three -- March 17th or 18th in Fort

2    Lauderdale, grand theft in the third degree?

3         A.    What year was that?

4         Q.    Of this -- 2000, I'm sorry.

5         A.    All right.

6         Q.    Grand theft in the third degree, convicted,

7    plead no contest, fined, sentenced to 364 days in

8    jail running concurrent; then I guess I go to the

9    February 25th arrest, which is also in Fort

10   Lauderdale, possession of cocaine, DUI, alcohol or

11   drugs, driving while license suspended, obstruction -

12   not without violence, et cetera, et cetera, that's

13   where you got your year in jail, correct?

14        A.    Right, but I was put on probation first.

15        Q.    Okay.  Yeah.

16        A.    And then - then when I violated it, then

17   they gave me the 364.

18        Q.    Okay.  Well, I also have an arrest of July

19   26th in Fort Lauderdale, grand theft of a ring,

20   possession of drug paraphernalia, and convicted,

21   sentenced to 90 days of drug program at county

22   facility with release in December, and then you're

23   going to go on to an outside drug treatment?

24        A.    Uh-huh.

25        Q.    And then you're going to have to make three

1    year's probation, is that about where you're going to

2    be?

3         A.    That's correct, the July and the February

4    grand theft, they're both the same ones.

5         Q.    Okay.   That's --

6         A.    They're not separate charges.

7         Q.    Okay.   One is probably the violation of

8    probation and the other one --

9         A.    When they violate you, they charge for you

10   the same thing.

11        Q.    Okay.   I got you.   And I just wanted to --

12   okay.

13             Now, when I asked you about your prior

14   employment on those and you may have had a little bit

15   more time to answer those questions, you indicated

16   that you worked for Acme Sandblasting from September

17   '97 'til June of '98, and as a sandblaster and left,

18   moved -- because you moved to Fort Lauderdale?

19        A.    Uh-huh.

20        Q.    And then from June to September '98, you

21   worked for Supreme Sandblasting and you said you were

22   let go due to business slowing, is that correct or --

23        A.    From Supreme?

24        Q.    Yeah.

25        A.    Yes.

```
 1           Q.    Okay.  And then the next report of work I
 2    have is from June 'til September 1999, it was the
 3    Mobil gas station that you told me about?
 4           A.    Uh-huh.
 5           Q.    Then J.C. Penney's and then Dillards?
 6           A.    I worked at Acme when I got out for a
 7    couple weeks.
 8           Q.    Okay.
 9           A.    I don't know why it's not in there.
10           Q.    All right.  Now, what happens with your --
11    well, strike that.
12                 You're in the county facility now, correct?
13           A.    Yes.
14           Q.    And you're undergoing a drug rehab
15    treatment here?
16           A.    Yes.
17           Q.    What is - what type of confinement are you
18    in, do you share your cell with other folks?
19           A.    Yes.
20           Q.    How many other people are in your pod?
21           A.    Three.
22           Q.    In your pod --
23           A.    In my cell, but there's 64 people in a
24    unit.
25           Q.    In a pod or whatever it's called.
```

```
 1          A.    In a unit.

 2          Q.    And do you guys get to work out?

 3          A.    No.

 4          Q.    No weight-training or anything like that?

 5          A.    No.

 6          Q.    Did they ever have that here?

 7          A.    To my knowledge, no.

 8          Q.    How do you physically keep yourself in any

 9   sort of shape here?

10          A.    There is no way.

11          Q.    Okay.  All right.  Tell me a little bit

12   about your arm now, how does that bother you?  In

13   other words, what bothers you?  Is it a nerve injury,

14   an injury to the muscle, to the bone?

15          A.    Well, I plan on going to the doctor when I

16   get out and I guess he'll better be able to answer

17   that question.  All I know is it causes me a lot of

18   pain, I attempted to work out when I got out 'cause

19   I've been working out all my life, I cannot do it, it

20   causes a lot of pain when I work out as well.

21          Q.    How long have you lived in Broward County

22   approximately?

23          A.    Since August of '98.

24          Q.    And before then?

25          A.    Never.
```

1    Q.    Where did you live?

2    A.    Oh, Miami.

3    Q.    Okay.  And how long did you live in Dade

4    County, approximately?

5    A.    Ten years, approximately.

6    Q.    Ten years.  And do you have any family

7    around here?

8    A.    In Dade, I have some - some aunts and

9    uncles.

10    Q.    How about your parents, where are they?

11    A.    My father passed away and my mother lives

12    in South Carolina.

13    Q.    Okay.  Where were you born and raised?

14    A.    I was born in Miami, I was raised all

15    around the world, my dad was in the Air Force, which

16    we got transferred every three years to different

17    locations.

18    Q.    Okay.  Did you go to high school overseas

19    or where?

20    A.    Yes, partially.

21    Q.    Okay.  Did you ever graduate from high

22    school?

23    A.    I took a GED in South Carolina.

24    Q.    Okay.  Was that the last place your dad was

25    stationed in the Air Force?

52

```
 1         A.    No -- yes, he retired in Sumter, South
 2    Carolina.
 3         Q.    Do you have brothers and sisters?
 4         A.    Two brothers, two sisters.
 5         Q.    Do they have any problems with law
 6    enforcement?
 7         A.    At this time, no.
 8         Q.    At any time?
 9         MR. DANIELS:  Let me object as to
10         relevancy.
11         MR. GUNTHER:  I understand.
12         MR. DANIELS:  Go ahead.
13         THE WITNESS:  My brother had some trouble
14         when he was a teenager; other than that, nobody
15         has had any trouble.
16         Q.    (By Mr. Gunther)  How about you, did your
17    problems start when you were an adult or did they
18    start when you were a kid, with law enforcement, you
19    know, with committing crimes?
20         A.    When I was a kid.
21         Q.    Give me a minute, I got to ask you some
22    specific questions about some of the allegations you
23    made and then I'm through.
24         All right.  Would you agree that the
25    kicking and beatings with a baton stopped before you
```

```
1    were bit in the butt by this dog?

2        A.    I would agree that the - the kicking and

3    the beating with the flashlights stopped once he

4    pulled my pants down.

5        Q.    Okay.  Well, did any other beatings happen

6    after that?

7        A.    No.

8        Q.    Okay.  So, I mean, the only touching after

9    that was to get you from the side of the house to the

10   street and eventually into a police car, correct?

11       A.    Uh-huh.

12       Q.    Is that correct?

13       A.    Yes.

14       Q.    You weren't beaten on the way to the street

15   or --

16       A.    I don't recall, no.

17       Q.    Or in the car.  Okay.  Okay.  What you

18   basically in your complaint say against the three

19   Fort Lauderdale Police officers is that they either

20   kicked you or beat you with either batons or their

21   flashlights, that is a correct statement?

22       A.    Yes.

23       Q.    And it was all three of them, is that

24   correct?

25       A.    Yes.
```

1        Q.    At the same time?

2        A.    And it could have been more.

3        Q.    It could have been more?

4        A.    Yeah, but I personally believe it was more,

5   but those are the ones that I can say.

6        Q.    Do you know if there was anyone in any

7   supervisory capacity after your arrest?

8        A.    To my knowledge, I didn't see anybody.

9   It's one of those officers were a supervisor.

10       Q.    If I were to show you an aerial view of

11  where you were arrested, could you locate the house

12  for me or anything like that?

13       A.    Never.

14       Q.    Okay.  Who had you been with the evening

15  before the arrest?

16       A.    I was by myself, most of that day, my

17  boss -- I had called my boss up, and I believe it was

18  to - to get my money from him, the money he owed me

19  for working.  He sent somebody over to pick me up,

20  went - I went to his house for a couple of hours.

21       Q.    Who was your boss?

22       A.    Mark.

23       Q.    Mark?

24       A.    Supreme Sandblasting.

25       Q.    Okay.  All right.  So, you were trying to

```
 1    collect money from him that day?
 2         A.   I believe that's the reason I went over
 3    there.
 4         Q.   Okay.
 5         A.   His friend picked me up, I don't know his
 6    friend, brought me over there, I stayed over there
 7    probably an hour, maybe two, it was a little over an
 8    hour, then he brought me back over there to the house
 9    I was staying.
10         Q.   What house were you staying at?
11         A.   It was a friend of his - of Mark's, he had
12    hooked me up there.
13         Q.   And who was that friend?
14         A.   I don't remember her name.
15         Q.   Okay.  And now, you were charged with
16    possession of cocaine, you know where that was found
17    that evening?
18         A.   I had a pipe and they - they took the
19    residue from the pipe and they charged me with
20    possession of cocaine.
21         Q.   Where was that pipe, on you or in the car?
22         A.   That pipe was with me.
23         Q.   On you, and the drug paraphernalia
24    obviously was the --
25         A.   The pipe.
```

56

```
 1         Q.   The pipe.  Do you know the address where
 2    you lived the night of this incident?
 3         A.   No, I just know where it is.
 4         Q.   It says here you got a tattoo, "Hugh," on
 5    your left hand?
 6         A.   Yeah.
 7         Q.   How long have you had that tattoo?
 8         A.   I was 13 years old.
 9         Q.   And what about in the --
10         A.   The cross.
11         Q.   The cross in between your thumb and index
12    finger, what's the significance, if any, of that?
13         A.   None.
14         Q.   Pardon?
15         A.   No significance.
16         Q.   And you got another cross or something on
17    your forearm?
18         A.   Yes.
19         Q.   Any significance to that?
20         A.   No.
21         Q.   And I guess you got "Carol" on your left
22    ankle?
23         A.   Yes.
24         Q.   Who's that?
25         A.   Ex.
```

1      Q.   Ex.  "Mark" on your left calf?

2      A.   Mark?

3      Q.   A mark.

4      A.   Yeah.

5      Q.   Trick question.  What kind of mark you got

6   on there?

7      A.   No, it was - it was an unfinished tattoo.

8      Q.   Excuse me?

9      A.   Unfinished tattoo.  I was going to say,

10  you're getting a little kinky there.

11     Q.   No, not me, you got the mark.  What's your

12  real name, Hugh?

13     A.   Yes.

14     Q.   Hugh?

15     A.   Hugh.

16     Q.   Hugh.  Christopher, is that your middle

17  name?

18     A.   Yes.

19     Q.   And your date of birth?

20     A.   10/21/66.

21          MR. GUNTHER:  Okay.  That's all the

22      questions I have.  Thank you.

23          MR. GOLDSTEIN:  You want to go first?

24          MR. DANIELS:  No, no, you go.

25                    CROSS-EXAMINATION

```
 1          Q.   (By Mr. Goldstein)   My name is Mark

 2   Goldstein, I represent Officer Church and the City of

 3   Hallandale in this case.  I'm not going to rehash all

 4   the questions that Mr. Gunther asked you, I'm just

 5   going to follow up on a few and maybe ask a few of my

 6   own.

 7          It's your position that the officers from

 8   the City of Hallandale and the City of Fort

 9   Lauderdale acted maliciously and in bad faith in this

10   case?

11          A.   Definitely.

12          Q.   Why do you say that?

13          A.   I wasn't resisting arrest and the -- I gave

14   myself up, I stood up and put my hands in the air and

15   they proceeded to kick my ass.  And then, to put the

16   dog on me, for what reason?

17          Q.   Well, would you also say that they acted in

18   willful and wanton disregard for your life and

19   safety?

20          A.   For my safety?

21          Q.   Yeah.

22          A.   When?

23          Q.   During this incident.

24          A.   While they were beating me, were they

25   concerned about my safety?  I don't think so.
```

1    Q.   Okay.  You said you weighed approximately

2    190 pounds at the time of the arrest?

3    A.   To 200, yes.

4    Q.   And now you weigh about 240?

5    A.   245.

6    Q.   What do you attribute the weight increase

7    to?

8    A.   Jail.

9         MR. GUNTHER:  Good jail food.

10        THE WITNESS:  I came in the jail at 218 or

11    217.

12    Q.   (By Mr. Goldstein)  You do push-ups or

13    anything?

14    A.   I don't do anything.

15    Q.   So you'd say your waistline has just grown

16    then?

17    A.   Yes.

18    Q.   You haven't gained any more muscle in your

19    opinion?

20    A.   No.

21    Q.   Okay.  How did you meet your attorney, Mr.

22    Daniels?

23    A.   I called him up and asked him -- I

24    explained what happened to me and he came and saw me

25    in jail.

1          Q.    How did you manage to call Mr. Daniels out

2     of the 67,000 members of the Florida Bar, how did you

3     find him?

4               MR. DANIELS:   Object as to relevancy, you

5          can answer the question.

6               THE WITNESS:   Yellow Pages.

7          Q.    (By Mr. Goldstein)   Did anyone recommend

8     him to you?

9          A.    No.  Never heard of him up until I opened

10    the Yellow Pages.

11         Q.    How did you know he was a good lawyer?

12         A.    I didn't.

13         Q.    Did anyone in the Public Defender's Office

14    tell you to get a lawyer?

15         A.    No.

16         Q.    Are you receiving any current treatment for

17    the injuries that you contain - that you contend you

18    received in the incident?

19         A.    I can't while I'm in here, I have to wait

20    'til I get out.

21         Q.    So, right now, you're not getting any

22    treatment for any of the injuries which you said that

23    you sustained in this incident, is that right?

24         A.    That's correct.

25         Q.    When was the last time you received any

61

```
 1    treatment for the injuries that you sustained as a
 2    result of the incident?
 3         A.   It was in '98.
 4         Q.   You worked in Dillards from February to
 5    July of this year, is that right?
 6         A.   No.
 7         Q.   It's not?
 8         A.   No.
 9             MR. GUNTHER:  I'm sorry, what was the
10         question?
11             MR. GOLDSTEIN:  He worked in Dillards
12         from -- I said February to July of 2000, he's
13         saying that's incorrect; just give me a second.
14             MR. GUNTHER:  Dillards, February 'til July
15         of 2000.
16             MR. GOLDSTEIN:  Yeah.
17         Q.   (By Mr. Goldstein)  Okay.  When did you
18    work in Dillards?
19         A.   I believe I started in March.
20             MR. GUNTHER:  Oh, okay.
21         Q.   (By Mr. Goldstein)  March to July of 2000?
22         A.   Yeah.
23         Q.   And you made $9 an hour, right?
24         A.   Yes.
25         Q.   You said you took the GED in South
```

```
 1    Carolina, is that right?
 2        A.   Yes.
 3        Q.   Did you pass it?
 4        A.   Yes.
 5        Q.   You have any college or junior college?
 6        A.   Yes.
 7        Q.   Where did you go to college or junior
 8    college?
 9        A.   At M-DCC.
10        Q.   What is that?
11        A.   Miami-Dade Community College.
12        Q.   And how many college credits did you
13    obtain?
14        A.   I don't recall.
15        Q.   How long did you go for?
16        A.   It was three semesters.
17        Q.   What were you studying?
18        A.   I didn't have a major at that time, I was
19    taking regular courses at the time.
20        Q.   Why did you do that?
21        A.   'Cause I was undecided, I didn't know which
22    area I wanted to go.
23        Q.   Why did you decide to go to college then?
24        A.   I feel like it's important to have a
25    college education.
```

63

```
 1        Q.   You feel like you can make more money with
 2   a college education?
 3        A.   I believe it's possible.
 4        Q.   When you get out of prison, you plan on
 5   enrolling in college anywhere?
 6        A.   Yes.
 7        Q.   Where?
 8        A.   I want to go to Broward Community College.
 9        Q.   What do you want to do, what kind of degree
10   do you want to pursue?
11        A.   Either business or computers.
12        Q.   And you want to work in the business or
13   computer field then when you graduate, is that right?
14        A.   Yes, yes, seeing how I can't sandblast.
15        Q.   The answers to your interrogatories that --
16   which are the written questions that Mr. Gunther
17   showed you, they remain accurate today?
18        A.   They were what?
19        Q.   They remain accurate today?
20        A.   To my knowledge, yes.  As far as dates, I
21   can't --
22             MR. GUNTHER:  Listen, if it's February
23        until July or March 'til July, I don't think --
24             MR. GOLDSTEIN:  That's not what we're
25        talking about.
```

64

```
1              MR. GUNTHER:  I don't think anybody is
2       going to raise hell about that.
3              MR. GOLDSTEIN:  That's not what we're
4       talking about.
5       Q.   (By Mr. Goldstein)  But they generally
6    remain accurate?
7       A.   To my knowledge, yes.
8       Q.   Has anyone told you that you need any
9    future medical treatment as a result of this
10   incident?
11      A.   No, because I haven't seen any specialist.
12      Q.   How about the doctors that you did see, did
13   they ever tell you that you need some future
14   operation or treatment or anything like that?
15      A.   I recall the doctor in the infirmary at the
16   jail, he said that I may need - he said it was too
17   early to tell at that moment, at that time.
18      Q.   And he was the one who treated you how long
19   after the incident?
20      A.   Three to four weeks I was in the infirmary.
21      Q.   And he hasn't seen you since, has he?
22      A.   No.
23      Q.   Anyone else?
24      A.   No.
25      Q.   Who have you discussed this incident with?
```

```
 1          A.    My attorney.

 2          Q.    Anyone else?

 3          A.    I believe I may have - I mentioned it to my

 4   family.

 5          Q.    Which family members?

 6          A.    My brothers and sisters.

 7          Q.    Have you told - have you discussed this

 8   incident with anyone residing in South Florida?

 9          A.    Not in detail.

10          Q.    How about in general terms?

11          A.    Yes.

12          Q.    Who?

13          A.    A friend of mine.

14          Q.    Who's that?

15          A.    Her name is Sherry.

16          Q.    What is Sherry's last name?

17          A.    Nerring.

18          Q.    Can you spell that, please?

19          A.    N-E-R-R-I-N-G.

20          Q.    And when did you discuss the incident with

21   her?

22          A.    I believe it was when I was in the

23   infirmary.  I told her that I was arrested and what

24   happened.

25          Q.    Where does she live?
```

66

```
 1        A.    Lauderhill.

 2        Q.    Still lives there?

 3        A.    Yes.

 4        Q.    You wouldn't happen to know her address,

 5   would you?

 6        A.    Not offhand, no.

 7        Q.    You've sued the City of Hallandale for

 8   negligence; are you aware of that?

 9        A.    Uh-huh.

10        Q.    What did the City of Hallandale do that was

11   negligent?

12        A.    The City of Hallandale, in my opinion,

13   hired an animal.

14        Q.    Are you referring to the dog or to the

15   police officer?

16        A.    I'm referring to the police officer.

17        Q.    Okay.

18        A.    Officer Church.

19        Q.    So, you're saying that the negligence of

20   the City of Hallandale was in hiring Officer Church

21   who you believe was somehow unfit for the position?

22        A.    Most definitely.

23        Q.    And what other ways, in your opinion, was

24   the City of Hallandale negligent?

25              MR. DANIELS:  You want to explain to him
```

1    what negligence means?  Maybe he doesn't

2    understand.

3         MR. GOLDSTEIN:  Take your best shot, he

4    can do it.

5         MR. DANIELS:  Okay.  What did the City of

6    Hallandale or Church do wrong in your opinion?

7         MR. GOLDSTEIN:  No, no, don't answer that,

8    don't answer that; negligence is the failure to

9    observe a reasonable standard of care.

10        MR. DANIELS:  You asked me to do my best.

11        MR. GOLDSTEIN:  I've done the honors, I've

12    done the honors.

13        MR. DANIELS:  Okay.

14        Q.   (By Mr. Goldstein)  What else do you

15    believe that the City of Hallandale did that failed

16    to observe a reasonable standard of care?

17        A.   I don't know that I can answer that

18    question at this time.

19        Q.   Well, let me ask you this; you say that

20    they hired Church, who was an animal?

21        A.   Yes.

22        Q.   Do you have any knowledge as to whether

23    Church had any past record with the City or before

24    his employment with the City that would have led the

25    City to believe that he was unfit to be a police

```
 1    officer?
 2          A.    I don't have any concrete.
 3          Q.    Do you have anything that's not concrete?
 4          A.    I'm sure many officers know what kind of
 5    guy he is, that he works with.
 6          Q.    How are you sure?
 7          A.    I'm sure I wasn't the first.  This happens
 8    every day in America, police brutality, every single
 9    day.
10          Q.    Uh-huh.  Well, I'm not asking about the
11    LAPD.
12          A.    I didn't say the LAPD.
13          Q.    I'm asking about Tim Church; you made a
14    statement that Hallandale hired an animal.
15          A.    Yeah; what would you call him?
16          Q.    Well, what I'm saying is that, what
17    information do you have that, when Hallandale hired
18    Officer Church, they knew or should have known that
19    he was unfit to be a police officer?
20          A.    I don't know that I can answer that
21    question.
22          Q.    At or near the date of your arrest, what
23    types of drugs were you using?
24          A.    I used cocaine a couple days; other than
25    that, nothing else besides the beer that day.
```

```
 1          MR. GOLDSTEIN:  Okay.  That's all I have.
 2     Thanks.
 3          MR. DANIELS:  I don't have any questions.
 4               REDIRECT EXAMINATION
 5     Q.   (By Mr. Gunther)  Let me show him -- I've
 6 got the document here and -- well, maybe it's in
 7 here.  I can do that by a written thing, but it shows
 8 a guilty plea to the charges.  Yeah, here it is.
 9     A.   To the '98 charges?
10     Q.   Yes, sir, not no contest.
11     A.   To my knowledge, I --
12     Q.   But guilty --
13     A.   To my knowledge, I plead no contest.
14          MR. DANIELS:  Let me see.
15          MR. GUNTHER:  Let -- I'll show it to you.
16          MR. DANIELS:  Okay.
17          THE WITNESS:  That's adjudicated; if you
18     plead no contest, they will still do that.
19          MR. DANIELS:  It doesn't say what you
20     plead.
21          THE WITNESS:  Okay.  Well, to my
22     knowledge, I plead no contest.
23          MR. GUNTHER:  Look, I don't think as a
24     practical matter it makes a bit of difference,
25     okay?  But mark that as Defendant's 2, and
```

70

1          that's all the questions I have.  I thank you

2          for your time.

3                  (Whereupon, the document referred to was

4          marked Defendant's Exhibit No. 2 for

5          Identification.)

6               MR. DANIELS:  Off the record.

7                  (Discussion off the record.)

8               MR. DANIELS:  We'll waive.

9              AND FURTHER DEPONENT SAITH NOT

10                        STIPULATION

11       It is hereby stipulated by and between counsel

12   for the respective parties and the witness that the

13   reading and signing of the foregoing deposition and

14   notice of filing be, and the same are, hereby

15   waived.

16                  (Deposition concluded at 5:00 p.m.)

17

18

19

20

21

22

23

24

25

```
 1
 2                          + + + +
 3
 4                  CERTIFICATE OF OATH
 5
 6    STATE OF FLORIDA
 7    COUNTY OF BROWARD
 8        I, the undersigned authority, certify that Hugh
 9    Hodge personally appeared before me and was duly
10    sworn.
11        WITNESS my hand and official seal this 29th day
12    of November, 2000.
13
14
15                    Lynn Cantin, R.M.R.
                       Registered Merit Reporter
16                     Notary Public, State of Florida
                       My Commission Expires: May 12, 2002
17
18                          LYNN CANTIN
                            MY COMMISSION # CC 719045
19                          EXPIRES: May 12, 2002
                            Bonded Thru Notary Public Underwriters
20
21
22
23
24
25
```

CERTIFICATE

STATE OF FLORIDA
COUNTY OF BROWARD


     I, Lynn Cantin, Registered Merit Reporter and

Notary Public duly commissioned and qualified in and

for the State of Florida at Large, do hereby certify

that I was authorized to and did stenographically

report the foregoing deposition of Hugh Hodge; and

that said transcript is a true and complete record of

my stenographic notes.


     I FURTHER CERTIFY that I am not a relative,

employee, attorney or counsel of any of the parties,

or a relative or employee of such attorney or

counsel, nor financially interested in the action.


     Dated this 29th day of November, 2000.




                    Lynn Cantin, R.M.R.

# THE CIRCUIT/COUNTY COURT, IN AND FOR BROWARD COUNTY, FLORIDA

**FAILURE TO PAY FINE BY THE BELOW DATE MAY RESULT IN A WARRANT FOR YOUR ARREST AND/OR THE SUSPENSION OF YOUR DRIVER'S LICENSE AND DELINQUENCY FEES IMPOSED.**

DATE: 10-20-98    CASE NO. 98-18292610    ARREST NO. FLOBE10544    AKA    GREG HODGES

EST ____    VAC ____    AGENCY ____

## COURT STATUS

Judge Hodge

**COURT STATUS**

- ☐ TRIAL
- ☐ JURY
- ☐ COURT
- ☐ PLED NOLO
- ☐ FINAL V.O.

- ☐ CHANGE OF PLEA
- ☑ PLED GUILTY I-V
- ☐ WITHHELD
- ☐ NOLLE PROSEQUI
- ☐ DISMISSED
- ☑ ADJ. GUILTY I-V
- ☐ VC EACH COUNT
- ☐ ACQUITTED
- ☑ PUBLIC DEFENDER FEE $50

ROR/SURETY SUMMONS/CASH BOND

**CHARGE(S)**

I - Petit Theft
II - Resist Off
III - Poss Burg Tools
IV - Owning while lic Susp Rev
V - Worst W/O Cntrl

**SENTENCE:** I + II - 7 Hrs in BCT W/C for 45 Days 1/3

III - V

Restitution is Reserved

**DUI USE ONLY**

| | PROBATION WITH SPECIAL CONDITIONS | |
|---|---|---|
| COUNT | | |
| FINE | CC | VC |
| CJC | EMTF | CDC | SN1 |
| DUI SCHOOL | EVALUATION | |
| LICENSE SUSP. | DAYS IMMOBILIZATION | WORK PERMIT |
| COMMUNITY SERVICE HOURS | | |

| | COUNT(S) III-V | TIME SERVED 45 | DAYS |
|---|---|---|---|
| $ | FINE | COURT COST | 5% | V.C. | CJC | SN1 |
| $ | FINE | COURT COST | 5% | V.C. | CJC | SN1 |
| $ | FINE | COURT COST | 5% | V.C. | CJC | SN1 |
| PLUS $ | FINE | DEFERRAL FEE TO: | | | | |

AT EXHIBIT 2
Deponent T Hodges
11-7-00
Date ____ Rptr ____
WWW.USDEPOCDOK.COM

SHERIFF'S COPY.

BY _____ (DEPUTY CLERK)

JUDGE _____

DISP 4 - 5/97

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-6228-CIV-SEITZ/GARBER

HUGH HODGE,

     Plaintiff,

v.

TIMOTHY M. CHURCH, et al.,

     Defendants.

_____/

### PLAINTIFF'S NOTICE OF SERVICE OF ANSWERS
### TO INTERROGATORIES PROPOUNDED BY
### DEFENDANTS, THOMAS REED, PATRICK HART, DAVID
### WHEELER AND CITY OF FORT LAUDERDALE

COMES NOW the Plaintiff, HUGH HODGE, by and through his attorneys of record, and

files this his Notice of Service of Answers to Interrogatories propounded by the Defendants,

THOMAS REED, PATRICK HART, DAVID WHEELER and CITY OF FORT LAUDERDALE

on July 21, 2000.

     I HEREBY CERTIFY that a true and correct copy of the foregoing notice with the original
Interrogatory Answers were mailed on the _____ day of October, 2000 to the offices of: Dieter K.
Gunther, Esq., Adorno & Zeder, P.A, 888 Southeast Third Avenue, Suite 500, Fort Lauderdale, FL
33335-9002, Attorney for Defendants, THOMAS REED, PATRICK HART, DAVID WHEELER,
and CITY OF FORT LAUDERDALE and copies of the Notice and Interrogatory Answers to
Mark Goldstein, Esq., City Attorney, Hallandale Beach, 400 S. Federal Highway, Hallandale
Beach, FL 33009, Attorney for Defendant, CITY OF HALLANDALE.

                    DANIELS & DANIELS
                    Attorneys At Law, P.A.
                    Attorneys for Plaintiff
                    4300 North University Drive, Suite B-200
                    Fort Lauderdale, Florida 33351
                    Telephone:   (954) 572-7100
                      Fax:   (954) 572-0667

                    BY:_____
                      GORDON S. DANIELS, ESQ.
                      Florida Bar No. 350648

Δ ≠ EXHIBIT 1
Deponent Π H HODGE
Date 1/19/10 Rptr._____
WWW.DEPOBOOK.COM

CASE NO. 00-6228-CIV-SEITZ/GARBER

## ANSWERS TO INTERROGATORIES

1.    Full Name:  Hugh Christopher Hodge
      Have also used: Hugh Hodge, Greg Hodge
      Date of Birth: 10/21/66
      Place of Birth: Miami, FL
      SS# 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

      Present Address:        Mr. Greg Hodge, Arrest No. 570007382, c/o Conte Facility, P.O.
                              Box 407016, Fort Lauderdale, FL 33340.

2.    Present Address: Refer to Interrogatory #1.  Resided there from 8/2000 with an expected
      release in 12/2000.

      Former Addresses:
      999 W. Prospect Road, Apt. #28, Fort Lauderdale, FL 33309 - 8/98 - 8/00.
      12217 S.W. 120 Terrace, #B-101, Miami, FL 33175 - 4/87 - 8/98
      2827 Hathaway Drive, Sumter, SC 29150 - 1980 - 1987

3.    Joe Mayadeane
      1520 N.W. 15th Place
      Fort Lauderdale, FL

      Plaintiff
      Defendants - Timothy M. Church, Thomas Reed, Patrick Hart and David Wheeler.

4.    Witnesses, other than eye-witnesses to the incident:

      Emergency Room Physician, Dr. Raybin, and nurses, names unknown, at Broward General
      Medical Center, 1600 Andrews Avenue, Fort Lauderdale, FL 33316, and Radiology staff,
      names unknown.

      Public Defender's investigator, name unknown - took pictures of Plaintiff's arm.

      Fort Lauderdale police officer took photos before Plaintiff's injuries were stitched - name
      unknown.

      Doctor(s) and treating nurse(s) at the Infirmary, Broward County Jail.  One nurse had a
      first name of Roxanne.  Last name unknown.

5.    Joe Mayadeane

      (a)    Oral statements.
      (b)    The statements were taken at 1520 N.W. 15th Place, Fort Lauderdale, FL on or
             about November 17, 1998, and February 11, 1999.
      (c)    By investigators, Leonard Belstock and J. M. Smith.

(d)    No written statement was given. No recorded statement was made. Daniels & Daniels only has reports from the investigators detailing their conversations with Mr. Joe Mayadeane.

6.    Arrested 7/26/00, Fort Lauderdale, grand theft (ring), and possession of drug paraphernalia. Convicted, pled no contest, no fine, sentenced 90 days at drug program at Conte Facility with release in December, 2000, and then will be going to an outside drug treatment facility. On 3 years' probation,

Arrested 2/25/00, Fort Lauderdale, Florida, Broward County, Broward County Courthouse, possession of cocaine, DUI alcohol or drugs, driving while license suspended, obstruction, no violence, convicted, pled no contest, fine of $549.00, sentenced to 364days (not including probation time) at Broward County Jail.

Arrested 3/17/00 or 3/18/00, Fort Lauderdale, Florida, Broward County, Broward County Courthouse, grand theft in the 3rd degree, convicted, pled no contest, fine of $549.00, sentenced to 364 days in jail running concurrent (not including probation time), Broward County Jail.

Arrested 9/6/98, Fort Lauderdale, Florida, Broward County, Broward County Courthouse, for grand theft (car), possession of drugs, resisting arrest without violence. Convicted, pled no contest, received 7 months in jail (but served 5 months), no fine.

Arrested 1995, 1996, 1997, Miami, Florida, Dade County/Miami-Dade County, Dade County Courthouse - 3 separate charges  - driving under suspension, dui and possession of drugs - but Plaintiff does not remember which charge went with what year nor other details regarding these arrests. Convicted, pled no contest, jailed and fined.

Arrested September 1990, Miami, Florida, Dade County/Miami Dade County for theft.-Rite Aid. Received 1 week jail then probation for 5 years, which time was then cut. Convicted, pled guilty, no fine

Arrested 1984 and 1994 in Sumter, South Carolina, Sumter County Courthouse, Sumter County, :

For 1984 convicted of writing bad checks; did time in prison, served 2-1/2 years out of 5-year sentence. Pled guilty.

For 1994, Plaintiff doesn't remember reason but was jailed, no fines.

See also Answer to Interrogatory No. 17.

7.    Yes. See answers to Interrogatory #6 above. Answers are to the best of Plaintiff's ability as drug use has affected Plaintiff's memory.

8.    9/6/98 - served 5 months - Released 2/1/99 in the morning, do not remember exact time (7-month sentence reduced to 5 months). First 2 months was at Broward County Jail, downtown Fort Lauderdale, Florida. Then served 3 months in the Broward County

Stockade located near Powerline Road and Commercial Boulevard, Fort Lauderdale, FL. No bail posted.

9.      NOTE:  Plaintiff is not sure of the employment dates which are listed for Dillards, J.C. Penneys, Mobil Gas Station, Supreme Sandblasting, Acme Sandblasting, Sears, Acme Sandblasting and Rite Aid listed below; therefore these dates are approximations.

Dillards - Feb-July 2000
Galleria Mall, Fort Lauderdale, FL, 35 hours, $9/hour, sales associate, quit to enter a drug treatment facility prior to incarceration - never made it..

J.C. Penneys - Sept. 99 - Jan. 2000
Coral Square Mall, Coral Springs, FL, 40 hours, $7.49/hr, sales associate, fired for missing days and being late.

Mobil Gas Station - June - Sept. 1999
Military Trail and Sample Road, Deerfield Beach, FL, 40 hours, $7/hr, sales cashier. Left for better job.

Supreme Sandblasting - June - Sept. 1998
5900 Powerline Road, Fort Lauderdale, FL, 40 hours, $8/hr, sandblaster, Let go due to business slowing.

Acme Sandblasting - Sept. 1997 - June 1998
Hialeah, FL, 50 hours, $10/hr, sandblaster.  Left because moving to Ft. Lauderdale.

Sears - Feb. 1997 - Sept. 1997
Westland Mall, Hialeah, FL, 40 hours, $7/hr, sales associate, fired for not following sales procedures.

Acme Sandblasting - Oct. 1995 - Jan. 1997
Hialeah, FL., 50 hours, $10/hr, sandblaster, Laid off due to business being slow

Rite Aid - March - Sept. 1995
S.W. 57th Avenue (Red Road), Miami, FL, 40 hours, $8/hr, assistant manager, fired for theft.

Plaintiff does not remember employment history prior to 1995.  Also, Plaintiff states that during the time he worked full time at the jobs listed above, he occasionally did odd jobs: sandblasting, painting, car body work, but doesn't remember names of employers or amounts paid.

10.     From 9/6/97 through 9/6/98, income estimated to be $1,300/month due to his sandblasting jobs.  Plaintiff went back to work immediately after release, but states that he is no longer able to work 40-50 hours doing sandblasting, at a much higher hourly wage than his other jobs. Plaintiff is only able to work half the hours - or 20 to 25 hours per week - sandblasting, before his injured right arm acts up, becomes sore and painful, and he has to stop.   Plaintiff has lost income and will continue to lose income due to the fact he can no longer work 40-50 hours doing sandblasting and will have to work full time at more sedentary positions at a lower hourly rate.  Amount of loss of

income to Plaintiff immediately afterwards and in the future is undeterminable at this time.

11.    1986 Worker's Compensation Claim - Columbia, South Carolina.  Injured neck - slipped
and fell at job.  Was working for a construction company.  Received 2-3 weeks lost wages from
being disabled.

12.    March 26, 1999 - Coral Springs Medical Center Emergency Room, Coral Springs, FL.
       Seen by Emergency Room physician, Dr. Mary Mailloux for injury to right eye.  I had
       walked into a blunt hook extending from the back of a door and the hook struck my right
       eye.  I had a follow-up visit with W. Randy Burks, M.D., 5800 Colonial Drive, Suite 100,
       Coral Springs, FL.  I was also seen by Dr. Donald Woods, 7886 W. Sample Road, Coral
       Springs, FL 33065 and by a neuro-ophthalmologic physician, Matthew D. Kay, M.D., 5601
       North Dixie Highway, Suite #307, Fort Lauderdale, FL 33334.

       1997 - Palmetto General Hospital, Hialeah, FL for an ulcer.  Inpatient for 3 days.  Hospital
       physician treated him.  Name of doctor and date of admission unknown.

       1986 - Baptist Hospital, Columbia, SC - Hospital doctor treated for 1986 Worker's
       Compensation Claim and put in traction.  Name of doctor and date of admission unknown.

       1984 - Don't remember name of hospital in Columbia, SC - appendix removed.  Hospital
       physician.  Name of doctor and date of admission unknown.

       See also Answer to Interrogatory #17.

13.    See Answers to Interrogatory #11 and #12.  Also:

       Summer 1988 - auto accident near Kendall Drive off Turnpike ramp, Miami, Florida -
       broke right hand.  Used private doctor in Coral Gables; doesn't remember name; believes
       he was an orthopedist.  Was disabled for about 6 weeks.

       Summer 1996- broke left hand - fell down steps.  Treated at Jackson Memorial Hospital
       Emergency Room, Miami, Florida, by a hospital ER physician and ER orthopedic surgeon.
       Was disabled for 6 weeks.

14.    Injuries - Right arm biceps area - tore muscle close to bone, very deep, 2 large gashes.  I
       suffered loss of muscle tissue and weakness in arm which remains to this day.    Severe
       pain radiates in right arm when I put any stress to it such as lifting heavy items or working
       at any sandblasting jobs.

My pants were pulled down and police canine bite me at least 6 -7 times, giving me bite marks and
gashes on both sides of buttocks (worse on right side).  I also suffered bruises to ribs and back
from being hit with metal flashlights and batons by police and my both legs badly bruised from
police kicking them.  I could not sit down for one month and had trouble walking for about two
weeks due to injuries to leg and buttocks.

Suffered infections to dog bites afterwards.

15.    Broward General Medical Center, 1600 S. Andrews Avenue, Fort Lauderdale, FL 33316.
       ER physician - Dr. Raybin. Nurses in ER - one RN's last name was Shock, I believe.
       Radiology staff - names unknown. Do not know specialty of ER doctor. Date of
       treatment: 9/6/98 - was discharged from ER, not admitted.

       Received medical treatment at the Broward County Jail Infirmary for one month - Given
       Keflex and Tylenol to treat infections from dog bites and for pain respectively. Buttocks
       more severely infected from dog bites. Took 18 stitches out of arm - 9 stitches in each
       gash. One of the nurses treating me was named Roxanne (last name unknown). Don't
       remember exact date of admission or discharge or specialty of treating physician(s).

       See also answer to Interrogatory #18.

16.    See Interrogatory #15.

17.    Baker-acted at University Pavilion Hospital, Tamarac, FL earlier this year - do not
       remember the date. I was charged for driving under suspension and was arrested. I did not
       serve time nor probation. I pled guilty; no fine. I was in the hospital one day because I
       didn't remember doing it because I was under the influence. Seen by a psychiatrist in
       University Pavilion - name unknown.

       See also answer to Interrogatory #18.

18.    Psychiatrist, Dr. Leman, in Broward County Jail Infirmary - treated him for anxiety and
       depression in September 1998 (exact date unknown). Only saw him twice and believe he
       gave me medication, but do not remember name of medication. I never received a bill..

19.    No additional hospitalizations. I was already a patient in the Broward County Jail
       Infirmary when Dr. Lieman, a psychiatrist on staff, treated me for nightmares, anxiety,
       mental anguish, distress and depression in September 1998. I believe I saw him twice.
       Never received a bill.

20.    Haven't received nor paid any bills even though treated at Broward General Medical
       Center Emergency Room, ER Coastal Physicians, or Radiologist at hospital and at the
       Broward County Jail Infirmary.

21.    Alcohol - Yes, I have a drink about twice a week. Never received treatment for
       alcoholism.

       Drugs - Yes, Cocaine and marijuana. Received treatment for drug addiction. Presently at
       Conte Facility, ATAC Program - Nelson Fernandini is my counselor. Sept. 26, 2000 until
       October 24, 2000 and then go into another drug treatment facility called Spectrum.

       March to June 2000, BARC - Broward Addiction Rehab Center, Fort Lauderdale for
       cocaine and Marijuana - Counselor Mike Florio.

       In 1997, I was in the House of Hope. Counselor David Greer. I was there for two weeks
       under my own admission.

Village South, Biscayne Boulevard, Miami, FL during a summer month in 1996.
Counselor's name was Bruce.

22.     Five hours immediately preceding incident, I was in a rental house near North Federal
        Highway between Oakland and Sunrise Boulevard behind Solid Gold. I drank three beers
        by myself. I met Michael Viola 4 or 5 hours before the incident. He drove me to the house
        of Mark, my boss, and back to my rented house.

        Twelve hours immediately preceding incident, I drank three beers. I had not consumed any
        other drugs or alcohol.

23.     Florida Driver's License: #H32032366-380-0

24.     None other than any treating physicians and psychiatrists listed on witness list.

25.     While I was not resisting, I was beaten by the police and attacked and bitten by the police
        dog. I also was beaten by the police after they handcuffed me.

CASE NO.: 00-6228-CIV-SEITZ

HUGH HODGE

STATE OF _____ )

                                    SS:

COUNTY OF _____ )

The foregoing instrument was acknowledged before me, this, the _____ day of _____, 2000 by _____, who was personally known to me or who has produced _____ as identification and who did take an oath.

_____
Signature of Notary Public

_____
Printed Name of Notary Public

My Commission Expires:

(Seal)