UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-6228-CIV-SEITZ/GARBER

HUGH HODGE,

     Plaintiff,

v.

TIMOTHY M. CHURCH, et al.,

     Defendants.

_____/

## MOTION TO DISMISS AND MOTION FOR ENLARGEMENT OF TIME AND MOTION TO COMPEL PRODUCTION OF PHOTOGRAPHS OF POLICE

COMES NOW the Plaintiff, HUGH HODGE, by and through his undersigned attorneys, and moves for a Motion to Dismiss the Defendants Patrick Hart, David Wheeler and City of Fort Lauderdale's Motion of Summary Judgment or, in the alternative, grant Plaintiff an enlargement of time to file a Memorandum in Response to Defendants' Motion for Summary Judgment and Motion to Compel Production of Photographs of Police, and states as follows:

1.     On January 18, 2001, the Plaintiff received Defendants' Motion for Summary Judgment filed under Certificate of Mailing date of January 16, 2001.

2.     The Motion for Summary Judgment and Memorandum are in violation of this Court's "Order Granting Enlargement of Time" dated November 2, 2000 in that this Order states that the deadline for filing dispositive pretrial motions and memoranda of law shall be January 15, 2001.

3.     There is a private citizen, Joseph Mayadeene, who witnessed the arrest of Mr. Hodge. His deposition was taken on November 22, 2000. A copy of the deposition transcript is attached hereto as Exhibit "A". Mr. Mayadeene stated that he did witness the incident. However, one of the police officers pulled out his gun and pointed it at him (page 7 lines 24-25 and page 8, lines 1-8). The police officer stated to him, Get your fucking ass inside before I blow your head off" (page 10, lines 8-13). Mr. Hodge was on the ground at that time (page 10, lines 15-15). Unfortunately at the deposition of Mr. Mayadeene, did not want to answer questions about the incident because he was afraid of police

retaliation (page 5 lines 14-25 and page 6 lines 1-5). The undersigned attorney did meet with Mr.

Mayadeene after the deposition and he contradicted many of the statements made by the police in their

depositions and relied upon by the Defendants in their "Concise Statement Of Undisputed Material

Facts." Mr. Mayadeene, however, has, to date, refused to allow his allegations to be transcribed.

In addition, Mr. Mayadeene has stated that there were about twenty (20) police officers present

when Mr. Hodge was arrested (page 7 lines 24-25, page 8 lines 1-17 and page 9 lines 3-15). This is in

contradiction to the testimony of police officers, Thomas Reed, Timothy M. Church and David Wheeler.

The two police officers with the K-9 Unit were officers Timothy M. Church with the City of Hallandale

and Thomas Reed with the City of Fort Lauderdale.

4.    Officer Church (Hallandale) stated in his deposition that:

    (A)    There were no other officers present during the arrest of Mr. Hodge other

        than himself and Officer Reed (page 23, lines 23-25 and page 45, lines 5-8);

    (B)    That there were no civilians present (page 24, lines 10-12 and page 44, lines 6-

        11); and

    (C)    Neither he nor officer Reed ever took out their handgun (page 48, lines 1-8).

5.    Officer Reed (Fort Lauderdale) stated in this deposition that:

    (A)    There were no civilians out (page 20, lines 8-10, page 32, lines 18-24 and page

        42, lines 7-14);

    (B)    Neither he nor Officer Church ever pulled out a gun (page 43, lines 12-25 and

        page 44, lines 1-2);

    (C)    After Mr. Hodge was handcuffed, the dog was removed from Mr. Hodge. Mr.

        Hodge was then patted down and then Officer Reed requested the closest

        perimeter unit to come up to the front of the residence (page 32, line 24 and page

HODGE V. CHURCH, ET AL.
CASE NO. 00-6228-CIV-SEITZ/GARBER
Page3

33, lines 1-22). Then two officers, Timothy Shields and Jay Smith came (page

34, lines 11-16). Mr. Reed put Mr. Hodge in the back of a police car and

Officers Shields and Smith drove away (page 40, lines 7-13). <u>There were no</u>

<u>other officers involved</u> (page 40, lines 14-16); and

(D)    Before Mr. Hodge was taken away, there were no other police officers present

other than Hart, Shields and Smith (page 43, lines 9-12).

6.    Sergeant Wheeler (Fort Lauderdale) stated in his deposition that:

(A)    He came to the scene and went to the home where Mr. Hodge was apprehended

and spoke to a black gentlemen who said he did not see a thing (page 9, lines 14-

19, page 10, and page 11, lines 1-11).

(B)    The only officers involved in the apprehension were Officers Church and Reed

(page 15, lines 19-25 and page 16, lines 1-2).

(C)    He never knew of any witness (page 35, lines 7-25 and page 36, lines 1-2).

Please find attached the depositions of Officer Church as Exhibit (B), Officer Reed as Exhibit (C) and

Sergeant Wheeler as Exhibit (D).

7.    In order to resolve which police officers were present at the scene and involved in the

arrest of Mr. Hodge, Plaintiff filed two Second Requests for Production, one for Defendants, City of

Hallandale and Timothy M. Church, and the other for Defendants, City of Fort Lauderdale, Thomas

Reed, Patrick Hart and David Wheeler., both dated November 21, 2000, requesting Defendants to

provide Plaintiff with photographs of Officers Timothy Church, Thomas Reed, Patrick Hart, David

Wheeler, Timothy Shields and Jay Smith, for the purposes of review and identification by Joe

Mayadeene.

8.    Defendants filed Objections dated November 27 and November 28, 2000 respectively,

refusing to provide photographs.

9.    In the interests of justice, it is vitally important to determine who is telling the truth and who was involved in this incident.

10.    Therefore, it is requested that the Plaintiff be given additional time in order to attempt to obtain an Affidavit from Mr. Mayadeene in order to properly respond to the Motion For Summary Judgment.

11..    In that the Attorney for the Plaintiff is on the trial docket (in another case) starting January 29, 2001 and has been and will be preparing for said Trial, it is requested that an additional thirty (30) days (from the date that the Motion was required to be responded to) be granted.

WHEREFORE, the Plaintiff, HUGH HODGE, respectfully requests that this Court:

1.    Dismiss Defendants Patrick Hart, David Wheeler and the City of Fort Lauderdale's Motion for Summary Judgment as being untimely or, in the alternative, grant Plaintiff, Hugh Hodge, additional time in which to respond to Defendants' Motion for Summary Judgment.

2.    Order the Defendants to produce photographs as requested in Plaintiff's Second Request for Production, one for each set of Defendants, dated November 21, 2000, of Officers Timothy Church, Thomas Reed, Patrick Hart and David Wheeler, as well as Officers Jay Smith and Timothy Shields, or, alternatively, to provide the photographs to the Court so that arrangements can be made for Mr. Mayadeene and Mr. Hodge to view these photographs.

**I HEREBY CERTIFY** that a copy of the foregoing was hand-delivered on January 25, 2001, to the offices of: DIETER K. GUNTHER, ADORNO & ZEDER, P.A., Attorney for Defendants, Thomas Reed, Patrick Hart, David Wheeler and City of Fort Lauderdale, 888 Southeast 3rd Avenue,

HODGE V. CHURCH, ET AL.
CASE NO. 00-6228-CIV-SEITZ/GARBER
Page 5

Suite 500, Fort Lauderdale, FL 33335-9002 and MARK GOLDSTEIN, ESQ., Attorney for Defendant,

City of Hallandale Beach, 400 S. Federal Highway, Hallandale Beach, Florida 33009.

DANIELS & DANIELS, PA
Attorneys for Plaintiff
4300 North University Drive, Suite B-200
Fort Lauderdale, Florida 33351
Telephone  (954) 572-7100
FAX:       (954) 572-0667

By: _____
    GORDON S. DANIELS, ESQ.
    Florida Bar No. 350648

LEAVE (2ND) FOR ENLARGEMENT OF TIME AND OR REQUEST FOR HEARING.wpd

1                     UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF FLORIDA
2

3
     HUGH HODGE,                                            COPY
4
                 Plaintiff,
5
     vs.                          CASE NO. 00-6228-CIV-SEITZ/GARBER
6
     TIMOTHY M. CHURCH, THOMAS REED,
7    PATRICK HART, DAVID WHEELER, CITY
     OF FORT LAUDERDALE, and CITY
8    OF HALLANDALE,

9                 Defendants.
     - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
10
                              Fort Lauderdale, Florida
11
                              November 22nd, 2000
12
                              1:30 o'clock P.M.
13

14   APPEARANCES:

15        GORDON S. DANIELS, ESQUIRE
          Appearing on behalf of the Plaintiff
16
          ADORNO & ZEDER, P.A.
17        By:  DIETER K. GUNTHER, ESQ.
          Appearing on behalf of Defendants Reed, Hart, Wheeler
18        and City of Fort Lauderdale

19        MARK GOLDSTEIN, ESQUIRE
          Appearing on behalf of City of Hallandale
20

21

22                         - - - - -

23                         DEPOSITION

24                             OF

25                        JOE MAYADEENE

1                          I N D E X

2    Direct Examination by Mr. Gunther                    3.

3    Cross Examination by Mr. Daniels                     7
4

5                        E X H I B I T S

6                    (No Exhibits marked)

7

8                        + + + + +

9           Deposition of JOE MAYADEENE, a witness of lawful age,

10   taken by the Defendant, for the purpose of discovery and for

11   use as evidence in the above-entitled cause, wherein HUGH

12   HODGE is the Plaintiff, and TIMOTHY M. CHURCH, THOMAS REED

13   PATRICK HART, DAVID WHEELER, CITY OF FORT LAUDERDALE, and CITY

14   OF HALLANDALE, are the Defendants, pending in the United

15   States District Court for the Southern District of Florida,

16   pursuant to notice heretofore filed, before MICHAEL R.

17   MONAHAN, Registered Professional Reporter and Notary Public in

18   and for the State of Florida at Large, at 888 S.E. 3rd

19   Avenue, Fort Lauderdale, Florida, on the 22nd day of November,

20   2000, at 1:30 o'clock P.M.

21

22

23

24

25

1   Thereupon:

2                      JOE MAYADEENE

3   a witness named in the notice heretofore filed, being of

4   lawful age, and being first duly sworn, testified on his oath

5   as follows:

6                      DIRECT EXAMINATION

7           Q    (By Mr. Gunther)  Would you state your name,

8   please?

9           A    Joseph Mayadeene.

10          Q    Where do you live?

11          A    1520 Northwest 15th Place, Fort Lauderdale.

12          Q    How long have you lived at that address?

13          A    21 years now.

14          Q    Where are you originally from?

15          A    Jamaica.

16          Q    What country are you a citizen of now?

17          A    The United States.

18          Q    When did you become a United States citizen

19   approximately?

20          A    Quite a while ago.

21          Q    What is quite a while ago?

22          A    More than ten years.

23          Q    Who lives at that address with you?

24          A    My wife, my kids.

25          Q    What is your wife's name?

4

```
 1          A      Wanda.
 2          Q      Are your kids grown?
 3          A      Yes, they are.
 4          Q      Do you own any other property besides the house
 5    at 1520?
 6          A      Yes.
 7          Q      What is the other property that you own there?
 8          A      1516, 1517, 1521, and 1525.
 9          Q      Four other houses?
10          A      Yes.
11          Q      Those are all houses, aren't they?
12          A      Yes.
13          Q      And they are in the area called Lauderdale
14    Manors, correct?
15          A      Yes.
16          Q      Where are you employed?
17          A      Broward County.
18          Q      What do you do for Broward County?
19          A      I'm a plumber.
20          Q      How long have you worked for the county as a
21    plumber approximately?
22          A      14 years.
23          Q      Have you ever been convicted of a crime?
24          A      No.
25          Q      Going back to September 6th 1998, a little over
```

5

1    two years ago, your name was given to us as a person who
2    witnessed an arrest that took place somewhere near your
3    properties that night or that morning.  Do you remember seeing
4    something occur there?

5         A    It was an incident on the property, it happened
6    on my property.

7              MR. DANIELS:  When you say your property, which
8         one of then?

9         A    1516.

10             MR. DANIELS:  Thank you.

11        Q    Do you remember about what time of day or night
12   that was?

13        A    It was in the night.

14        Q    What was it that you saw happen that night?

15        A    As far as the case goes over the incident that
16   happened, I would like not to be involved in it, I'd like to
17   stay out of it.  I've been asked about that case prior to
18   today and I've had an investigator come out and I told them
19   the same thing, would I like not to be involved in it.

20        I live there and I wouldn't feel comfortable sitting
21   here and giving a deposition against the police officers.  I
22   wouldn't feel comfortable with myself knowing that I have to
23   live there in the community there because if you've been
24   targeted by the police, I could have a lot of problems and I
25   don't want to be involved in the case.

6

1        Q        Have you been targeted by the police?

2        A        I wouldn't say targeted but I've been arrested

3    wrongfully and if the police wanted to do something to you,

4    it's a big department and if they don't tell this one they'll

5    tell the next one and you'll have a lot of problems.

6        Q        When were you arrested quote wrongfully end

7    quote?

8        A        Before Mr. Seidwick (phonetic) became a judge.

9        Q        Was Mr. Seidwick your lawyer?

10        A        Yes, he was.

11        Q        That was a few years ago, that was before this

12    incident of 1998, correct?

13        A        If I recall, yes.

14        Q        Have you had any other contact with the Fort

15    Lauderdale Police besides your own arrest at that time when

16    Judge Seidwick was still a lawyer?

17        A        Yes.

18        Q        When was that?

19        A        It happened about four years ago when my brother

20    got arrested.

21        Q        Who got arrested?

22        A        My brother.

23        Q        He was arrested by the Fort Lauderdale Police?

24        A        Yes.

25        Q        Other than your brother being arrested by the

1    Fort Lauderdale Police, have you had any other incidents or

2    contacts with Fort Lauderdale?

3            A       Not recently.

4            Q       How about since the September 6th, 1998

5    incident?

6            A       No.

7            Q       Well, if you don't want to get involved in it,

8    your name was given to us as a witness but I'm not going to

9    press it.  The lawyer for Mr. Hodge may want to ask you some

10   questions.

11           A       Okay.

12                           CROSS EXAMINATION

13           Q       (By Mr. Daniels)  Mr. Mayadeene, my name is

14   Gordon Daniels and I represent Mr. Hodge.  I was the one who

15   sent the investigators and you gave two statements on this, do

16   you remember that?

17           A       If I recall --

18           Q       Not statements but you talked to the

19   investigator twice?

20           A       Right.

21           Q       One thing they did say to me is that you said

22   that after this incident you called the police department to

23   try to report this?

24           A       Yes, but not reporting about the incident that

25   happened.  When the incident happened, when the police was in

```
 1    the yard, I came out of my house I was looking across toward
 2    where they was and he pulled out his gun and pointed it at me.
 3            Q      The policeman did?
 4            A      Yes, one of the police officers.
 5            Q      Do you know from which police department?
 6            A      Fort Lauderdale.  Well, all of them had on the
 7    black uniform that night.  Most of them had black uniforms, so
 8    I don't know.
 9            Q      How many police officers were there?
10            A      About twenty.
11            Q      About twenty of them?
12            A      Yes, about twenty police officers were there.
13            Q      Where was this that he pointed his gun at you,
14    was this on your property?
15            A      They were standing on my property and I was
16    standing right on my property and they pointed across.  First
17    I was on this side of the fence and he pointed the gun at me.
18                    MR. GUNTHER:  Can we get this other gentleman
19                out of here?
20                    MR. DANIELS:  Yes.  This is the man with a
21                subpoena.  It's a subpoena for trial and we're
22                serving you now to make it easier.
23            A      Okay.
24                    (Discussion off the record)
25            Q      You said you work for Broward County as a
```

1    plumber.  Do you have a work number over there?

2         A    Yes.

3         Q    What is your work number?

4         A    765-4241.

5         Q    What office do you work out of?

6         A    Right over here at the juvenile facility or

7    something.

8         Q    On State Road 84?

9         A    It's 4th Avenue.

10        Q    Off of State Road 84 and 4th Avenue.  What do

11   you do as a plumber, do you go to different areas?

12        A    Yes, we cover from the Dade County line to the

13   Palm Beach County line and from the beach to 27th.

14        Q    Is there any other phone number for you other

15   than that?

16        A    My home phone?

17        Q    Any other telephone number.

18        A    No, that's it.  It's the easiest way to get me.

19        Q    I've tried to call you at that home number but I

20   never got through.  It kept on ringing and ringing.

21        You said there were twenty police officer there that

22   night.  Tell me what happened, how many of them pointed a gun

23   at you?

24        A    One.

25        Q    Do you know from which department he was?

1               MR. GUNTHER:  Objection, asked and answered.

2               MR. DANIELS:  You can still answer it.

3       A       All had black uniforms on.  I called the City of

4    Fort Lauderdale Police Department and told them I want to

5    report it and they said that the captain would get back to me

6    and he didn't get back to me.  I called two times and he

7    didn't get back to me and I left it at that.

8       Q       Did the person say anything to you when he

9    pointed the gun at you?

10      A       Yes.

11      Q       What did he say?

12      A       Get your fucking ass inside before I blow your

13   head off.

14      Q       My client, Mr. Hodge, where was he at that time?

15      A       Over there on the ground.

16      Q       He was laying on the ground or was he standing

17   up?

18      A       If you continue like this, then I'm going to be

19   involved and I said I don't want to be involved.  You can ask

20   me pertaining to myself and I'll answer, but I don't want to

21   get involved with Mr. Hodge to the case.

22      Q       The problem that we have is that we have police

23   officers saying one thing and --

24      A       I understand your situation and I don't know how

25   we can resolve it, maybe we can't today.  Maybe we have to go

1    in front of the judge.  I understand your situation and I'm

2    sympathetic toward you, however I have a problem and that is

3    that my client is making a claim against these police officers

4    and you're the only witness that knows what happened, other

5    than the police officer and Mr. Hodge.  So that's how come

6    your testimony is very important.

7            I just want to put on the record that I served Mr.

8    Mayadeene, the process server served him with a subpoena for

9    trial dated May 21st, 2000.

10           Is there anything that we could do to make you feel

11   more comfortable in testifying?  I understand your concerns,

12   but is there anything that we can do, if we went in front of

13   the judge and asked the judge for something, would that make a

14   difference to you?

15       A    I don't know what the judge could offer me that

16   would have me go any deeper into the case, you know.

17       Q    These gentlemen over here are the attorneys for

18   the police department.

19       A    I understand that.  He said it's from

20   Hallandale, and I don't remember seeing any Hallandale police

21   officers.  The officer with the dog is from Fort Lauderdale,

22   you know.  You had four persons, it was about twenty.

23       Q    The reason why we have four is that four of them

24   filed what's called incident reports as to what happened and

25   they said they were the only ones that were involved.

```
 1                 MR. GUNTHER:  Objection to the form of the
 2            question.  That's not what the testimony is.
 3       Q    That's how come it's important that you testify
 4    to tell what you saw and what you know about this, because
 5    obviously we have a conflict as to what they're saying and
 6    what you're saying.
 7                 MR. GUNTHER:  Objection.  There's no conflict at
 8            this point.
 9       Q    If I ask you questions about what happened, are
10    you going to answer me?
11       A    Questions of what happened to who?
12       Q    Questions about what you saw happen to Mr.
13    Hodge or what you saw happen.  All we want is the truth, we're
14    not asking for anything other than for you to tell us the
15    truth.  Whether that truth is helpful to Mr. Hodge or not
16    helpful to him or if it's helpful to the police officers or
17    helpful to them, I don't care, and I don't think these
18    attorneys care.  All we want is to know truthfully what
19    happened and what you saw happen and if something bad
20    happened then we should know about it because --
21       A    Because it will continue happening.
22       Q    Right.
23       A    I knew that's what you were going to say.
24       Q    I know you know.
25       A    At the same time I can say something and
```

1    something bad still happens and who's going to help me when it

2    happens to me?

3            Q    Well, the other thing we can do, I don't know

4    if these attorneys want to do this, but we can go off the

5    record and you can tell your story to everybody off the record

6    and they can get an idea as to what you know.

7            A    If you do that, I'll talk to you.

8            MR. DANIELS:  I think we have a mediation set

9            up, so at least we'll know what he'll say if he

10           testified at trial.

11           MR. GUNTHER:  I know what he's going to say.

12           MR. DANIELS:  Because you spoke to him before

13           this deposition.

14           MR. GUNTHER:  No, I spoke to --

15           MR. DANIELS:  You spoke to him at another time.

16           THE WITNESS:  Yes, I called him.

17           MR. DANIELS:  Fine.

18           MR. GOLDSTEIN:  I would object to this gentleman

19           showing up and testifying at trial without someone

20           having the opportunity to have his testimony as to

21           what he's going to say at trial on a deposition

22           record.  I'm not saying I'm not open to your

23           suggestion, I'm saying that should this case proceed

24           to trial, I would like a record in the way of a

25           deposition.

14

1          MR. GUNTHER:  I think we probably would all want

2     that.

3          MR. DANIELS:  But I can't physically force Mr.

4     Mayadeene to testify, nor would I want to.

5          MR. GOLDSTEIN:  No one is looking for that, no.

6          MR. DANIELS:  I understand the situation, but we

7     have a medication set up and if we really want to do

8     the right thing maybe we should, Mr. Gunther seems to

9     know but --

10          MR. GUNTHER:  I've spoken to him for one or two

11     minutes.

12          MR. DANIELS:  When I asked you if you knew, you

13     said you knew, so I don't know how long you spoke to

14     him.

15          MR. GOLDSTEIN:  I have no problem with us having

16     a session informally speaking with Mr. Mayadeene, but

17     should this case proceed to trial I would certainly

18     not waive any of our rights to depose Mr. Mayadeene.

19     But if you want to talk with him afterwards, if

20     he's willing to do that, that's fine, and I have no

21     problem with that.

22          MR. DANIELS:  That's fine with me.

23          MR. GUNTHER:  Okay.

24          MR. DANIELS:  Then we'll talk to him off the

25     record.

1           MR. GUNTHER:  We'll conclude the deposition at

2     this time then.

3           MR. DANIELS:  Yes.

4           MR. GUNTHER:  I'll take a copy of whatever we

5     have.

6           MR. GOLDSTEIN:  I'm not going to order a copy

7     yet.

8           MR. DANIELS:  I'll order it.

9           MR. GUNTHER:  Sir, we've terminated this

10    deposition and I have ordered the transcript to

11    reflect our agreement and what you've said so far.

12    As a witness you have the right, because you're

13    only a witness and you're not a party to this

14    lawsuit, to read and sign what this man has put down.

15    Customarily that right is waived by the witnesses

16    because we feel he accurately puts down my questions

17    and more importantly your answers.  But you can

18    either make arrangements with him to read what had

19    been put down so father or you can waive that right.

20    It's up to you.

21          THE WITNESS:  I'll waive it.

22          MR. GUNTHER:  Thank you.  I'm ordering it and if

23    you want I'll give you a copy.

24          MR. GOLDSTEIN:  We're not concluding or

25    terminating, we're continuing this deposition if need

```
 1              be to some later date.
 2                   MR. DANIELS:  Okay.
 3                    AND FURTHER DEPONENT SAITH NOT
 4              (The Deposition concluded at 2:30 P.M.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                          STIPULATION

2          It is hereby stipulated by and between counsel for the

3    respective parties and the witness that the reading and

4    signing of the foregoing deposition and notice of filing be,

5    and the same are, hereby waived.

6

7                       CERTIFICATE OF OATH

8    STATE OF FLORIDA      )
                           : SS
9    COUNTY OF BROWARD     )

10              I, the undersigned authority, certify that

11   JOE MAYADEENE personally appeared before me and was duly

12   sworn.

13              WITNESS my hand and official seal this

14   _____ day of November, 2000.

15

16                           _____
                             MICHAEL R. MONAHAN, R.P.R.
17                           Notary Public, State of Florida
                             Commission # CC 900827
18                           My Commission Expires: 2/20/04

19

20

21

22

23

24

25

```
 1                       C E R T I F I C A T E

 2

 3      STATE OF FLORIDA    )

 4      COUNTY OF BROWARD   )

 5

 6            I, MICHAEL R. MONAHAN, a Registered Professional

 7      Reporter and Notary Public duly commissioned and qualified in

 8      and for the State of Florida at Large, do hereby certify that

 9      I was authorized to and did stenographically report the

10      foregoing deposition; and that that transcript is a true

11      record of the testimony given by the witness.

12            I further certify that I am not a relative, employee,

13      attorney or counsel for any of the parties or counsel

14      connected with the action, nor am I financially interested in

15      the action.

16            Dated this _____ day of November, 2000.

17

18                              _____
19                              Michael R. Monahan, R.P.R.
                                Notary Public, State of Florida
20                              Commission # CC 900827
                                My Commission expires 2/20/04
21

22

23

24

25
```

```
 1                    STIPULATION

 2        It is hereby stipulated by and between counsel for the

 3   respective parties and the witness that the reading and

 4   signing of the foregoing deposition and notice of filing be,

 5   and the same are, hereby waived.

 6

 7                    CERTIFICATE OF OATH

 8   STATE OF FLORIDA      )
                           : SS
 9   COUNTY OF BROWARD     )

10             I, the undersigned authority, certify that

11   JOE MAYADEENE personally appeared before me and was duly

12   sworn.

13             WITNESS my hand and official seal this

14   30TH day of November, 2000.

15

16                              _____

17                              MICHAEL R. MONAHAN, R.P.R.
                                Notary Public, State of Florida
                                Commission # CC 900827
18                              My Commission Expires: 2/20/04

19

20

21

22

23

24

25
```

ESQUIRE DEPOSITION SERVICE   (800) 211-3376 & (954) 728-9004

1                        C E R T I F I C A T E

2

3

      STATE OF FLORIDA    )
4
      COUNTY OF BROWARD   )
5

6
           I, MICHAEL R. MONAHAN, a Registered Professional
7
      Reporter and Notary Public duly commissioned and qualified in
8
      and for the State of Florida at Large, do hereby certify that
9
      I was authorized to and did stenographically report the
10
      foregoing deposition; and that that transcript is a true
11
      record of the testimony given by the witness.
12
           I further certify that I am not a relative, employee,
13
      attorney or counsel for any of the parties or counsel
14
      connected with the action, nor am I financially interested in
15
      the action.
16
           Dated this 30TH day of November, 2000.
17

18

19                               Michael R. Monahan, R.P.R.
                                 Notary Public, State of Florida
20                               Commission # CC 900827
                                 My Commission expires 2/20/04
21

22

23

24

25

1

```
 1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
 2                 DIVISION:  MIAMI

 3  HUGH HODGE,                )
                              )
 4          Plaintiff,         )
                              )
 5    v.                       )     Case No.   00-6228 CIV-
                              )                SEITZ/GARBER
 6  TIMOTHY M. CHURCH, THOMAS  )
    REED, PATRICK HART, DAVID  )
 7  WHEELER, CITY OF FORT      )
    LAUDERDALE, and CITY OF    )
 8  HALLANDALE,                )
                              )
 9          Defendants.        )
    _____x
10                              400 South Federal Highway
                                Room 219
11                              Hallandale Beach, Florida
                                Wednesday, November 15, 2000
12                              2:10 p.m.
    APPEARANCES:
13
            DANIELS & DANIELS, P.A.,
14          BY:  GORDON S. DANIELS, ESQ.,
            appearing on behalf of the Plaintiff.
15
            ADORNO & ZEDER, P.A.,
16          BY:  DIETER K. GUNTHER, ESQ.,
            appearing on behalf of City/Ft. Laud.,
17          Reed, Hart and Wheeler.

18          CITY ATTORNEY - HALLANDALE BEACH,
            CARLA CODY, ESQ.,
19          appearing on behalf of City/Hallandale Bch.
                       - - - - - - - - - -
20

21                        DEPOSITION

22

23                            OF

24

25              OFFICER TIMOTHY M. CHURCH
```

2

1                           I N D E X

2

3    WITNESS                          DIRECT              CROSS

4

5    OFFICER TIMOTHY CHURCH              3                 --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1          Deposition of OFFICER TIMOTHY M. CHURCH, a

2  witness of lawful age, taken by the Plaintiff for the

3  purpose of discovery and for use as evidence in the

4  above-entitled cause, wherein HUGH HODGE is the Plaintiff

5  and TIMOTHY M. CHURCH, etc. et al., are the Defendants,

6  pending in the United States District Court, Southern

7  District of Florida, pursuant to notice heretofore filed,

8  before JACKQULYN G. HOLLAND, a Registered Professional

9  Reporter and Notary Public in and for the State of Florida

10 at Large, at 400 South Federal Highway, Room 219,

11 Hallandale Beach, Broward County, Florida, on the 15th day

12 of November, 2000, commencing at 2:10 o'clock p.m.

13

14               --------------

15

16 Thereupon,

17               OFFICER TIMOTHY CHURCH

18 having been first duly sworn to tell the truth, the whole

19 truth, and nothing but the truth, testified as follows:

20               DIRECT EXAMINATION

21 BY MR. DANIELS:

22       Q.    Please state your name for the record.

23       A.    Timothy Michael Church.

24       Q.    Okay.  Are you employed?

25       A.    Yes.

```
 1          Q.     Who are you employed by?

 2          A.     City of Hallandale Beach.

 3          Q.     What capacity?

 4          A.     Police officer.

 5          Q.     Okay.  Are you with a specific unit of the

 6 police?

 7          A.     Yes.  I'm assigned to the K-9 unit.

 8          Q.     How long have you been a police officer with

 9 the City of Hallandale?

10          A.     A little less than five years.

11          Q.     When did you start?

12          A.     February of '96.

13          Q.     Have you always been an officer with the K-9

14 unit?

15          A.     No.

16          Q.     Or did you start somewhere else?

17          A.     I was regular road patrol.

18          Q.     When did you then change from regular road

19 patrol to something else?

20          A.     I believe I went into K-9 the end of April or

21 the beginning of May of '98.

22          Q.     Okay.  And you have been with them since

23 then?

24          A.     Yes.

25          Q.     When you go from regular road patrol to K-9
```

1  unit, is this something you ask for?

2       A.    Well, they put a letter of interest out -- or

3  they put a letter of opening pending out, and I put in a

4  letter of interest.

5       Q.    What do you have to do, then, to become a

6  member of the K-9 unit?

7             Do you have to go to some special school?  Or

8  how does that work?

9       A.    Yes, you have to go through basic school with

10 a dog, once you are placed with a dog.

11      Q.    How long is that school?

12      A.    The basic patrol school is 500 hours.

13      Q.    Okay.

14            Over a period of how many weeks is it?

15      A.    It is usually between 12 and 14 weeks, I

16 believe.

17      Q.    And who gives that?  Is that the City of

18 Hallandale?

19      A.    No, I went through the City of Fort

20 Lauderdale Police Department.

21      Q.    Now, this incident happened on September 6,

22 1998.

23      A.    Correct.

24      Q.    Were you in training at that time?

25      A.    I was finishing up my training, yes.

6

1        Q.    Finishing up.

2              Is there any other city in Broward County

3  that does training other than the City of Fort Lauderdale,

4  or is that where everybody goes?

5        A.    I don't know.

6        Q.    For the K-9 unit I'm talking about.

7        A.    No, other people do their own training

8  sometimes.

9        Q.    But the City of Fort Lauderdale doesn't have

10 their own training?

11       A.    Excuse me?

12       Q.    But City of Hallandale, excuse me, doesn't

13 have their own training?

14       A.    Not their own basic training, no.

15       Q.    What type of dog were you assigned?

16       A.    German Shepherd.

17       Q.    Do you know how many pounds that dog is?

18       A.    75 pounds, approximately.

19       Q.    How old is that dog?

20       A.    He's five years old now.

21       Q.    Do you still have the same dog?

22       A.    Yes.

23       Q.    What's the name of the dog?

24       A.    Gero, G-e-r-o.

25       Q.    Is there anything unusual about the dog?

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

7

```
 1        A.    No.

 2        Q.    How about the teeth?  Anything with the

 3 teeth?

 4              The teeth steeled tip or anything like that?

 5        A.    No.

 6        Q.    Regular teeth?

 7        A.    Yes.  He's missing two.

 8        Q.    Missing two.  Now you got me kind of curious.

 9              How did he miss two teeth?

10        A.    They were rotten; they pulled them out.

11        Q.    Okay.  Were those two teeth missing on the

12 date of this incident, September 6, 1998?

13        A.    No.

14        Q.    So he didn't brush them enough?

15        A.    I don't ...

16              (Discussion off the record.)

17 BY MR. DANIELS:

18        Q.    So the dog's teeth, they don't have any,

19 like, steel tips or anything like that?

20        A.    No.

21        Q.    Do any of the dogs have those?

22        A.    I have seen dogs that have broken teeth and

23 they are fixed; whether they are -- whatever they fix them

24 with, I don't know.

25        Q.    But they don't put any coverings on their
```

8

1  teeth as police officer dogs for a particular purpose?

2          A.      I'm not aware of that.

3          Q.      Okay.

4          A.      I have never been told anything like that.

5          Q.      Is there any manual regarding the use of the

6  dogs?

7          A.      I don't really understand what you mean by

8  that.

9          Q.      In other words, are there any written

10  procedures regarding the use of the dogs?

11         A.      Yes.

12         Q.      Who puts those out?

13         A.      Usually each department has their own policy.

14         Q.      Okay.  When you say the department, you mean

15  like the K-9 unit or the City --

16         A.      The police department usually has a list of

17  policies about how the department operates, and there is

18  usually a policy regarding usages of K-9 care, custody,

19  training; all that.

20         Q.      Does the City of Hallandale have their own

21  policy regarding that?

22         A.      Yes.

23         Q.      If I wanted to get a copy of that, what would

24  that be called?

25                 Is there a specific manual, name of a manual?

1        A.    It is under, I believe it is procedural

2  orders, policies and procedures.  I don't know the exact

3  name of the book.

4        Q.    Is it one book that has procedures for all

5  different things or just related to K-9?

6        A.    It is one book that has procedures of the

7  entire works of the police department.

8        Q.    I see.  And one chapter of that is related to

9  the K-9?

10       A.    Correct.

11       Q.    Are they updated each year?

12             How often are they updated?

13       A.    I couldn't answer that; I'm not involved in

14 writing the policy.

15       Q.    Okay.  Are those books kept anywhere?

16       A.    I believe so, yes.

17       Q.    I mean, does each police officer have one?

18       A.    Yes.

19       Q.    So you would have one.

20       A.    Yes.

21       Q.    Okay.  And are they kept in a particular

22 library in the police department?

23       A.    I believe there's -- there is one downstairs

24 in the briefing room library, and I believe there's copies

25 of them on the computer.

1       Q.    All right.  It is either called procedural

2  orders, or what else might it be called?

3       A.    Or policies and procedures.

4       Q.    Okay.  All right.  And do you also in your

5  training with the City of Fort Lauderdale, do you go over

6  what's stated in that book?

7       A.    Well, we really didn't go over it, because

8  everybody has a different policy, everybody's policy reads

9  different.

10      Q.    How do you learn about this policy?  Is it a

11  specific course that they give you at the City of

12  Hallandale?

13      A.    No, it is a matter of reading it.

14      Q.    Just reading it?

15      A.    Yes.

16      Q.    Have you ever had your deposition taken

17  before?

18      A.    Yes.

19      Q.    How many times, approximately?

20      A.    50 to a hundred times.

21      Q.    Okay.

22            MR. GUNTHER:  Hopefully in criminal cases.

23            THE WITNESS:  All criminal cases, yes.

24            MR. GUNTHER:  Thank you.

25            THE WITNESS:  Yes, never been in a civil case

1          before.

2   BY MR. DANIELS:

3          Q.    Okay.   So nothing that we are here on today,

4   an allegation of overuse of police force --

5          A.    No.

6          Q.    Okay.   All right.

7                Now when you were assigned to the City of

8   Fort Lauderdale, at that time, when did you start training

9   in the City of Fort Lauderdale?

10               This happened in --

11               MR. GUNTHER:   Let me object to the form.   It

12          is two-part.   One says assigned, and started

13          training.   So.

14               MR. DANIELS:   Okay.

15               MR. GUNTHER:   Note my objection.

16               MR. DANIELS:   You're right.

17  BY MR. DANIELS:

18         Q.    You said you became part of the K-9 unit in

19  April of '98?

20         A.    Yes.

21         Q.    That's when you started training with the

22  City of Fort Lauderdale?

23         A.    No.   I began training with the City of Fort

24  Lauderdale at the beginning of May.

25         Q.    Beginning of May?

1          A.     Sometime the first half of May.

2          Q.     At that time, did you have your dog?

3          A.     When I began training?

4          Q.     Yes.

5          A.     Yes.

6          Q.     Okay.  And part of that training is to go out

7  with Fort Lauderdale Police Department K-9 Unit?

8          A.     Yes.

9          Q.     Before this incident on September 6, 1998,

10  how many times did you go out with the Fort Lauderdale K-9

11  Unit?

12         A.     I'm not sure.  A couple of times.  I don't

13  know exactly.

14         Q.     When you go out with the Fort Lauderdale

15  Police Department K-9 Unit, do they have their own K-9

16  also?

17         A.     No.  In the situation my dog is in their car

18  and they are, like, training officer.

19         Q.     So they don't have another dog?

20         A.     Not with them, no.

21         Q.     And it is the City of Hallandale police

22  vehicle.

23         A.     Fort Lauderdale police vehicle.

24         Q.     Okay.  On the date of this incident, who was

25  your training officer at that time?

```
 1        A.     Officer Tom Reed.

 2        Q.     Had he been your training officer the entire

 3  time, before this incident?

 4        A.     Sometimes; depends.

 5        Q.     Other officers are assigned to you?

 6        A.     Just depends on who happens to be, you know,

 7  able to do it that night.

 8               It was him.

 9        Q.     Oh.

10        A.     It was him or -- I happened to ride with him

11  that night; I may have rode with him one more time.

12        Q.     Okay.  And another time that you were out,

13  you may have rode with some other officer?

14        A.     Uh-huh.

15        Q.     Yes?

16        A.     Yes.

17        Q.     Okay.  Before you worked for the City of

18  Hallandale, did you have another job before that?

19        A.     Yes.

20        Q.     Who was that with?

21        A.     I worked as a police officer in New York

22  State.

23               MR. GUNTHER:  I'm sorry.  I didn't hear that.

24               MR. DANIELS:  Police officer in New York

25          State.
```

1              MR. GUNTHER:   Thank you.

2  BY MR. DANIELS:

3         Q.    From when to when?

4         A.    I began in the summer of '95 and ended the

5  winter of -- the early part of '96 when I got hired down

6  here.

7         Q.    Did you have to go through any training?

8         A.    Yes.

9         Q.    When was that?  The summer of 1995 or before

10 then?

11        A.    No, it began in March of '95 and ended in the

12 summer of '95.

13        Q.    Okay.  Is there any commitment when you join

14 a police department to stay so many years?

15        A.    I was hired part-time; I put myself through

16 the academy.

17        Q.    Oh, you paid for the academy yourself?

18        A.    Yes.

19        Q.    I see.

20        A.    And I was hired part-time.

21        Q.    Okay.  Why did you transfer from New York to

22 Florida?

23        A.    Because they conduct their hiring

24 differently, it is all civil service.  I wanted a full

25 time job, and I wanted to come to a warmer climate, so I

1  applied in Florida and got hired full time.

2        Q.    Okay.  Fair enough.

3              And before you worked as a police officer in

4  New York State, did you have another job?

5        A.    Yes.

6        Q.    What was that job?

7        A.    I was a bartender and a dishwasher.

8        Q.    All right.  Briefly just give me your

9  educational --

10        A.    I have a Bachelor's degree.

11        Q.    From what school?

12        A.    State University of New York at Brockport.

13        Q.    Any other schooling other than the academy?

14        A.    I have an Associate's degree from a community

15  college.

16        Q.    Okay.

17              When did you graduate college?

18        A.    December of '94.

19        Q.    From December '94, you were a bartender and

20  dishwasher?

21        A.    No, I was a bartender and dishwasher while I

22  was in college until I started the police academy in March

23  '95.

24        Q.    Okay.  Fine.

25              All right.  When you are with the Fort

1 Lauderdale Police Department under their training, what

2 rules are you under?

3             In other words, are you under the Hallandale

4 rules regarding the use of the K-9 or under the Fort

5 Lauderdale rules regarding the use of the K-9?

6       A.    They are all basic rules.

7       Q.    Okay.  I don't know if there is a difference

8 or not.  I'm just asking you if you know what rules you

9 are under.

10      A.    As far as the usage of the dog, I would go

11 under Fort Lauderdale, because they are a little more

12 strict.

13      Q.    Okay.

14      A.    A little more outlined, I should say.

15      Q.    Okay.  And before you went out on the road

16 with the Fort Lauderdale Police Department, were you told

17 what those rules were or did you read those rules?

18      A.    I read over their policy and I was told what

19 their rules were, yes.

20      Q.    Okay.  Do you know what the policy, what book

21 that's located in?

22      A.    It's their policy book; I really don't know.

23      Q.    Okay.  But while training with them in their

24 city, you would then be under their specific rule

25 regarding use of the K-9.

1          MR. GUNTHER:  Object to the form.

2          MS. CODY:  I object.

3  BY MR. DANIELS:

4      Q.    That will be your understanding?

5      A.    (No verbal response.)

6          MR. GUNTHER:  You can answer it.

7          THE WITNESS:  Yes.

8  BY MR. DANIELS:

9      Q.    Okay.  Do you know any of the differences

10 between the Fort Lauderdale rules and the City of

11 Hallandale rules?

12     A.    Not right off the top of my head.

13     Q.    All right.  On the day of this incident, when

14 did you start work?

15     A.    I worked my regular shift back here in

16 Hallandale, and then I went up afterwards and did some

17 training with Fort Lauderdale.

18     Q.    I see.  Okay.  And when did you arrive at

19 Fort Lauderdale to begin your training?

20     A.    It was at nighttime.  I don't know exactly

21 what time it was.

22     Q.    Okay.

23     A.    I would say maybe after 11:00 o'clock at

24 night.

25     Q.    Where do you report?

1          A.     I just met with them wherever they were.    I

2    don't exactly remember where they were at.

3          Q.     They tell you where to meet?

4          A.     Yes.   I got in contact with them to do

5    training and they said meet us here; I don't remember

6    exactly where we met.

7          Q.     Do you drive your patrol vehicle over there

8    with the dog inside?

9          A.     Yes.

10         Q.     And you transfer the dog over to their

11   vehicle?

12         A.     Right.

13         Q.     And this is a specific vehicle that you are

14   supposed to have when you have a dog?  Is it a different

15   type of vehicle?

16         A.     It has a special K-9 container in the

17   vehicle.

18         Q.     All right.  Before this incident happened

19   that we are on here today, were you involved in any other

20   incidents that day?

21         A.     I don't recall.

22         Q.     Okay.

23         A.     Not with Fort Lauderdale.

24         Q.     That's when I mean meant.

25         A.     No, not with For Lauderdale.

1    Q.    Okay.

2    A.    Not that I recall, anyway.

3    Q.    How did you first become involved in this

4 incident?

5    A.    They requested a K-9 for bail-out of a stolen

6 vehicle.

7    Q.    Are you talking about they requested, meaning

8 the City of Fort Lauderdale Police Department?

9    A.    Fort Lauderdale Police Department, yes.

10    Q.    What happened?

11    A.    Myself and Officer Reed responded to the

12 scene.

13    Q.    And do you remember where that scene was?

14    A.    It was in, I have to refer --

15    Q.    You can look at your -- what do you have with

16 you?

17    A.    Just the report that you have.

18    Q.    Okay.  The incident report.

19    A.    It was 1513 Northwest 15th Court, Fort

20 Lauderdale.

21    Q.    Okay.

22          What happened when you arrived at the scene?

23    A.    We met with Officer Hart.

24    Q.    Okay.  And did you know Officer Hart before

25 this?

1          A.     I had met him; just to say hello.

2          Q.     Okay.  And he is with the City of Fort

3   Lauderdale?

4          A.     Yes.

5          Q.     What happened when you met with him?

6          A.     He stated that he had this stolen vehicle

7   that had crashed, the driver had bailed out of the

8   vehicle, and ran from the car.

9          Q.     Okay.  What happened after that?

10          A.     At that time he stated that he, or he said he

11   stood by at that location, let no other people come into

12   the area or out of the area.  And at that time myself and

13   Officer Reed deployed my K-9 partner.

14          Q.     You deployed.  Tell me what happened after

15   that.

16          A.     I gave the command to search.  At which time

17   he alerted to the presence of fresh human scent and

18   initiated a track.

19          Q.     Okay.

20                 Could they tell it was fresh human scent as

21   opposed to old human scent?

22          A.     They are taught to pick up the freshest human

23   scent and follow it to its source.

24          Q.     Was there anyone else with you or was it just

25   you and Officer Reed?

1    A.    Myself and Officer Reed.

2    Q.    What happened after that?

3    A.    We continued the track.

4          It went through a couple of yards and ended

5 up in front of 1516 Northwest 15th Place.

6    Q.    What happened after that?

7    A.    At that time, K-9 Gero began to alert to the

8 increasing presence of the fresh human scent.  At that

9 time I illuminated the bushes with my flashlight and

10 observed what ended up being Mr. Hodge hiding in the

11 bushes.

12    Q.    Okay.  At that time is the dog restrained?

13    A.    Yes.

14    Q.    Okay, it is on the leash?

15    A.    Yes.

16    Q.    Who had the leash?

17    A.    Me.

18    Q.    Do you know how long that leash is?

19    A.    The leash's total length is 15 feet; however,

20 it is very rarely used at that total length.

21    Q.    All right.

22          When the dog I guess, what, located Mr.

23 Hodge, where was Mr. Hodge at that time?

24    A.    He was concealed partially in the bushes

25 between the corner of the building, in the bushes.

1          Q.     Okay.  How does the dog let you know that he

2   has located a person?

3          A.     His alert becomes very intense.

4          Q.     What does he do?  Bark or --

5          A.     No, not -- no.

6                 It is a change in behavior.  With Gero, his

7   tail becomes erect, his body becomes very rigid, his ears

8   will point up and forward, he will be staring at the

9   direction of the person he has located.  He may bark.

10                He is giving us an obvious indication that he

11  has located what he is looking for.

12         Q.     Is it different with different dogs?

13         A.     Every dog -- dogs alert, I can testify only

14  to my dog.

15         Q.     Right.  I'm asking is it different with

16  different dogs?

17         A.     Right.  Right.  It is a variation; I can't

18  say.

19         Q.     Okay.  So you put your flashlight on.

20                What type of flashlight do you have?

21         A.     I have, it is as Stream Light SLR 20

22  rechargeable flashlight.

23         Q.     How big is it?

24         A.     About (indicating), is that a foot maybe.

25         Q.     About a foot?

23

```
 1         A.    Yes, not real big.

 2         Q.    Do you know how big of a diameter it is?

 3         A.    (Indicating.)

 4         Q.    About an inch?

 5         A.    An inch and a half, maybe.

 6         Q.    Is it made out of metal?

 7         A.    Yes.

 8         Q.    Is it only used for a flashlight or is it

 9  used for anything else?

10               Do you train on it?  Do you use it to hit

11  people?  Anything like that?

12         A.    No, I use it as a flashlight.

13         Q.    That's it.  Is it supposed to be used for any

14  other purpose other than that?

15         A.    It is used as a flashlight, yes.

16         Q.    Okay.

17               All right, now, were you the only one that

18  had the flashlight at that time, or did Officer Reed also

19  have a flashlight?

20         A.    I'm not sure with Officer Reed.  I know my

21  flashlight had illuminated; if Officer Reed's did also,

22  I'm not sure.

23         Q.    Was there any other police officer with you

24  at that time?

25         A.    No.
```

1          Q.      Do you know what time of day that was, by the

2    way?

3          A.      Early morning.

4          Q.      1:00 o'clock, 2:00 o'clock, 3:00 o'clock?    Or

5    do you know?

6          A.      I will refer back to the report.    I believe

7    around 4:00 a.m.

8          Q.      Okay.    This is a residential area?

9          A.      Yes.

10         Q.      Were there any civilians in the area at that

11   time?

12         A.      Not that I know of.

13         Q.      So what happened after that, after you

14   illuminated the bushes?

15         A.      I observed Mr. Hodge attempting to conceal

16   himself in there, had his hands, I couldn't see his hands,

17   just see pieces of him.

18              At that time I announced, police officer,

19   Hallandale Beach Police K-9 Unit, that he was under

20   arrest.    I informed him to come out of his hiding place

21   and show his hands.

22         Q.      What happened after that?

23         A.      Nothing.    So then I issued another warning.

24         Q.      Are you the only one that did the warning --

25         A.      Yes.

```
 1        Q.      -- or did Officer Reed also?

 2        A.      Only I did.

 3        Q.      How far were you from Mr. Hodge at that time?

 4        A.      A few feet.

 5        Q.      Two feet, three feet, four feet?  Or between

 6   three and four?

 7        A.      I would say between three and six feet.

 8        Q.      Okay.

 9        A.      Estimate.  I don't know for sure.

10        Q.      That's fine.

11                Would there be anything preventing Mr. Hodge

12   from hearing you?

13        A.      No.

14        Q.      How many times did you say it?

15                Twice you repeated it?

16        A.      Gave two warnings, yes.

17        Q.      Okay.

18        A.      Each warning consisting of what I told you.

19        Q.      Say that again.  I'm sorry.

20        A.      Each warning --

21        Q.      No, say what you said.

22        A.      Identified myself as a police officer with

23   the K-9 unit, that he was under arrest, to come out of the

24   bushes and conceal his hands.  I mean expose his hands.

25   I'm sorry.
```

1    Q.    Expose.

2          So you didn't get any response.

3    A.    No.

4    Q.    Okay.  What happened next?

5    A.    I gave the second warning and advised that I

6  would release my partner.  And again I got no response

7  that he was coming out of the bushes, verbal or physical.

8    Q.    When you say release your partner, do you say

9  it like that?  Or do you say release my dog?

10    A.    I don't remember exactly what words; I may

11  say release the dog, yes.

12    Q.    I'm asking you that, because I would assume

13  probably if somebody says, release my partner, they might

14  not know what you are talking about.

15    A.    Right.  I would probably say release the dog,

16  correct; I wouldn't say I would release my partner.

17    Q.    And there was still no response.

18    A.    Correct.

19    Q.    And then what happened?

20    A.    Then at that time I gave K-9 Gero the command

21  to apprehend him.

22    Q.    How do you do that?  What do you say?

23    A.    I slack off on the leash and give him the

24  apprehension command.

25    Q.    Which is what?

1      A.      Stellen.

2              Dutch.

3      Q.      Okay, spell stellen.

4      A.      S-t-e-l-l-e-n.

5      Q.      Is that a Dutch dog?

6      A.      He is from Holland originally.

7      Q.      Speaks in English, this dog?

8      A.      He knows a little bit of English from being

9  around the house; all his work commands are in Dutch.

10     Q.      So how do you say halt in Dutch?

11             MR. GUNTHER:  Say it.

12             THE WITNESS:  (No verbal response.)

13  BY MR. DANIELS:

14     Q.      Or stop.  You want the dog to stop, what do

15  you say?

16     A.      I give him -- it is called voet.  And Gero

17  returns.

18     Q.      That is not Dutch.

19     A.      Yes, it is, it is spelled v-o-e-t, but if

20  sounds like foot.

21             If I were to give him that command, he would

22  return back to me.

23     Q.      I understand you are the only one that

24  controls that dog.  Police Officer Reed, does he know all

25  these commands?

1       A.      I don't know what his dogs --

2       Q.      I understand, but he wouldn't know your

3  command?

4               MR. GUNTHER:  Reed has a Belgian dog.

5               THE WITNESS:  He might from training, but I

6          don't know.  I can't speak for Officer Reed.

7  BY MR. DANIELS:

8       Q.      No, I'm just saying while you are out there

9  with the dog, you are the one that was controlling the

10 dog.

11      A.      Correct.

12      Q.      Officer Reed had no control over that dog.

13              Am I correct?

14      A.      He had nothing to do with working the dog.

15      Q.      He wouldn't know the commands.  Or am I

16 wrong, or right?

17      A.      I couldn't tell you.  He helps out; I can't

18 tell when whether he knows the commands, whether he

19 doesn't know.  I can't speak for Officer Reed.

20      Q.      Okay.  Like if I went to the dog and said

21 stellen, would the dog listen to me, or he will only

22 listen to you?

23      A.      I doubt it.  He might, I don't know.  I doubt

24 it.

25      Q.      Okay.

1              I'm just trying to figure out the fact that,

2    I mean these commands are something that are in Dutch and

3    obviously not a lot of people know Dutch.

4         A.    Correct.

5         Q.    I would assume that Officer Reed does not

6    know -- did you tell Officer Reed what the commands were

7    for the dog?

8         A.    No.

9         Q.    Okay.  Did Officer Reed ever command your dog

10   at any time --

11        A.    No.

12        Q.    -- when you were with him?

13        A.    No.

14        Q.    And you say you slacked off on the leash.

15             Does that mean you let the dog go?

16        A.    I let off the leash; I still had the leash in

17   my hand so if something happened I could still have hold

18   of the dog.

19             However, I let him, to go forward.

20        Q.    So the dog was never unleased?

21        A.    No.

22        Q.    And what happened after that?

23        A.    He then entered the bushes, made contact with

24   Mr. Hodge in the upper right arm and attempted to pull him

25   out of the bushes.  Which he is trained to do.

1          At that time, Mr. Hodge became combative,

2 began to struggle with the dog as the dog was trying to

3 pull him out of his hiding spot.

4          As he did that, he was able to free his arm

5 from the dog's mouth.  At that time, the dog went back in

6 and made contact with Mr. Hodge in the buttocks.  As they

7 continued to struggle, Mr. Hodge was grabbing at the dog,

8 striking at the dog.

9          As he was trying to get away, the dog was

10 trying to pull him back, which caused him to pull out

11 again.  Which his pants ripped, and the dog re-contacted

12 again in his buttocks.

13          The whole time we're telling him to stop

14 fighting, stop fighting the dog, put his hands behind his

15 back.  He didn't listen to any of those, continued to

16 struggle with the dog.

17          At one time I struck him with my flashlight

18 in the arm in the back to get his compliance, in order to

19 get him to put his hands behind his back.

20          Finally he stopped resisting; he was able to

21 be handcuffed, and the dog was removed.

22     Q.    Let me ask you something specifically.  As

23 far as the dog -- I'm sorry.  I'm not talking up loud

24 enough.  When the dog is trained to go and I guess get the

25 person, is he trained to go to a specific part of the

1 person's body?

2       A.      No.  He will take the first part that is ...

3       Q.      Available?

4       A.      Available to him, yes.

5       Q.      Okay.

6       A.      If his leg had been there, he would have

7 grabbed him by the leg.

8       Q.      Okay.  So the dog then grabbed his arm?

9       A.      Correct.

10      Q.      At that time, you and Officer Reed are four

11 to six feet away from him or something like that.

12      A.      Yes, within that general area.

13      Q.      Okay.  And I guess you have the flashlight on

14 the situation; you can see what's happening?

15      A.      Right.

16      Q.      And you can hear what's happening?

17      A.      Yes.

18      Q.      Okay.  How was he facing, Mr. Hodge?  Was he

19 faced down on the ground?

20      A.      Face northwesterly direction; he was in the

21 bushes upright, head pointed toward the sky, feet on the

22 ground, crouched down in the bushes.

23      Q.      Was he on all fours?

24      A.      I don't think so.

25      Q.      When you say crouched down?

```
 1        A.    He was trying to hide behind the bushes like
 2  this (indicating).

 3        Q.    I see.

 4        A.    I could only see pieces of him.

 5        Q.    So he was on two feet?

 6        A.    Yes.

 7        Q.    And he was just like, okay, crouched down?

 8        A.    Correct.

 9        Q.    Okay.

10              When the dog grabbed Mr. Hodge, do you know
11  what arm he grabbed him on?

12        A.    Right arm.

13        Q.    And he was pulling.

14              Is that what he is supposed to do, pull him?

15        A.    He is supposed to pull him out of his place
16  of hiding back to me.

17        Q.    Does that cause Mr. Hodge to fall down or
18  anything like that?

19        A.    During the struggle, there was a struggle
20  between him and the dog, which Mr. Hodge fell forward.

21        Q.    So he is falling facedown onto the ground?

22        A.    Yes, that way (indicating).

23        Q.    Okay.

24        A.    Well, during the struggle he did fall
25  forward.  It was after, I mean, when he was fighting with
```

33

1  the dog and pulled away from the dog.

2         Q.    Okay.  So the next thing that happened is

3  that he is grabbing the dog and then he is getting the

4  dog --

5         A.    He pulled his arm out of the dog, yes.

6         Q.    Pulled his arm out of the dog?

7         A.    Yes.

8         Q.    Okay.  And then the dog reconnected with him

9  in his buttocks.

10        A.    Buttocks, yes.

11        Q.    At that time, since he had gotten him in his

12 buttocks, was Mr. Hodge on the ground at that time?

13        A.    He was going toward the ground, yes.  He was,

14 he was either on his -- almost on the ground or partially

15 up on his elbows.  I can't remember exactly.

16        Q.    Right.  Okay.  And during this time period

17 from between the time that he grabbed the dog, grabbed him

18 on the arm, and the time that the dog then reconnected to

19 his buttocks, you are telling Mr. Hodge what?

20        A.    Place his hands behind his back, stop

21 fighting the dog.  He was grabbing the dog, hitting the

22 dog.

23        Q.    He was hitting the dog?

24        A.    Swatting at the dog, yes; grabbing his muzzle

25 when it was on his arm, and when it is was on his

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1  buttocks, he was reaching back trying to swat the dog.  I

2  told him stop fighting, place his arms behind his back.

3       Q.    Was Officer Reed saying anything too?

4       A.    Yes.  Officer Reed was also giving him

5  commands.

6       Q.    Was there any other officer in that area at

7  that time?

8       A.    Not in that area, no.

9       Q.    Okay.  So now after he bit Mr. Hodge in the

10 buttocks, what happened after that?

11      A.    Mr. Hodge was still trying to get away.

12      Q.    Right.

13      A.    Going forward.  And the dog is trying to pull

14 him back.

15      Q.    Right.

16      A.    At that time, the dog --

17      Q.    When you say forward, you mean going away

18 from you?

19      A.    Mr. Hodge is trying to go away from us; the

20 dog is trying to pull him back to me.

21      Q.    Okay.

22      A.    Which caused the dog to rip again, pull out.

23            Mr. Hodge pulled away.  At that time, his

24 pants ripped and the dog went in again and recontacted his

25 buttocks.

1        Q.      At the same area?

2        A.      I don't know if it was the exact area; it was

3   in the general --

4        Q.      General area?

5        A.      General buttock area.

6        Q.      What happened after that?

7        A.      Still telling him stop fighting, put his hand

8   behind his back.  And I struck him with the flashlight in

9   his arm in the back to get him to comply.

10       Q.      Were you the only one that struck Mr. Hodge?

11       A.      Yes.

12       Q.      Or did Officer Reed strike him?

13       A.      No, I was the only one, that I recall.  I

14  don't remember Officer Reed striking him.

15       Q.      Okay.

16               Do you know which arm you struck him in?

17       A.      No, I don't.

18       Q.      Okay.

19       A.      It was the upper, the upper part of his back

20  towards his shoulders.

21       Q.      Toward his shoulders.

22               Do you know how many times you struck him?

23       A.      A couple of times.

24       Q.      Two times or more that -- when somebody says

25  couple --

```
 1        A.    More than two times.
 2        Q.    Okay.  So just to get it down, between two
 3  and five times --
 4        A.    Yes.
 5        Q.    -- between two and four?  How much is it?
 6        A.    I would say between two and five times.
 7        Q.    And was this after the dog reconnected a
 8  second time to his buttocks or before?  Or when was this?
 9        A.    It was during that time.
10        Q.    Okay.
11        A.    I can't give you the exact.
12        Q.    Okay.
13              So now we're on the second time the dog
14  connected to Mr. Hodge's buttocks.
15              What happened after that?
16        A.    We still continued to give him commands.
17  Finally he stopped fighting and resisting, and put his
18  hands behind his back; was taken into custody.
19        Q.    Do you know how long this entire incident
20  took from the time that the dog grabbed him on his arm
21  until the time that he gave up?
22        A.    It seems like a long -- it wasn't very long.
23  I can't ...
24        Q.    Okay.
25        A.    Not a very long period of time.
```

1          Q.    All right.  What happened after that?

2          A.    He was handcuffed, the dog was removed, and

3 he was transported to the hospital.

4          Q.    He was handcuffed and then he was removed.

5 You and Officer Reed removed him?

6          A.    No.

7                He was handcuffed.

8          Q.    Right.

9          A.    I took my dog.

10         Q.    Okay.

11         A.    And then Mr. Hodge was taken to a unit and

12 taken to the hospital.

13         Q.    Okay.  Now who took him to the unit?

14         A.    I don't know.  At that time -- I was working

15 my dog; I took my dog, and that was it.

16         Q.    Okay.  So who handcuffed Mr. Hodge?

17         A.    Officer Reed.

18         Q.    And then you took your dog to the patrol unit

19 that you and Officer Reed were both in before?

20         A.    Correct.

21         Q.    After Officer Reed handcuffed Mr. Hodge, what

22 did Officer Reed do?

23               Is he the one that took him, or did he come

24 back to the patrol car where you were?

25         A.    I don't know who transported him.  Officer

1  Reed came back to where I was.

2        Q.    So somebody then had to come to the scene?

3        A.    There were perimeter units out there.   Once

4  we said we had him into custody, they responded to where

5  we were.

6        Q.    You don't know who responded.

7        A.    No.

8        Q.    So after he was handcuffed, did you have any

9  other further contact with Mr. Hodge?

10       A.    No.

11       Q.    Did you talk to him at any time after he was

12 handcuffed?

13       A.    No.

14       Q.    How about from the time that you came upon

15 Mr. Hodge until the time that he was handcuffed, did you

16 talk to Mr. Hodge at all?

17             Did he say anything to you?  Did you say

18 anything to him?

19       A.    Other than telling him to --

20       Q.    Other than what you said before.

21       A.    My warnings and all that.

22       Q.    Right.

23       A.    I never carried on any conversation.

24       Q.    No?

25       A.    No.

1    Q.    How about Officer Reed?  Did he have any

2  conversation with Mr. Hodge?

3    A.    Not that I recall, no.

4    Q.    Did you ever see Mr. Hodge again after he was

5  handcuffed?

6    A.    Yes.

7    Q.    When was that?

8    A.    I saw him at the hospital, and then I saw him

9  when he was released to the Fort Lauderdale jail.

10    Q.    Okay.  All right.  Which hospital was he --

11    A.    I believe it was Broward General.

12    Q.    Why did you go to Broward General Medical

13  Center?

14    A.    Because I had to go down there with Officer

15  Reed and Sergeant Wheeler, Sergeant Wheeler was conducting

16  the post apprehension review, and I went with him to see

17  how they do it, and because we had to get his information

18  for our report.

19    Q.    Whose information?  Mr. Hodge?

20    A.    Mr. Hodge's information.

21          I didn't know his name at the time.  I didn't

22  know anything about him at the time.

23    Q.    Okay.  So who gave you that information?  His

24  name and --

25    A.    I don't recall.

1      Q.    It wasn't from you questioning Mr. Hodge?

2      A.    No, I didn't get any information -- I didn't

3  talk to Mr. Hodge at all.  I didn't get any information

4  from him.

5      Q.    Then you said you saw him the next time in

6  jail?

7      A.    They were transporting him from the hospital

8  back to the jail; I just happened to be standing in the

9  parking lot when they brought him in.

10      Q.    That was the last time you saw him?

11      A.    Yes.

12      Q.    Okay.

13            I'm just looking at this report from you.

14  Actually, Hallandale Police Department says the culprit

15  was identified by Officer Hart and then transported to

16  Broward General Hospital for treatment.

17      A.    Right.

18      Q.    What does that mean, identified?

19      A.    Identified as the person that he saw leaving

20  the vehicle; driving the vehicle, leaving the vehicle.

21      Q.    Okay.  His name wasn't given at that time?

22      A.    Not to me, no.

23      Q.    Okay.

24            He was charged with resisting a law

25  enforcement officer without violence.  All right.  What

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1  does that mean?  When it says resisting a law enforcement

2  officer without violence.

3              MR. GUNTHER:  Object.  Calls for a legal

4        conclusion.

5              Go ahead.

6              THE WITNESS:  (No verbal response.)

7              MR. GUNTHER:  Go ahead.

8              THE WITNESS:  Go ahead?

9              MR. GUNTHER:  Yes, go ahead, give us your

10        best definition of the law.

11             THE WITNESS:  It means that he was told to do

12        something or he was interfering with a lawful

13        investigation.  Therefore, we told him to come

14        out of his hiding place, and he did not, he

15        refused to.  Which meant that we had to take

16        further steps to further this investigation.

17 BY MR. DANIELS:

18        Q.    I see.  Okay.

19        A.    And he was not complying with what he was

20 told to do during the lawful arrest.

21             But he did not, seeing that it was without

22 violence, he did not offer any violence.

23        Q.    To you?

24        A.    To myself.

25        Q.    Now, I notice there were photographs taken --

```
 1          A.    Yes.

 2          Q.    -- of Mr. Hodge by Sergeant Wheeler.

 3          A.    Correct.

 4          Q.    Were you present when those photographs were

 5 taken?

 6          A.    I don't know if I was there when they took

 7 them or not.

 8          Q.    Okay.

 9          A.    To be honest with you.

10          Q.    The reason why I'm asking you is it talks

11 about the culprit received a laceration to his right

12 biceps, left buttocks and a puncture to his buttock.

13          A.    Right.

14          Q.    Where did you get this information from?

15          A.    When I was at the hospital.

16          Q.    How did you get this information?

17          A.    I was standing there looking at him.  I mean,

18 maybe Sergeant Wheeler might have told me.  I don't really

19 recall.

20          Q.    So you could see Mr. Hodge at that time?

21          A.    Correct.

22          Q.    Okay.  When you fill out this report as to

23 what his injuries are, are you supposed to go over and

24 look to see what the injuries are?

25                Is that what you are supposed to do?
```

1          A.     You should know where they are, yes, so you

2    can tell the medical people where they are, and you can

3    see them and you can document them.

4          Q.     Okay.  I mean, you weren't involved with the

5    medical people at that time?

6          A.     No.

7          Q.     But I mean you put them on this police report

8    I assume for a reason.

9          A.     Yes, so they are documented.

10          Q.     Were there any other injuries other than the

11    laceration to his right biceps, left buttocks and a

12    puncture to his buttocks that you noticed on Mr. Hodge at

13    that time?

14          A.     He had some red marks on his back where he

15    had been hit with the flashlight.

16          Q.     Okay.

17                 Why were those not documented in your report?

18          A.     Well, I documented that I struck him with the

19    flashlight, and there were also photographs which would

20    have taken care of that documentation.

21                 I documented the laceration and puncture

22    wounds to document where the dog actually made contact and

23    what those injuries were.

24          Q.     No, I understand.

25                 I'm saying why didn't you also document the

1  red marks?

2        A.    Because I assume that they would -- by me

3  stating that I did strike him in the back and seeing

4  photographs should be able to put that's what the red

5  marks were from.

6        Q.    Okay.  All right.

7              During the entire time from the time that you

8  came upon Mr. Hodge until the time that he was placed

9  under arrest and handcuffed, okay, did you notice any

10 civilians in the area at all?

11       A.    No.

12       Q.    Now was Officer Reed, was he with you the

13 entire time?

14       A.    Yes.

15       Q.    Okay.  And how far away was Officer Reed from

16 you?

17       A.    Not very far.

18       Q.    What was that, one foot --

19       A.    Within a few feet.

20       Q.    Within two to three feet?

21       A.    Could be, yes.

22       Q.    So you would be able to hear anything that

23 Officer Reed said and he would be able to hear anything

24 that you said?

25       A.    Yes.

1          Q.     Did you ever notice a black male

2 approximately 55 years old in the area where this incident

3 occurred?

4          A.     No.

5          Q.     During that entire time, from the time that

6 you located Mr. Hodge until the time that he was

7 handcuffed, you were the only officers over there?

8          A.     Correct.

9          Q.     Okay.  And then after he was handcuffed, you

10 weren't involved; you left and you went to your car.

11         A.     Right.  He was transported.

12         Q.     Some other officers may have come over and

13 transported him, an Officer Reed joined you in the car?

14         A.     Correct.

15         Q.     Do you know if any officers other than

16 yourself hit Mr. Hodge at all?

17         A.     No.

18         Q.     Do you know of any officers kicking Mr. Hodge

19 other than yourself?

20         A.     I never kicked him.

21         Q.     I know that you didn't kick him.

22                MS. CODY:  Didn't kick him.  Right.

23 BY MR. DANIELS:

24         Q.     Do you know of any officers kicking Mr.

25 Hodge?

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1        A.      No.

2        Q.      Okay.   Now when the dog I guess grabbed Mr.

3  Hodge and then Mr. Hodge -- you say initially grabbed him

4  by the arm -- pushed the dog off his arm, is that

5  something the dog normally does, then will try to

6  reconnect?

7        A.      Yes.

8        Q.      Do you have to tell the dog to do that?

9        A.      No.   He will try to reconnect on his own.

10        Q.      Now, do you have to tell the dog, say the dog

11  grabs the person and pulls him out, do you have to tell

12  the dog to let go or does the dog do it automatically?

13        A.      I could tell him, but what we do is we

14  actually take the dog off.   That's for the suspect's

15  safety.

16        Q.      How do you do that?   How do you take him off?

17        A.      We restrict the air that the dog is getting,

18  and that way he releases his grasp.

19        Q.      What do you do?   Tighten the leash?

20        A.      Tighten the chain around his neck.

21        Q.      I'm just curious.   If someone is fighting

22  with the dog, if they were to grab the chain and tighten

23  it around the neck, would the dog --

24        A.      If he was able to choke the dog to the point

25  where the dog felt he had to let go or he was going to die

1  or whatever, then the dog -- I don't think -- could have

2  happened.  Sure, anything could happen.  But.

3       Q.    All right.  Why do you do that as opposed to

4  telling the dog to let go?

5       A.    Because if we call out to the dog where we

6  give him a verbal command to release, the dog is trained

7  that if the subject moves in a threatening manner, he will

8  contact again.

9       Q.    I see.

10       A.    This way the dog is on the person, the person

11  is handcuffed; they are now secured, no longer a threat,

12  the dog is removed.  I have control over my dog; if the

13  man moves, I have the dog so he doesn't connect again.

14       Q.    Is the dog released while the person is being

15  handcuffed?

16       A.    No.

17       Q.    So the dog is still attached to the person

18  while you handcuff the person?

19       A.    Correct.

20       Q.    In Mr. Hodge's case, where is the dog

21  attached while you were handcuffing him?

22       A.    His buttocks.

23       Q.    Mr. Hodge, was he facedown on the ground?

24       A.    Correct.

25       Q.    Okay.

1             Did you have, at any time, any of your

2  handguns out?

3        A.    No.

4        Q.    Do you know whether Officer Reed had any of

5  his handguns out at any time?

6        A.    No.

7        Q.    You don't know or he didn't?

8        A.    No, I never saw his handgun out.

9        Q.    Okay.

10            Was Mr. Hodge, I guess after you handcuffed

11 him, okay -- well, you didn't handcuff him; actually.

12 Officer Reed handcuffed him?

13       A.    Yes.  Right.

14       Q.    Okay.  Did you see Mr. Hodge get up?

15       A.    I was in the area when he got up and walked

16 him to the patrol car.

17       Q.    How far away were you?

18       A.    (No verbal response.)

19            MR. GUNTHER:  From what?

20            MR. DANIELS:  Let me start again.

21 BY MR. DANIELS:

22       Q.    These are not trick questions, so if you

23 don't understand something, I will be glad to change or

24 rephrase it.

25            All right.  He is handcuffed, he is on the

1 ground handcuffed by Officer Reed.

2      A.    Correct.

3      Q.    After he is handcuffed, you then put pressure

4 on the chain of the dog, I don't know, do you also give a

5 command?

6      A.    No.  The dog just lets go.

7      Q.    The dog just releases.  And then you walk the

8 dog some distance away?

9      A.    Correct.

10      Q.    Are you standing around or are you putting

11 the dog into the patrol car?

12      A.    I was -- I don't know, exactly sure, but I

13 was probably walking back to the patrol car, which is the

14 next block over.

15      Q.    Right.  Okay.

16      A.    I was in the area for a short period of time.

17      Q.    So you are walking away.

18      A.    Yes.

19      Q.    Can you see Mr. Hodge at that time?

20      A.    Yes.

21      Q.    Okay.  Did you see him getting up?

22      A.    Yes.

23      Q.    Now, these other police officers that came

24 over, did they come over after Mr. Hodge got up or before

25 he got up, if you know?

1    A.    I don't remember.

2    Q.    Okay.  Did the other police officers come

3 before he was handcuffed or after he was handcuffed?

4    A.    No, after he was handcuffed.

5    Q.    After he is handcuffed.

6          You have to actually call them and say --

7    A.    He's in custody.

8    Q.    He's in custody?

9    A.    Right.

10   Q.    In custody means he is handcuffed?

11   A.    Yes.

12   Q.    Who called them?  Did you call them?

13   A.    No.

14   Q.    So Officer Reed had to call, I assume?

15   A.    I assume.

16   Q.    So Officer Reed calls, says he's in custody.

17         Your dog is restrained.  And I assume it

18 takes a little while, because they are on the perimeter,

19 for the police officers to come over?

20   A.    There was a perimeter close by.

21   Q.    So how long did it take for the other police

22 officers to come over?

23   A.    Quickly.  They were in the area.

24   Q.    You were still in the area.

25   A.    Yes.

51

```
 1        Q.    These were Fort Lauderdale police officers?

 2        A.    Correct.

 3        Q.    You don't know who they were?

 4        A.    No.

 5        Q.    Do you know how many they were?

 6        A.    No.

 7        Q.    Okay.

 8        A.    There was a perimeter; there were units in

 9 the area.  I don't know.

10        Q.    Okay.  And they came over and they then took

11 Mr. Hodge from Officer --

12        A.    Correct.

13        Q.    At that time, was Mr. Hodge up from the

14 ground?  Is he standing?

15        A.    From what I recall, yes.

16        Q.    Okay.  And did those officers -- and you see

17 the other officers with Mr. Hodge, Mr. Hodge is

18 standing --

19        A.    Uh-huh.

20        Q.    Yes?

21        A.    As far as I recall, yes.

22        Q.    Okay.

23        A.    I mean, he had to be standing to eventually

24 get to the car.

25        Q.    Fine.  And did those other officers touch Mr.
```

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1  Hodge as far as hit him or anything like that?

2          I mean, obviously they touched him to take

3  custody of him.  But did those other officers hit Mr.

4  Hodge in any way?

5          A.    No.

6          Q.    And did you see those officers, did you see

7  them take Mr. Hodge?  In other words, walk with him

8  towards the patrol car?

9          A.    Yes.  I mean, I don't remember exactly, can't

10 picture them walking to the car, but he was taken to the

11 patrol car.

12         Q.    Okay.  And about how long was Mr. Hodge in

13 your sight during that time period?

14         A.    A few moments.

15         Q.    During any time that Mr. Hodge was in your

16 sight, from the time that he was handcuffed until the time

17 that you last saw him, okay, did any officer ever hit Mr.

18 Hodge in any way?

19         A.    No.

20         Q.    Was Mr. Hodge bleeding?  Did you notice some

21 bleeding?

22         A.    (Nods head in the affirmative.)

23         Q.    Okay.

24         A.    Yes.

25         Q.    And where was he bleeding from?

53

1          A.     The arm.

2          Q.     All right.  Can I see what you have?

3          A.     Sure.

4          Q.     During the time that you are training with

5   the Fort Lauderdale Police Department, you are paid a

6   salary for doing that?

7          A.     (No verbal response.)

8          Q.     Are you paid during this time period that you

9   are training with the Fort Lauderdale Police Department?

10         A.     Yes.

11         Q.     Okay.  And who pays you?

12         A.     City of Hallandale.

13         Q.     City of Hallandale?

14         A.     It was my regular workday when I was

15   training.

16         Q.     Okay.  So that is part of your job, is

17   training?

18         A.     Correct.

19         Q.     When did you prepare this incident report?

20         A.     I would have to refer to it.  9/8 of '98.

21         Q.     Okay.  This incident happened on September 6.

22   Is there a reason why you waited two days to prepare this?

23         A.     Make sure I had all my -- all the people's

24   information, I had vehicle information.  I don't know what

25   day of the week it was; maybe I wasn't even on for two

1  more days.

2              Looks like to me that it was a Sunday

3  morning.  I was off Sundays and Mondays, so I would -- and

4  Tuesday.

5        Q.    Okay.

6        A.    So I would have not come back into work until

7  probably Tuesday night.

8        Q.    Okay.  Now it says, see Fort Lauderdale

9  Police case number.

10       A.    Correct.

11       Q.    Did you review that before you prepared your

12  report?

13       A.    No.

14       Q.    How did you know the case number?

15       A.    Got it from one of the Fort Lauderdale

16  officers that night for a reference.

17       Q.    How did you know what Mr. Hodge was charged

18  with?

19       A.    Because like I say, I saw him when they were

20  bringing him into the jail and I saw Officer Hart and I

21  saw a copy of the probable cause affidavit, which listed

22  his charges.

23       Q.    Have you seen anything else regarding this

24  case other than the probable cause affidavit?

25       A.    Yes, I've seen whatever paperwork my attorney

1 has.

2      Q.    Okay.  I mean anything, I wasn't asking for

3 your attorney's paperwork, I'm just asking you have you

4 reviewed any other reports by any police agencies?

5      A.    Yes.

6      Q.    Was that for the preparation of your report

7 or for this deposition?

8      A.    For this deposition; it was after I prepared

9 this.

10      Q.    Okay.

11           Now, when you prepare your incident report,

12 do you do it from memory or do you make notes at the

13 scene?  Or how do you do that?

14      A.    Everything was from memory except for the

15 specifics, people's names, case number, vehicle type,

16 addresses.

17      Q.    Okay.

18      A.    But the actual --

19      Q.    Facts.

20      A.    Yeah, whatever took place was from memory.

21      Q.    Okay.

22           I notice on the K-9 supplement report of the

23 Fort Lauderdale Police Department done by Officer Reed --

24      A.    Yes.

25      Q.    Okay.  Before you prepared your report did

1 you and Reed --

2          A.     No.

3          Q.     Now, Sergeant Wheeler also responded to the

4 scene?

5          A.     Correct.

6          Q.     Did you see that?

7          A.     See what?

8          Q.     When Sergeant Wheeler came to the scene.

9          A.     Yes.

10         Q.     Okay.  Where were you at that time?

11         A.     After I put my dog up, I went back over to

12 the apprehension scene to talk to Sergeant Wheeler.

13         Q.     So after you put your dog in the vehicle?

14         A.     Yes.

15         Q.     You then went out back to the scene?

16         A.     Right.

17         Q.     I assume Mr. Hodge was no longer there.

18         A.     No.

19         Q.     Okay.  He was no longer there.  Right?

20         A.     Correct.

21         Q.     Okay.  And Sergeant Wheeler came.  And what

22 happened after that?

23         A.     Spoke with me and Officer Reed; he took

24 photographs of the area; he did what, I don't know exactly

25 what it is his duties are supposed to be.  And then he

1 left and went to the hospital.

2         Q.    Okay.  And then you followed him to the

3 hospital?

4         A.    We went to the hospital, I don't know if we

5 followed him.

6         Q.    I meant --

7         A.    We got there after he did or the same time.

8         Q.    Okay.

9         A.    Whatever it was, I don't recall.

10        Q.    Two more minutes, and we'll be done.  See if

11 I'm missing anything.

12              During the time that Mr. Hodge was being

13 bitten by the dog, did Mr. Hodge say anything?

14        A.    Not that I recall.

15        Q.    Okay.

16        A.    Might have been -- I mean, there was a lot

17 going on, a lot of commotion.

18        Q.    I understand.

19        A.    He was saying, I mean, he might have been

20 saying something; nothing that was audible to me that I

21 can recall as what his statement was.

22        Q.    Did he say anything, like, to the effect,

23 don't bite me, or anything like that?

24        A.    No.  Not that I recall.

25        Q.    How was the lighting in that area?

58

1      A.    Pretty dark.   From what I remember.

2      Q.    Okay, I don't have any other questions.

3            MS. CODY:   Okay.

4            MR. GUNTHER:   No questions.

5            MS. CODY:   None.

6            THE COURT REPORTER:   Copies if ordered?

7            MR. DANIELS:   Yes.

8            MR. GUNTHER:   Yes, I want a copy and a mini

9       if it is ordered.

10           MR. DANIELS:   I'm not going to order it right

11      now.

12           MR. GUNTHER:   But if it is, that's what I

13      want.

14           Do you all waive or not waive signature and

15      signing?

16           MS. CODY:   No, we're definitely reading.

17           Copy if he orders it, as well.

18           (Thereupon, the deposition adjourned at 3:30

19      p.m.)

20

21

22

23

24

25

## CERTIFICATE OF OATH

STATE OF FLORIDA        )

COUNTY  OF  BROWARD  )

       I, the undersigned authority, certify that
OFFICER TIMOTHY M. CHURCH personally appeared before me
and was duly sworn.

       WITNESS my hand and official seal this
22nd day of January, 2001.

*Jackqulyn G. Holland*

_____
JACKQULYN G. HOLLAND
Notary Public - State of Florida
My commission No.  CC927587
Expires:  May 21, 2004.

## REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA        )
COUNTY  OF  BROWARD  )

       I, JACKQULYN GIPSON HOLLAND, Registered
Professional Reporter, certify that I was authorized to
and did stenographically report the deposition of OFFICER
TIMOTHY M. CHURCH; that a review of the transcript was
requested; and that the transcript is a true and correct
record of my stenographic notes.

       I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties, nor
am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I
financially interested in the action.

       Dated this 22nd day of January, 2001.

*Jackqulyn G. Holland*
_____
JACKQULYN G. HOLLAND
Registered Professional Reporter.

60

1                    CORRECTION SHEET

2
RE:     HUGH HODGE V. TIMOTHY M. CHURCH, etc. et al.
3
        Case No:  00-6228
4       Deposition of:  OFFICER TIMOTHY M. CHURCH
        Date Taken:  November 15, 2000
5
PAGE NO.         LINE NO.           CORRECTION OR CHANGE
6
7   _____    _____    _____
    _____    _____    _____
8   _____    _____    _____
    _____    _____    _____
9   _____    _____    _____
    _____    _____    _____
10  _____    _____    _____
    _____    _____    _____
11  _____    _____    _____
    _____    _____    _____
12  _____    _____    _____
    _____    _____    _____
13  _____    _____    _____
    _____    _____    _____
14  _____    _____    _____
    _____    _____    _____
15  _____    _____    _____
    _____    _____    _____
16  _____    _____    _____
    _____    _____    _____
17  _____    _____    _____
Under penalties of perjury, I declare that I have read my
18 deposition and that it is true and correct subject to any
changes in form or substance entered here.
19

20 _____
Date
21

22

23 _____
OFFICER TIMOTHY M. CHURCH, Deponent
24

25

```
 1                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                   DIVISION:  MIAMI

 3  HUGH HODGE,                    )
                                   )
 4         Plaintiff,              )
                                   )
 5    v.                           )   Case No.   00-6228 CIV-
                                   )              SEITZ/GARBER
 6  TIMOTHY M. CHURCH, THOMAS      )
    REED, PATRICK HART, DAVID      )
 7  WHEELER, CITY OF FORT          )
    LAUDERDALE, and CITY OF        )
 8  HALLANDALE,                    )
                                   )
 9         Defendants.             )
    _____x
10  To:  City Attorney - Hallandale Beach
         Carla Cody
11       400 South Federal Highway
         Hallandale Beach, FL 33009
12
         Your client's deposition taken in the above-styled
13  case on November 15, 2000 is now ready for signature.

14       Since the deposition was ordered on an expedited
    basis, the original and one copy were delivered to Mr.
15  Gordon Daniels today, January 23, 2001.  Please have your
    client read your copy of the deposition.  An errata sheet
16  is attached to the end of the transcript for your
    convenience.
17
         Please contact our office if you have any
18  questions.

19                          Very Truly Yours,

20                          Jackqulyn A Holland

21                          _____
                            JACKQULYN G. HOLLAND, RPR
22                          Capital Reporting Service
                            888 S. Andrews Ave., #304
                            Ft. Lauderdale, FL  33316
23                          (954) 522-6401

24  Date:  January 23, 2001
    cc:  Gordon S. Daniels, Esq.
25       Dieter K. Gunther, Esq.
```

```
 1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
 2                  DIVISION:  MIAMI

 3  HUGH HODGE,                )
                               )
 4          Plaintiff,         )
                               )
 5    v.                       )   Case No.   00-6228 CIV-
                               )              SEITZ/GARBER
 6  TIMOTHY M. CHURCH, THOMAS  )
    REED, PATRICK HART, DAVID  )
 7  WHEELER, CITY OF FORT      )
    LAUDERDALE, and CITY OF    )
 8  HALLANDALE,                )
                               )
 9          Defendants.        )
    _____x
10                              888 South Andrews Avenue
                                Suite 304
11                              Fort Lauderdale, Florida
                                Thursday, November 16, 2000
12                              10:15 a.m.
    APPEARANCES:
13
            DANIELS & DANIELS, P.A.,
14          BY:  GORDON S. DANIELS, ESQ.,
            appearing on behalf of the Plaintiff.
15
            ADORNO & ZEDER, P.A.,
16          BY:  TAMATHA ALVAREZ, ESQ.,
            appearing on behalf of City/Ft. Laud.,
17          Reed, Hart and Wheeler.

18          CITY ATTORNEY - HALLANDALE BEACH,
            CARLA CODY, ESQ.,
19          appearing on behalf of City/Hallandale Bch.

20          ALSO PRESENT:  SERGEANT DAVID WHEELER.

21                  ----------

22

                         DEPOSITION
23
                             OF
24
                   OFFICER THOMAS REED
25
```

2

1                                I N D E X

2

3  WITNESS                DIRECT    CROSS    REDIRECT    RECROSS

4  OFF. THOMAS REED        3                   46
              (By Ms. Cody)       46
5             (BY Ms. Alvarez)    50

6

7                          E X H I B I T S

8

9  PLAINTIFF'S                               FOR IDENTIFICATION

10    No. 1  - K-9 Suplement by Officer Reed -    46

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               Deposition of OFFICER THOMAS REED, a witness

2  of lawful age, taken by the Plaintiff for the purpose of

3  discovery and for use as evidence in the above-entitled

4  cause, wherein HUGH HODGE is the Plaintiff and TIMOTHY M.

5  CHURCH, etc. et al., are the Defendants, pending in the

6  United States District Court, Southern District of

7  Florida, pursuant to notice heretofore filed, before

8  JACKQULYN G. HOLLAND, a Registered Professional Reporter

9  and Notary Public in and for the State of Florida at

10 Large, at Capital Reporting Service, 888 South Andrews

11 Avenue, Suite 304, Fort Lauderdale, Broward County,

12 Florida, on the 16th day of November, 2000, commencing at

13 10:15 o'clock a.m.

14

15                    - - - - - - - - - - - - -

16

17 Thereupon,

18                   OFFICER THOMAS REED

19 having been first duly sworn to tell the truth, the whole

20 truth, and nothing but the truth, testified as follows:

21                   DIRECT EXAMINATION

22 BY MR. DANIELS:

23        Q.    Please state your name for the record.

24        A.    Thomas K. Reed, R-e-e-d.

25        Q.    Okay.  And who are you employed by?

4

```
 1        A.    The City of Fort Lauderdale Police
 2 Department?
 3        Q.    Are you assigned to any specific unit?
 4        A.    The K-9 unit.
 5        Q.    Okay.  And when did you start with the City
 6 of Fort Lauderdale Police Department?
 7        A.    October 29th, of 1990.
 8        Q.    What did you start out as?
 9        A.    A police officer.
10        Q.    Okay --
11        A.    Went to the academy.
12        Q.    Went to the?
13        A.    No, I went on the police academy as a road
14 patrolman for I think two years, two and a half years.
15        Q.    And then you joined the K-9 unit?
16        A.    Yes.
17        Q.    Around 1992 or 1993?
18        A.    Right around there; I'm not exactly sure.
19        Q.    That's fine.
20              Have you been with the K-9 unit since then?
21        A.    Yes.
22        Q.    Have you ever had your deposition taken
23 before?
24        A.    Yes.
25        Q.    Approximately how many times?
```

1      A.      Well.

2      Q.      Approximately.  More than ten times?

3      A.      Yes.  I have probably given maybe 75 to a

4 hundred depos.

5      Q.      Okay.  Anything in a civil matter, or just

6 all criminal matters?

7      A.      Just criminal, I believe.

8      Q.      What we are here today on is a civil matter

9 as opposed to a criminal matter.

10     A.      Right.  No, I don't remember giving any civil

11 depos.

12     Q.      Okay.

13             Now, to become a K-9 unit officer, what do

14 you have to go through?

15             You have to go through the academy,

16 obviously, to become a police officer.

17             Is there any kind of training to become a K-9

18 officer?

19     A.      First you put in for the selection process,

20 which is just a letter of intent.  Then they make a

21 determination based on the amount of people that put in

22 and the amount of positions available.

23             If you are selected, then you go to a K-9

24 school, which is between 1600 -- about 480 hours, about 16

25 weeks.

```
 1        Q.    Who gives that school?

 2        A.    Our city puts on a K-9 school.

 3        Q.    Is there any additional training after that

 4  ongoing?

 5        A.    We do some sort of training every day; we do

 6  formal training once a week on a Wednesday night.

 7  Training is ongoing.

 8        Q.    Is there any particular manual regarding K-9?

 9        A.    There's a standard operating procedure.

10        Q.    Okay.  Is that located where?

11        A.    I'm sure the City has a copy.

12        Q.    I mean, what is it called?

13        A.    SOP.

14        Q.    SOP?

15        A.    Yes, K-9 SOP.

16        Q.    So if I wanted to get a copy of that, what

17  would I ask for, the K-9 SOPs?

18        A.    Correct.

19        Q.    Okay.

20              What kind of dog do you have?

21        A.    Currently I have a Belgian Merol (phonetic).

22        A.    Does it speak Belgian?

23        A.    Actually, it was trained in Holland, so it

24  has Dutch commands.

25        Q.    Dutch commands, okay.
```

1          In 1998, did you have the same dog?

2     A.     No.  I had a German Shepherd.

3     Q.     Okay.  What type of commands was it?  English

4 commands?

5     A.     Czechoslovakia.

6     Q.     You want an English dog?

7     A.     Most of my purchases are from overseas, so

8 they come with some kind of training.

9     Q.     How come they come from over there?

10    A.     Over there it is strictly a commodity; they

11 are strictly trained for police work.  And we sent a

12 vendor over there, and we purchase through our vendor.

13    Q.     Okay.  All right.

14           I understand on September 6, 1998 you were

15 training another officer at that time in the K-9 unit.

16    A.     Yes.

17    Q.     What was the name of that officer?

18    A.     Timothy Church.

19    Q.     Okay.  And was this the first time that you

20 were training him or you had trained him before this?

21    A.     He was currently attending the K-9 school.

22    Q.     Right.

23    A.     And part of the ending of the school is a

24 field training, where he goes out and works actual calls.

25    Q.     Right.  And was this the first day that you

1  had met him or you had met him before?

2       A.    I had been with him, with the group

3  throughout the whole school.

4       Q.    oh, I see.  Are you a training officer at

5  that school?

6       A.    I'm not a training officer, at that time, no;

7  I was just helping out.

8       Q.    Okay.  When did you become a training

9  officer?

10      A.    About two years ago, went through an FDLE

11 certification course.

12      Q.    Have you had any other position with the Fort

13 Lauderdale Police Department other than as a patrol

14 officer and as a K-9 unit officer?

15      A.    No, sir.

16      Q.    Okay.  Let me just go briefly into your

17 employment background and then I will come back to this.

18            Before you became an officer with Fort

19 Lauderdale, did you have any other jobs?

20      A.    Yes.

21      Q.    What jobs did you have before that?

22      A.    I was a stock boy and a receiving clerk at a

23 local drug store in New York.

24      Q.    Okay.  And from when to when?  Just the

25 years, basically.

1       A.      I got hired probably at 16, 16 or almost 17.

2       Q.      Okay.

3       A.      And I worked there until I got hired at the

4  police department.  And I did other side jobs in between.

5       Q.      Okay.  How old were you when you were hired

6  by the police department?

7       A.      21, I think.

8       Q.      How about your educational background.  You

9  go to college?

10      A.      I am one class away from my Bachelor's in

11 criminal investigation.

12      Q.      Are you going to college now?

13      A.      Correct.  Most of my college was taken at

14 State University College at Buffalo; I'm currently taking

15 classes now to finish it, and transferring back.

16      Q.      Where are you taking classes now?

17      A.      Right now, I'm going to Florida Gulf Course

18 University.

19      Q.      Any other type of education or training other

20 than what we discussed?

21      A.      In what specific area?

22      Q.      I know you have told me you have had training

23 as a K-9 officer, you are currently undergoing weekly, you

24 are having training, and you also told me you became a

25 training officer with FDLE, and you are getting your

1 Bachelor degree.

2           Any other type of training?

3      A.    I'm a firearms instructor, and I have gone

4 through instructor technique with the FDLE also.

5      Q.    Instructor technique in firearms?

6      A.    Instructor technique is the general program

7 to teach you to be an instructor, and then you can branch

8 out in different categories.  Which is firearms

9 instructor, which is another 80-hour course, or 40 hours,

10 I think.  And then K-9 instructor, which is another 40

11 hours.

12      Q.    Okay.  Now go back to this training with

13 Officer Church.  You told me that you were part of this

14 school, he was going to school to become a K-9 officer.

15 And that school is given by Fort Lauderdale?

16      A.    Yes.

17      Q.    And you said that you were assigned to that

18 school?

19           How does that work?

20      A.    There's two head instructors.

21      Q.    Okay.

22      A.    And then I was assisting to help them because

23 I wanted to go further.

24      Q.    I see.

25      A.    And while handling calls for service on the

1  road.

2        Q.    I see.

3              What are the names of the head instructors at

4  that time?  Or what were their names?

5        A.    Phil Seguin.

6        Q.    How do you spell his last name?

7        A.    S-e-g-u-i-n.

8        Q.    And the other person?

9        A.    Kenneth Kelley, K-e-l-l-e-y.

10       Q.    Okay.  So they are the two head instructors,

11 and then you were assisting them.

12       A.    Correct.

13       Q.    And you were there the entire time that

14 Officer Church was training.

15       A.    Not the entire time.  I was also handling, if

16 a call came in, I would leave the school and go to handle

17 the call.

18       Q.    I see.  What were the hours of the school?

19       A.    They varied.

20       Q.    Okay.

21       A.    There's a set schedule they have, but it

22 varied.  The first portion of the school starts, you do a

23 lot of daylight stuff, and then we move into later in the

24 night.

25       Q.    I see.  Is there a school every day of the

1 week, or how does that work?

2      A.    Primarily it was Tuesday through Saturday,

3 Sunday -- I'm sorry.  Wednesday through Saturday; Sunday,

4 Monday and Tuesday off.

5      Q.    All right.  Were there any other assistant

6 instructors other than yourself?

7      A.    I don't know if anybody else came out there

8 in that school; I don't recall.

9      Q.    How many people are training at that time?

10      A.    I don't know.

11      Q.    Approximately?  A lot, or just --

12      A.    No, I think there might have been maybe four

13 in that school, three or four.

14      Q.    I know that Officer Church was from the City

15 of Hallandale.

16      A.    Right.

17      Q.    Were there any other cities over there other

18 than Fort -- was Fort Lauderdale there?

19      A.    We had one Fort Lauderdale K-9 dog, their

20 K-9, there was an Aventura K-9 dog.

21           Wait a minute.  Yes.  Oh, no, there was.

22 North Miami Beach had a dog in there also.

23      Q.    All right.  Now this was the end of the

24 school, or the end of the training period on September 6,

25 1998, or approximately on that date.

1              The end; right?

2        A.    Right.

3        Q.    Okay.  And as part of that training, they go

4    out on field calls?

5        A.    Correct.

6        Q.    How does that work?  As far as going out on

7    field calls?  Do you drive around, waiting for somebody to

8    call you?  How does that work?

9        A.    We do training in between service calls.

10             So if we are not receiving any calls to

11   assist other officers, then we are out running training

12   calls or training problems or scenarios.

13       Q.    I see.  What do you do?  Go to a field and

14   practice it?  Or is there a specific location?  How does

15   that work?

16       A.    No.  We make calls up and we go from there.

17       Q.    I see.  Okay.  And then if you get a call,

18   then you go and respond to that call if they need you?

19       A.    Correct.

20       Q.    Okay.  This is yours; right?

21             If you need to refer to your -- is it called

22   a K-9 supplement?

23       A.    Yes, sir.

24       Q.    Now I see over here it says this incident

25   happened on September 6, 1998.  And on the right-hand side

1  it says, 4:00 o'clock in the morning.

2          Is that when the incident happened or when

3  you wrote that report up?

4      A.   Probably when I'm writing the report.

5      Q.   Do you know what time this incident happened?

6      A.   I can refer to the initiating officer's

7  report.

8      Q.   Okay.

9      A.   The actual theft took place at 2:25.  And

10  then the location of the car started at 3:32.

11      Q.   That's when the police officers located the

12  car and started following it?

13      A.   That's what his report is; I don't know, I

14  wasn't there.

15      Q.   That's what it says.

16      A.   Correct.

17      Q.   Okay.  Tell me what happened.

18          When did you first become involved?  Where

19  were you?

20      A.   I don't know exactly where I was.

21      Q.   Okay.

22      A.   They requested a K-9 to 1513 Northwest 15th

23  Court.

24      Q.   Okay.  And at this time, you were with

25  Officer Church?

```
 1          A.    Yes.

 2          Q.    And he had his dog with him.  Which I

 3 understand speaks Dutch.

 4          A.    Correct.

 5          Q.    Okay.  And its name is Geiro?

 6          A.    Gero.

 7          Q.    Gero, G-e-r-o?

 8          A.    G-e-r-o.

 9          Q.    Did you know the commands of that dog at that

10 time?  Did you know how to command that dog?

11          A.    I knew him, yes, but would the dog listen to

12 me, I don't know.

13          Q.    You knew him because you were training with

14 him?

15          A.    Correct.

16          Q.    Okay.  When you are training with Officer

17 Church, are you commanding the dog yourself?  Are you

18 telling the dog what to do?

19          A.    No.

20          Q.    No.  You are just letting him do it?

21          A.    We evaluate what he does and we instruct him

22 how to do it either properly or what might help better, or

23 we monitor what the dog is doing as far as his progress.

24          Q.    You don't say, look, this is the way we do

25 it, let me show you, and take his dog and try to go
```

1  through it with his dog?

2        A.      No.

3        Q.      No.   Okay.

4                All right.  So did you ever have occasion to

5  control his dog in any way?  In other words, tell commands

6  to his dog and his dog would follow your commands?

7        A.      I don't recall.  The dog might and it might

8  not.  I mean, he's pretty much been trained by that

9  officer, so he's going to respond to him.  I mean, I might

10  tell him to sit and he might sit.

11        Q.      Okay.

12        A.      It is pretty much up to the dog at that

13  point.

14        Q.      All right.  So you knew the words that were

15  needed to command the dog but you never really took any

16  action commanding the dog yourself.

17                MS. ALVAREZ:  Object --

18  BY MR. DANIELS:

19        Q.      That you can remember.

20                MS. ALVAREZ:  Object to form.

21                MR. DANIELS:  Okay.

22                MS. ALVAREZ:  You can answer.

23  BY MR. DANIELS:

24        Q.      You can answer if you understand my question,

25  if it makes sense to you.

1          A.    I didn't understand the question.

2          Q.    Okay.  Am I correct in saying that you

3  understood how to command that dog, you understood the

4  words that were needed to command the dog?

5          A.    Correct.

6          Q.    Okay.  But what you are telling me is that

7  you never yourself ever commanded that dog that you can

8  remember.

9          A.    Correct.

10         Q.    Okay.

11               At the time of this incident you did not have

12  your dog with you?

13         A.    Correct.

14         Q.    Your purpose was to train him with his dog?

15         A.    Correct.

16         Q.    Okay.  So now you get a call to respond to

17  1513 Northwest 15th Court regarding a bail-out of a stolen

18  vehicle, which somebody left a stolen vehicle.

19               Tell me what happened after that.

20         A.    We respond there and I met with the

21  initiating officer, along with Officer Church.

22         Q.    The initiating officer, is that Officer Hart?

23         A.    Yes.

24         Q.    Okay.

25         A.    He shows us, tells us what happened briefly.

1  They tried to stop the car, that it was an auto theft car,

2  he tried to stop it; he crashed in the fence, and the

3  culprit fled.

4        Q.    Right.

5        A.    He had set up a perimeter.  The perimeter is

6  already established, which is just a box around the area

7  keeping people from coming in and people from leaving.

8  All the overheads are eliminated and he directs us to the

9  last location that he had seen the culprit flee.

10       Q.    When you say the overheads are eliminated,

11  what do you mean by that?

12       A.    The red and blue spinners.

13       Q.    On the vehicles, you are talking about?

14       A.    Yes, the police cars.  The spinning lights

15  are gone and the flashing red and blues are gone.

16       Q.    Okay.  Then you and Officer Church go out to

17  find this person?

18       A.    Correct.

19       Q.    Was there anyone else that went with you, or

20  just you and Officer Church?

21       A.    And his K-9 partner.

22       Q.    Okay.

23       A.    That's it.

24       Q.    All right.  Now I understand from Officer

25  Church they pick up the freshest scent.

1      A.     They pick up the freshest scent.  That's how

2  they are trained.  That's why we set up a perimeter and

3  the initiating officer doesn't let anybody go in where he

4  has seen the culprit go.

5      Q.     Tell me what happened after that.

6      A.     Officer Hart directed us to where he had last

7  seen Mr. Hodge run.  Officer Church got K-9 Gero, deployed

8  him in that location, and he started to track.

9      Q.     Okay.  And did you stay with Officer Church

10 at that time or did you stay with him throughout the time?

11     A.     I walked with him through the whole search.

12     Q.     Okay.  So tell me what happened after that.

13     A.     We followed the search through the front yard

14 of where the car actually had crashed, then through the

15 back yard and through the back yard of the next residence,

16 into the front yard and then westerly along the front face

17 of the next resident, which is 1516 15 Place.

18          The dog starts giving what is an alert, which

19 is just an increase in his excitement or behavior.

20     Q.     Does it bark or --

21     A.     No.  It is a physical, like the dog gets

22 excited like when you have a cat you are about to feed

23 them, they get excited.  His body shows signs he is

24 getting excited.

25          Through the whole search Officer Church is

```
 1  using his flashlight.  As the dog starts to show alert, he
 2  illuminates along the front face and the north side of the
 3  house.  Mr. Hodge is hiding in the bushes between the
 4  house and a shrub.
 5          Q.    Okay.
 6                Now, this is a residential area; right?
 7          A.    Yes.
 8          Q.    Did you notice any civilians at all in that
 9  area?
10          A.    There were no civilians out.
11          Q.    Okay.  Now, Mr. Church had a flashlight.  Did
12  you have a flashlight also?
13          A.    Yes.
14          Q.    Was it also illuminated?
15          A.    No.
16          Q.    Okay.
17                How come you didn't have yours illuminated?
18          A.    I'm walking behind Officer Church and if my
19  flashlight is illuminated, it would almost like paint a
20  bull's eye on him if the culprit -- it will make a big
21  shadow if the culprit is armed, it creates a target for
22  him to shoot at.
23          Q.    Okay.
24                I understand Officer Church had a flashlight
25  he said about a foot long.
```

```
 1              Is that about right?
 2       A.    Approximately.  It is a Stream Light SLR 20
 3  flashlight.  I don't know the exact dimensions.
 4       Q.    You have the same type of flashlight?
 5       A.    I have the same type of flashlight.
 6       Q.    You keep that on your belt?  Where do you
 7  keep that?
 8       A.    Some people have a loop that they put them
 9  in; I just keep it in the front of my gun belt, just wedge
10  it between my belt and my stomach.
11       Q.    Do you have anything else, like a baton or
12  anything like that?
13       A.    No.
14       Q.    When Officer Church illuminates the
15  flashlight on Mr. Hodge, where were you at that time?
16       A.    Behind him, probably less than two feet, and
17  off to his right-hand side.
18       Q.    What happened after that?
19       A.    He identified him as the same culprit we were
20  looking for, still in the white T shirt and blue shorts.
21  He gave two warnings, identifying announcement, identified
22  himself as Hallandale K-9 officer, advised your client
23  that he was under arrest and to come out.
24       Q.    Okay.
25       A.    He waited a couple of seconds.  He didn't get
```

1 any response.  He didn't move or he didn't make any verbal

2 response.

3          He then identified himself again and told him

4 if he didn't come out he was going to send the dog in.

5     Q.     Okay.  And, again, did Mr. Hodge do anything?

6     A.     No.

7     Q.     So what happened after that?

8     A.     He commanded his dog take Mr. Hodge into

9 custody.

10          The dog did as he was trained to do, went in

11 and contacted him in the right arm.

12     Q.     Okay.  How far away was Officer Church from

13 Mr. Hodge at that time?

14     A.     I guess, or estimate around six feet.

15     Q.     Okay.  Would there have been any problem with

16 Mr. Hodge hearing what Officer Church was saying?

17     A.     No.

18          MS. ALVAREZ:  Object to form.

19 BY MR. DANIELS:

20     Q.     Okay.

21     A.     No.

22     Q.     So the dog went in.

23          Now, is this dog on a leash at that time?

24     A.     Yes.

25     Q.     Okay.  And I understand, what, there is a

1 chain collar around the dog?

2      A.    Correct.

3      Q.    Officer Church lets the leash go, and this

4 gives more slack for the dog to go --

5      A.    He is not attached to the collar at this

6 point; he is attached to the harness that the dog wears.

7      Q.    A harness?

8      A.    The dog is wearing a choke chain, a chain

9 that you described.  But he is attached to the harness

10 which goes across his chest, and there is a buckle around

11 his chest and along the spine that he is attached to.

12      Q.    I see.  Okay.

13      So he let's go of the slack on the leash.

14 Then he gives the command in Dutch to the dog to apprehend

15 Mr. Hodge.

16      A.    Right.

17      Q.    And what happened?

18      A.    The dog went in and did as he was commanded

19 and contacted him in like the right arm area.

20      Q.    Okay.  Did you see this, by the way?

21      A.    Yes.

22      Q.    You were able to see this.

23      A.    Yes.

24      Q.    Okay.  And what happened?

25      A.    As soon as the dog made contact, Mr. Hodge

1  became very violent, he started fighting with the dog, and

2  he tried to go away from us.

3          As soon as the dog went in, the dog made

4  contact.  First Officer Church started telling your client

5  to put his hand behind his back so that he could be

6  handcuffed.

7      Q.    Let me ask you.  Mr. Hodge, at that time, how

8  is he positioned?  Was he laying on the ground?  Was he

9  standing?  Was he crouching?

10     A.    Kind of crouching like almost in a catcher's

11 position and facing, I guess it would be like

12 northwesterly.  So he is kind of in like a catcher's

13 position.

14     Q.    He is on two feet bending down with his

15 knees?

16     A.    Right.  Almost like sitting on his ankles but

17 his feet are still flat.

18     Q.    Is he facing you; away from you?

19     A.    He is facing kind of away from us, in like a

20 45-degree angle away from us.

21     Q.    Okay.  And the dog grabs his right arm.

22          Am I correct?

23     A.    Yes.

24     Q.    The idea is to pull Mr. Hodge towards you?

25     A.    Well, once the dog makes contact, he will

1  hold on.  And then he will, either the dog is going to

2  pull him out or Mr. Hodge is going to come out, follows

3  instructions.  And then he is going to be handcuffed.

4       Q.    Okay.  During that time period, Mr. Hodge was

5  fighting with the dog, you said?

6       A.    Correct.

7       Q.    What was he actually doing?  Was he hitting

8  the dog?

9       A.    He started striking him with his other arm,

10 and he was trying to pull away, pull his arm free from the

11 dog's mouth.

12      Q.    Was he saying anything at that time?

13      A.    No.  I don't recall if he said anything.

14      Q.    During that time, Officer Church was saying

15 what?

16      A.    To tell him to stop fighting with the dog and

17 to place his hands behind his back.

18      Q.    What happened after that?

19      A.    Mr. Hodge wasn't complying with anything that

20 Officer Church was saying.  I then started yelling the

21 same thing to him, maybe not the exact same words, quit

22 fighting the dog, put your hands behind your back.

23      Both of us were pretty much yelling at the

24 same time.  Then as the struggle got more combative,

25 Officer Church moved in and he, you know, he struck Mr.

1  Hodge I believe twice.

2       Q.    Okay.  All right.  Let me ask you this.  Did

3  Mr. Hodge pull the dog off his arm at any point?  If you

4  remember?

5       A.    I don't know if he pulled the dog off his arm

6  or he pulled free of the dog.

7       Q.    He got free?

8       A.    Correct.

9       Q.    So Mr. Hodge, somehow he was fighting the

10 dog --

11      A.    Correct.

12      Q.    -- and either he pulled his arm away from the

13 dog or pulled the dog off him or a combination of both,

14 and his arm got free of the dog at one point?

15      A.    Right.

16      Q.    And during that time period, Officer Church

17 is telling him to stop resisting?

18      A.    Correct.

19      Q.    And you are telling him to stop resisting.

20      A.    Correct.

21      Q.    Correct?

22            And what happened after that, after Mr. Hodge

23 freed himself from the dog?

24      A.    The way he was sitting, once the force was

25 released from the dog, he kind of moved, which would be

27

1  away from us; the dog's feet hit the ground and he

2  recontacted him in the buttock.

3       Q.    Okay.  And how was Mr. Hodge, at that point?

4  What was his position?

5            Was he on the ground, was he still crouching,

6  was he on all fours?

7       A.    He was more, he was leaning away, I don't

8  know if he had completely made it to the ground.

9       Q.    Okay.

10      A.    I guess when the two parties were pulling,

11 the dog pulling one way, he the other, when the force was

12 released, he fell this way, and the dog, as soon as his

13 feet hit the ground, he went in --

14      Q.    So he fell forward, Mr. Hodge?

15      A.    Kind of.  Which would be his left-hand, like

16 off to his forward left.

17      Q.    Okay.

18      A.    That would be the easiest way to describe it.

19      Q.    All right.  And then the dog reconnected with

20 his buttock?

21      A.    Correct.

22      Q.    Okay.  And what happened after that?

23      A.    The dog contacted him on the buttocks, and

24 Mr. Hodge was still trying to get away and go away from

25 us.  Now his arms are free so he is kind of using them

1  like to pull away.  He even reached back a couple of times

2  to strike the dog.

3           We are still yelling to him to quit fighting

4  with the dog.  The dog is holding on to his pants and his

5  buttocks, but the material or just the struggle was

6  causing the dog to continue to try to hold on, but he is

7  not able to keep constant control.  So he is trying to

8  hold on and try to hold on.

9       Q.    What was Mr. Hodge wearing at that time?

10      A.    I believe he had blue jean shorts on.

11      Q.    Okay.  All right.  So what happened after

12 that?

13           Now, the dog, you are saying that the dog was

14 unable to maintain a grip?

15      A.    Correct.

16      Q.    Okay.

17      A.    The dogs are trained to bite and hold.  Once

18 they make contact, there is no struggle, they will hold on

19 and that will be it.

20      Q.    Okay.  So he bit him in the buttocks the

21 first time.  What happened after that?

22      A.    He is still struggling to try to get away.

23 And as he is pulling away, the dog is literally like

24 sliding down the pant, meaning the pants are resisting to

25 the dog's teeth actually, I would say that.

1          Then not only is finally the pants are

2  ripping, because the dog is trying to hold on and there is

3  just the force, something has to give.

4          Q.    Okay.

5                So the dog is grabbing on to the pants?

6          A.    And the buttocks, yes.

7          Q.    And the buttocks.  And the pant goes -- are

8  the pants getting off Mr. Hodge at that time, coming down?

9          A.    I don't know if they are -- the waistline is

10  coming down.  You know, the waistline.  You know what I

11  mean.  Somebody is pulling at the seat of your pants.

12         Q.    Okay.  And you are saying also the pants are

13  ripping?

14         A.    Yes.

15         Q.    Is the dog letting go, re-biting?

16         A.    No.  He is holding on constantly.  They are

17  trained to maintain steady contact.  So as soon as he

18  feels the lessening pressure, the dog will continue to

19  drive in.

20                When he pulled away and the dog drives in,

21  once he gets that distance, the dog --

22         Q.    As soon as the pressure decreases a little,

23  he will grab on a little tighter.

24         A.    Right.  To try to get back to the grip that

25  he was initially on.

30

1       Q.      And what happened after that?

2       A.      After, I don't know the exact timeframe,

3  finally he starts listening, either Mr. Hodge finally

4  realizes he can't get away or he's just tired of fighting.

5  And then I move in and handcuff him.

6       Q.      Okay.  Now, at one point you said that

7  Officer Church struck Mr. Hodge.

8       A.      Yes.

9       Q.      When was that?

10       A.      During the struggle.

11       Q.      Sometime during the struggle?

12               Was that between the time that the dog was

13  letting go of his arm and the time that the dog connected

14  with his buttocks?  Or you are not sure of the time?

15       A.      I'm not exactly sure of the time.  I would

16  say it was when the dog, I believe it was when it was on

17  his buttocks.

18       Q.      Okay.

19       A.      There's no time between the time of the arms

20  and the buttocks.  You know what I'm saying.  It is like

21  spontaneous.

22       Q.      Spontaneous.  In other words, he pushed the

23  dog away from his arm or somehow the dog disconnected from

24  his arm --

25       A.      Right.

```
1          Q.     -- and you say immediately the dog --

2          A.     As soon as his feet hit the ground, he went

3   back in and contacted him in the buttocks.

4          Q.     Okay.  And what did Officer Church hit Mr.

5   Hodge with?

6          A.     I believe it was his flashlight.

7          Q.     Is that the only thing that he used?

8          A.     Yes.

9          A.     Did he kick him at all?

10         A.     No.

11         Q.     Did he punch him at all?

12         A.     I don't recall.

13         Q.     His flashlight.

14                Do you know where he hit him and how many

15  times?

16         A.     I believe it was two, and it was up on the

17  top portion of his body, toward his back.

18         Q.     Okay.  And did you strike Mr. Hodge at any

19  time during that time period?

20         A.     I don't recall striking him.

21         Q.     What happened after that?

22         A.     I said earlier, either Mr. Hodge ran out of,

23  you know, ran out of energy or he finally decided to

24  comply with our instructions.  I moved in, and I still had

25  to pull his arms behind his back to handcuff him.  They
```

1  were still at his side.

2          Q.    Is the dog still connected to Mr. Hodge at

3  that time?

4          A.    Yes, in his buttocks.

5          Q.    So Mr. Hodge is on the ground at that time?

6          A.    The upper portion of his body is still a

7  little bit in the bushes.  And he is kind of a little bit

8  closer than he was earlier.  You know what I mean.

9          Q.    Okay.

10         A.    And I just moved in, between the house and

11  the bush area, and handcuffed him.

12         Q.    Okay.  Did Mr. Hodge say anything to anybody

13  during that time period?

14                From the time that you first made contact

15  with Mr. Hodge until the time he was handcuffed, did Mr.

16  Hodge say anything to you or to anybody?

17         A.    I don't recall him saying anything.

18         Q.    Okay.  And during that time period from the

19  time that you first located Mr. Hodge until you handcuffed

20  him, did you notice any civilians in the area at all?

21         A.    No.  There were no civilians when we

22  approached him.  And then I couldn't tell you once the

23  fight was on; there was no way I could -- I mean, I was

24  focused on Mr. Hodge.

25         Q.    Okay, so now after Mr. Hodge was handcuffed,

1 then what happened.  Did Officer Church order Geiro to --

2 am I pronouncing that right?

3    A.    Gero.

4    Q.    Gero.

5          Did he order him to let go of Mr. Hodge?

6    A.    We don't --

7    Q.    Oh.

8    A.    He physically removes the dog from Mr. Hodge.

9    Q.    He pulls him on his collar.  Is that how it

10 works?

11    A.    He brings the choke collar up underneath his

12 harness and just pushes upper pressure and reaches around

13 it and like pinches the larynx area, which limits the

14 dog's air intake, which causes him to open his mouth and

15 release.

16    Q.    All right.  What happened after that?

17    A.    The dog released.  Officer Church stepped

18 back.

19          I patted Mr. Hodge down, and I requested the

20 closest perimeter unit to come up to the front of the

21 residence.  And we secured him in the back of the car,

22 took him to Broward General.

23    Q.    All right.  Now, when you patted him down,

24 what did you find on him?

25    A.    I ended up finding a crack cocaine pipe.

```
 1          Q.    All right.   Anything else?

 2          A.    No.

 3          Q.    All right.   And then did Mr. Hodge get up?

 4                In other words, was he standing at that

 5  point?

 6          A.    No.   He did stand up and I helped him stand

 7  up, and he was handcuffed.   It might be a little

 8  difficult; I helped him to his feet and walked him to the

 9  roadway and secured him in a car.   And they took him to

10  Broward General.

11          Q.    So some other officers came up from the

12  perimeter?

13          A.    Yes.   I requested them to come up.

14          Q.    Do you remember the names of those officers?

15          A.    I believe it was Timothy Shields and I think

16  Jay Smith; they were a two-man car then.

17          Q.    And they took Mr. Hodge from you?

18          A.    Well, I put him in the back of the car.

19          Q.    You put him in the back of the car and then

20  they drove Mr. Hodge over to the hospital, which is

21  Broward General Medical Center.

22          A.    Yes.

23          Q.    And then you went back to the vehicle where

24  Officer Church was?

25          A.    Right.   Well, I called Sergeant Wheeler at
```

1  home, notified him --

2      Q.      Okay.

3      A.      -- of the K-9 usage.

4      Q.      Okay.

5      A.      I woke him up.  He started to come out.

6              And then we went back to my car, which is

7  parked a block away where the initial track started, and

8  we waited for the sarge to show up.

9      Q.      Okay.  And what happened after that?

10     A.      The sergeant talks to us.  I brief him on the

11 incident, walk him through the search, and he takes

12 pictures of the apprehension scene, the vehicle crash

13 area, and walk him through the track.

14     Q.      Okay.  And then what happened?

15     A.      We call 10-8, in-service, handle any other

16 calls; didn't have any other calls; went back doing

17 training series.

18     Q.      Okay.  I understand that Officer Wheeler, he

19 went over to Broward General Medical Center after that.

20             Are you aware of that?

21     A.      Sergeant Wheeler, yes.

22     Q.      Sergeant Wheeler.  I'm sorry.

23             Did you also go to Broward General Medical

24 Center?

25     A.      No.

1       Q.    No?

2       A.    (Shakes head in the negative.)

3       Q.    I'm sorry.  You have to answer verbally; she

4  can't down the shake.

5       A.    No.

6       Q.    Okay.

7             At any point did you go to Broward General

8  Medical Center to meet with Sergeant Wheeler?

9       A.    No.

10      Q.    Do you know whether Officer Church went to

11 Broward General Medical Center?

12      A.    I don't know.

13      Q.    Okay.  Now you say that after Sergeant

14 Wheeler came to the scene, okay, and then you went over

15 with him what happened, and then he took photographs of

16 the scene, and then Sergeant Wheeler left, and then you

17 went back in-service.

18            What does that mean?

19      A.    Went back to handle any calls that might come

20 out.  We call it in-service or for additional work,

21 anything that might happen from that point on.

22      Q.    Okay.  Was Officer Church with you at that

23 time?

24      A.    I believe he was for a little bit.  I don't

25 know what time he went home that night; and I stayed out

1  and worked the rest of my shift.

2      Q.    Okay.  So immediately you and Officer Church

3  went out in-service.  And did you handle any other calls

4  that night?

5      A.    I don't know.

6      Q.    That you remember.

7      A.    I don't recall if we did or if we didn't.

8      Q.    So you and Officer Church are leaving to go

9  in-service.  And do you know how long or for what period

10 of time you and Officer Church were together?

11     A.    No.

12     Q.    Was it more than an hour?

13     A.    I have no idea.

14          MS. ALVAREZ:  From when are you talking

15       about?  From leaving?

16          MR. DANIELS:  No, I'm talking about from the

17       time they went back into service after they left

18       the scene.

19          MS. ALVAREZ:  Okay.

20 BY MR. DANIELS:

21     Q.    Do you remember?

22     A.    I have no idea.

23     Q.    The reason why I'm asking you this is that

24 when we took the deposition of Officer Church, he told us

25 that when Sergeant Wheeler went to Broward General Medical

1  Center, that thereafter you and he went over to Broward

2  General Medical Center, met with Officer Wheeler.

3          I'm just trying to figure this out.

4          MS. ALVAREZ:  Objection to form.

5          MR. DANIELS:  Let her make an objection.

6      That's fine.

7          MS. ALVAREZ:  Okay.

8          MR. DANIELS:  That's fine.  I'm just trying

9      to find out what happened.  Trying to see if this

10     may refresh his memory; maybe he doesn't

11     remember --

12          THE WITNESS:  I don't remember going to

13     Broward General at all.

14  BY MR. DANIELS:

15      Q.    Okay.

16      A.    It is not a practice for us to go there.  So

17  I don't remember going.

18      Q.    I'm not trying to trick you; I'm just --

19      A.    I don't remember being there.  I don't

20  remember, so I don't think I did.  I don't know.  I would

21  say no, I didn't go.

22      Q.    All right.

23          Did you ever come in contact with Mr. Hodge

24  after you had handcuffed him and placed him in the police

25  vehicle and he left the scene?

1                Did you ever come in contact with Mr. Hodge

2 again in any way?

3          A.    No.

4                Well, I think I was there when they got his

5 name real quick I think at the scene.

6          Q.    At the scene?

7          A.    At the scene.

8                I think he gave his name because we asked him

9 what -- I think his name was tattooed on his hand or

10 something.  Something like, what is like Hodge, I think it

11 was written, like each letter was on a finger or

12 something.  And we said what is Hodge.  He said, my name,

13 Tim Hodge or something.

14         Q.    Right.  Okay.  Yeah.

15               Did he make any other comment to you?  Or did

16 you have any other conversation with him?

17         A.    No.  Not that I remember.  I mean, we could

18 have said something passive; I don't recall.

19         Q.    Okay.

20               Other than you getting his name at the scene,

21 okay, and I'm talking about now he is at the scene, did

22 you physically walk him from where you handcuffed him to

23 the police car?

24         A.    Yes.

25         Q.    Okay.  Were there any other officers that

1 walked with him at that time, or just you?

2     A.    Just me.

3     Q.    Okay.  And when you got to the police car,

4 this was the police car of Timonthy Shields and Officer

5 Jay Smith?

6     A.    Yes.

7     Q.    And they were there.  You put Mr. Hodge in

8 the back of the vehicle --

9     A.    Right.

10     Q.    -- I assume.  And then these other officers,

11 Officer Shields and Officer Smith then drove Mr. Hodge

12 away?

13     A.    Yes.

14     Q.    Were there any other officers involved at

15 that time?

16     A.    Not that I recall, no.

17     Q.    All right.  Okay.  And then after Mr. Hodge

18 left the scene with Officer Shields and Officer Smith, did

19 you ever come in contact with Mr. Hodge again in any way?

20     A.    No.

21     Q.    Okay.  I'm just trying to find out --

22     A.    No, I'm trying to think.

23     Q.    Right.

24     A.    I don't remember talking to him at all.

25     Q.    Did you have anything else to do with this

1  matter, other than preparing this report, this K-9

2  supplemental report?

3        A.    No.

4        Q.    Okay.  Did you prepare this at the scene?  Or

5  where do you prepare this?

6        A.    I probably wrote this either at home or on

7  the laptop -- no, I don't think we had laptop at this

8  time.  Probably at home on my computer.

9        Q.    Okay.  And I see it was done, you say it was

10 done at 4:00 o'clock in the morning?

11       A.    That's probably the time that he was -- when

12 I asked for the numbers.  That is probably not the time it

13 was written.

14       Q.    Oh, this is the time when you asked for

15 the --

16       A.    For the information.

17       Q.    What numbers are you talking about?

18       A.    The case number.

19       Q.    The case number?

20       A.    Yes.

21       Q.    I see.  You call up, you get the case number?

22       A.    Yes.

23       Q.    So this is the time.  So this is after Mr.

24 Hodge has been arrested, everything is done?

25       A.    And we are clearing the scene.

1      Q.    You are clearing the scene.  You then call up
2  and get a case number?
3      A.    Well, I ask for a case number.
4      Q.    They give it to you.  And this is the time
5  that you would have asked for it, approximately?
6      A.    Approximately, yes.
7      Q.    From the time that you were called to come to
8  the scene until the time that Mr. Hodge left with Officer
9  Shields and Officer Smith, okay, till that time, did you
10 notice any civilian in the area?  You yourself?
11     A.    I did not notice anybody, no.
12     Q.    Okay.  Did any civilian ever come up to you
13 and Officer Church at any time?
14     A.    No.
15     Q.    Other than Officer Shields and Officer Smith,
16 who drove Mr. Hodge away, and Officer Hart, who you
17 initially went to when you came to the scene, he is the
18 one that gave you the information regarding where Mr.
19 Hodge had run to, or the direction that he ran, were there
20 any other officers that you came in contact with, other
21 than also Sergeant Wheeler?
22     A.    During the search or after --
23     Q.    I'm talking about at the scene.
24     A.    Once I cleared the perimeter, other officers
25 I know pulled up to see if Officer Hart needs any

1  assistance.  But that's when we went back to my car.  They

2  weren't doing any police function other than the call was

3  over and kind of just asking to help.

4         Q.    That's when you came back to your car after

5  Mr. Hodge was taken away?

6         A.    Right.

7         Q.    Okay.  I'm talking before Mr. Hodge was taken

8  away.

9               Did you come into contact with any other

10 police officers other than Officer Hart, Officer Shields,

11 Officer Smith, before Mr. Hodge was taken away?

12        A.    No.

13        Q.    Did Officer Church ever pull his gun for any

14 reason, take his gun out of his holster for any reason?

15        A.    No, he wouldn't have a free hand to do so.

16        Q.    Did you ever take your gun out of your

17 holster for any reason?

18               MS. ALVAREZ:  What timeframe?

19               MR. DANIELS:  Good.

20 BY MR. DANIELS:

21        Q.    From the time you were initially called to

22 the scene until Mr. Hodge left the scene, did you take

23 your gun out of the holster for any reason?

24        A.    No.

25        Q.    And did Officer Church take his gun out of

1  the holster for any reason?

2        A.    No.

3        Q.    From the time that you came to the scene

4  until the time that Mr. Hodge left, did you ever hit Mr.

5  Hodge at all?

6        A.    I don't recall striking him at all.

7        Q.    Okay.  And when I say, and you said striking,

8  when I say strike, I mean with your hands, your feet or

9  any part of your body.

10        A.    I don't recall hitting, my hands, feet,

11  anything.

12        Q.    Was Mr. Hodge bleeding at all from any part

13  of his body?

14        A.    Yes.

15        Q.    Where was he bleeding from?

16        A.    From the arm and the buttock.

17        Q.    Did you have to pull up his pants at all?

18  Were the shorts pulled down at all, exposing his buttock,

19  do you know?

20        A.    I believe they were drooped but not

21  completely down.  I mean, they weren't around his ankles.

22        Q.    Right.

23        A.    I think he was having -- if I remember

24  correctly, maybe they were down low enough so that he was

25  having trouble walking to the car.  So I remember kind of

1  (indicating), like pulling them up for him.

2       Q.    Were they ripped?

3       A.    I believe so, yes.

4       Q.    Other than this supplemental report, have you

5  prepared any other report regarding it?

6             MS. ALVAREZ:  Object to form.  Asked and

7          answered.

8             You can answer.

9  BY MR. DANIELS:

10      Q.    You can answer.  It is only an objection.

11      A.    No, that's it.

12      Q.    Okay.  Is that your signature on the

13 supplemental report?

14      A.    That's my name printed; the signature is the

15 sergeant's.

16      Q.    Oh, I see.  Okay.

17            Is this your printing of your name?

18      A.    Yes, I'm T. K. Reed, Thomas K. Reed.

19      Q.    You print your name?

20      A.    Yes.

21      Q.    Okay.

22            MR. DANIELS:  I would just make this an

23          exhibit.

24            Can you think of there's anything else?

25            I'm done.

```
1              (Whereupon, said document was marked as

2         Plaintiff's Exhibit No. 1 for identification.)

3              MS. CODY:  I have a quick question, actually.

4              MR. DANIELS:  Go ahead.

5                        CROSS EXAMINATION

6 BY MS. CODY:

7         Q.   I just want to know based on what you

8 observed with all of the officers involved in the case, do

9 you think anyone acted improper?

10             MS. ALVAREZ:  Object to form.

11             MR. DANIELS:  I would object to form also.

12 BY MS. CODY:

13        Q.   Do you think anyone did anything wrong?

14             MR. DANIELS:  Object to form.

15             MS. ALVAREZ:  Same objection.

16             MR. DANIELS:  You can answer it.

17             THE WITNESS:  No.

18             MS. CODY:  Okay.

19             THE WITNESS:  That's it?

20                       REDIRECT EXAMINATION

21 BY MR. DANIELS:

22        Q.   Other than Sergeant Wheeler and other than

23 your attorneys, have you discussed this matter with

24 anybody else?

25        A.   I probably reviewed the incident with Tim
```

1  Church after the, you know, the incident took place as

2  part of the training, but I don't recall.  I mean, I might

3  have talked to somebody about it, but other than that, I

4  doubt -- I mean just in general conversation.

5          Q.    Right.  But I mean in an official manner,

6  anything like that?

7          A.    No.

8          Q.    Did Officer Church continue to train with you

9  after this incident?

10         A.    He still trains with us through this day.  He

11  comes out and we just train with him -- Hallandale sends

12  out a K-9 dog, I think they rotate every third week or

13  something.

14         Q.    Okay.  So now after this incident, he was

15  still finishing up his schooling, I take it.

16         A.    Correct.

17         Q.    Right.  And you were still the assistant

18  instructor over there?

19         A.    Correct.

20         Q.    And he continued to train with you for how

21  long after that?

22         A.    I don't know when the final date of the

23  school was.

24         Q.    You don't know.  Okay.  But for some period.

25  And you are saying that still he comes out to train with

1  you every so often?

2      A.    Right.  They have a rotating roster at

3  Hallandale.  Our unit trains formally every Wednesday, and

4  they have three dogs, one of the three dogs.

5      Q.    I see.  With the people they will send them?

6      A.    Correct.

7      Q.    The dogs don't just come out there and train.

8      A.    No.

9      Q.    Okay.  So every third time you get to see

10  Officer Church.

11      A.    Yeah, I believe so.  I don't know how they

12  set --

13      Q.    Approximately.

14      A.    Right.  They send the dog to train with us.

15      Q.    All right.  And now are you a head instructor

16  there?

17      A.    No.

18      Q.    What is your position over there?

19      A.    I'm still a handler and a helper.

20      Q.    Assistant instructor?

21      A.    I don't know what they -- we don't have --

22          SERGEANT WHEELER:  (Shakes head in the

23        negative.)

24          MR. DANIELS:  They don't have assistant

25        instructors.  No.  So he's a handler.

1 BY MR. DANIELS:

2      Q.    Other than being an assistant instructor, you

3 are on the road also?

4      A.    Yes, I'm still working the police dog.

5      Q.    When you have a police dog, is it like any

6 road officer, you go and drive around with the dog and

7 when they need you they call you.  Otherwise you do --

8      A.    We will train throughout the night, we will

9 handle calls for service.  We won't handle a call that

10 will tie us up for a long period of time because our

11 primary responsibility is utilization of the dog.

12     Q.    I see.

13     A.    So we will go to maybe backup or domestics.

14 Or say a homicide happens or traffic fatality, we don't

15 handle that.  We can assist but we have to be in a

16 position that we can clear if the assistance of the dog is

17 needed.

18     Q.    Okay, makes sense.

19           Let me ask you this.  I have to ask this

20 question.  Have you ever been disciplined at all regarding

21 Fort Lauderdale Police Department?

22     A.    No.

23           MR. DANIELS:  I don't have any further

24        questions.

25           MS. ALVAREZ:  I have a quick question.

1                    CROSS-EXAMINATION

2  BY MS. ALVAREZ:

3        Q.    Officer Reed, when Sergeant Wheeler responded

4  to the scene, had Mr. Hodge been taken from the scene

5  already?

6        A.    Yes.

7              MS. ALVAREZ:  Thank you.  That's it.

8              We'll read.

9              Thank you.

10              (Thereupon, the deposition adjourned at 11:05

11  a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  CERTIFICATE OF OATH

 2   STATE OF FLORIDA      )

 3   COUNTY  OF  BROWARD  )

 4               I, the undersigned authority, certify that
     OFFICER THOMAS REED personally appeared before me and was
 5   duly sworn.

 6               WITNESS my hand and official seal this
     23rd day of January, 2001.

 7

 8                       Jackqulyn G.Holland

 9   _____
                        JACKQULYN G. HOLLAND
10                      Notary Public - State of Florida
                        My commission No.  CC927587
11                      Expires:  May 21, 2004.

12              REPORTER'S DEPOSITION CERTIFICATE

13   STATE OF FLORIDA      )
     COUNTY  OF  BROWARD  )
14

                I, JACKQULYN GIPSON HOLLAND, Registered
15   Professional Reporter, certify that I was authorized to
     and did stenographically report the deposition of OFFICER
16   THOMAS REED; that a review of the transcript was
     requested; and that the transcript is a true and correct
17   record of my stenographic notes.

18              I further certify that I am not a relative,
     employee, attorney, or counsel of any of the parties, nor
19   am I a relative or employee of any of the parties'
     attorney or counsel connected with the action, nor am I
20   financially interested in the action.

21              Dated this 23rd day of January, 2001.

22   _____
                        JACKQULYN G. HOLLAND
23                      Registered Professional Reporter.

24

25
```

1                          CORRECTION SHEET

2

  RE:      HUGH HODGE V. TIMOTHY M. CHURCH, etc. et al.

3

          Case No:  00-6228
4         Deposition of:  OFFICER THOMAS REED
          Date Taken:  November 16, 2000

5

  PAGE NO.          LINE NO.              CORRECTION OR CHANGE

6

7    _____        _____      _____
     _____        _____      _____
8    _____        _____      _____
     _____        _____      _____
9    _____        _____      _____
     _____        _____      _____
10   _____        _____      _____
     _____        _____      _____
11   _____        _____      _____
     _____        _____      _____
12   _____        _____      _____
     _____        _____      _____
13   _____        _____      _____
     _____        _____      _____
14   _____        _____      _____
     _____        _____      _____
15   _____        _____      _____
     _____        _____      _____
16   _____        _____      _____
     _____        _____      _____
17   _____        _____      _____

  Under penalties of perjury, I declare that I have read my
18 deposition and that it is true and correct subject to any
  changes in form or substance entered here.

19

20 _____
  Date
21

22

23 _____
  OFFICER THOMAS REED, Deponent
24

25

```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
 2                   DIVISION:  MIAMI

 3 HUGH HODGE,                     )
                                   )
 4          Plaintiff,             )
                                   )
 5   v.                            )   Case No.   00-6228 CIV-
                                   )              SEITZ/GARBER
 6 TIMOTHY M. CHURCH, THOMAS       )
   REED, PATRICK HART, DAVID       )
 7 WHEELER, CITY OF FORT           )
   LAUDERDALE, and CITY OF         )
 8 HALLANDALE,                     )
                                   )
 9          Defendants.            )
   _____ x
10 To:  Dieter K. Gunther, Esq.
        Adorno & Zeder, P.A.
11      888 S.E. 3rd Avenue, Suite 500
        Fort Lauderdale, FL  33335
12
        Your client's deposition taken in the above-styled
13 case on November 16, 2000 is now ready for signature.

14      Since the deposition was ordered on an expedited
   basis, the original and one copy were delivered to Mr.
15 Gordon Daniels today, January 23, 2001.  Please have your
   client read your copy of the deposition.  An errata sheet
16 is attached to the end of the transcript for your
   convenience.
17
        Please contact our office if you have any
18 questions.

19                        Very Truly Yours,

20                        Jackqulyn G Holland

21                        JACKQULYN G. HOLLAND, RPR
                          Capital Reporting Service
22                        888 S. Andrews Ave., #304
                          Ft. Lauderdale, FL  33316
23                        (954) 522-6401

24 Date:  January 23, 2001
   cc:  Gordon S. Daniels, Esq.
25
```

1

```
 1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
 2                DIVISION:  MIAMI

 3  HUGH HODGE,                    )
                                   )
 4         Plaintiff,              )
                                   )
 5    v.                           )    Case No.   00-6228 CIV-
                                   )               SEITZ/GARBER
 6  TIMOTHY M. CHURCH, THOMAS      )
    REED, PATRICK HART, DAVID      )
 7  WHEELER, CITY OF FORT          )
    LAUDERDALE, and CITY OF        )
 8  HALLANDALE,                    )
                                   )
 9         Defendants.             )
    _____x
10  |                         888 South Andrews Avenue
    |                         Suite 304
11  |                         Fort Lauderdale, Florida
    |                         Thursday, November 16, 2000
12  |                         11:15 a.m.
    APPEARANCES:
13
            DANIELS & DANIELS, P.A.,
14          BY:  GORDON S. DANIELS, ESQ.,
            appearing on behalf of the Plaintiff.
15
            ADORNO & ZEDER, P.A.,
16          BY:  TAMATHA ALVAREZ, ESQ.,
            appearing on behalf of City/Ft. Laud.,
17          Reed, Hart and Wheeler.

18          CITY ATTORNEY - HALLANDALE BEACH,
            CARLA CODY, ESQ.,
19          appearing on behalf of City/Hallandale Bch.
                      ----------
20

21                    DEPOSITION

22

23                        OF

24

25            SERGEANT DAVID WHEELER
```

2

1                    I N D E X

2

3  WITNESS                 DIRECT              CROSS

4

5  SGT. DAVID WHEELER           3

6          (By Ms. Cody)                    37

7          (By Ms. Alvarez)                 38

8

9                    E X H I B I T S

10

11

12  DEFENDANT'S                      FOR IDENTIFICATION

13

14    No. 1  -Report by Sgt. Wheeler -          37

15

16

17

18

19

20

21

22

23

24

25

1                    Deposition of SERGEANT DAVID WHEELER, a

2  witness of lawful age, taken by the Plaintiff for the

3  purpose of discovery and for use as evidence in the

4  above-entitled cause, wherein HUGH HODGE is the Plaintiff

5  and TIMOTHY M. CHURCH, etc. et al., are the Defendants,

6  pending in the United States District Court, Southern

7  District of Florida, pursuant to notice heretofore filed,

8  before JACKQULYN G. HOLLAND, a Registered Professional

9  Reporter and Notary Public in and for the State of Florida

10 at Large, at Capital Reporting Service, 888 South Andrews

11 Avenue, Suite 304, Fort Lauderdale, Broward County,

12 Florida, on the 16th day of November, 2000, commencing at

13 11:15 o'clock a.m.

14

15                    - - - - - - - - - - - - - -

16

17 Thereupon,

18                    SERGEANT DAVID WHEELER

19 having been first duly sworn to tell the truth, the whole

20 truth, and nothing but the truth, testified as follows:

21                    DIRECT EXAMINATION

22 BY MR. DANIELS:

23        Q.    Please state your name for the record.

24        A.    David A. Wheeler.

25        Q.    Who are you employed by?

4

1        A.    City of Fort Lauderdale Police Department.

2        Q.    When did you start working for the City of

3  Fort Lauderdale?

4        A.    In 1981.

5        Q.    I see you are with the K-9 unit.

6        A.    That's correct.

7        Q.    What is your position with the K-9 unit?

8        A.    I'm the sergeant in charge of the K-9 unit.

9        Q.    Are you the head person in charge of the K-9

10 unit?  Someone is above you?  You are head honcho?

11       A.    Well, I have bosses above me, but as far as

12 the soup and nuts administrations of the K-9

13 administration, I'm it.

14       Q.    When did you become sergeant of the K-9 unit?

15       A.    In 1995.

16       Q.    Okay.  When did you graduate high school?

17       A.    1973.

18       Q.    From 1973 until 1981 what jobs did you have?

19       A.    I worked at the Sweden House Restaurant

20 initially as a cleanup person and became a cook and

21 assistant manager and then the kitchen manager.

22             I worked construction for Greenleaf

23 Construction as a form carpenter and a concrete finisher.

24 During the application process to become a police officer,

25 I obtained employment at Marcel's Restaurant, which was a

1  country club, tennis club restaurant, and cooked for a

2  short period of time.  And then I was hired as a police

3  officer.

4        Q.    Okay.  How about your educational background?

5        A.    High school and two years of college.

6        Q.    Then did you go to the academy?

7        A.    Yes.  High school, police academy, and after

8  becoming a police officer, I finished college, to keep the

9  chronology straight.

10        Q.    Okay.  Officer Reed talked about these SOPs,

11  standard operating procedures that are used.

12              Is that what they are called?  Is there a

13  book they are kept in?

14        A.    There's two.  There's a standard operating

15  procedures for the K-9 unit, which is supplement,

16  additional to the policies and procedures for the Fort

17  Lauderdale Police Department.

18        Q.    I see.  Okay.  And those are two separate

19  manuals?

20        A.    That's correct.

21        Q.    Okay.  Where would they be located?  Who has

22  possession?

23              Are they located in the police library?  Is

24  there such a thing as a police library?

25        A.    I don't know if there is a such a thing as a

1  police library.  I would certainly hope there is.

2              There are a number of places you could find

3  the manuals.  For you to obtain a copy, I would recommend

4  you contact the accreditation office of the Fort

5  Lauderdale Police Department.

6          Q.    Accreditation officer?

7          A.    Accreditation office.

8          Q.    Office.  I'm sorry.

9              That is located in the Fort Lauderdale Police

10 Department?

11         A.    That's correct.

12         Q.    Okay.  Fine.

13             Now I understand that, is that correct, the

14 first time you became involved in this particular incident

15 we are talking about, the September 6, 1998 incident, was

16 when you were called, waken up from sleep, I guess, by

17 Officer Reed after this incident had occurred?

18         A.    I don't recall specifically whether it was

19 Officer Reed that called, but, yes, I was waken up.

20         Q.    Okay.

21         A.    By a telephone call.

22         Q.    Okay.  And do you remember what the call

23 said?  Generally?

24         A.    Generally that there was an incident of a K-9

25 use of force involving Officer Church.  And because he was

1  in training with our current K-9 academy, I responded.

2      Q.    Now, do you respond to every use of a K-9,

3  you know, use of force?

4            In other words, let's say it wasn't a

5  training incident, it was just a normal police officer,

6  let's say that Officer Reed was out and this had happened

7  without Officer Church being involved, would you be called

8  to arrive at the scene?

9      A.    Probably.

10     Q.    What is the purpose of that?

11     A.    Every time there's an incident of K-9 force,

12  an investigation is required by the City of Fort

13  Lauderdale Police Department.  As the head of the K-9

14  unit, most of those investigations fall squarely on my

15  shoulders.

16     Q.    Okay.  So then you arrived at the scene.  I

17  guess there's no one else.  I mean, if you are sleeping no

18  one else takes over your position?  There's no assistant

19  sergeant or anything like that?

20     A.    At times I will assign an acting sergeant,

21  but when it comes down to something like this, no, I'm it.

22     Q.    Okay.  So now you are to get out of bed and

23  drive down there.

24            And you went down there, and what happened?

25     A.    When I arrived, Mr. Hodge had already left

1  the scene.  I interviewed Officer Reed and Officer Church.

2  I believe I spoke to a couple of the officers at the

3  scene, but I don't remember any conversations specifically

4  with them.  I do recall speaking with Officer Church and

5  Officer Reed.  And then the resident of the house where

6  Mr. Hodge was apprehended; I knocked on the door and spoke

7  to the gentleman there.

8          Q.    Okay.  Is that the one that the fence was

9  knocked down?

10         A.    No.

11         Q.    Okay.  All right, so you spoke to Officer

12 Reed and Officer Church?

13         A.    That's correct.

14         Q.    And you asked them what happened and so

15 forth?  Is that about --

16         A.    Yes.

17         Q.    Okay.  And then you spoke to some other

18 police officers?

19         A.    I'm sure I did, yes.

20         Q.    What's the purpose of speaking to the other

21 police officers?

22         A.    To determine if they saw or heard anything

23 critical to my investigation.

24         Q.    Do you remember the names of those police

25 officers that you spoke to?

9

```
 1          A.    No, sir.

 2          Q.    Did you prepare a report on this?

 3          A.    Yes.

 4          Q.    Do you have your report with you?

 5                May I just see it.

 6                MS. ALVAREZ:  Can we take a break for a

 7          moment, please?

 8                MR. DANIELS:  Yes.

 9                (A brief recess was taken.)

10                MS. ALVAREZ:  Okay, we can go back on.

11                MR. DANIELS:  Okay.

12                MS. ALVAREZ:  Thank you.

13  BY MR. DANIELS:

14          Q.    And then you say that you knocked on the door

15  of a homeowner there?

16          A.    That's correct.

17          Q.    Okay.  The home of where Mr. Hodge was

18  apprehended?

19          A.    That's correct.

20          Q.    And what was the purpose of that?

21          A.    To see if the occupants inside saw or heard

22  anything.

23          Q.    Okay.  And did you speak to anyone over

24  there?

25          A.    I spoke to a gentleman, as I recall, at that
```

```
 1 residence.
 2       Q.    Do you remember his name?
 3       A.    No.
 4       Q.    If I use the word Mayadeene, would that mean
 5 anything to you?  Does that ring a bell?
 6       A.    No, sir.
 7       Q.    Could you describe this person that you spoke
 8 to?
 9             Was he black or white?
10       A.    Black gentleman.
11       Q.    Do you know how old he was?
12       A.    As I recall, he was a little bit heavy set,
13 very sleepy.
14       Q.    Okay.
15       A.    Estimating 45 to 50 years old.
16       Q.    Okay.  Did he have any facial hair?
17       A.    I don't remember.
18       Q.    Anything, any distinguishing characteristics
19 about him that you remember?
20       A.    Nothing other than what I have given you.
21       Q.    Okay.  And so you asked him if he had heard
22 anything or saw anything?
23       A.    That's correct.
24       Q.    And what did he say to you?
25       A.    He said he heard a commotion but was unable
```

11

1 to tell me what exactly he heard.  He just heard loud

2 noise, voices.

3        Q.    Okay.

4        A.    And he heard, you know, rustling like a

5 scuffle, but as to specifics, he could not elaborate, or

6 did not elaborate.

7        Q.    Right.  You asked him whether he saw anything

8 also?

9        A.    Yes, sir.

10        Q.    Did he say whether he saw anything?

11        A.    He said he did not see a thing.

12        Q.    Okay.  All right.  Was there anyone else in

13 the residence?

14        A.    I don't know.

15        Q.    Okay.

16        A.    When I spoke with him, as I recall, was at

17 his front door, and he never invited me or opened the door

18 fully.  He was right there at the front door.

19        Q.    Okay.

20        A.    As I recall, he was standing in the door.

21        Q.    All right.  So that was the only person that

22 you spoke to.  The only civilian person that you spoke to?

23        A.    That's correct.

24        Q.    Okay.

25        A.    At the scene.

1      Q.    At the scene.

2            Did you speak to any -- well, I guess you

3  spoke to a nurse - I'm not talking about that for a

4  minute -- that wasn't at the scene, okay.

5            All right.  So this civilian person.

6  Apparently, this was at nighttime.  Do you know what time

7  this was?  Around 2:00 or 3:00 in the morning?

8      A.    About 4:00 a.m.

9      Q.    About 4:00 in the morning.  Okay.

10           This person said that he had heard something,

11 but had not seen anything.

12     A.    That's correct.

13     Q.    Okay.  Are those the only people that you

14 spoke to at the scene?  Officer Church, Officer Reed, some

15 other police officers that you don't remember the name of

16 and the civilian that you don't remember the name of?

17     A.    That's all that I recall.

18     Q.    Okay.  And then what happened?

19           You took pictures also, I take it?

20     A.    Yes, I did.

21     Q.    What did you take pictures of?

22     A.    The apprehension scene and the vehicle that

23 Mr. Hodge fled from, its location.  And then I took

24 pictures of Mr. Hodge later on.

25     Q.    Now, I know you were here today during the

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1 deposition of Officer Reed.  You heard what Officer Reed

2 had to say.

3            Is there anything that he is saying today

4 that is different than what he told you at the scene?

5            MS. ALVAREZ:  Objection.

6            You can answer.

7            THE WITNESS:  Today he seemed more clear that

8        he did not strike Mr. Hodge and at the scene he

9        was unsure; he stated he probably did.

10 BY MR. DANIELS:

11        Q.    Okay.

12        A.    In the actual apprehension process.

13        Q.    Do you remember what he said he probably

14 struck Mr. Hodge with?  Like was it with his hands, with

15 his flashlight?  Or do you remember?

16            MS. ALVAREZ:  Object to the form.  When?

17        Then?  The night --

18            MR. DANIELS:  Yes, the night -- that's what

19        we are talking about.  The night when this

20        happened.  Right.

21            THE WITNESS:  On the night that this

22        happened, I believe he stated it was with a fist.

23            MR. DANIELS:  Okay.

24 BY MR. DANIELS:

25        Q.    Okay.  Do you remember how many times?

14

```
 1        A.    I don't believe he could tell me a number

 2 because of the nature of the -- and the combativeness of

 3 the fight.

 4        Q.    Okay.

 5        A.    It may have been once, it may have been

 6 several times.

 7        Q.    Was there anything else that you remember

 8 that he said differently when you interviewed him at the

 9 scene than what he said today during his deposition?

10             MS. ALVAREZ:  Object to form.

11             THE WITNESS:  (No verbal response.)

12             MR. DANIELS:  You have to let him know that

13        he can still --

14             MS. ALVAREZ:  You can still --

15             THE WITNESS:  I know that.  I'm considering

16        whether or not --

17 BY MR. DANIELS:

18        Q.    No, take your time.  Take your time.  This

19 has been -- it's been some time.  I understand.

20        A.    Can I confer with her one second?

21             MS. ALVAREZ:  No, we can't.

22             THE WITNESS:  We can't.

23             Okay, no.

24             MR. DANIELS:  No.  I would let you confer.

25        This is not a trick situation; this is just to
```

1              find out what happened and find out the truth and

2              to do the right thing, basically.

3    BY MR. DANIELS:

4         Q.    Do you know of any other officers that were

5    involved in apprehending Mr. Hodge other than Officer Hart

6    pointing out to Officer Reed and Officer Church where Mr.

7    Hodge had fled towards, the direction of, and Officer

8    Timothy Shields and Officer Jay Smith, who Officer Reed

9    said were he believes to be the officers that had the car

10   that transported Mr. Hodge over to Broward General Medical

11   Center?

12             Any other officers that were involved in this

13   other than those officers?

14        A.    Any officers involved in this or any officers

15   involved in the apprehension?

16        Q.    Involved in the apprehension.

17             I understand there were officers involved in

18   the perimeter.

19        A.    The only officers that my investigation

20   showed were involved in the actual apprehension were

21   Officer Church and Officer Reed.

22        Q.    Okay.

23             If there were any other officers that were

24   involved in the apprehension, would they have to file a

25   supplemental report?

16

```
 1        A.    Yes.

 2        Q.    Okay.  All right.

 3              Is there anything else that you did at the

 4  scene, other than what we discussed?  Other than what you

 5  told me already?

 6        A.    I did look around the neighborhood due to the

 7  late hour to see if any other lights were on in the

 8  residences right close by, or if anybody was standing

 9  around.

10        Q.    Okay.

11        A.    Civilian wise, other than police officers.

12        Q.    Okay.  And did you notice anyone?

13        A.    No.

14        Q.    Anything else other than that?

15        A.    At the scene?

16        Q.    At the scene.

17        A.    No, sir, nothing.

18        Q.    Okay.  And now then what happened?

19              You left the scene.

20        A.    And went to the hospital.

21        Q.    Okay.  And that's Broward General Medical

22  Center where Mr. Hodge was?

23        A.    That's correct.

24        Q.    What did you do when you got to the hospital?

25        A.    I introduced myself to Mr. Hodge.
```

1      Q.    By the way, was he in the emergency room?   Is

2 that where he was?

3      A.    That's correct.

4      Q.    I assume there were officers with him; I

5 assume Officer Shields and Officer Smith.   Were they

6 there?   Or were there other officers?

7      A.    I don't recall them being there.   I do recall

8 Officer Hart being there by the time I got there.

9             Officer Shields and Officer Smith might have

10 still been there but I don't recall.

11      Q.    You don't recall?

12      A.    I do recall Officer Hart being there.

13      Q.    You got to the scene, Officer Hart was there.

14 What about Officer Reed?

15      A.    I don't believe Officer Reed came to the

16 hospital.   I do recall Officer Church.

17      Q.    Okay.   So when you get to the scene, Officer

18 Hart was there.   I guess Officer Church was not there at

19 the time.   He came a little later?

20      A.    I believe he came later.

21      Q.    Okay.   So you got to the scene.   And what did

22 you observe?   When you got to the hospital.   I'm sorry.

23      A.    Mr. Hodge was laying on a bed in the rear

24 section of the emergency room.   And there were some

25 medical personnel around, and the officers to ensure that

1  he was there, handcuffed to the bed, behaving himself.

2       Q.    Right.

3       A.    And medical treatment was given, or was

4  already initiated, had started.

5       Q.    Right.  And then you took photographs of Mr.

6  Hodge at that time?

7       A.    I spoke to him first.

8       Q.    You spoke to him first, okay.

9            You spoke to him, and what did you say to him

10 and what did he say to you?

11      A.    I introduced myself, explained to him why I

12 was there, that I was investigating the incident, use of

13 K-9 force in his apprehension.  And I asked him what

14 happened.

15      Q.    Okay.  And what did he say?

16      A.    As I recall, he wasn't real specific.  And I

17 started putting more direct questions to him.

18      Q.    Okay.  So what did you ask him?

19      A.    I asked him if he had stolen a vehicle, been

20 in a stolen vehicle.  And he admitted to that.

21      Q.    Okay.

22      A.    I asked him, I went on to state the obvious,

23 you obviously fled from the vehicle and hid.

24      Q.    Right.

25      A.    I asked him why he didn't give up to the

19

1  officers.  And I don't recall any answer to that.  That

2  being the perimeter units.

3          Q.    I see, okay.

4          A.    I then asked him about the K-9 officers, did

5  you see them coming up.

6          Q.    Right.

7          A.    The officers with the dog.  And he responded

8  in an affirmative manner.

9          Q.    Okay.

10          A.    I asked him if the K-9 officers said anything

11  to him, gave him any kind of warnings, offered him a

12  chance to come out.

13          Q.    Right.

14          A.    And he stated that they did.

15          Q.    Okay.

16          A.    I asked him why he did not just simply

17  surrender to them.

18          Q.    Right.

19          A.    And he stated back to me, I just freaked.

20          Q.    Okay.

21          A.    He went on to express that he was extremely

22  fearful of being arrested and that he fought violently

23  against the dog and the officers' efforts due to that

24  fear.

25          Q.    Okay.  Anything else that he said to you?

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1        A.    He stated that he was regretful for the

2 fight.  He also informed me at some time during the

3 conversation, either before this or after this, that he

4 had been arrested in the past.

5        Q.    Okay.

6        A.    And I don't recall anything else specific.

7        Q.    Was Officer Hart there at that time?  When

8 you were interviewing or speaking to Mr. Hodge.

9        A.    He was in the emergency room area, the

10 general area, yes.

11       Q.    Now, was Officer Hart, would he be considered

12 the arresting officer?

13       A.    I believe he was in this case.

14       Q.    So would he have to be the one preparing the

15 probable cause affidavit?

16       A.    If he was the arresting officer making the

17 arrest, yes.

18       Q.    Okay.  Do you know whether Officer Hart spoke

19 to Mr. Hodge at all?

20       A.    I imagine he did.

21       Q.    Okay.  I mean while you were there.  Did you

22 hear Officer Hart question Mr. Hodge at all?

23       A.    Certain assumptions that we were to make, you

24 know, he may have asked name, address, things like this.

25       Q.    Right.

1       A.      Specifically do I recall that, no.

2       Q.      Okay.  All right.

3               By the way, before you do that, before you

4  question Mr. Hodge, do you have to give him his Miranda

5  warnings?

6       A.      No.

7       Q.      No?  Okay.

8               I'm just curious.  This is all academics.

9  This is over with, the criminal portion of it.  But why

10 don't you have to give him his Miranda warnings at that

11 time?

12      A.      I'm not criminally investigating this, and

13 the only result in that is if I give -- if I don't give

14 someone Miranda warnings, I can't go on the witness stand

15 until they give up their fifth amendment rights.  Then I

16 can be called back to impeach.  But what he gives me I

17 can't relate to the jury because you have the right to

18 remain silent.

19      Q.      Right.

20      A.      But I can still gather the information.

21      Q.      So you were gathering the information for

22 what purpose?

23              Was it just for your own investigation

24 regarding your K-9 unit to make sure that he had done

25 things properly?

```
 1        A.    Yes.

 2        Q.    So it wasn't for the criminal investigation?

 3        A.    Not specifically.

 4        Q.    Okay.  Now, was Mr. Hodge, was he lucid?  Did

 5   he make sense when he answered your questions?

 6        A.    Yes.

 7        Q.    Did he appear to be intoxicated or high on

 8   anything at that time?

 9        A.    Yes, he did.

10        Q.    Okay.  In what way?

11        A.    He was high.  He was buzzing.  He was like he

12   had had 47 cups of coffee.  I mean, he was tense.

13        Q.    Like a tense or, a very, like how could I say

14   that, seem to be like going all over the place?

15              I'm trying to get an idea.  Tense being what?

16   It may be difficult to put it into words.  That's what I'm

17   trying to do.

18        A.    I've had a little practice.

19              His body language, which is a communication

20   probably more important than the words we say.

21        Q.    Okay.

22        A.    Jitteriness in the eyes, a fast fluctuation

23   back and forth at times.  Certain muscles tensing up.

24              You can tell that somebody is un-at-ease, and

25   somebody is in a nervous or excited mode.
```

1      Q.    All right.

2      A.    And he was displaying those attributes.

3      Q.    Okay.  I mean, obviously, he had run away

4  from the police, the dog that had been involved in

5  arresting him, it was obvious he went through a number of

6  different situations before you ran into him.

7            Could it have been because of that as opposed

8  to him being high on drugs?

9            MS. ALVAREZ:  Object to form.

10            MS. CODY:  Objection to form.

11            THE WITNESS:  Based on my 19 years of

12        experience as a police officer.

13  BY MR. DANIELS:

14      Q.    Okay.

15      A.    In my opinion, based on the possible

16  narcotics available in the street, he had been

17  free-basing.

18      Q.    Okay.

19      A.    He had had cocaine.

20      Q.    Okay.

21      A.    His nervousness tended that way.  It may not

22  have been cocaine, but that's my opinion, he was

23  definitely high.

24      Q.    All right.

25            I understand you spoke to the nurse over

1  there, I think.  Right?

2          Yes, the nurse attending.  You said the nurse

3  attending Mr. Hodge stated he was high.

4      A.    That's correct.

5      Q.    You actually spoke to her, then, I take it.

6      A.    She was present and working on him when Mr.

7  Hodge made the statement to me that he just freaked.

8      Q.    Just freaked.  Does that mean having

9  something to do with drugs or does that mean he just went

10  crazy?

11          Is freaked a drug term?  I don't know.

12          MS. ALVAREZ:  Objection.

13          THE WITNESS:  (No verbal response.)

14  BY MR. DANIELS:

15      Q.    No --

16      A.    I don't know.

17      Q.    Okay, I thought maybe you knew.  Okay.  I

18  thought it meant something to you.  All right.

19          So freaked means, the general word means just

20  freaked out, went crazy, something like that?

21          MS. ALVAREZ:  Objection.

22  BY MR. DANIELS:

23      Q.    What does the term just freaked mean to you?

24          How is that.

25      A.    In the context of the conversation --

```
 1              MS. ALVAREZ:   Objection.

 2              MR. DANIELS:   Okay.

 3              MS. ALVAREZ:   Thank you.

 4              THE WITNESS:   The context of the conversation

 5         that night, he panicked.

 6  BY MR. DANIELS:

 7         Q.    Panicked, okay.

 8         A.    He acted in a manner irresponsible to what

 9  was transpiring around him.

10         Q.    Okay.

11              Now also he told you, he went on and

12  explained, I'm reading from this report, he went on and

13  explained he wanted to escape and never surrendered until

14  after he fought with the officers.

15         A.    That's correct.

16         Q.    Is that what he said to you?   Okay.

17              So he wanted to escape.   Okay.

18              All right.   Now, you say that also at that

19  point, Officer Church arrived at some point.

20         A.    Yes.

21         Q.    Okay.  And do you know --

22         A.    This is at the hospital now.

23         Q.    At the hospital we're talking about?

24         A.    Yes.

25         Q.    At the hospital.
```

1            You come to the hospital, you notice Officer

2 Hart over there, Mr. Hodge was over there.  The nurse is

3 over there taking care of him.

4            At what point after you arrived at the

5 hospital did Officer Church arrive?  How long after?  Five

6 minutes, ten minutes, an hour?  Half hour?

7       A.    I noticed Officer Church at the hospital.  He

8 may have arrived before me.  I noticed him at the

9 hospital.  I believe it was after I had conducted the

10 interview with Mr. Hodge.  I may have already taken the

11 pictures of Mr. Hodge and was about to leave, but that's

12 the time when I recall seeing Officer Church.

13       Q.    Right.  Okay.  So how long was that?  Was

14 that an hour?  Was that a half hour?

15       A.    I was probably at the hospital for about 30

16 minutes.  I was anxious to go home and get to bed.

17       Q.    Okay.  And now so Officer Church was there.

18 And just to make sure, was Officer Reed over there also?

19            MS. ALVAREZ:  Object to form.

20            THE WITNESS:  I don't recall specifically.

21 BY MR. DANIELS:

22       Q.    Okay.  And did you go over to Officer Church

23 and speak to him or did he come over to you?

24            Did you speak to each other?

25       A.    Knowing Officer Church, I can assume that I

27

1 said something to him.

2      Q.    Okay.

3      A.    Did I interview him any further there, not

4 that I recall.

5      Q.    Okay.  What would be the purpose of Officer

6 Church coming to the hospital?

7      A.    To gather additional information for his

8 police report.

9      Q.    Did you see Officer Reed any further that

10 day?  In other words, did you see him when you left the

11 hospital?  Was he in the parking lot?

12           The reason why I'm saying this, I'm assuming

13 that Officer Church and Officer Reed drove together,

14 because they had only one patrol car.  And so they would

15 have to go to the hospital together, I would assume.

16           Would that be a good assumption?

17           MS. ALVAREZ:  Objection.

18           THE WITNESS:  No.

19 BY MR. DANIELS:

20      Q.    No.  Why not?

21      A.    When they are doing field training, they

22 locate the car centrally, which is probably the police

23 station.

24      Q.    You locate -- what does that mean, locate the

25 car?  What does that mean?

28

```
 1        A.    We will put the car in the middle of the
 2  city.  Because Tom Reed is there with his dog and he will
 3  need to periodically go back and check on his dog.
 4             Now Officer Church came with his dog and his
 5  police car, but he will be patrolling in Fort Lauderdale.
 6  I'm assuming Tom is driving because he knows the city.
 7  This is how they set up, I don't recall specifically that
 8  night, but this is how we do it when we do the training
 9  with OJ agencies, out of jurisdiction agencies.
10             So Tom would have his car with Officer Church
11  and Officer Church's dog, Tom's dog will be in Officer
12  Church's car probably parked at our police station.
13        Q.    Okay.
14        A.    That being conveniently located in this
15  instance about midway between the apprehension location
16  and the hospital.  This is extremely reasonable that
17  Officer Church having to gather more information, Officer
18  Reed being the duty-minded professional he is, wants to go
19  work his dog and be available to the City, would have
20  swapped cars and Officer Church respond in his vehicle
21  with his dog and Officer Reed taken his dog from Officer
22  Church's car.
23        Q.    I see.
24        A.    Therefore, they probably separated at least
25  until Officer Church is finished with gathering the
```

1   information, further information at the hospital for his

2   report.

3         Q.   Okay.  All right.  And so Officer Church

4   would be with the Hallandale Police Department, he would

5   have to make his own separate report?

6         A.   I don't know if he would have to, but he did

7   in this case.

8         Q.   Okay.  And the reason why he would need more

9   information, wouldn't Officer Reed need the same

10  information, or no?

11             MS. ALVAREZ:  Object to form.

12  BY MR. DANIELS:

13        Q.   In other words, why wouldn't Officer Reed

14  also go over there to get the information that Officer

15  Church was getting if Officer Church was getting needed

16  information?

17             MS. ALVAREZ:  Object to form.

18  BY MR. DANIELS:

19        Q.   Does that make sense?

20        A.   It makes sense that Officer Church, if he has

21  to prepare a report for his detective, has specific

22  requirements from that department and that agency, and he

23  has to fulfill those; he is obligated to fulfill those.

24        Q.   Okay.

25        A.   Depending on the orders given from his

```
 1  commanders.
 2        Q.    Right.
 3        A.    Officer Reed would know that our police
 4  reports through the booking officer would have all the
 5  statistical information on Mr. Hodge.
 6        Q.    Okay.
 7        A.    And knowing that Officer Church was obviously
 8  gathering information either more complete or less
 9  complete and with the reports that you have with Officer
10  Reed's supplement not requiring all that, that's why
11  Officer Reed may not have responded to the hospital.  His
12  basic report on this would be a supplement, which is a
13  narrative.
14        Q.    Okay.
15        A.    Does that make sense?
16        Q.    I think so.
17              Basically, what you are saying is basically
18  Church being of Hallandale, might have his own
19  requirements under his police department and he would have
20  to get more specific information, and Officer Reed
21  wouldn't.
22        A.    It has been my experience that the idiot
23  blocks for different agencies --
24        Q.    Are different?
25        A.    Are standardized, but they are unique in some
```

1 aspects.

2       Q.    Okay.

3       A.    The idiot blocks, which is a slang term for

4 state, city, date of birth, name, height, weight.

5       Q.    All right.

6            So do you know that for a fact that that is

7 what happened in this particular case?  Or are you just

8 assuming that as far as that they swapped cars?

9       A.    As I stated, I'm assuming that.

10      Q.    Okay.  All right.  And did Officer Church go

11 into the same room that Mr. Hodge was in?

12      A.    The emergency room is not a private room.

13      Q.    Okay.  It's a big area?

14      A.    It's got partitioned off sides and a common

15 front that they can pull a curtain.

16      Q.    What I meant was basically here, did he go

17 in -- you were obviously standing next to Mr. Hodge

18 speaking to him and also taking photographs of him.

19            Did Officer Church also go towards you and

20 also was next to Mr. Hodge at any time that you saw

21 Officer Church?

22      A.    Not that I recall.  He was in the general

23 area in the emergency room, but not standing next to Mr.

24 Hodge.

25      Q.    Okay.  Could he see Mr. Hodge?

32

1                    MS. ALVAREZ:   Objection.

2                    THE WITNESS:   Probably.

3  BY MR. DANIELS:

4         Q.     Now when you left the hospital, was Officer

5  Church still there?

6         A.     I don't recall.

7         Q.     Do you recall anything specifically you and

8  Officer Church spoke about?

9                At the hospital I'm talking about.

10        A.     No, not at the hospital.

11        Q.     All right.  Now, after the hospital, and you

12 went back home, did you ever discuss this at all with

13 Officer Church or Officer Reed as to what had occurred

14 after the hospital?

15        A.     Yes.

16        Q.     Okay.  And when did you do that?

17        A.     I talked to them about it last night.

18        Q.     Okay.  In preparation for this deposition

19 today?

20        A.     And at other times, yes.

21        Q.     Okay.

22        A.     I mean, I can't tell you the specific dates.

23        Q.     Okay.

24        A.     Since the lawsuit has been filed and it's

25 come back up.

33

1      Q.    Fine.

2      A.    Since his agency received your intent, yes,

3  I've spoken about it several times.

4      Q.    Okay.  What I'm saying is after you left the

5  hospital, okay, did you, like within that week after that,

6  did you speak to Officer Hart, Officer Church, Officer

7  Reed as to what had occurred?

8      A.    With regards to additional or supplemental

9  information to this investigation, not that I recall.

10     Q.    Okay.  All right.

11           Well, let me ask you this.  I asked you a

12  question as to whether or not there was anything different

13  that Officer Reed said during his deposition and what he

14  said to you when you spoke to him at the scene.  You

15  wanted to speak to, ask your attorney a question.

16           Could you tell me what you wanted to ask her.

17           MS. ALVAREZ:   Objection.

18           THE WITNESS:   I wanted to ask her if I should

19       or could clarify a point.

20  BY MR. DANIELS:

21     Q.    And what point is that?

22     A.    Officer Reed stated to me when he struck him,

23  or he may have struck, he was not sure because of the

24  nature of the fight, and as I recall, those blows, or

25  blow, were to get Mr. Hodge's compliance.  And there was

1 like one or two fists thrown to the back area, and it was

2 the area that he stated that he struck him, was to the

3 back area.

4          Q.    What was the point?

5                I'm sorry.   What point did you want to

6 clarify?

7          A.    The manner in which you asked the question at

8 that time, the context of it, I would be offering

9 clarification information you really hadn't asked for.

10 And I wanted to know if she wanted me to clarify that so

11 we didn't end up playing more games for a lengthier period

12 of time.

13         Q.    Okay.   I don't think I'm playing any --

14         A.    No, it is not a game.

15         Q.    And I don't think, you know, I'm not trying

16 to ask you anything tricky.   I just trying to find out

17 what you know about the situation, that's all.

18               I never try, you know, to trick anyone or

19 anything like that.   It is not my purpose.

20         A.    I'm not saying tricking.

21         Q.    Right.

22         A.    I'm saying that the rules of conduct for

23 depositions.

24         Q.    Okay.

25         A.    To, you know, keep it within that context.

35

1        Q.    Okay.

2              Is that it, basically?  Is that it?  Anything

3 else?

4        A.    That was the only clarification, or the thing

5 that I wanted to confer with her about.

6        Q.    Okay.

7              Let me ask you this.  I know I gave you this

8 person's name before, Mr. Mayadeene, which is the civilian

9 that said he observed the scene.

10             Did you ever hear about an individual

11 observing what had happened, a civilian observing what had

12 happened?  Did anyone ever tell you that there was a

13 civilian that observed what happened?

14       A.    Not until I received some sort of letter

15 within the last week or two.  Something about somebody had

16 stepped forward or something.  I don't know if Officer

17 Reed relayed that to me or verbally or something.

18       Q.    Okay.  The letter you received, was that from

19 who?

20       A.    It was a notification I believe from the City

21 Attorney's Office.

22       Q.    Okay.  All right.

23       A.    Something about a witness.

24       Q.    About a witness.  But that was the first time

25 that you had heard that there may be a witness?

36

```
 1        A.      Yes, sir.

 2        Q.      Okay.

 3                Did any police officer, anyone ever tell you

 4  that any police officers struck Mr. Hodge after he was

 5  handcuffed and while he was handcuffed?

 6        A.      No, sir.

 7        Q.      Okay.

 8                Okay, I'm just reviewing some stuff, and I'm

 9  almost done.

10        A.      I thought you said we were going to be quick.

11                (Discussion off the record.)

12  BY MR. DANIELS:

13        Q.      Let me ask you, is there anything else that

14  we have not discussed today, okay, is there anything else

15  that you feel is important, because obviously I can't

16  think of everything, I wish I could, but I can't, that you

17  feel is important that we have not discussed?

18        A.      With regards to this case, no, sir.

19        Q.      All right, I have don't have any further

20  questions.

21                MS. CODY:  I just have a couple of questions

22                MR. DANIELS:  Okay.

23                         CROSS EXAMINATION

24  BY MS. CODY:

25        Q.      I'm going to show you a report that you
```

37

1  indicated that you wrote based on the incident.

2            Is that a copy of the report?

3       A.    Yes.

4       Q.    Okay, a fair and accurate copy of it?

5       A.    Yes.

6       Q.    And that is your initial or signature by your

7  name?

8       A.    Yes.

9            MS. CODY:  All right.  I would like to have

10          this marked as an exhibit.

11          MR. DANIELS:  Thank you, that's a good idea.

12          (Whereupon, said document was marked as

13          Defendant's Exhibit No. 1 for identification.)

14  BY MS. CODY:

15      Q.    The incident happened on September 6, and I

16  see you wrote your report on September 21st.  So did you

17  take notes that night?  Or how did you do it?

18            When you went out to the scene, did you take

19  any notes, or you just remembered everything everybody

20  said to you?

21      A.    Both, combination.

22      Q.    Okay.  So --

23      A.    I may have notes, jottings, memory; I have

24  the photographs, so that way it will come back.  So that's

25  what, that and other administrative duties --

38

```
1         Q.    Okay.

2         A.    -- come into play in the completion.

3         Q.    Okay.  And based on the experience that you

4  have as the sergeant -- are you over the K-9 unit, the

5  whole Fort Lauderdale K-9, I guess academy?

6         A.    K-9 unit, yes.

7         Q.    Okay.  Based on what was told to you by the

8  officers, do you think that everything was done

9  appropriately?

10             MS. ALVAREZ:  Object to form.

11             MR. DANIELS:  I will object to the form.

12             THE WITNESS:  Yes.

13  BY MS. CODY:

14         Q.    According to your procedure?

15         A.    Yes.

16             MS. CODY:  Okay.  That's it.  I just had a

17         couple of questions.

18             MR. DANIELS:  Okay.

19             MS. ALVAREZ:  I have a couple of questions.

20                       CROSS EXAMINATION

21  BY MS. ALVAREZ:

22         Q.    Sergeant Wheeler, when you arrived at the

23  scene, Mr. Hodge was not there; is that correct?

24         A.    That is correct.

25         Q.    You made no physical or verbal contact with
```

39

1  him at the scene?

2          A.      That's correct.

3          Q.      The first time you made contact with him was

4  at the hospital?

5          A.      That's correct.

6          Q.      Did you make any physical contact with him at

7  any time?

8          A.      (No verbal response.)

9          Q.      Did you hit him, kick him, strike him?

10         A.      No.

11         Q.      Okay.

12                 We were also talking about what Sergeant Reed

13 had told you the night of the incident, what he may or may

14 not have said to you.

15                 You said that Reed may have told you that he

16 may have stricken Mr. Hodge.  Is that correct?

17         A.      That is correct.

18         Q.      But if he would have done so, he told you

19 that it was to get compliance with his verbal commands as

20 well as Church's verbal commands.

21                 Is that correct?

22         A.      That is correct.

23         Q.      Okay, thank you.

24                 MR. DANIELS:  Okay.  No further questions.

25                 MS. ALVAREZ:  We'll read.  Thanks.

1          MR. DANIELS:  If the depositions are ordered,

2     you will get copies; I'm not ordering them right

3     now.

4          MS. ALVAREZ:  Yes, I will take a copy, and a

5     mini, condensed, and an Ascii.  Thanks.

6          MS. CODY:  I will take a copy

7          (Thereupon, the deposition adjourned at 12:05

8     p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA        )

3    COUNTY  OF  BROWARD  )

4            I, the undersigned authority, certify that
     SERGEANT DAVID WHEELER personally appeared before me and
5    was duly sworn.

6            WITNESS my hand and official seal this
     23rd day of January, 2001.

7

8                              *Jackqulyn G. Holland*

9         _____
          JACKQULYN G. HOLLAND
10        Notary Public - State of Florida
          My commission No.  CC927587
11        Expires:  May 21, 2004.

12           REPORTER'S DEPOSITION CERTIFICATE

13   STATE OF FLORIDA        )
     COUNTY  OF  BROWARD  )
14

             I, JACKQULYN GIPSON HOLLAND, Registered
15   Professional Reporter, certify that I was authorized to
     and did stenographically report the deposition of SERGEANT
16   DAVID WHEELER; that a review of the transcript was
     requested; and that the transcript is a true and correct
17   record of my stenographic notes.

18           I further certify that I am not a relative,
     employee, attorney, or counsel of any of the parties, nor
19   am I a relative or employee of any of the parties'
     attorney or counsel connected with the action, nor am I
20   financially interested in the action.

21           Dated this 23rd day of January, 2001.

22                              *Jackqulyn G. Holland*
          _____
          JACKQULYN G. HOLLAND
23        Registered Professional Reporter.

24

25

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

42

1                    CORRECTION SHEET

2
RE:     HUGH HODGE V. TIMOTHY M. CHURCH, etc. et al.
3
        Case No:  00-6228
4       Deposition of:  SERGEANT DAVID WHEELER
        Date Taken:  November 16, 2000
5
PAGE NO.         LINE NO.              CORRECTION OR CHANGE
6
7   _____      _____      _____
    _____      _____      _____
8   _____      _____      _____
    _____      _____      _____
9   _____      _____      _____
    _____      _____      _____
10  _____      _____      _____
    _____      _____      _____
11  _____      _____      _____
    _____      _____      _____
12  _____      _____      _____
    _____      _____      _____
13  _____      _____      _____
    _____      _____      _____
14  _____      _____      _____
    _____      _____      _____
15  _____      _____      _____
    _____      _____      _____
16  _____      _____      _____
    _____      _____      _____
17
Under penalties of perjury, I declare that I have read my
18 deposition and that it is true and correct subject to any
   changes in form or substance entered here.
19

20 _____
   Date
21

22

23 _____
   SERGEANT DAVID WHEELER, Deponent
24

25

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

43

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                     DIVISION:  MIAMI

 3  HUGH HODGE,                    )
                                   )
 4          Plaintiff,             )
                                   )
 5    v.                           )    Case No.   00-6228 CIV-
                                   )               SEITZ/GARBER
 6  TIMOTHY M. CHURCH, THOMAS      )
    REED, PATRICK HART, DAVID      )
 7  WHEELER, CITY OF FORT          )
    LAUDERDALE, and CITY OF        )
 8  HALLANDALE,                    )
                                   )
 9          Defendants.            )
    _____x

10  To:  Dieter K. Gunther, Esq.
         Adorno & Zeder, P.A.
11       888 S.E. 3rd Avenue, Suite 500
         Fort Lauderdale, FL   33335

12
         Your client's deposition taken in the above-styled
13  case on November 16, 2000 is now ready for signature.

14       Since the deposition was ordered on an expedited
    basis, the original and one copy were delivered to Mr.
15  Gordon Daniels today, January 23, 2001.  Please have your
    client read your copy of the deposition.  An errata sheet
16  is attached to the end of the transcript for your
    convenience.

17
         Please contact our office if you have any
18  questions.

19                            Very Truly Yours,

20
                              _____
21                            JACKQULYN G. HOLLAND, RPR
                              Capital Reporting Service
22                            888 S. Andrews Ave., #304
                              Ft. Lauderdale, FL   33316
23                            (954) 522-6401

24  Date:  January 23, 2001
    cc:  Gordon S. Daniels, Esq.
25
```

Date:        September 21, 1998

To:          Operations Support/Captain Lenny Schneider

From:        K-9 Unit/Sergeant David Wheeler

Subject:     K-9 Use of Force Review/Officer Reed/OR#98-139628

With regard to this K-9 Use of Force Review, Officer Reed was the Fort Lauderdale K-9 Handler responsible for the application of K-9 force; however, the actual force was applied by Hallandale K-9 team of Officer Timothy Church with his K-9 partner, Gero. This team recently graduated from our K-9 Academy. Officer Church and his partner were working with and under the direction of Fort Lauderdale K-9 Officer Reed throughout this incident. This was part of Officer Church's field training with the Academy.

On September 6, 1998, Fort Lauderdale officers reported that a white male just fled from what appeared to be a stolen car. This occurred at 1513 N.W. 15 Court. Upon Officer Reed and Church's arrival, Patrolman Hart had confirmed that the car was stolen. Further, the culprit was being described as a white male, between 20 and 30 years old, wearing a white tee shirt, and blue shorts. Officer Hart advised the culprit had been seen running north to the rear of this residence.

Officer Church, under the direction of FLPD K-9 Officer Reed, retrieved his K-9 partner and initiated a track of the culprit. Already, a perimeter had been established by FLPD marked units. Each police cruiser was displaying its overhead emergency lights. These red and blue lights were reflecting throughout the perimeter.

Officers Church and Reed tracked the culprit a short distance, two yards, when they located him hidden between a bush and the residence of 1516 N.W. 15 Place.

A perimeter Unit was about 100 feet away in the intersection with its emergency lights on when Officers Church and Reed located the culprit hiding. Officer Church loudly announced that he was a police officer and that the culprit was under arrest. Officer Church continued that the culprit needed to exit his hiding place with his hands exposed. After no responses was received, Officer Church repeated his verbal warning and included the fact that K-9 force would be used if the culprit failed to immediately comply.

Despite the marked police car being so close, the immediate presence of two uniformed police officers, the presence of the police work dog, this culprit, who perfectly fit the physical description, failed to move or respond to the officers. Therefore, due to the culprits continued resistance to this lawful arrest, K-9 force was necessarily applied.

DEFENDANT'S EXHIBIT

1

K-9 Gero was released and contacted the culprit, Hugh Hodge, on his right biceps just above the elbow. Hodge, pulled away violently and ripped his arm from this contact. K-9 Gero recontacted Hodge on his buttocks and started pulling Hodge from his hiding place.

During this fight, both Officer Reed and Church were assisting the dog in removing Hodge from his hide. Hodge, continued to struggle violently against the Officers' and Dog's efforts. Again Hodge pulled violently away from the dog. By doing so Hodge ripped his pants and caused the dog to make a third contact on the other cheek of Hodge's buttocks.

Finally, Officers Reed and Church forced Hodge to the ground and secured Hodge in handcuffs. Both officers stated they found it necessary to strike Hodge several times in the back to obtain the surrender and get Hodge secured.

I responded to the scene to conduct this review of the K-9 use of force. I interviewed Officer Church and Officer Reed at the scene. I located no civilian witnesses at the scene. Additionally, I took a photographic record of the scene. Next, I went to Broward General Medical Center's Emergency Room where Hodge was treated and released back to FLPD after medical clearance. There, I interviewed Mr. Hodge and took photographs of him. I noted that Mr. Hodge seemed intoxicated, apparently high on some controlled substance. The nurse attending Mr. Hodge stated that he was "high."

I introduced myself to Mr. Hodge. He acknowledged me. I asked him what happened. Mr. Hodge went on and stated that he did take the car without the owner's permission. His statement lead me to believe that the victim of the auto theft might be acquainted in some manner with Mr. Hodge. I asked Mr. Hodge why he simply did not surrender to the police. Mr. Hodge stated " I just freaked." he went on and explained he wanted to escape and never surrendered until after he fought with the officers.

As a result of these interviews and my observations, I find that this K-9 Use of Force is *Justified*, and it complies with all the FLPD policies and procedures governing such a use of force for the following enumerated reasons.

1.  Felony grand theft auto was committed by an apparent adult culprit.
2.  The culprit knowingly and continually resisted all attempts of arrest.
3.  The culprit fled from uniformed officers.
4.  He remained hidden despite the obvious police presence, known by the lighted perimeter.
5.  He refused to respond to or comply with uniformed K-9 officers proclamations of his arrest.
6.  Upon initial force being applied, the culprit continued to resist making additional force necessary to complete this arrest.