UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-6228-CIV-SEITZ/GARBER

HUGH HODGE,

    Plaintiff,
v.

TIMOTHY M. CHURCH, et al.,

    Defendants.
_____/



## PLAINTIFF'S AMENDED RESPONSE TO MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, CITY OF HALLANDALE

Plaintiff, HUGH HODGE (hereinafter referred to as "HODGE"), by and through his undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.5, respectfully request the Court to deny Summary Judgment of Defendant, CITY OF HALLANDALE, (hereinafter referred to as "HALLANDALE"), and in support thereof, states as follows:

### CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS

In the middle of the night, Plaintiff stole a vehicle, led the police on a chase and ultimately drove the stolen vehicle into a fence. Plaintiff then ran from the police and hid behind shrubbery. Plaintiff was arrested and ultimately pled guilty to the charges of possession of cocaine, grand theft, possession of drug paraphernalia, driving with a suspended license and resisting arrest without violence.

### DISPUTED FACTS

We are <u>not</u> disputing the allegations that HODGE stole a vehicle and fled from the police. However we <u>are</u> disputing the police officers' allegations as to what happened during the



CASE NO. 00-6228-CIV-SEITZ/GARBER
Page 2

arrest of HODGE. We are claiming that the police officers' actions during the arrest of HODGE were <u>both</u> negligent and intentionally malicious resulting in injuries to HODGE. To make the record complete we will state both what the police officers allege, what the witness alleges and what HODGE alleges.

## ALLEGATIONS OF POLICE OFFICERS

HART states that he was in his patrol car chasing HODGE. HODGE then abandoned the vehicle and fled on foot. HART testified that he called the K-9 Unit, set up a perimeter and never left his perimeter post until HODGE was apprehended. (Deposition of HART, Page 31 lines 5-11).

At that time CHURCH (with HALLANDALE) was training his dog (Gero) with Officer REED (with FORT LAUDERDALE). <u>They responded to the scene.</u>

CHURCH stated that when the dog located HODGE hiding in the bushes, CHURCH identified himself as a police officer and advised HODGE to come out with his hands up or he would release the dog. He stated that he gave this warning <u>two</u> times.(Deposition of CHURCH, Page 24 lines 13-25, Page 25 lines 1-25 and Page 26 lines 1-18). CHURCH stated that when he did not receive a response from HODGE, he slacked off on the leash and gave the apprehension command. He testified that the dog was never unleashed. (Deposition of CHURCH, Page 26 lines 19-24 and Page 29 lines 20-21).

According to CHURCH, HODGE finally stopped resisting, put his hands behind his back, and was taken into custody. HODGE was then handcuffed.. REED then helped him to his feet and walked him to the car. (Deposition of CHURCH, Page 37 lines 1-3 and Deposition of REED, Page 34 lines 3-22).

## ALLEGATIONS OF JOSEPH MAYADEENE

Joseph Mayadeene (hereinafter referred to as "MAYADEENE"), a civilian, witnessed the apprehension of HODGE. He owns the home next to where the apprehension took place. MAYADEENE first saw <u>two</u> (2) police officers with flashlights. They did not have a dog with them. Then <u>another</u> officer came with a dog. That officer then let the dog off the leash. None of the police officers identified themselves as police officers or warned HODGE to come out or they would put the dog on him. (Deposition of MAYADEENE, Page 6 lines 14-16, Page 7 lines 20-23, Page 11 lines 15-17, Page 12 lines 17-19 and Page 15 lines 7-20). At that time, there were <u>three</u> (3) police officers present (Deposition of MAYADEENE, Page 16 lines 2-5).

While the dog was on him, HODGE was screaming "Get him off me." Then one of the police officers pulled HODGE out by his foot. They then took the dog off him and handcuffed him. At that time there were <u>four</u> (4) police officers present. (Deposition of MAYADEENE, Page 17 lines 1-5, Page 18 lines 7-9, Page 19 lines 7-16).

After they put the handcuffs on him, one of the police officers kicked HODGE. (Deposition of MAYADEENE, Page 23 lines 6-9 and Page 25 lines 16-23).

Then a police officer put the dog on HODGE and said "sic em." That's the time the dog ripped a hole in HODGE's pants. HODGE was handcuffed at this time. (Deposition of MAYADEENE, Page 26 lines 4-8, lines 22-24, Page 29 lines 5-14 and Page 30 lines 6-8).

The police then dragged HODGE out to the road. Then two officers helped him up from the road and put him in a car (Deposition of MAYADEENE, Page 39 lines 13-18 and Page 37 lines 7-12).

Towards the end of the incident there were about <u>fifteen to twenty</u> (15 to 20) police

officers present. (Deposition Of MAYADEENE, Page 52 lines 13-16).

## ALLEGATIONS OF HUGH HODGE

HODGE admits that he ran from the police and hid behind some shrubby (Deposition of HODGE, Page 8 lines 7-13).

HODGE then noticed a K-9 Officer and two Fort Lauderdale Police Officers. Then another Officer ran up to them and said "he's got to be in this area somewhere." (Deposition of HODGE, Page 10 lines 14-20 and Page 13 lines 14-18).

As the police officers walked towards HODGE, he stood up and put his hands in the air. (Deposition of HODGE, Page 14 lines 12-15).

At that time, a police officer grabbed HODGE by the wrist and slammed him to the ground. Then they all surrounded him and started kicking and beating him. At that time there were at least four officers. <u>HART was present and kicking and hitting him.</u> (Deposition of HODGE, Page 16 lines 18-24 and Page 18 lines 7-24).

Then the K-9 Officer put the dog on his arm. (Deposition of HODGE, Page 19 lines 1-4).

Then HODGE was handcuffed with his hands behind his back. He was then kicked and beaten. (Deposition of HODGE, Page 21 lines 18-25).

Then they put the dog on his buttocks. The dog was ripping his pants. (Deposition of HODGE, Page 25 lines 23-25 and Page 26 lines 1-8).

Then they dragged him out to the street. (Deposition of HODGE, Page 29 lines 7-10).

## MEMORANDUM OF LAW

A. **Applicable Legal Standards Regarding Motion for Summary Judgment**

The courts have held that the burden is on the summary judgment movant to demonstrate

conclusively that the non-moving party cannot prevail and if the record reflects the existence of any genuine issue of material fact or the possibility of any issue or if the record raises even the slightest doubt that an issue might exist, then summary judgment is improper. Penno v. American General Home Equity, 629 So.2d 307 (Fla. 2DCA, 1993). Additionally, the reviewing court must draw every reasonable inference in favor of the non-moving party. Fine Arts Museums v. First National, 633 So.2d 1179 (Fla.4DCA, 1994).

B.    **Plaintiff's Claim of Negligence Against HALLANDALE**

According to the witness MAYADEENE, when HODGE was hiding in the bushes the HALLANDALE Police Officer, CHURCH, let the dog off the leash and onto HODGE without giving any verbal warnings.(Deposition of MAYADEENE Page 15 lines 7-20).

While training with the Fort Lauderdale K-9 Unit, CHURCH is required to follow Fort Lauderdale's Standard Operating Procedures (S.O.P.'s) Regarding The Use Of K-9s. (Deposition of CHURCH {Page 16 lines 23-25 and Page 17 lines 1-7).

The Fort Lauderdale S.O.P. Regarding The Use Of K-9s states that "Whenever possible the K-9 handler shall verbally give the suspect an opportunity to surrender or halt before using the dog." ( Attached as Exhibit "A" is a copy of the Fort Lauderdale S.O.P. Regarding The Use K-9s, which was attached as an Exhibit during the deposition of Fort Lauderdale Police Officer KELLY).

It is our position that officer CHURCH was negligent in letting the dog on HODGE, while he was hiding in the bushes, without first verbally warning HODGE as required by Fort Lauderdale's S.O.P.'s.

Since CHURCH was an employee/agent of HALLANDALE, his negligence would be

CASE NO. 00-6228-CIV-SEITZ/GARBER
Page 6

imputed to them.

Additionally, the Courts have held, under 42 U.S.C. §1983, that a police officer is liable if he refuses to intervene when a constitutional violation takes place in his presence. Byrd v. Clark 783 F.2d 1002 (11th Cir.1986). In that same vein, we would argue that CHURCH was negligent under common law in not stopping the beating and the placing of the dog on HODGE after HODGE was handcuffed.

## CONCLUSION

Based on the foregoing, the Plaintiff, HUGH HODGE, is requesting that this Honorable Court deny Defendants' Motion for Summary Judgment as to the CITY OF HALLANDALE.

**I HEREBY CERTIFY** that a copy of the foregoing was mailed on February 28, 2001, to the offices of: DIETER K. GUNTHER, ADORNO & ZEDER, P.A., Attorney for Defendants, Thomas Reed, Patrick Hart, David Wheeler and City of Fort Lauderdale, 888 Southeast 3rd Avenue, Suite 500, Fort Lauderdale, FL 33335-9002 and MARK GOLDSTEIN, ESQ., Attorney for Defendant, City of Hallandale Beach, 400 S. Federal Highway, Hallandale Beach, Florida 33009.

DANIELS & DANIELS, PA
Attorneys for Plaintiff
4300 North University Drive, Suite B-200
Fort Lauderdale, Florida 33351
Telephone:   (954) 572-7100
         Fax:   (954) 572-0667

By: _____
GORDON S. DANIELS, ESQ.
Florida Bar No. 350648

RESPONSE(AMENDED) TO MTN SJ HALLANDALE.wpd

| POLICY 305 | K-9 UNIT, NARCOTICS AND EXPLOSIVES DETECTION TEAMS | |
|---|---|---|
| | Revised: 06/98, 9/99 | RELATED POLICIES: |
| | CFA STANDARDS: 17.04, 17.12 | |

A. **PURPOSE AND SCOPE**

1. The K-9 Unit is available in order to effect a faster, safer, and more effective way to handle incidents of burglary, building alarms, and suspects fleeing on foot and/or hiding. The K-9 Unit may also be used for narcotics detection involving marijuana, hash, cocaine, crack cocaine, and heroin. The K-9 Unit and the requesting unit will achieve the maximum effectiveness through a well-coordinated effort. All actions will be undertaken with an emphasis being placed on officer and citizen safety.

2. The Fort Lauderdale Police Department utilizes several kinds of searching dogs. For the purposes of this policy, the K-9 Unit will be used to refer to dogs that search for suspects. These dogs are active alert dogs and they are trained to apprehend a suspect by force when necessary. Some of the K-9s are cross-trained and can search for narcotics or bombs, however, they are active alert canines, and should never be used to search a person.

3. The second type of dog utilized by the Department is the Narcotics Detector Teams. These dogs are passive alert - they detect, they do not apprehend. Special Investigations and Patrol have these types of canines. These dogs can be used to search a person.

B. **THE K-9 UNIT**

1. RESPONSIBILITIES OF K-9 HANDLERS AND POLICE OFFICERS

   a. The decision to use a K-9 should be made as soon as possible.

   b. It shall be the duty of the supervisor or officer in charge of the scene, to set up a perimeter around the area or building to be searched to insure containment; and that all unauthorized persons and vehicles are prohibited from entering the search area.

   c. No officer shall enter the perimeter unless authorized by the K-9 handler, supervisor, officer in charge, or unless an emergency occurs.

   d. On arrival at the scene, after being briefed on the situation, the K-9 handler shall advise the supervisor or officer in charge how he intends to effect the search and what assistance he will need.

   The K-9 handler is authorized to search for a suspect using the method he feels will be the most effective in locating the suspect. All searches must

Exhibit "A"    305 - Page 1



be consistent with public safety.

e. No officer shall knowingly walk across or along the same path taken by the suspect, nor permit others to do so.

f. When use of force should be considered by a K-9 handler:

(1). Protection of the handler;

(2). Fleeing suspects after refusing to halt;

(3). Hiding suspect that refuses to come out;

(4). Hiding suspect that is not visible to the K-9 handler; or

(5). When the dog is assaulted.

NOTE: Only that force necessary to effect an arrest should be used. Whenever possible, the K-9 handler shall verbally give the suspect an opportunity to surrender or halt before using the dog.

g. Unless authorized by a supervisor, a K-9 unit will **NOT** be utilized in the following instances if the suspect is **known** to be a **JUVENILE** or where there is a reasonable belief that suspect is a juvenile and:

(1). The crime is of a misdemeanor nature (OR)

(2). The crimes are non-violent felonies, **(other than forcible felonies)**, and no other information is **known** that aggravates the incident, e.g., the suspect was possibly armed. Examples of a non-violent felony include fraud, auto burglary, forgery, auto theft, and grand larceny.

**FORCIBLE FELONY:** treason, murder, manslaughter, sexual battery, carjacking, home invasion robbery, robbery, burglary, arson, kidnapping, aggravated assault, aggravated battery, aggravated stalking, aircraft piracy, unlawful throwing, placing or discharging of a destructive device or bomb, and or any other felony which involves the use of threat of physical force or violence against any individual. Refer to FSS 776.08.

(3). There is little likelihood of escape.

A decision to use a K-9 Unit may be authorized by a supervisor, based on extenuating circumstances that would indicate that public safety would be best served by using a K-9 Team in the given situation. Consideration should be given to other options available to apprehend a suspect prior to using K-9.

h. A K-9 Unit will **NOT** be utilized in the case involving an adult or non-known juvenile where:

    (1). Crimes of a misdemeanor nature have occurred, and there is no reasonable belief that the suspect's actions may result in a forcible felony.

    (2). There is little likelihood of escape.

    Reasonable belief, in section 7 and 8, must be based upon a well-founded suspicion that a felony has occurred or is about to occur and which may pose a threat to the community, or may be cause for concern to officer or citizen safety. These facts must be related, in detail, in the officer's report.

i. K-9s will not be used for a body search of a person, (except as provided in section E, Narcotics Detector Teams).

j. K-9s will not be used for crowd control, except at the order of a shift captain or above. If a shift captain is not available, a call out will be made to the Operations Support Captain or above for approval.

k. The K-9 will not be used for tracking a lost person, except when authorized by a shift captain or above in an emergency. If a shift captain is not available, a call out will be made to the Operations Support Captain or above for approval. If it becomes necessary to track a lost person, the K-9 handler will take reasonable precautions to prevent a bite from occurring.

l. Call out Procedures

    (1). A K-9 Unit can be called out for any situation where the facts of the case meet the criteria for the use of K-9 as described above. To be considered:

        (a). The severity of the crime.

        (b). The likelihood of escape.

        (c). Containment in a perimeter.

        (d). The size of the area or building to be searched (a large building can be searched more thoroughly and quickly by K-9).

    (2). Call out for K-9 must be approved by a sergeant or above.

    (3). The K-9 Unit Sergeant will be called prior to any call out. The supervisor will determine the K-9 Unit to be called and he will notify communications of the appropriate call out.

    (4). K-9 Narcotics Detectors will be utilized in the same manner as described in Section E (5) below.

      (5).    K-9 will NOT be used to search for a known armed suspect barricaded in a building. (This should be referred to SWAT.)

2. **OPERATIONAL GUIDELINES FOR THE K-9 UNIT (OFFICERS AND SERGEANT)**

   As result of the use of K-9 (dog and handler), the K-9 officer will complete a "K-9 Supplement Report" form.

   a. If a bite occurs:

   Pictures of all wounds will be taken by the handler, as soon as practical after the bite occurs. Additional pictures of the scene will be taken by the K-9 handler. All applicable pictures will be submitted to the photo lab prior to the completion of the K-9 handler's work shift, to be processed as a priority with a copy to be forwarded to the Operations Support Captain.

   The officer will contact Risk Management and relay the information regarding the injury or leave a phone audix message (information should include: case number, arrested's name, date of birth, type of injury, and location of offense).

   b. The K-9 Sergeant will have the responsibility of reviewing the photographs and K-9 Unit officer's supplement on each K-9 use. This will be completed in all cases, even if the K-9 supervisor is not the reviewing supervisor.

   c. Monthly, each member of the K-9 Unit will submit to the Unit Supervisor a detailed statistical report of their K-9 related activities as outlined in the Unit SOP. Monthly, the Unit Supervisor shall (as outlined in the K-9 SOP) forward a copy of all training and deployment summaries and statistics to the Operations Support Captain. The Unit Supervisor will retain a copy.

   d. Each member of the K-9 Unit will be responsible for knowing, adhering to, and maintaining a current copy of the Fort Lauderdale Police Department's K-9 S.O.P. Manual.

3. **USE OF K-9 REVIEW (SERGEANTS, CAPTAINS, ALL REVIEWING AUTHORITIES)**

   a. A first line supervisor will respond to all dog **bites** to conduct a review of the incident. This supervisor will then complete a written review of the use of the K-9, and forward same to the Operations Support Captain within five working days from receipt of all necessary records (i.e.: reports, photos, tapes, etc.). To be included with this review will be a copy of **ALL** related police reports and supplements, and the probable cause affidavit.

   b. The reviewing supervisor will indicate, based on Department policy and their findings during the review, if the use of K-9 was justified or not.

        Complete details of the findings will be fully described in the written review.

    c.    In the event a K-9 is used outside our jurisdictional boundaries, the same policies will apply. The K-9 supervisor may be called out to conduct the use review, if absolutely necessary.

4.    K-9 NARCOTICS DETECTORS (AGGRESSIVE ALERT/APPREHENSION K-9)

These types of narcotics detectors are also active alert and apprehension-trained dogs. They are normally used to apprehend suspects during a search. They may be used in any situation requiring a narcotics search, and should be used in situations that may pose a threat to individuals. Care should be used when searching around people and delicate property. Narcotics detector K-9s can locate the odor of a narcotic in the general and specific area where the substance is present.

    a.    The decision to use the narcotics detecting K-9 should be made as soon as possible.

    b.    It will be the sole responsibility of the K-9 handler to determine how to proceed with the search for the odor of narcotics.

    c.    Narcotics detection K-9s will NOT be used to search a person.

    d.    Each handler of a dual trained K-9/narcotics detecting dog will be responsible for knowing, adhering to, and maintaining a current copy of the Fort Lauderdale Police Department's K-9 and Narcotics Detections Team S.O.P.

    e.    Call out procedures (see section E, subsection 5 below).

**C.    NARCOTICS DETECTION TEAMS**

1.    NARCOTICS DETECTOR TEAMS USE AND UTILIZATION (PASSIVE ALERT)

Narcotics Detector Teams can locate the general and specific areas where the odor of a narcotic substance is present. This section refers to Narcotics Detection Teams (passive alert dogs).

Narcotics Detector Teams can be used to search a person.

    a.    The decision to utilize a Narcotics Detection Team should be made as soon as possible.

    b.    It will be the sole responsibility of the Narcotics Detection Team handler to determine how to proceed with the search for the odor of narcotics.

    c.    If a search of a person is desired, only a passive alert dog will perform such a search, and it will be the sole responsibility of the handler to determine how to conduct the search.

    d.    Each handler of a Narcotics Detector Team will be responsible for knowing, adhering to, and maintaining a current copy of the Fort Lauderdale Police Department's Narcotics Detection Team S.O.P. manual.

    e.    Call Out Procedures:

        (1).    Every effort should be made to locate an on-duty Narcotics Detection Team or Narcotics K-9 Team prior to a call out.

        (2).    Call outs should be made considering:

            (a).    Likelihood of detection.

            (b).    Severity of the case (based on probable cause).

            (c).    Reasonable suspicion that narcotics are possibly present based on past information, on-going case investigation, or probable cause.

        (3).    Call outs must be approved by a captain or above.

        (4).    The K-9 Unit supervisor will be notified of the need for a call out by communications personnel once it has been approved by the supervisor. This will be done in the event a Patrol Narcotics Detection Team or K-9 Narcotics Detector is to be called. The K-9 supervisor will make the determination of which team is called out and relay that to the Communications Center.

        (5).    The Special Investigations Unit Narcotics Detection Team may be used at that division's discretion. The S.I.D. sergeant-in-charge of the Narcotics Detection Team will be notified prior to the actual call out.

        (6).    Narcotics Detection Teams will NOT be called out (but may be used if on-duty) in cases such as a traffic stop for a minor infraction where there is little or no additional evidence to suspect <u>sizable</u> quantities of narcotics or that misdemeanor amounts of a drug will be found during the search.

**D.     EXPLOSIVES DETECTION TEAMS**

    1.    EXPLOSIVES DETECTION K-9 TEAM'S USE AND UTILIZATION

Explosive Detection K-9 Teams, commonly referred to as a "Bomb Dog", can be utilized only to augment a search, by detecting the odor of specific explosive

substances. The actual list is confidential, but it includes most of the substances common to explosives.

    a.    The Explosives Detection K-9 Team is NOT TO BE USED TO EXAMINE A SUSPICIOUS PACKAGE/ITEM/SUSPECT BOMB. That is the duty of a Bomb Technician, due to the inherent dangers presented by a potential explosive. The Explosives Detection K-9 Team is used ONLY to SEARCH AREAS to help determine if a suspected explosive item(s) might be present. Therefore, when a package must be checked, the Bomb Squad (Technicians) must be called.

    b.    Explosive detection dogs are not to be used to search a person.

        (1).    Explosives Detection K-9 Teams bring integrity and an added level of confidence to the search for explosives. These teams are not foolproof, however. Because the dog smells for odor, as opposed to looking for a device, the dog's reliability is greatly enhanced over a human search. This integrity becomes compromised when the search area increases in size, resulting in time restrictions and post-search security difficulties. Depending upon the size of the area to be searched, the environmental conditions of the area, and the time restrictions involved, an explosive detection team search may or may not be prudent.

        (2).    This type of detection work is highly specialized; therefore, the handler of the bomb dog is authorized to search for the explosives using the method and pattern that the handler believes will be the most effective in locating the explosives. All searches must be consistent with public safety.

2.    Call Out Considerations and Procedure

    a.    Every effort should first be made to locate on-duty personnel from a team, prior to initiating a call-out.

    b.    Call Outs must be approved by a Shift Captain or above. Due to the unique and specialized nature of this type of search, the Operations Support Captain, K-9 Sergeant or K-9 Trainer may also be consulted to determine if a call out is warranted

    c.    When a Bomb Dog is called out for a search, the Bomb Squad (minimum 2 technicians) may be notified or additionally called out if the On Scene Supervisor or Bomb Dog handler deems it prudent and necessary.

    d.    Special Event "preventative security" type searches do not require a call out to the Bomb Squad. However, the Bomb Squad should be notified, in advance whenever possible, for information purposes.