```
1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
2                 DIVISION:  MIAMI

3  HUGH HODGE,                )
                              )
4          Plaintiff,         )          ORIGINAL
                              )
5    v.                       )    Case No.  00-6228 CIV-
                              )          SEITZ/GARBER
6  TIMOTHY M. CHURCH, THOMAS  )
   REED, PATRICK HART, DAVID  )
7  WHEELER, CITY OF FORT      )
   LAUDERDALE, and CITY OF    )
8  HALLANDALE,                )
                              )
9          Defendants.        )
   _____x
10                                400 South Federal Highway
                                  Room 219
11                                Hallandale Beach, Florida
                                  Wednesday, November 15, 2000
12                                2:10 p.m.
   APPEARANCES:
13
        DANIELS & DANIELS, P.A.,
14      BY:  GORDON S. DANIELS, ESQ.,
        appearing on behalf of the Plaintiff.
15
        ADORNO & ZEDER, P.A.,
16      BY:  DIETER K. GUNTHER, ESQ.,
        appearing on behalf of City/Ft. Laud.,
17      Reed, Hart and Wheeler.

18      CITY ATTORNEY - HALLANDALE BEACH,
        CARLA CODY, ESQ.,
19      appearing on behalf of City/Hallandale Bch.
                  ----------
20

21                   DEPOSITION

22

23                      OF

24

25         OFFICER TIMOTHY M. CHURCH
```

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

```
1                    I N D E X

2

3  WITNESS                   DIRECT          CROSS

4

5  OFFICER TIMOTHY CHURCH        3            --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          Deposition of OFFICER TIMOTHY M. CHURCH, a

2   witness of lawful age, taken by the Plaintiff for the

3   purpose of discovery and for use as evidence in the

4   above-entitled cause, wherein HUGH HODGE is the Plaintiff

5   and TIMOTHY M. CHURCH, etc. et al., are the Defendants,

6   pending in the United States District Court, Southern

7   District of Florida, pursuant to notice heretofore filed,

8   before JACKQULYN G. HOLLAND, a Registered Professional

9   Reporter and Notary Public in and for the State of Florida

10  at Large, at 400 South Federal Highway, Room 219,

11  Hallandale Beach, Broward County, Florida, on the 15th day

12  of November, 2000, commencing at 2:10 o'clock p.m.

13

14               - - - - - - - - - - - - - -

15

16  Thereupon,

17               OFFICER TIMOTHY CHURCH

18  having been first duly sworn to tell the truth, the whole

19  truth, and nothing but the truth, testified as follows:

20               DIRECT EXAMINATION

21  BY MR. DANIELS:

22       Q.    Please state your name for the record.

23       A.    Timothy Michael Church.

24       Q.    Okay.  Are you employed?

25       A.    Yes.

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1          Q.    Who are you employed by?

2          A.    City of Hallandale Beach.

3          Q.    What capacity?

4          A.    Police officer.

5          Q.    Okay.  Are you with a specific unit of the

6  police?

7          A.    Yes.  I'm assigned to the K-9 unit.

8          Q.    How long have you been a police officer with

9  the City of Hallandale?

10         A.    A little less than five years.

11         Q.    When did you start?

12         A.    February of '96.

13         Q.    Have you always been an officer with the K-9

14 unit?

15         A.    No.

16         Q.    Or did you start somewhere else?

17         A.    I was regular road patrol.

18         Q.    When did you then change from regular road

19 patrol to something else?

20         A.    I believe I went into K-9 the end of April or

21 the beginning of May of '98.

22         Q.    Okay.  And you have been with them since

23 then?

24         A.    Yes.

25         Q.    When you go from regular road patrol to K-9

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

 1  unit, is this something you ask for?

 2       A.    Well, they put a letter of interest out -- or

 3  they put a letter of opening pending out, and I put in a

 4  letter of interest.

 5       Q.    What do you have to do, then, to become a

 6  member of the K-9 unit?

 7             Do you have to go to some special school?  Or

 8  how does that work?

 9       A.    Yes, you have to go through basic school with

10  a dog, once you are placed with a dog.

11       Q.    How long is that school?

12       A.    The basic patrol school is 500 hours.

13       Q.    Okay.

14             Over a period of how many weeks is it?

15       A.    It is usually between 12 and 14 weeks, I

16  believe.

17       Q.    And who gives that?  Is that the City of

18  Hallandale?

19       A.    No, I went through the City of Fort

20  Lauderdale Police Department.

21       Q.    Now, this incident happened on September 6,

22  1998.

23       A.    Correct.

24       Q.    Were you in training at that time?

25       A.    I was finishing up my training, yes.

1          Q.     Finishing up.

2                 Is there any other city in Broward County

3  that does training other than the City of Fort Lauderdale,

4  or is that where everybody goes?

5          A.     I don't know.

6          Q.     For the K-9 unit I'm talking about.

7          A.     No, other people do their own training

8  sometimes.

9          Q.     But the City of Fort Lauderdale doesn't have

10  their own training?

11          A.     Excuse me?

12          Q.     But City of Hallandale, excuse me, doesn't

13  have their own training?

14          A.     Not their own basic training, no.

15          Q.     What type of dog were you assigned?

16          A.     German Shepherd.

17          Q.     Do you know how many pounds that dog is?

18          A.     75 pounds, approximately.

19          Q.     How old is that dog?

20          A.     He's five years old now.

21          Q.     Do you still have the same dog?

22          A.     Yes.

23          Q.     What's the name of the dog?

24          A.     Gero, G-e-r-o.

25          Q.     Is there anything unusual about the dog?

```
 1          A.    No.

 2          Q.    How about the teeth?  Anything with the

 3  teeth?

 4                The teeth steeled tip or anything like that?

 5          A.    No.

 6          Q.    Regular teeth?

 7          A.    Yes.  He's missing two.

 8          Q.    Missing two.  Now you got me kind of curious.

 9                How did he miss two teeth?

10          A.    They were rotten; they pulled them out.

11          Q.    Okay.  Were those two teeth missing on the

12  date of this incident, September 6, 1998?

13          A.    No.

14          Q.    So he didn't brush them enough?

15          A.    I don't ...

16                (Discussion off the record.)

17  BY MR. DANIELS:

18          Q.    So the dog's teeth, they don't have any,

19  like, steel tips or anything like that?

20          A.    No.

21          Q.    Do any of the dogs have those?

22          A.    I have seen dogs that have broken teeth and

23  they are fixed; whether they are -- whatever they fix them

24  with, I don't know.

25          Q.    But they don't put any coverings on their
```

1  teeth as police officer dogs for a particular purpose?

2        A.    I'm not aware of that.

3        Q.    Okay.

4        A.    I have never been told anything like that.

5        Q.    Is there any manual regarding the use of the

6  dogs?

7        A.    I don't really understand what you mean by

8  that.

9        Q.    In other words, are there any written

10 procedures regarding the use of the dogs?

11       A.    Yes.

12       Q.    Who puts those out?

13       A.    Usually each department has their own policy.

14       Q.    Okay.  When you say the department, you mean

15 like the K-9 unit or the City --

16       A.    The police department usually has a list of

17 policies about how the department operates, and there is

18 usually a policy regarding usages of K-9 care, custody,

19 training; all that.

20       Q.    Does the City of Hallandale have their own

21 policy regarding that?

22       A.    Yes.

23       Q.    If I wanted to get a copy of that, what would

24 that be called?

25             Is there a specific manual, name of a manual?

1      A.   It is under, I believe it is procedural

2 orders, policies and procedures.  I don't know the exact

3 name of the book.

4      Q.   Is it one book that has procedures for all

5 different things or just related to K-9?

6      A.   It is one book that has procedures of the

7 entire works of the police department.

8      Q.   I see.  And one chapter of that is related to

9 the K-9?

10      A.   Correct.

11      Q.   Are they updated each year?

12           How often are they updated?

13      A.   I couldn't answer that; I'm not involved in

14 writing the policy.

15      Q.   Okay.  Are those books kept anywhere?

16      A.   I believe so, yes.

17      Q.   I mean, does each police officer have one?

18      A.   Yes.

19      Q.   So you would have one.

20      A.   Yes.

21      Q.   Okay.  And are they kept in a particular

22 library in the police department?

23      A.   I believe there's -- there is one downstairs

24 in the briefing room library, and I believe there's copies

25 of them on the computer.

```
 1        Q.    All right.  It is either called procedural

 2  orders, or what else might it be called?

 3        A.    Or policies and procedures.

 4        Q.    Okay.  All right.  And do you also in your

 5  training with the City of Fort Lauderdale, do you go over

 6  what's stated in that book?

 7        A.    Well, we really didn't go over it, because

 8  everybody has a different policy, everybody's policy reads

 9  different.

10        Q.    How do you learn about this policy?  Is it a

11  specific course that they give you at the City of

12  Hallandale?

13        A.    No, it is a matter of reading it.

14        Q.    Just reading it?

15        A.    Yes.

16        Q.    Have you ever had your deposition taken

17  before?

18        A.    Yes.

19        Q.    How many times, approximately?

20        A.    50 to a hundred times.

21        Q.    Okay.

22              MR. GUNTHER:  Hopefully in criminal cases.

23              THE WITNESS:  All criminal cases, yes.

24              MR. GUNTHER:  Thank you.

25              THE WITNESS:  Yes, never been in a civil case
```

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1          before.

2  BY MR. DANIELS:

3          Q.    Okay.  So nothing that we are here on today,

4  an allegation of overuse of police force --

5          A.    No.

6          Q.    Okay.  All right.

7                Now when you were assigned to the City of

8  Fort Lauderdale, at that time, when did you start training

9  in the City of Fort Lauderdale?

10               This happened in --

11               MR. GUNTHER:  Let me object to the form.  It

12          is two-part.  One says assigned, and started

13          training.  So.

14               MR. DANIELS:  Okay.

15               MR. GUNTHER:  Note my objection.

16               MR. DANIELS:  You're right.

17  BY MR. DANIELS:

18          Q.    You said you became part of the K-9 unit in

19  April of '98?

20          A.    Yes.

21          Q.    That's when you started training with the

22  City of Fort Lauderdale?

23          A.    No.  I began training with the City of Fort

24  Lauderdale at the beginning of May.

25          Q.    Beginning of May?

```
 1          A.    Sometime the first half of May.

 2          Q.    At that time, did you have your dog?

 3          A.    When I began training?

 4          Q.    Yes.

 5          A.    Yes.

 6          Q.    Okay.  And part of that training is to go out

 7 with Fort Lauderdale Police Department K-9 Unit?

 8          A.    Yes.

 9          Q.    Before this incident on September 6, 1998,

10 how many times did you go out with the Fort Lauderdale K-9

11 Unit?

12          A.    I'm not sure.  A couple of times.  I don't

13 know exactly.

14          Q.    When you go out with the Fort Lauderdale

15 Police Department K-9 Unit, do they have their own K-9

16 also?

17          A.    No.  In the situation my dog is in their car

18 and they are, like, training officer.

19          Q.    So they don't have another dog?

20          A.    Not with them, no.

21          Q.    And it is the City of Hallandale police

22 vehicle.

23          A.    Fort Lauderdale police vehicle.

24          Q.    Okay.  On the date of this incident, who was

25 your training officer at that time?
```

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

```
 1          A.    Officer Tom Reed.

 2          Q.    Had he been your training officer the entire

 3  time, before this incident?

 4          A.    Sometimes; depends.

 5          Q.    Other officers are assigned to you?

 6          A.    Just depends on who happens to be, you know,

 7  able to do it that night.

 8                It was him.

 9          Q.    Oh.

10          A.    It was him or -- I happened to ride with him

11  that night; I may have rode with him one more time.

12          Q.    Okay.  And another time that you were out,

13  you may have rode with some other officer?

14          A.    Uh-huh.

15          Q.    Yes?

16          A.    Yes.

17          Q.    Okay.  Before you worked for the City of

18  Hallandale, did you have another job before that?

19          A.    Yes.

20          Q.    Who was that with?

21          A.    I worked as a police officer in New York

22  State.

23                MR. GUNTHER:  I'm sorry.  I didn't hear that.

24                MR. DANIELS:  Police officer in New York

25            State.
```

```
 1              MR. GUNTHER:  Thank you.

 2   BY MR. DANIELS:

 3         Q.    From when to when?

 4         A.    I began in the summer in '95 and ended the

 5   winter of -- the early part of '96 when I got hired down

 6   here.

 7         Q.    Did you have to go through any training?

 8         A.    Yes.

 9         Q.    When was that?  The summer of 1995 or before

10   then?

11         A.    No, it began in March of '95 and ended in the

12   summer of '95.

13         Q.    Okay.  Is there any commitment when you join

14   a police department to stay so many years?

15         A.    I was hired part-time; I put myself through

16   the academy.

17         Q.    Oh, you paid for the academy yourself?

18         A.    Yes.

19         Q.    I see.

20         A.    And I was hired part-time.

21         Q.    Okay.  Why did you transfer from New York to

22   Florida?

23         A.    Because they conduct their hiring

24   differently, it is all civil service.  I wanted a full

25   time job, and I wanted to come to a warmer climate, so I
```

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1 applied in Florida and got hired full time.

2          Q.    Okay.  Fair enough.

3                And before you worked as a police officer in

4 New York State, did you have another job?

5          A.    Yes.

6          Q.    What was that job?

7          A.    I was a bartender and a dishwasher.

8          Q.    All right.  Briefly just give me your

9 educational --

10         A.    I have a Bachelor's degree.

11         Q.    From what school?

12         A.    State University of New York at Brockport.

13         Q.    Any other schooling other than the academy?

14         A.    I have an Associate's degree from a community

15 college.

16         Q.    Okay.

17               When did you graduate college?

18         A.    December of '94.

19         Q.    From December '94, you were a bartender and

20 dishwasher?

21         A.    No, I was a bartender and dishwasher while I

22 was in college until I started the police academy in March

23 '95.

24         Q.    Okay.  Fine.

25               All right.  When you are with the Fort

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1  Lauderdale Police Department under their training, what

2  rules are you under?

3             In other words, are you under the Hallandale

4  rules regarding the use of the K-9 or under the Fort

5  Lauderdale rules regarding the use of the K-9?

6        A.    They are all basic rules.

7        Q.    Okay.  I don't know if there is a difference

8  or not.  I'm just asking you if you know what rules you

9  are under.

10       A.    As far as the usage of the dog, I would go

11  under Fort Lauderdale, because they are a little more

12  strict.

13       Q.    Okay.

14       A.    A little more outlined, I should say.

15       Q.    Okay.  And before you went out on the road

16  with the Fort Lauderdale Police Department, were you told

17  what those rules were or did you read those rules?

18       A.    I read over their policy and I was told what

19  their rules were, yes.

20       Q.    Okay.  Do you know what the policy, what book

21  that's located in?

22       A.    It's their policy book; I really don't know.

23       Q.    Okay.  But while training with them in their

24  city, you would then be under their specific rule

25  regarding use of the K-9.

1              MR. GUNTHER:  Object to the form.

2              MS. CODY:  I object.

3  BY MR. DANIELS:

4        Q.    That will be your understanding?

5        A.    (No verbal response.)

6              MR. GUNTHER:  You can answer it.

7              THE WITNESS:  Yes.

8  BY MR. DANIELS:

9        Q.    Okay.  Do you know any of the differences

10 between the Fort Lauderdale rules and the City of

11 Hallandale rules?

12       A.    Not right off the top of my head.

13       Q.    All right.  On the day of this incident, when

14 did you start work?

15       A.    I worked my regular shift back here in

16 Hallandale, and then I went up afterwards and did some

17 training with Fort Lauderdale.

18       Q.    I see.  Okay.  And when did you arrive at

19 Fort Lauderdale to begin your training?

20       A.    It was at nighttime.  I don't know exactly

21 what time it was.

22       Q.    Okay.

23       A.    I would say maybe after 11:00 o'clock at

24 night.

25       Q.    Where do you report?

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

18

```
 1          A.    I just met with them wherever they were.   I
 2  don't exactly remember where they were at.
 3          Q.    They tell you where to meet?
 4          A.    Yes.  I got in contact with them to do
 5  training and they said meet us here; I don't remember
 6  exactly where we met.
 7          Q.    Do you drive your patrol vehicle over there
 8  with the dog inside?
 9          A.    Yes.
10          Q.    And you transfer the dog over to their
11  vehicle?
12          A.    Right.
13          Q.    And this is a specific vehicle that you are
14  supposed to have when you have a dog?  Is it a different
15  type of vehicle?
16          A.    It has a special K-9 container in the
17  vehicle.
18          Q.    All right.  Before this incident happened
19  that we are on here today, were you involved in any other
20  incidents that day?
21          A.    I don't recall.
22          Q.    Okay.
23          A.    Not with Fort Lauderdale.
24          Q.    That's when I mean meant.
25          A.    No, not with For Lauderdale.
```

```
 1          Q.     Okay.

 2          A.     Not that I recall, anyway.

 3          Q.     How did you first become involved in this

 4   incident?

 5          A.     They requested a K-9 for bail-out of a stolen

 6   vehicle.

 7          Q.     Are you talking about they requested, meaning

 8   the City of Fort Lauderdale Police Department?

 9          A.     Fort Lauderdale Police Department, yes.

10          Q.     What happened?

11          A.     Myself and Officer Reed responded to the

12   scene.

13          Q.     And do you remember where that scene was?

14          A.     It was in, I have to refer --

15          Q.     You can look at your -- what do you have with

16   you?

17          A.     Just the report that you have.

18          Q.     Okay.  The incident report.

19          A.     It was 1513 Northwest 15th Court, Fort

20   Lauderdale.

21          Q.     Okay.

22                 What happened when you arrived at the scene?

23          A.     We met with Officer Hart.

24          Q.     Okay.  And did you know Officer Hart before

25   this?
```

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1          A.    I had met him; just to say hello.

2          Q.    Okay.  And he is with the City of Fort

3  Lauderdale?

4          A.    Yes.

5          Q.    What happened when you met with him?

6          A.    He stated that he had this stolen vehicle

7  that had crashed, the driver had bailed out of the

8  vehicle, and ran from the car.

9          Q.    Okay.  What happened after that?

10         A.    At that time he stated that he, or he said he

11  stood by at that location, let no other people come into

12  the area or out of the area.  And at that time myself and

13  Officer Reed deployed my K-9 partner.

14         Q.    You deployed.  Tell me what happened after

15  that.

16         A.    I gave the command to search.  At which time

17  he alerted to the presence of fresh human scent and

18  initiated a track.

19         Q.    Okay.

20               Could they tell it was fresh human scent as

21  opposed to old human scent?

22         A.    They are taught to pick up the freshest human

23  scent and follow it to its source.

24         Q.    Was there anyone else with you or was it just

25  you and Officer Reed?

1          A.    Myself and Officer Reed.

2          Q.    What happened after that?

3          A.    We continued the track.

4                It went through a couple of yards and ended

5    up in front of 1516 Northwest 15th Place.

6          Q.    What happened after that?

7          A.    At that time, K-9 Gero began to alert to the

8    increasing presence of the fresh human scent.  At that

9    time I illuminated the bushes with my flashlight and

10   observed what ended up being Mr. Hodge hiding in the

11   bushes.

12         Q.    Okay.  At that time is the dog restrained?

13         A.    Yes.

14         Q.    Okay, it is on the leash?

15         A.    Yes.

16         Q.    Who had the leash?

17         A.    Me.

18         Q.    Do you know how long that leash is?

19         A.    The leash's total length is 15 feet; however,

20   it is very rarely used at that total length.

21         Q.    All right.

22               When the dog I guess, what, located Mr.

23   Hodge, where was Mr. Hodge at that time?

24         A.    He was concealed partially in the bushes

25   between the corner of the building, in the bushes.

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

```
 1          Q.    Okay.  How does the dog let you know that he
 2  has located a person?
 3          A.    His alert becomes very intense.
 4          Q.    What does he do?  Bark or --
 5          A.    No, not -- no.
 6                It is a change in behavior.  With Gero, his
 7  tail becomes erect, his body becomes very rigid, his ears
 8  will point up and forward, he will be staring at the
 9  direction of the person he has located.  He may bark.
10                He is giving us an obvious indication that he
11  has located what he is looking for.
12          Q.    Is it different with different dogs?
13          A.    Every dog -- dogs alert, I can testify only
14  to my dog.
15          Q.    Right.  I'm asking is it different with
16  different dogs?
17          A.    Right.  Right.  It is a variation; I can't
18  say.
19          Q.    Okay.  So you put your flashlight on.
20                What type of flashlight do you have?
21          A.    I have, it is as Stream Light SLR 20
22  rechargeable flashlight.
23          Q.    How big is it?
24          A.    About (indicating), is that a foot maybe.
25          Q.    About a foot?
```

1    A.    Yes, not real big.

2    Q.    Do you know how big of a diameter it is?

3    A.    (Indicating.)

4    Q.    About an inch?

5    A.    An inch and a half, maybe.

6    Q.    Is it made out of metal?

7    A.    Yes.

8    Q.    Is it only used for a flashlight or is it
9 used for anything else?

10         Do you train on it?  Do you use it to hit
11 people?  Anything like that?

12    A.    No, I use it as a flashlight.

13    Q.    That's it.  Is it supposed to be used for any
14 other purpose other than that?

15    A.    It is used as a flashlight, yes.

16    Q.    Okay.

17         All right, now, were you the only one that
18 had the flashlight at that time, or did Officer Reed also
19 have a flashlight?

20    A.    I'm not sure with Officer Reed.  I know my
21 flashlight had illuminated; if Officer Reed's did also,
22 I'm not sure.

23    Q.    Was there any other police officer with you
24 at that time?

25    A.    No.

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1          Q.    Do you know what time of day that was, by the

2   way?

3          A.    Early morning.

4          Q.    1:00 o'clock, 2:00 o'clock, 3:00 o'clock?   Or

5   do you know?

6          A.    I will refer back to the report.  I believe

7   around 4:00 a.m.

8          Q.    Okay.  This is a residential area?

9          A.    Yes.

10         Q.    Were there any civilians in the area at that

11  time?

12         A.    Not that I know of.

13         Q.    So what happened after that, after you

14  illuminated the bushes?

15         A.    I observed Mr. Hodge attempting to conceal

16  himself in there, had his hands, I couldn't see his hands,

17  just see pieces of him.

18               At that time I announced, police officer,

19  Hallandale Beach Police K-9 Unit, that he was under

20  arrest.  I informed him to come out of his hiding place

21  and show his hands.

22         Q.    What happened after that?

23         A.    Nothing.  So then I issued another warning.

24         Q.    Are you the only one that did the warning --

25         A.    Yes.

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1      Q.    -- or did Officer Reed also?

2      A.    Only I did.

3      Q.    How far were you from Mr. Hodge at that time?

4      A.    A few feet.

5      Q.    Two feet, three feet, four feet?  Or between

6 three and four?

7      A.    I would say between three and six feet.

8      Q.    Okay.

9      A.    Estimate.  I don't know for sure.

10      Q.    That's fine.

11            Would there be anything preventing Mr. Hodge

12 from hearing you?

13      A.    No.

14      Q.    How many times did you say it?

15            Twice you repeated it?

16      A.    Gave two warnings, yes.

17      Q.    Okay.

18      A.    Each warning consisting of what I told you.

19      Q.    Say that again.  I'm sorry.

20      A.    Each warning --

21      Q.    No, say what you said.

22      A.    Identified myself as a police officer with

23 the K-9 unit, that he was under arrest, to come out of the

24 bushes and conceal his hands.  I mean expose his hands.

25 I'm sorry.

1       Q.      Expose.

2               So you didn't get any response.

3       A.      No.

4       Q.      Okay.  What happened next?

5       A.      I gave the second warning and advised that I

6  would release my partner.  And again I got no response

7  that he was coming out of the bushes, verbal or physical.

8       Q.      When you say release your partner, do you say

9  it like that?  Or do you say release my dog?

10      A.      I don't remember exactly what words; I may

11 say release the dog, yes.

12      Q.      I'm asking you that, because I would assume

13 probably if somebody says, release my partner, they might

14 not know what you are talking about.

15      A.      Right.  I would probably say release the dog,

16 correct; I wouldn't say I would release my partner.

17      Q.      And there was still no response.

18      A.      Correct.

19      Q.      And then what happened?

20      A.      Then at that time I gave K-9 Gero the command

21 to apprehend him.

22      Q.      How do you do that?  What do you say?

23      A.      I slack off on the leash and give him the

24 apprehension command.

25      Q.      Which is what?

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

```
 1        A.    Stellen.

 2              Dutch.

 3        Q.    Okay, spell stellen.

 4        A.    S-t-e-l-l-e-n.

 5        Q.    Is that a Dutch dog?

 6        A.    He is from Holland originally.

 7        Q.    Speaks in English, this dog?

 8        A.    He knows a little bit of English from being

 9 around the house; all his work commands are in Dutch.

10        Q.    So how do you say halt in Dutch?

11              MR. GUNTHER:  Say it.

12              THE WITNESS:  (No verbal response.)

13 BY MR. DANIELS:

14        Q.    Or stop.  You want the dog to stop, what do

15 you say?

16        A.    I give him -- it is called voet.  And Gero

17 returns.

18        Q.    That is not Dutch.

19        A.    Yes, it is, it is spelled v-o-e-t, but if

20 sounds like foot.

21              If I were to give him that command, he would

22 return back to me.

23        Q.    I understand you are the only one that

24 controls that dog.  Police Officer Reed, does he know all

25 these commands?
```

```
 1        A.    I don't know what his dogs --

 2        Q.    I understand, but he wouldn't know your

 3 command?

 4              MR. GUNTHER:  Reed has a Belgian dog.

 5              THE WITNESS:  He might from training, but I

 6        don't know.  I can't speak for Officer Reed.

 7 BY MR. DANIELS:

 8        Q.    No, I'm just saying while you are out there

 9 with the dog, you are the one that was controlling the

10 dog.

11        A.    Correct.

12        Q.    Officer Reed had no control over that dog.

13              Am I correct?

14        A.    He had nothing to do with working the dog.

15        Q.    He wouldn't know the commands.  Or am I

16 wrong, or right?

17        A.    I couldn't tell you.  He helps out; I can't

18 tell when whether he knows the commands, whether he

19 doesn't know.  I can't speak for Officer Reed.

20        Q.    Okay.  Like if I went to the dog and said

21 stellen, would the dog listen to me, or he will only

22 listen to you?

23        A.    I doubt it.  He might, I don't know.  I doubt

24 it.

25        Q.    Okay.
```

```
 1              I'm just trying to figure out the fact that,
 2  I mean these commands are something that are in Dutch and
 3  obviously not a lot of people know Dutch.
 4         A.    Correct.
 5         Q.    I would assume that Officer Reed does not
 6  know -- did you tell Officer Reed what the commands were
 7  for the dog?
 8         A.    No.
 9         Q.    Okay.  Did Officer Reed ever command your dog
10  at any time --
11         A.    No.
12         Q.    -- when you were with him?
13         A.    No.
14         Q.    And you say you slacked off on the leash.
15              Does that mean you let the dog go?
16         A.    I let off the leash; I still had the leash in
17  my hand so if something happened I could still have hold
18  of the dog.
19              However, I let him, to go forward.
20         Q.    So the dog was never unleased?
21         A.    No.
22         Q.    And what happened after that?
23         A.    He then entered the bushes, made contact with
24  Mr. Hodge in the upper right arm and attempted to pull him
25  out of the bushes.  Which he is trained to do.
```

1          At that time, Mr. Hodge became combative,

2 began to struggle with the dog as the dog was trying to

3 pull him out of his hiding spot.

4          As he did that, he was able to free his arm

5 from the dog's mouth.  At that time, the dog went back in

6 and made contact with Mr. Hodge in the buttocks.  As they

7 continued to struggle, Mr. Hodge was grabbing at the dog,

8 striking at the dog.

9          As he was trying to get away, the dog was

10 trying to pull him back, which caused him to pull out

11 again.  Which his pants ripped, and the dog re-contacted

12 again in his buttocks.

13          The whole time we're telling him to stop

14 fighting, stop fighting the dog, put his hands behind his

15 back.  He didn't listen to any of those, continued to

16 struggle with the dog.

17          At one time I struck him with my flashlight

18 in the arm in the back to get his compliance, in order to

19 get him to put his hands behind his back.

20          Finally he stopped resisting; he was able to

21 be handcuffed, and the dog was removed.

22      Q.    Let me ask you something specifically.  As

23 far as the dog -- I'm sorry.  I'm not talking up loud

24 enough.  When the dog is trained to go and I guess get the

25 person, is he trained to go to a specific part of the

1  person's body?

2          A.    No.  He will take the first part that is ...

3          Q.    Available?

4          A.    Available to him, yes.

5          Q.    Okay.

6          A.    If his leg had been there, he would have
7  grabbed him by the leg.

8          Q.    Okay.  So the dog then grabbed his arm?

9          A.    Correct.

10         Q.    At that time, you and Officer Reed are four
11 to six feet away from him or something like that.

12         A.    Yes, within that general area.

13         Q.    Okay.  And I guess you have the flashlight on
14 the situation; you can see what's happening?

15         A.    Right.

16         Q.    And you can hear what's happening?

17         A.    Yes.

18         Q.    Okay.  How was he facing, Mr. Hodge?  Was he
19 faced down on the ground?

20         A.    Face northwesterly direction; he was in the
21 bushes upright, head pointed toward the sky, feet on the
22 ground, crouched down in the bushes.

23         Q.    Was he on all fours?

24         A.    I don't think so.

25         Q.    When you say crouched down?

```
 1          A.    He was trying to hide behind the bushes like

 2   this (indicating).

 3          Q.    I see.

 4          A.    I could only see pieces of him.

 5          Q.    So he was on two feet?

 6          A.    Yes.

 7          Q.    And he was just like, okay, crouched down?

 8          A.    Correct.

 9          Q.    Okay.

10                When the dog grabbed Mr. Hodge, do you know

11   what arm he grabbed him on?

12          A.    Right arm.

13          Q.    And he was pulling.

14                Is that what he is supposed to do, pull him?

15          A.    He is supposed to pull him out of his place

16   of hiding back to me.

17          Q.    Does that cause Mr. Hodge to fall down or

18   anything like that?

19          A.    During the struggle, there was a struggle

20   between him and the dog, which Mr. Hodge fell forward.

21          Q.    So he is falling facedown onto the ground?

22          A.    Yes, that way (indicating).

23          Q.    Okay.

24          A.    Well, during the struggle he did fall

25   forward.  It was after, I mean, when he was fighting with
```

1  the dog and pulled away from the dog.

2        Q.    Okay.  So the next thing that happened is

3  that he is grabbing the dog and then he is getting the

4  dog --

5        A.    He pulled his arm out of the dog, yes.

6        Q.    Pulled his arm out of the dog?

7        A.    Yes.

8        Q.    Okay.  And then the dog reconnected with him

9  in his buttocks.

10        A.    Buttocks, yes.

11        Q.    At that time, since he had gotten him in his

12  buttocks, was Mr. Hodge on the ground at that time?

13        A.    He was going toward the ground, yes.  He was,

14  he was either on his -- almost on the ground or partially

15  up on his elbows.  I can't remember exactly.

16        Q.    Right.  Okay.  And during this time period

17  from between the time that he grabbed the dog, grabbed him

18  on the arm, and the time that the dog then reconnected to

19  his buttocks, you are telling Mr. Hodge what?

20        A.    Place his hands behind his back, stop

21  fighting the dog.  He was grabbing the dog, hitting the

22  dog.

23        Q.    He was hitting the dog?

24        A.    Swatting at the dog, yes; grabbing his muzzle

25  when it was on his arm, and when it is was on his

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1  buttocks, he was reaching back trying to swat the dog.  I

2  told him stop fighting, place his arms behind his back.

3          Q.    Was Officer Reed saying anything too?

4          A.    Yes.  Officer Reed was also giving him

5  commands.

6          Q.    Was there any other officer in that area at

7  that time?

8          A.    Not in that area, no.

9          Q.    Okay.  So now after he bit Mr. Hodge in the

10 buttocks, what happened after that?

11         A.    Mr. Hodge was still trying to get away.

12         Q.    Right.

13         A.    Going forward.  And the dog is trying to pull

14 him back.

15         Q.    Right.

16         A.    At that time, the dog --

17         Q.    When you say forward, you mean going away

18 from you?

19         A.    Mr. Hodge is trying to go away from us; the

20 dog is trying to pull him back to me.

21         Q.    Okay.

22         A.    Which caused the dog to rip again, pull out.

23               Mr. Hodge pulled away.  At that time, his

24 pants ripped and the dog went in again and recontacted his

25 buttocks.

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1      Q.    At the same area?

2      A.    I don't know if it was the exact area; it was

3  in the general --

4      Q.    General area?

5      A.    General buttock area.

6      Q.    What happened after that?

7      A.    Still telling him stop fighting, put his hand

8  behind his back.  And I struck him with the flashlight in

9  his arm in the back to get him to comply.

10     Q.    Were you the only one that struck Mr. Hodge?

11     A.    Yes.

12     Q.    Or did Officer Reed strike him?

13     A.    No, I was the only one, that I recall.  I

14 don't remember Officer Reed striking him.

15     Q.    Okay.

16           Do you know which arm you struck him in?

17     A.    No, I don't.

18     Q.    Okay.

19     A.    It was the upper, the upper part of his back

20 towards his shoulders.

21     Q.    Toward his shoulders.

22           Do you know how many times you struck him?

23     A.    A couple of times.

24     Q.    Two times or more that -- when somebody says

25 couple --

```
 1          A.    More than two times.

 2          Q.    Okay.  So just to get it down, between two

 3   and five times --

 4          A.    Yes.

 5          Q.    -- between two and four?  How much is it?

 6          A.    I would say between two and five times.

 7          Q.    And was this after the dog reconnected a

 8   second time to his buttocks or before?  Or when was this?

 9          A.    It was during that time.

10          Q.    Okay.

11          A.    I can't give you the exact.

12          Q.    Okay.

13                So now we're on the second time the dog

14   connected to Mr. Hodge's buttocks.

15                What happened after that?

16          A.    We still continued to give him commands.

17   Finally he stopped fighting and resisting, and put his

18   hands behind his back; was taken into custody.

19          Q.    Do you know how long this entire incident

20   took from the time that the dog grabbed him on his arm

21   until the time that he gave up?

22          A.    It seems like a long -- it wasn't very long.

23   I can't ...

24          Q.    Okay.

25          A.    Not a very long period of time.
```

1          Q.     All right.  What happened after that?

2          A.     He was handcuffed, the dog was removed, and

3 he was transported to the hospital.

4          Q.     He was handcuffed and then he was removed.

5 You and Officer Reed removed him?

6          A.     No.

7                 He was handcuffed.

8          Q.     Right.

9          A.     I took my dog.

10         Q.     Okay.

11         A.     And then Mr. Hodge was taken to a unit and

12 taken to the hospital.

13         Q.     Okay.  Now who took him to the unit?

14         A.     I don't know.  At that time -- I was working

15 my dog; I took my dog, and that was it.

16         Q.     Okay.  So who handcuffed Mr. Hodge?

17         A.     Officer Reed.

18         Q.     And then you took your dog to the patrol unit

19 that you and Officer Reed were both in before?

20         A.     Correct.

21         Q.     After Officer Reed handcuffed Mr. Hodge, what

22 did Officer Reed do?

23                Is he the one that took him, or did he come

24 back to the patrol car where you were?

25         A.     I don't know who transported him.  Officer

1 Reed came back to where I was.

2      Q.   So somebody then had to come to the scene?

3      A.   There were perimeter units out there.  Once

4 we said we had him into custody, they responded to where

5 we were.

6      Q.   You don't know who responded.

7      A.   No.

8      Q.   So after he was handcuffed, did you have any

9 other further contact with Mr. Hodge?

10      A.   No.

11      Q.   Did you talk to him at any time after he was

12 handcuffed?

13      A.   No.

14      Q.   How about from the time that you came upon

15 Mr. Hodge until the time that he was handcuffed, did you

16 talk to Mr. Hodge at all?

17      Did he say anything to you?  Did you say

18 anything to him?

19      A.   Other than telling him to --

20      Q.   Other than what you said before.

21      A.   My warnings and all that.

22      Q.   Right.

23      A.   I never carried on any conversation.

24      Q.   No?

25      A.   No.

1      Q.    How about Officer Reed?  Did he have any

2   conversation with Mr. Hodge?

3      A.    Not that I recall, no.

4      Q.    Did you ever see Mr. Hodge again after he was

5   handcuffed?

6      A.    Yes.

7      Q.    When was that?

8      A.    I saw him at the hospital, and then I saw him

9   when he was released to the Fort Lauderdale jail.

10     Q.    Okay.  All right.  Which hospital was he --

11     A.    I believe it was Broward General.

12     Q.    Why did you go to Broward General Medical

13  Center?

14     A.    Because I had to go down there with Officer

15  Reed and Sergeant Wheeler, Sergeant Wheeler was conducting

16  the post apprehension review, and I went with him to see

17  how they do it, and because we had to get his information

18  for our report.

19     Q.    Whose information?  Mr. Hodge?

20     A.    Mr. Hodge's information.

21            I didn't know his name at the time.  I didn't

22  know anything about him at the time.

23     Q.    Okay.  So who gave you that information?  His

24  name and --

25     A.    I don't recall.

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

```
 1          Q.    It wasn't from you questioning Mr. Hodge?

 2          A.    No, I didn't get any information -- I didn't

 3  talk to Mr. Hodge at all.  I didn't get any information

 4  from him.

 5          Q.    Then you said you saw him the next time in

 6  jail?

 7          A.    They were transporting him from the hospital

 8  back to the jail; I just happened to be standing in the

 9  parking lot when they brought him in.

10          Q.    That was the last time you saw him?

11          A.    Yes.

12          Q.    Okay.

13                I'm just looking at this report from you.

14  Actually, Hallandale Police Department says the culprit

15  was identified by Officer Hart and then transported to

16  Broward General Hospital for treatment.

17          A.    Right.

18          Q.    What does that mean, identified?

19          A.    Identified as the person that he saw leaving

20  the vehicle; driving the vehicle, leaving the vehicle.

21          Q.    Okay.  His name wasn't given at that time?

22          A.    Not to me, no.

23          Q.    Okay.

24                He was charged with resisting a law

25  enforcement officer without violence.  All right.  What
```

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1  does that mean?  When it says resisting a law enforcement

2  officer without violence.

3              MR. GUNTHER:  Object.  Calls for a legal

4         conclusion.

5              Go ahead.

6              THE WITNESS:  (No verbal response.)

7              MR. GUNTHER:  Go ahead.

8              THE WITNESS:  Go ahead?

9              MR. GUNTHER:  Yes, go ahead, give us your

10         best definition of the law.

11              THE WITNESS:  It means that he was told to do

12         something or he was interfering with a lawful

13         investigation.  Therefore, we told him to come

14         out of his hiding place, and he did not, he

15         refused to.  Which meant that we had to take

16         further steps to further this investigation.

17  BY MR. DANIELS:

18         Q.    I see.  Okay.

19         A.    And he was not complying with what he was

20  told to do during the lawful arrest.

21              But he did not, seeing that it was without

22  violence, he did not offer any violence.

23         Q.    To you?

24         A.    To myself.

25         Q.    Now, I notice there were photographs taken --

```
 1          A.    Yes.

 2          Q.    -- of Mr. Hodge by Sergeant Wheeler.

 3          A.    Correct.

 4          Q.    Were you present when those photographs were

 5  taken?

 6          A.    I don't know if I was there when they took

 7  them or not.

 8          Q.    Okay.

 9          A.    To be honest with you.

10          Q.    The reason why I'm asking you is it talks

11  about the culprit received a laceration to his right

12  biceps, left buttocks and a puncture to his buttock.

13          A.    Right.

14          Q.    Where did you get this information from?

15          A.    When I was at the hospital.

16          Q.    How did you get this information?

17          A.    I was standing there looking at him.  I mean,

18  maybe Sergeant Wheeler might have told me.  I don't really

19  recall.

20          Q.    So you could see Mr. Hodge at that time?

21          A.    Correct.

22          Q.    Okay.  When you fill out this report as to

23  what his injuries are, are you supposed to go over and

24  look to see what the injuries are?

25                Is that what you are supposed to do?
```

1          A.    You should know where they are, yes, so you

2    can tell the medical people where they are, and you can

3    see them and you can document them.

4          Q.    Okay.  I mean, you weren't involved with the

5    medical people at that time?

6          A.    No.

7          Q.    But I mean you put them on this police report

8    I assume for a reason.

9          A.    Yes, so they are documented.

10         Q.    Were there any other injuries other than the

11   laceration to his right biceps, left buttocks and a

12   puncture to his buttocks that you noticed on Mr. Hodge at

13   that time?

14         A.    He had some red marks on his back where he

15   had been hit with the flashlight.

16         Q.    Okay.

17               Why were those not documented in your report?

18         A.    Well, I documented that I struck him with the

19   flashlight, and there were also photographs which would

20   have taken care of that documentation.

21               I documented the laceration and puncture

22   wounds to document where the dog actually made contact and

23   what those injuries were.

24         Q.    No, I understand.

25               I'm saying why didn't you also document the

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1  red marks?

2      A.    Because I assume that they would -- by me

3  stating that I did strike him in the back and seeing

4  photographs should be able to put that's what the red

5  marks were from.

6      Q.    Okay.  All right.

7          During the entire time from the time that you

8  came upon Mr. Hodge until the time that he was placed

9  under arrest and handcuffed, okay, did you notice any

10 civilians in the area at all?

11     A.    No.

12     Q.    Now was Officer Reed, was he with you the

13 entire time?

14     A.    Yes.

15     Q.    Okay.  And how far away was Officer Reed from

16 you?

17     A.    Not very far.

18     Q.    What was that, one foot --

19     A.    Within a few feet.

20     Q.    Within two to three feet?

21     A.    Could be, yes.

22     Q.    So you would be able to hear anything that

23 Officer Reed said and he would be able to hear anything

24 that you said?

25     A.    Yes.

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

```
 1          Q.    Did you ever notice a black male

 2  approximately 55 years old in the area where this incident

 3  occurred?

 4          A.    No.

 5          Q.    During that entire time, from the time that

 6  you located Mr. Hodge until the time that he was

 7  handcuffed, you were the only officers over there?

 8          A.    Correct.

 9          Q.    Okay.  And then after he was handcuffed, you

10  weren't involved; you left and you went to your car.

11          A.    Right.  He was transported.

12          Q.    Some other officers may have come over and

13  transported him, an Officer Reed joined you in the car?

14          A.    Correct.

15          Q.    Do you know if any officers other than

16  yourself hit Mr. Hodge at all?

17          A.    No.

18          Q.    Do you know of any officers kicking Mr. Hodge

19  other than yourself?

20          A.    I never kicked him.

21          Q.    I know that you didn't kick him.

22                MS. CODY:  Didn't kick him.  Right.

23  BY MR. DANIELS:

24          Q.    Do you know of any officers kicking Mr.

25  Hodge?
```

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

```
 1          A.    No.

 2          Q.    Okay.  Now when the dog I guess grabbed Mr.

 3   Hodge and then Mr. Hodge -- you say initially grabbed him

 4   by the arm -- pushed the dog off his arm, is that

 5   something the dog normally does, then will try to

 6   reconnect?

 7          A.    Yes.

 8          Q.    Do you have to tell the dog to do that?

 9          A.    No.  He will try to reconnect on his own.

10          Q.    Now, do you have to tell the dog, say the dog

11   grabs the person and pulls him out, do you have to tell

12   the dog to let go or does the dog do it automatically?

13          A.    I could tell him, but what we do is we

14   actually take the dog off.  That's for the suspect's

15   safety.

16          Q.    How do you do that?  How do you take him off?

17          A.    We restrict the air that the dog is getting,

18   and that way he releases his grasp.

19          Q.    What do you do?  Tighten the leash?

20          A.    Tighten the chain around his neck.

21          Q.    I'm just curious.  If someone is fighting

22   with the dog, if they were to grab the chain and tighten

23   it around the neck, would the dog --

24          A.    If he was able to choke the dog to the point

25   where the dog felt he had to let go or he was going to die
```

1  or whatever, then the dog -- I don't think -- could have

2  happened.  Sure, anything could happen.  But.

3         Q.    All right.  Why do you do that as opposed to

4  telling the dog to let go?

5         A.    Because if we call out to the dog where we

6  give him a verbal command to release, the dog is trained

7  that if the subject moves in a threatening manner, he will

8  contact again.

9         Q.    I see.

10        A.    This way the dog is on the person, the person

11 is handcuffed; they are now secured, no longer a threat,

12 the dog is removed.  I have control over my dog; if the

13 man moves, I have the dog so he doesn't connect again.

14        Q.    Is the dog released while the person is being

15 handcuffed?

16        A.    No.

17        Q.    So the dog is still attached to the person

18 while you handcuff the person?

19        A.    Correct.

20        Q.    In Mr. Hodge's case, where is the dog

21 attached while you were handcuffing him?

22        A.    His buttocks.

23        Q.    Mr. Hodge, was he facedown on the ground?

24        A.    Correct.

25        Q.    Okay.

48

```
 1            Did you have, at any time, any of your
 2  handguns out?
 3        A.    No.
 4        Q.    Do you know whether Officer Reed had any of
 5  his handguns out at any time?
 6        A.    No.
 7        Q.    You don't know or he didn't?
 8        A.    No, I never saw his handgun out.
 9        Q.    Okay.
10            Was Mr. Hodge, I guess after you handcuffed
11  him, okay -- well, you didn't handcuff him; actually.
12  Officer Reed handcuffed him?
13        A.    Yes.  Right.
14        Q.    Okay.  Did you see Mr. Hodge get up?
15        A.    I was in the area when he got up and walked
16  him to the patrol car.
17        Q.    How far away were you?
18        A.    (No verbal response.)
19            MR. GUNTHER:  From what?
20            MR. DANIELS:  Let me start again.
21  BY MR. DANIELS:
22        Q.    These are not trick questions, so if you
23  don't understand something, I will be glad to change or
24  rephrase it.
25            All right.  He is handcuffed, he is on the
```

1  ground handcuffed by Officer Reed.

2       A.    Correct.

3       Q.    After he is handcuffed, you then put pressure

4  on the chain of the dog, I don't know, do you also give a

5  command?

6       A.    No.  The dog just lets go.

7       Q.    The dog just releases.  And then you walk the

8  dog some distance away?

9       A.    Correct.

10      Q.    Are you standing around or are you putting

11 the dog into the patrol car?

12      A.    I was -- I don't know, exactly sure, but I

13 was probably walking back to the patrol car, which is the

14 next block over.

15      Q.    Right.  Okay.

16      A.    I was in the area for a short period of time.

17      Q.    So you are walking away.

18      A.    Yes.

19      Q.    Can you see Mr. Hodge at that time?

20      A.    Yes.

21      Q.    Okay.  Did you see him getting up?

22      A.    Yes.

23      Q.    Now, these other police officers that came

24 over, did they come over after Mr. Hodge got up or before

25 he got up, if you know?

pp

```
 1          A.    I don't remember.

 2          Q.    Okay.  Did the other police officers come

 3  before he was handcuffed or after he was handcuffed?

 4          A.    No, after he was handcuffed.

 5          Q.    After he is handcuffed.

 6                You have to actually call them and say --

 7          A.    He's in custody.

 8          Q.    He's in custody?

 9          A.    Right.

10          Q.    In custody means he is handcuffed?

11          A.    Yes.

12          Q.    Who called them?  Did you call them?

13          A.    No.

14          Q.    So Officer Reed had to call, I assume?

15          A.    I assume.

16          Q.    So Officer Reed calls, says he's in custody.

17                Your dog is restrained.  And I assume it

18  takes a little while, because they are on the perimeter,

19  for the police officers to come over?

20          A.    There was a perimeter close by.

21          Q.    So how long did it take for the other police

22  officers to come over?

23          A.    Quickly.  They were in the area.

24          Q.    You were still in the area.

25          A.    Yes.
```

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1    Q.    These were Fort Lauderdale police officers?

2    A.    Correct.

3    Q.    You don't know who they were?

4    A.    No.

5    Q.    Do you know how many they were?

6    A.    No.

7    Q.    Okay.

8    A.    There was a perimeter; there were units in

9  the area.  I don't know.

10        Q.    Okay.  And they came over and they then took

11  Mr. Hodge from Officer --

12        A.    Correct.

13        Q.    At that time, was Mr. Hodge up from the

14  ground?  Is he standing?

15        A.    From what I recall, yes.

16        Q.    Okay.  And did those officers -- and you see

17  the other officers with Mr. Hodge, Mr. Hodge is

18  standing --

19        A.    Uh-huh.

20        Q.    Yes?

21        A.    As far as I recall, yes.

22        Q.    Okay.

23        A.    I mean, he had to be standing to eventually

24  get to the car.

25        Q.    Fine.  And did those other officers touch Mr.

1  Hodge as far as hit him or anything like that?

2           I mean, obviously they touched him to take

3  custody of him.  But did those other officers hit Mr.

4  Hodge in any way?

5       A.    No.

6       Q.    And did you see those officers, did you see

7  them take Mr. Hodge?  In other words, walk with him

8  towards the patrol car?

9       A.    Yes.  I mean, I don't remember exactly, can't

10 picture them walking to the car, but he was taken to the

11 patrol car.

12      Q.    Okay.  And about how long was Mr. Hodge in

13 your sight during that time period?

14      A.    A few moments.

15      Q.    During any time that Mr. Hodge was in your

16 sight, from the time that he was handcuffed until the time

17 that you last saw him, okay, did any officer ever hit Mr.

18 Hodge in any way?

19      A.    No.

20      Q.    Was Mr. Hodge bleeding?  Did you notice some

21 bleeding?

22      A.    (Nods head in the affirmative.)

23      Q.    Okay.

24      A.    Yes.

25      Q.    And where was he bleeding from?

1        A.     The arm.

2        Q.     All right.  Can I see what you have?

3        A.     Sure.

4        Q.     During the time that you are training with

5   the Fort Lauderdale Police Department, you are paid a

6   salary for doing that?

7        A.     (No verbal response.)

8        Q.     Are you paid during this time period that you

9   are training with the Fort Lauderdale Police Department?

10       A.     Yes.

11       Q.     Okay.  And who pays you?

12       A.     City of Hallandale.

13       Q.     City of Hallandale?

14       A.     It was my regular workday when I was

15  training.

16       Q.     Okay.  So that is part of your job, is

17  training?

18       A.     Correct.

19       Q.     When did you prepare this incident report?

20       A.     I would have to refer to it.  9/8 of '98.

21       Q.     Okay.  This incident happened on September 6.

22  Is there a reason why you waited two days to prepare this?

23       A.     Make sure I had all my -- all the people's

24  information, I had vehicle information.  I don't know what

25  day of the week it was; maybe I wasn't even on for two

1  more days.

2          Looks like to me that it was a Sunday

3  morning.  I was off Sundays and Mondays, so I would -- and

4  Tuesday.

5          Q.    Okay.

6          A.    So I would have not come back into work until

7  probably Tuesday night.

8          Q.    Okay.  Now it says, see Fort Lauderdale

9  Police case number.

10          A.    Correct.

11          Q.    Did you review that before you prepared your

12  report?

13          A.    No.

14          Q.    How did you know the case number?

15          A.    Got it from one of the Fort Lauderdale

16  officers that night for a reference.

17          Q.    How did you know what Mr. Hodge was charged

18  with?

19          A.    Because like I say, I saw him when they were

20  bringing him into the jail and I saw Officer Hart and I

21  saw a copy of the probable cause affidavit, which listed

22  his charges.

23          Q.    Have you seen anything else regarding this

24  case other than the probable cause affidavit?

25          A.    Yes, I've seen whatever paperwork my attorney

1  has.

2       Q.    Okay.   I mean anything, I wasn't asking for

3  your attorney's paperwork, I'm just asking you have you

4  reviewed any other reports by any police agencies?

5       A.    Yes.

6       Q.    Was that for the preparation of your report

7  or for this deposition?

8       A.    For this deposition; it was after I prepared

9  this.

10      Q.    Okay.

11            Now, when you prepare your incident report,

12 do you do it from memory or do you make notes at the

13 scene?  Or how do you do that?

14      A.    Everything was from memory except for the

15 specifics, people's names, case number, vehicle type,

16 addresses.

17      Q.    Okay.

18      A.    But the actual --

19      Q.    Facts.

20      A.    Yeah, whatever took place was from memory.

21      Q.    Okay.

22            I notice on the K-9 supplement report of the

23 Fort Lauderdale Police Department done by Officer Reed --

24      A.    Yes.

25      Q.    Okay.  Before you prepared your report did

1  you and Reed --

2       A.    No.

3       Q.    Now, Sergeant Wheeler also responded to the

4  scene?

5       A.    Correct.

6       Q.    Did you see that?

7       A.    See what?

8       Q.    When Sergeant Wheeler came to the scene.

9       A.    Yes.

10       Q.    Okay.  Where were you at that time?

11       A.    After I put my dog up, I went back over to

12  the apprehension scene to talk to Sergeant Wheeler.

13       Q.    So after you put your dog in the vehicle?

14       A.    Yes.

15       Q.    You then went out back to the scene?

16       A.    Right.

17       Q.    I assume Mr. Hodge was no longer there.

18       A.    No.

19       Q.    Okay.  He was no longer there.  Right?

20       A.    Correct.

21       Q.    Okay.  And Sergeant Wheeler came.  And what

22  happened after that?

23       A.    Spoke with me and Officer Reed; he took

24  photographs of the area; he did what, I don't know exactly

25  what it is his duties are supposed to be.  And then he

1  left and went to the hospital.

2      Q.    Okay.  And then you followed him to the

3  hospital?

4      A.    We went to the hospital, I don't know if we

5  followed him.

6      Q.    I meant --

7      A.    We got there after he did or the same time.

8      Q.    Okay.

9      A.    Whatever it was, I don't recall.

10     Q.    Two more minutes, and we'll be done.  See if

11 I'm missing anything.

12           During the time that Mr. Hodge was being

13 bitten by the dog, did Mr. Hodge say anything?

14     A.    Not that I recall.

15     Q.    Okay.

16     A.    Might have been -- I mean, there was a lot

17 going on, a lot of commotion.

18     Q.    I understand.

19     A.    He was saying, I mean, he might have been

20 saying something; nothing that was audible to me that I

21 can recall as what his statement was.

22     Q.    Did he say anything, like, to the effect,

23 don't bite me, or anything like that?

24     A.    No.  Not that I recall.

25     Q.    How was the lighting in that area?

1         A.    Pretty dark.  From what I remember.

2         Q.    Okay, I don't have any other questions.

3               MS. CODY:  Okay.

4               MR. GUNTHER:  No questions.

5               MS. CODY:  None.

6               THE COURT REPORTER:  Copies if ordered?

7               MR. DANIELS:  Yes.

8               MR. GUNTHER:  Yes, I want a copy and a mini

9         if it is ordered.

10              MR. DANIELS:  I'm not going to order it right

11        now.

12              MR. GUNTHER:  But if it is, that's what I

13        want.

14              Do you all waive or not waive signature and

15        signing?

16              MS. CODY:  No, we're definitely reading.

17              Copy if he orders it, as well.

18              (Thereupon, the deposition adjourned at 3:30

19        p.m.)

20

21

22

23

24

25

1                    <u>CERTIFICATE OF OATH</u>

2    STATE OF FLORIDA        )

3    COUNTY  OF  BROWARD  )

4              I, the undersigned authority, certify that
     OFFICER TIMOTHY M. CHURCH personally appeared before me
5    and was duly sworn.

6              WITNESS my hand and official seal this
     22nd day of January, 2001.

7

8                              *Jackqulyn G Holland*

9    _____
     JACKQULYN G. HOLLAND
10   Notary Public - State of Florida
     My commission No.  CC927587
11   Expires:  May 21, 2004.

12        <u>REPORTER'S DEPOSITION CERTIFICATE</u>

13   STATE OF FLORIDA        )
     COUNTY  OF  BROWARD  )
14
              I, JACKQULYN GIPSON HOLLAND, Registered
15   Professional Reporter, certify that I was authorized to
     and did stenographically report the deposition of OFFICER
16   TIMOTHY M. CHURCH; that a review of the transcript was
     requested; and that the transcript is a true and correct
17   record of my stenographic notes.

18            I further certify that I am not a relative,
     employee, attorney, or counsel of any of the parties, nor
19   am I a relative or employee of any of the parties'
     attorney or counsel connected with the action, nor am I
20   financially interested in the action.

21            Dated this 22nd day of January, 2001.

22                              *Jackqulyn G Holland*
     _____
23   JACKQULYN G. HOLLAND
     Registered Professional Reporter.

24

25

1
# CORRECTION SHEET

2

RE:    HUGH HODGE V. TIMOTHY M. CHURCH, etc. et al.

3

4
Case No:  00-6228
Deposition of:  OFFICER TIMOTHY M. CHURCH
Date Taken:  November 15, 2000

5

PAGE NO.          LINE NO.          CORRECTION OR CHANGE

6

7

8

9

10

11

12

13

14

15

16

17
Under penalties of perjury, I declare that I have read my

18
deposition and that it is true and correct subject to any
changes in form or substance entered here.

19

20
_____

Date

21

22

23
_____

OFFICER TIMOTHY M. CHURCH, Deponent

24

25

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                        DIVISION:  MIAMI

3  HUGH HODGE,                       )
                                     )
4           Plaintiff,               )
                                     )
5    v.                              )    Case No.   00-6228 CIV-
                                     )               SEITZ/GARBER
6  TIMOTHY M. CHURCH, THOMAS         )
   REED, PATRICK HART, DAVID         )
7  WHEELER, CITY OF FORT             )
   LAUDERDALE, and CITY OF           )
8  HALLANDALE,                       )
                                     )
9           Defendants.              )
   _____x
10  To:  City Attorney - Hallandale Beach
         Carla Cody
11       400 South Federal Highway
         Hallandale Beach, FL 33009
12
            Your client's deposition taken in the above-styled
13  case on November 15, 2000 is now ready for signature.

14          Since the deposition was ordered on an expedited
    basis, the original and one copy were delivered to Mr.
15  Gordon Daniels today, January 23, 2001.  Please have your
    client read your copy of the deposition.  An errata sheet
16  is attached to the end of the transcript for your
    convenience.
17
            Please contact our office if you have any
18  questions.

19                              Very Truly Yours,

20                              *Jackqulyn G Holland* (signature)

21                              _____
                                JACKQULYN G. HOLLAND, RPR
22                              Capital Reporting Service
                                888 S. Andrews Ave., #304
23                              Ft. Lauderdale, FL  33316
                                (954) 522-6401

24  Date:  January 23, 2001
    cc:  Gordon S. Daniels, Esq.
25       Dieter K. Gunther, Esq.