1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
2          CASE NO. 00-6228-CIV-SEITZ/GARBER

3                                                    **ORIGINAL**

4    HUGH HODGE,                              )
                                              )
5        Plaintiff,                           )
                                              )
6        vs.                                  )
     TIMOTHY M. CHURCH, THOMAS REED, PATRICK   )
7    HART, DAVID WHEELER, CITY OF FORT         )
     LAUDERDALE, and CITY OF HALLANDALE,       )
8                                              )
         Defendants.                           )
9    _____X

10                            888 S. Andrews Ave.
                              Fort Lauderdale, Florida
11                            November 9, 2000
                              4:10 p.m.
12
     APPEARANCES:
13
           LAW OFFICE OF DANIELS & DANIELS, P.A.
14         BY: GORDON S. DANIELS, ESQ.,
           appearing on behalf of the Plaintiff.
15
           OFFICE OF THE CITY ATTORNEY
16         BY: MARK GOLDSTEIN, ESQ.,
           appearing on behalf of Timothy Church and
17         the City of Hallandale.

18         LAW OFFICE OF ADORNO & ZEDER, P.A.
           BY: DIETER K. GUNTHER, ESQ.,
19         appearing on behalf of Thomas Reed, Patrick
           Hart, David Wheeler, and the City of Fort
20         Lauderdale.

21         ALSO PRESENT:  Tammy Alvarez

22                         ------------
                           DEPOSITION
23
                              OF
24
                         PATRICK HART
25


                CAPITAL REPORTING SERVICE, INC.
              Fort Lauderdale, FL (954) 522-6401

```
 1                    I N D E X

 2    WITNESS                                    PAGE

 3    PATRICK HART

 4    Direct Examination by Mr. Daniels            3

 5    Cross-Examination by Mr. Gunther            43

 6    Redirect Examination by Mr. Daniels         44

 7

 8                  E X H I B I T S

 9    PLAINTIFFS'      FOR IDENTIFICATION

10    Exhibit 1      Two-page probable cause affidavit.

11    Exhibit 2      Two-page offense incident report.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CAPITAL REPORTING SERVICE, INC.
Fort Lauderdale, FL (954) 522-6401

```
 1              Deposition of PATRICK HART, a witness of
 2     lawful age, taken by the Defendant for the purpose
 3     of discovery and for use as evidence in the
 4     above-entitled cause, wherein HUGH HODGE is the
 5     Plaintiff and TIMOTHY M. CHURCH, THOMAS REED,
 6     PATRICK HART, DAVID WHEELER, CITY OF FORT
 7     LAUDERDALE, and CITY OF HALLANDALE are the
 8     Defendants, pending in the United States District
 9     Court, Southern District of Florida, Miami
10     Division, pursuant to notice heretofore filed,
11     before JENNIFER D. DESHONG, a Certified Reporter
12     and Notary Public in and for the State of Florida
13     at Large, at the office of Capital Reporting
14     Services, Inc., 888 S. Andrews Ave., Ste. 304,
15     Fort Lauderdale, Broward County, Florida, on the
16     9th day of November, 2000, commencing at 4:10 p.m.
17                 ------------
18     Thereupon,
19                 PATRICK HART,
20     having been first duly sworn to tell the truth,
21     the whole truth, and nothing but the truth,
22     testified as follows:
23                 DIRECT EXAMINATION
24     BY MR. DANIELS:
25         Q.    Please state your name for the record.
```

CAPITAL REPORTING SERVICE, INC.
Fort Lauderdale, FL (954) 522-6401

```
 1              A.    Patrick Hart.

 2              Q.    Mr. Hart, my name is Gordon Daniels and

 3      I'm the attorney for Mr. Hodge regarding the

 4      incident that happened on September 6, 1998, so

 5      I'm going to be asking you some questions.  If

 6      there's anything that you don't understand, just

 7      let me know, I'll be glad to repeat or rephrase

 8      the question.  If you need to look at anything,

 9      let me know also, okay?

10              A.    Okay.

11              Q.    What is your profession?

12              A.    I'm a police officer.

13              Q.    With what city?

14              A.    City of Fort Lauderdale.

15              Q.    Do you have a rank?

16              A.    Patrolman.

17              Q.    How long have you been a patrolman with

18      the City of Fort Lauderdale?

19              A.    Almost four years.

20              Q.    Are you assigned to any particular

21      division?

22              A.    Patrol.

23              Q.    Have you always been in that same

24      division throughout your four years?

25              A.    Yes, I have.
```

```
 1           Q.   So when did you start with the City of
 2    Fort Lauderdale as a patrolman, what year?
 3           A.   1997.
 4           Q.   Before that were you employed?
 5           A.   What?
 6           Q.   Before 1997 were you employed?
 7           A.   Yes, I was.
 8           Q.   Who were you employed by?
 9           A.   Wackenhut Corporation.
10           Q.   I'm not speaking loud enough, I
11    apologize.  Wackenhut Corporation, okay.  How long
12    were you employed by them, from what year to what
13    year?
14           A.   Roughly from '95 to beginning of '97.
15           Q.   What did you do for them?
16           A.   Customer protection officer, security
17    officer.
18           Q.   How did you become a police officer,
19    what did you do?
20           A.   Applied for the position at City of
21    Fort Lauderdale and was hired.
22           Q.   You went through some training course?
23           A.   That's correct.
24           Q.   How long is the training?
25           A.   I believe it's somewhere in the range
```

1    of 800 hours.

2         Q.   Before you worked for Wackenhut were

3    you employed?

4         A.   Yes, I was.

5         Q.   Who were you employed by?

6         A.   That would be Lowes.

7         Q.   How do you spell that?

8         A.   L-O-W-E-S.

9         Q.   What type of company is that, what do

10   they do?

11        A.   It's a home repair company, just like

12   Home Depot.

13        Q.   When did you work for them?

14        A.   From '95 to - either '94 or '93, I'm

15   not sure.

16        Q.   What did you do for them, were you in

17   sales?

18        A.   Yeah, I worked - just say sales.

19        Q.   Before that were you employed?

20        A.   Yes, I was.

21        Q.   Who were you employed by?

22        A.   Florida Grill and Bar.

23        Q.   Where are they located?

24        A.   Tallahassee.

25        Q.   When did you work for them?

CAPITAL REPORTING SERVICE, INC.
Fort Lauderdale, FL (954) 522-6401

```
 1          A.   I think '93, just for the year '93.

 2          Q.   What did you do for them?

 3          A.   I was a waiter.

 4          Q.   Before that were you employed?

 5          A.   No, I was not.

 6          Q.   What's your educational background, go

 7     to college?

 8          A.   Yes, I did.

 9          Q.   Where'd you go to college?

10          A.   Florida State University.

11          Q.   From when to when?

12          A.   From '93 to '95.

13          Q.   Now, Wackenhut Corporation, where are

14     they located?

15          A.   The office I worked out of was out of

16     Miami.

17          Q.   They have a main office?

18          A.   I believe they do.

19          Q.   Where is that?

20          A.   I -- It's moved.

21               MR. GUNTHER:  If you know.

22               MR. DANIELS:  If you know.

23               MR. GUNTHER:  They are up the coast

24     somewhere.

25               MR. DANIELS:  All right.
```

```
1      BY MR. DANIELS:

2            Q.   Let's go to the incident that happened

3      on September 6, 1998, when was your first

4      involvement in that incident?

5            A.   I noticed a car similar to a BOLO that

6      was put out.

7            Q.   BOLO means what, be on the lookout?

8            A.   Be on the lookout.

9            Q.   Were you in your vehicle at that time?

10           A.   Yes, I was.

11           Q.   And you were on duty at that time?

12           A.   Yes, I was.

13           Q.   Was there anyone else in your vehicle?

14           A.   No.

15           Q.   What happened after that?

16           A.   I notified dispatch of what I had

17     found.

18           Q.   Then what happened?

19           A.   Advised them of the tag which matched

20     except for one letter.

21           Q.   Then what did you do?

22           A.   At that point I stood by for

23     confirmation of whether the vehicle was the right

24     vehicle matching the BOLO.

25           Q.   What happened after that?
```

```
 1          A.    I requested backup.

 2          Q.    Did you get backup?

 3          A.    Yes, I did.

 4          Q.    How many vehicles?

 5          A.    I have no idea.

 6          Q.    More than one?

 7          A.    Yes.

 8          Q.    Then what happened?

 9          A.    We followed the vehicle.

10          Q.    Are you following the vehicle at the

11    same time that you're requesting backup?

12          A.    Yes, I am.

13          Q.    Then what happened?

14          A.    After the backup units arrived we

15    attempted to do a felony stop.

16          Q.    How do you attempt to do that?

17          A.    We turn our overhead lights on and

18    engage our sirens.

19          Q.    What happened?

20          A.    The vehicle accelerated and I believe

21    made a left-hand turn around the corner.

22          Q.    Then what happened?

23          A.    The vehicle was driven into the fence

24    on the corner and the driver bailed out of the

25    vehicle and fled on foot.
```

CAPITAL REPORTING SERVICE, INC.
Fort Lauderdale, FL (954) 522-6401

```
 1              Q.   Did the driver bail out before the

 2     vehicle hit the fence or after the vehicle hit the

 3     fence?

 4              A.   After.

 5              Q.   What speed was the vehicle moving, if

 6     you know?

 7                   MR. GUNTHER:   The time it hit the

 8     fence?

 9     BY MR. DANIELS:

10              Q.   Yeah, at the time it hit the fence.

11              A.   At the time it hit the fence?

12              Q.   Yeah.

13              A.   I have no idea.

14              Q.   Was it going fast, slow, medium?

15              A.   It was accelerating.

16              Q.   So the vehicle hit the fence and then

17     the individual in the vehicle you say bailed out

18     of the vehicle?

19              A.   That's correct.

20              Q.   Then what happened?

21              A.   At that point I attempted to establish

22     a perimeter.

23              Q.   How did you attempt to do that?

24              A.   Advising particular points in the area

25     over the radio.
```

1        Q.    Where were the points of the perimeter,

2    if you know?

3        A.    Roughly it was going to be 15 Court, 16

4    Street, 15 Terrace, and probably 16 Avenue.

5        Q.    Where was it that the vehicle hit the

6    fence, if you know?

7        A.    It was 1513 Northwest 15 Court.

8        Q.    What happened after that, after you set

9    up a perimeter?

10       A.    Secured the last known area the

11   Defendant was seen and waited for K-9 to arrive.

12       Q.    Secured means what, you just stayed

13   there?

14       A.    Stayed in that area.

15       Q.    Was anyone else with you at that time,

16   any other police officer?

17       A.    No, not at that time.

18       Q.    Do you know what time of day that was?

19       A.    Roughly somewhere in the area of 3:30

20   in the morning.

21       Q.    What type of neighborhood is this?  Is

22   this a residential neighborhood, a business

23   neighborhood, or what?

24       A.    Residence.

25       Q.    At the time that you secured the area

1    were there any any civilians in the area?

2         A.   At that time, no.

3         Q.   You waited, you say you waited for

4    backup at that time?

5         A.   I waited --

6              MR. GUNTHER:  He said K-9.

7              THE WITNESS:  K-9.

8    BY MR. DANIELS:

9         Q.   I'm sorry.  How long did that take?

10        A.   A couple seconds.

11        Q.   Who arrived?

12        A.   Officer Church and Officer Reed.

13        Q.   Is that Thomas Reed and Timothy H.

14   Church?

15        A.   Yes, it is.

16        Q.   Am I correct in that Church is with the

17   Hallandale police department and Reed is with Fort

18   Lauderdale?

19        A.   Yes.

20        Q.   They're both with the K-9 units to

21   their respective cities?

22        A.   Yes.

23        Q.   Did you know any of them before this?

24        A.   I knew Officer Reed.

25        Q.   Did not know Officer Church?

1          A.    No.

2          Q.    Have you ever been assigned to the K-9

3     unit yourself at all?

4          A.    No.

5          Q.    Did they give any training in the K-9

6     unit and how it works?

7          A.    No.

8               MR. GUNTHER:  I object.  He said he

9     wasn't in the K-9 unit.

10              MR. DANIELS:  I understand.  I'm asking

11    did they give him any training in the unit.

12              MR. GUNTHER:  Other than setting up in

13    the perimeter and getting out of the way.

14    BY MR. DANIELS:

15         Q.    Being how the K-9 unit works and so

16    forth.

17         A.    No.

18         Q.    These are the only two individuals that

19    arrived at that time?

20         A.    That's correct.

21         Q.    What happened after that?

22         A.    I advised Officer Reed the last known

23    direction and last -- Where I was standing is

24    where I last saw him.

25         Q.    What happened after that?

1          A.    After that I left that stop and went

2     back out to the corner of, I think it's 15 Court

3     and 15 Terrace and reestablished my perimeter

4     spot.

5          Q.    What was the purpose of that?  In other

6     words, were were leaving them alone to look for

7     the perpetrator or what was the situation?  What

8     was the reason of you going back to --

9          A.    The reason I went back to my spot is it

10    was unmanned.

11         Q.    What was your understanding of what

12    Church and Reed were going to do?

13         A.    They were going to initiate a track for

14    the Defendant.

15         Q.    Do they need anything to do that, any

16    like clothes or anything from -- How do they do

17    that?

18         A.    I have no idea.

19         Q.    So what happened after that?

20         A.    As I said, I went back to my perimeter

21    spot and established my perimeter spot and stood

22    by until I was advised otherwise.

23         Q.    So at some point you were advised

24    otherwise?

25         A.    Yes.

```
 1            Q.    How long after you left Church and
 2       Reed?
 3            A.    I have to say somewhere in the range of
 4       between five and fifteen minutes.
 5            Q.    What happened, how were you advised?
 6            A.    I was notified over the radio that the
 7       subject was taken into custody.
 8            Q.    Who advised you?
 9            A.    I believe Officer Reed was on the air.
10            Q.    Did he say anything else?
11            A.    They requested EMS what we say is code
12       three, or lights and sirens.
13            Q.    Or what, I'm sorry, I missed that?
14            A.    He advised EMS.
15            Q.    You said code three or --
16            A.    Code three means come lights and
17       sirens, come as fast as they can.
18            Q.    Oh, lights and sirens, I'm sorry, I
19       didn't hear that.  Where were you at that time
20       that you heard that?
21            A.    I was still at 15 Court and 15 Terrace.
22            Q.    Was anyone else with you at that time
23       that you heard that?
24            A.    No.
25            Q.    No?
```

```
 1          A.    No.

 2          Q.    So were you the one that contacted EMS?

 3          A.    No, that was, like I said, was done by

 4   Officer Reed over the radio.

 5          Q.    So what next happened?

 6          A.    After they advised the subject was in

 7   custody I returned to the Defendant's vehicle.

 8          Q.    By the way, when you I guess got to the

 9   scene was the Defendant's vehicle, was it still

10   running, was it turned off?

11          A.    It was still running.

12          Q.    Did you turn it off?

13          A.    I left it returning.

14          Q.    You left it running?

15          A.    (Witness nods head.)

16          Q.    So when you returned to the Defendant's

17   vehicle what did you do?

18          A.    At that point I did inventory of the

19   vehicle.

20          Q.    Did you turn it off at that point?

21          A.    I believe I did.

22          Q.    What did you find when you did

23   inventory?

24          A.    The best I can remember, there was a

25   lot of clothes and stuff in the car.
```

1          Q.    Anything illegal in the car that you

2     found?

3          A.    Not that I recall.

4          Q.    What happened after that?

5          A.    After that I stood by, requested Max

6     Towing to tow the vehicle, and waited for them.

7          Q.    What happened after that?

8          A.    Shortly after that I believe I was

9     relieved and I went to the hospital.

10         Q.    From the time that you took up your

11    perimeter after you left Church and Reed until the

12    time that you were relieved, were any other

13    officers with you at that time?

14         A.    Are you asking me during the entire

15    time?

16         Q.    No, no, no, I'm sorry, from the time

17    that you left Church and Reed, you left them and

18    went back to establish your perimeter until the

19    time that you were relieved by another officer I

20    take it, were there any other officers with you

21    during that time period?

22         A.    I believe after the perimeter was

23    cleared a couple officers stopped by where I was

24    at the car.

25         Q.    When you say the perimeter cleared,

CAPITAL REPORTING SERVICE, INC.
Fort Lauderdale, FL (954) 522-6401

```
1    what does that mean?
2         A.   After the Defendant's taken into
3    custody you clear the perimeter, everybody can go
4    back to duty.
5         Q.   I see.  After the perimeter was cleared
6    that's when you went to the vehicle?
7         A.   That's correct.
8         Q.   To do an inventory search?
9         A.   That's correct.
10        Q.   And you say before you went to the
11   vehicle - after the perimeter was cleared and
12   before you went to the vehicle some officers
13   showed up?
14        A.   Say that again, I'm sorry.
15        Q.   After you cleared the perimeter you
16   said some officers you believe stopped by?
17        A.   That's correct.
18        Q.   Was that before you went to the vehicle
19   to do an inventory search or after?
20        A.   I have to say probably after.
21        Q.   Do you know what officers showed up?
22        A.   Not offhand, no.
23        Q.   Then you say that you were relieved?
24        A.   That's correct.
25        Q.   Who relieved you?
```

```
 1              A.    I have to -- If I can look at my tow

 2      slip, it might be on the tow slim.

 3              Q.    Okay.

 4              A.    It doesn't appear to be.  I couldn't

 5      tell you who relieved me.

 6              Q.    Then you say that you went to the

 7      hospital?

 8              A.    That's correct.

 9              Q.    What was the purpose of you going to

10      the hospital?

11              A.    The Defendant had been transported

12      there and I was required to go there and stand by

13      while he got medical treatment.

14              Q.    What hospital was that, if you

15      remember?

16              A.    Broward General Hospital.

17              Q.    When you arrived at the hospital, by

18      the way, is there a specific place you went to the

19      hospital, in the emergency room, a specific place

20      prisoners were kept?

21              A.    I believe it was just the regular

22      emergency room.

23              Q.    When you arrived at Broward General,

24      who was present?

25              A.    I believe when I arrived the officers
```

1    that had transported him, and I believe that was

2    it at the time actually.

3        Q.   Who was that?

4        A.   That was Officer Smith and Officer

5    Shields.

6        Q.   And Shields?

7        A.   Yes.

8        Q.   Do you know Officer Smith's first name?

9        A.   Jay.

10       Q.   I'm sorry, Jay?

11       A.   Jay.

12       Q.   And Officer Shields' first name?

13       A.   Timothy.

14       Q.   Do you know whether or not they were

15   involved in the arrest of Mr. Hodge at the scene?

16       A.   As far as I know, they were just in the

17   perimeters, they were in a perimeter spot.

18       Q.   Why would they be the ones that then

19   transported him, how does that work?

20       A.   I believe they were actually the

21   closest patrol car to where he was taken into

22   custody.

23       Q.   How come the officers that took him

24   into custody didn't transport him?

25       A.   Because they have a K-9 unit.


                    CAPITAL REPORTING SERVICE, INC.
                Fort Lauderdale, FL (954) 522-6401

1          Q.    So that the only officers that took Mr.

2    Hodge into custody was the K-9 unit?

3          A.    To the best of my knowledge, yes.

4          Q.    And that would be Officer Reed and

5    Officer Church; would that be correct?

6          A.    That would be correct.

7          Q.    So what happened when you arrived at

8    the hospital?

9          A.    I stood by with the Defendant until he

10   received medical treatment.

11         Q.    How about Officer Smith and Officer

12   Shields, did they leave?

13         A.    Yeah, at that time I was relieving

14   them.

15         Q.    Did you speak to Mr. Hodge at that

16   time?

17         A.    The only things I spoke with him about

18   was his name, his age, date of birth, stuff like

19   that.

20         Q.    Was he placed under arrest at that

21   time?

22         A.    At that time he was already in custody.

23         Q.    Then what happened after that?

24         A.    After he was medically cleared I

25   transported him to Fort Lauderdale jail.

1          Q.   Were you there while he was being

2     treated?

3          A.   Yes, I was.

4          Q.   Did you notice any bruises on him at

5     that time?

6          A.   Could you define bruises?

7          Q.   How about black and blue marks, red

8     marks, anything like that?

9          A.   Other than the bite marks and the

10    scratches from the dog I did not notice any other

11    kinds of injuries.

12         Q.   No other marks other than bite marks

13    and scratches from the dog?

14         A.   That's correct.

15         Q.   Who was treating him, was it a doctor

16    or was it a nurse?

17         A.   I would assume it was probably a

18    doctor.

19         Q.   Well, you were there while he was being

20    treated.

21         A.   That's correct.

22         Q.   Do you have to be present when the

23    doctor does everything that he's supposed to do on

24    the patient?  Are you observing what the doctor's

25    doing?

CAPITAL REPORTING SERVICE, INC.
Fort Lauderdale, FL (954) 522-6401

```
1          A.   No, I'm just making sure he doesn't

2    leave.

3               MR. GUNTHER:  Who, the doctor or --

4               THE WITNESS:  No, the prisoner.

5               MR. GUNTHER:  Thank you.

6    BY MR. DANIELS:

7          Q.   Was there any nurse over there at that

8    time?

9          A.   There was quite a few hospital staff.

10         Q.   What I'm getting at, I mean, did you

11   happen to see him?  I know they were treating him,

12   did you happen to see him in the stage where his

13   pants were down and so forth?  Did you see the

14   bite marks on his buttock, that's what I'm asking

15   you?

16         A.   I saw them treat him.  Obviously they

17   had his pants off to treat him, so I would have to

18   say yes.

19         Q.   What did you see them do to him

20   specifically, if you remember?

21         A.   Specifically?

22         Q.   Yeah.

23         A.   They treated his wounds and patched him

24   up.

25         Q.   Treated his wounds meaning cleaning his
```

```
1    wounds?

2         A.   I would have to say that's probably

3    what they did, yeah.

4         Q.   They give him any stitches, do you

5    know?

6         A.   I can't remember.  I don't know.

7         Q.   Are you aware of any wounds to his arms

8    at all?

9         A.   He did have a bite mark on his arm.

10        Q.   Do you remember which arm it was?

11        A.   No.

12        Q.   I mean, would you consider it to be a

13   minor bite to the arm, a moderate bite to the arm,

14   or a major bite, if you know?

15             MR. GUNTHER:  Object to form.  I don't

16   know what minor and major means to him.  Go ahead

17   and describe it as best you can remember.

18             MR. DANIELS:  That's fine.

19   BY MR. DANIELS:

20        Q.   Describe it as best you can.

21        A.   One of his biceps.  I can't recall

22   which arm had been bitten, and had an opening in

23   his arm I guess.  I couldn't tell you if you

24   define it major or minor.

25        Q.   Fine.  Do you know whether he got
```

```
 1    stitches to that?
 2         A.   I'm not sure how they treated it to be
 3    honest with you.
 4         Q.   Do you know how long you were in the
 5    hospital with him?
 6         A.   I would have to say somewhere in the
 7    range of probably three, maybe four hours.
 8         Q.   Were you with him that entire time?
 9         A.   Yes, I was.
10         Q.   Were there any other officers that
11    stopped by during that time period?
12         A.   Yes, there was.
13         Q.   Who was that?
14         A.   That would be Sergeant Wheeler.
15         Q.   Who is Sergeant Wheeler?
16         A.   Sergeant Wheeler is the K-9 sergeant
17    for City of Fort Lauderdale.
18         Q.   Is he the head of the K-9 unit?
19         A.   He's the sergeant --
20              MR. GUNTHER:  Let me object to the
21    form.  He's the sergeant.
22              MR. DANIELS:  What's that?
23              MR. GUNTHER:  He's the sergeant.
24              MR. DANIELS:  I don't know if that's
25    the head.
```

1          MR. GUNTHER:  No, because the head is

2     probably the Chief of Police, the ultimate head.

3          MR. DANIELS:  That's how come I asked.

4          MR. GUNTHER:  No, it's the captain.

5          MR. GOLDSTEIN:  City Commission.

6          MR. GUNTHER:  No, it's a captain, but

7     Sergeant Wheeler is the only K-9 sergeant, so

8     you've got the right sergeant.

9          MR. DANIELS:  Okay.

10         MR. GUNTHER:  I think -- I'm not trying

11    to be difficult.

12         MR. DANIELS:  I know you're not.

13         MR. GUNTHER:  I'm trying to make it

14    easy.

15         MR. DANIELS:  That's fine.  I'm not

16    taking it like that.

17    BY MR. DANIELS:

18         Q.   Sergeant Wheeler and anybody else?

19         A.   I believe Officer Reed and Officer

20    Church stopped by.

21         Q.   Do you know what the purpose of

22    Sergeant Wheeler showing up was for?

23         A.   He was going to photograph the

24    Defendant.

25         Q.   Is that normal?  In other words, would

CAPITAL REPORTING SERVICE, INC.
Fort Lauderdale, FL (954) 522-6401

1    the K-9 sergeant be the one that does that?

2         A.   You would have to ask Sergeant Wheeler

3    that.

4         Q.   You don't know, okay.

5         A.   No, I don't.

6         Q.   And how about Officer Reed and Officer

7    Church, what was the purpose of them showing up?

8         A.   I believe they actually responded in

9    reference to meet with Sergeant Wheeler.

10        Q.   So all four of you were in this - was

11   it a room that you were in?

12        A.   It's like I wouldn't call it a room.  I

13   guess you call it where they have the beds at the

14   emergency room.

15        Q.   All four of you were over there at the

16   same time, you, Sergeant Wheeler, Sergeant Reed,

17   and Officer Church?

18        A.   Well, at the time the only two officers

19   in the room were probably Sergeant Wheeler and

20   myself.  When the other two officers arrived they

21   were off to the side and Sergeant Wheeler went

22   over to them.

23        Q.   I see.  So you know what Sergeant

24   Wheeler and Sergeant Reed and Officer Church were

25   talking about?

```
 1          A.    No, I do not.

 2          Q.    Were you there when Sergeant Wheeler

 3    took photographs of Mr. Hodge?

 4          A.    Yes, I was.

 5          Q.    Do you know how many photographs he

 6    took?

 7          A.    I have no idea.

 8          Q.    Do you know what type of camera he

 9    used, was it a flash camera, 35 millimeter?

10          A.    I believe it was 35 millimeter.

11          Q.    Did Sergeant Wheeler speak to Mr. Hodge

12    at all?

13          A.    Not to my knowledge.

14          Q.    How about Officer Reed, did he speak to

15    Mr. Hodge at that time?

16          A.    Not that I recall.

17          Q.    And Officer Church?

18          A.    No.

19          Q.    Were the pictures taken before Mr.

20    Hodge was treated or after he was treated?

21          A.    I believe actually before.

22          Q.    What happened after that?

23          A.    Defendant received medical treatment.

24          Q.    And then what happened?

25          A.    Then he was medically released back
```

1    into my custody and I transported him FLPD jail.

2         Q.   Were there any other officers that came

3    to that area other than what you've told me about?

4              MR. GUNTHER:   You're talking about the

5    triage area at the ER?

6    BY MR. DANIELS:

7         Q.   That's right, triage area at the ER.

8         A.   Not that I know of, no.

9         Q.   Were you the only one that transported

10   Mr. Hodge after that?

11        A.   From the hospital to the jail?

12        Q.   Yes, to the jail, that's fine.   During

13   that time did you speak to Mr. Hodge at all?

14        A.   After we arrived at the jail I advised

15   him of his Miranda Rights.

16        Q.   Which jail is that?

17        A.   Fort Lauderdale jail.

18        Q.   What happened after you advised him?

19        A.   He refused to talk to me.

20        Q.   Then what happened?

21        A.   Then he was booked.

22        Q.   Were you involved after that at all?

23        A.   After what?

24        Q.   After he was booked.

25        A.   No, not that I know of.

```
 1                    MR. GUNTHER:  Well, with Hodge you
 2      weren't involved?
 3                    THE WITNESS:  No.
 4                    MR. GUNTHER:  Okay.
 5      BY MR. DANIELS:
 6           Q.    With Hodge you weren't, okay.  What was
 7      your next involvement regarding this matter, since
 8      you're saying with Hodge?
 9           A.    You mean that night?
10           Q.    Yeah, that's what I meant.
11           A.    After Hodge was turned over to the jail
12      I filled out my probable cause affidavit.
13           Q.    Do you have a copy of that in your --
14           A.    No, I do not.
15           Q.    -- records that you have with you?
16      What is a probable cause affidavit?
17           A.    Probable cause affidavit is exactly
18      what it is.  It's an affidavit that you
19      demonstrate a probable cause for the Defendant's
20      arrest.
21           Q.    Where did you fill this out?
22           A.    I filled it out - actually, I believe I
23      filled it out at the city jail.
24           Q.    When did you fill it out?
25           A.    After Defendant Hodge was transferred
```

CAPITAL REPORTING SERVICE, INC.
Fort Lauderdale, FL (954) 522-6401

1    over to the jail.

2         Q.  Did you fill it out by yourself or was

3    anyone with you at the time?

4         A.  By myself.

5         Q.  Now, during the time that you say that

6    you met with Church and Reed at the scene and then

7    they went out to locate Mr. Hodge and you went

8    back to the perimeter and next thing you heard was

9    on your radio that Mr. Hodge had been apprehended,

10   did you leave from your perimeter point at all?

11        A.  No, I did not.

12        Q.  From the time that you were told that

13   Mr. Hodge was apprehended until the time that you

14   went to the hospital, did you speak to Officer

15   Church or Officer Reed or any other officer as to

16   what had occurred?

17             MR. GUNTHER:  Object to the form.  Go

18   ahead and answer it if you can.

19             THE WITNESS:  I'm sorry?

20             MR. GUNTHER:  Who did you talk to

21   afterwards, if anyone, as to what had occurred

22   after he was apprehended?

23   BY MR. DANIELS:

24        Q.  Did you speak to anyone at all?

25        A.  I spoke to a couple - the officers that

CAPITAL REPORTING SERVICE, INC.
Fort Lauderdale, FL (954) 522-6401

1     stopped by probably.

2          Q.    When you say stopped by you mean the

3     officers that stopped by when you were, what was

4     that, you said something about leaving the

5     perimeter?

6          A.    Cleared the perimeter.

7          Q.    Okay.

8          A.    And I also advised or stated there were

9     some officers that stopped by the car, probably

10     talked to them.

11          Q.    I thought those were the officers that

12     you were talking about when you cleared the

13     perimeter.

14          A.    I'm not too sure what you mean.  You

15     got me confused the way you're talking.

16          Q.    You cleared the perimeter and then you

17     said you went to check the inventory in the car.

18          A.    That's correct.

19          Q.    And you said that there were some

20     officers that stopped by.

21          A.    That's correct.

22          Q.    You don't remember the names of those

23     officers at all?

24          A.    No, I do not.

25          Q.    Were they involved in any way in the

```
 1    apprehension of Mr. Hodge, those officers?

 2         A.   No, not that I know of.

 3         Q.   Were there any --

 4              MR. GUNTHER:  Other than setting up a

 5    perimeter?

 6              THE WITNESS:  Yeah, that's correct.

 7    BY MR. DANIELS:

 8         Q.   Were there any other officers that

 9    showed up during that time period before you went

10    to the hospital?

11         A.   I believe Officer Reed and Officer

12    Church came back to their cars.

13         Q.   Did you speak to them at all?

14         A.   I believe I asked them if he was being

15    taken to Broward General and they said yes.

16         Q.   That's how you found out to go to

17    Broward General Hospital?

18         A.   That's correct.

19         Q.   Other than asking them that, did you

20    ask them what had occurred at the scene?

21         A.   I had asked them if they got, you know,

22    taken him into custody.  They said, yes, and at

23    that point Officer Reed handed over a crack

24    cocaine pipe.

25         Q.   I assume he told you that was from Mr.
```

```
 1      Hodge?
 2              A.   That's correct.
 3              Q.   Did they tell you anything else?   In
 4      other words, did Officer Church tell you anything
 5      else before you went to the hospital?
 6              A.   Not that I recall, no.
 7              Q.   Did Officer Reed tell you anything else
 8      before you went to the hospital?
 9              A.   Other than that he had gotten the crack
10      cocaine, he told me - I think he advised where he
11      found it on the Defendant, other than that, no.
12              Q.   Then you say you went to the hospital,
13      and at the hospital did you speak to Mr. Church or
14      Mr. Reed?
15              A.   I'm sure I probably --
16              MR. GUNTHER:  Object, asked and
17      answered, go ahead.
18              THE WITNESS:  I'm sure I did.
19      BY MR. DANIELS:
20              Q.   Do you know what you discussed?
21              A.   I couldn't tell you, probably this
22      case, obviously.
23              Q.   But you don't remember specifically?
24              A.   No.
25              Q.   Then when you transported Mr. Hodge to
```

CAPITAL REPORTING SERVICE, INC.
Fort Lauderdale, FL (954) 522-6401

1    jail you then prepared your probable cause

2    affidavit at that time?

3         A.   That's correct.

4         Q.   Did you speak to anyone before you

5    prepared this probable cause affidavit regarding

6    what had occurred or did you do it based on your

7    own personal knowledge?

8         A.   I did it based on my own personal

9    knowledge and some of the information given to me

10   by Officer Church and Officer Reed.

11        Q.   What information did Officer Church

12   give you?

13        A.   They advised me the location where he

14   was taken, or the address I should say, where he

15   was taken into custody, and they also advised me

16   to make sure they charged him with resisting

17   without violence.  They just more or less advised

18   me they had to take the Defendant into custody and

19   he refused to comply with their verbal orders.

20        Q.   When did you speak to Mr. Church about

21   this?

22        A.   Probably at the hospital.

23        Q.   How about Officer Reed, what did he

24   tell you?

25        A.   Probably the exact same thing.


CAPITAL REPORTING SERVICE, INC.
Fort Lauderdale, FL (954) 522-6401

```
1              Q.    And you also spoke to him at the

2     hospital?

3              A.    That's correct.

4              Q.    Do you know how long your conversation

5     with Mr. Church was?

6              A.    No.

7              Q.    How about with Officer Reed?

8              A.    No.

9              Q.    At any time while you were at the scene

10    did you notice any civilians at the scene?

11             A.    Shortly after the perimeter was cleared

12    and I went back to the vehicle the victim, I have

13    to refer to my report, the subject who owned the

14    house, driven the car into the fence, he came out

15    of his house.

16             Q.    Is that Mr. Singleton?

17             A.    I have to refer, it's Jerome Singleton.

18             Q.    Right.  What happened?

19             A.    I discussed the fence and the value he

20    felt it would cost to replace the fence and stuff

21    in that regards.

22             Q.    Any other civilians?

23             A.    Not that I know of, no.

24             Q.    You say that, am I correct that Officer

25    Church told you to charge Mr. Hodge with resisting
```

```
 1      arrest without violence; am I correct in that?

 2              A.   Well, that's based on --

 3              Q.   Officer Reed told you to do that?

 4              A.   Based on what they dealt with and based

 5      on the fact that he refused to obey my orders on

 6      the felony stop, that's why.

 7              Q.   Was it Officer Reed that said that to

 8      you?

 9              A.   I can't be a hundred percent positive

10      and tell you it was Church or Reed that said that

11      to me.  They explained the situation they dealt

12      with to take him into custody and he refused to

13      comply with the verbal orders.

14              Q.   What did they tell you?

15              MR. GUNTHER:  Object, asked and

16      answered.  Go ahead.

17              THE WITNESS:  More or less, gave him

18      verbal orders and that he refused to comply.

19      BY MR. DANIELS:

20              Q.   To what, surrender, give up?

21              A.   I couldn't tell you the exact words

22      they used.

23              Q.   What is resisting arrest without

24      violence, what does that that mean?

25              A.   What does that mean?
```

1          Q.    Yeah.

2                MR. GUNTHER:   Objection, calls for

3     legal conclusion.   Go ahead as best as you can.

4                THE WITNESS:   Failing to comply with

5     officers, either failure to comply, interrupting,

6     obstructing or -- What's the other word?

7                MR. GUNTHER:   Interfering.

8                THE WITNESS:   Interfering with the

9     lawful order or direct order from a police officer

10    or any legal officer by the State of Florida.

11               MR. DANIELS:   Give me a second.

12    BY MR. DANIELS:

13         Q.    Did you identify Mr. Hodge after he was

14    arrested?

15         A.    I did at the hospital.

16         Q.    I'm looking at this incident report

17    from the Hallandale police department and it says

18    that the culprit was identified by Officer Hart

19    and then transported to Broward General for

20    treatment; is that correct, incorrect?

21               MR. GUNTHER:   Objection, asks him to

22    comment on what somebody else wrote.

23               MR. DANIELS:   I'm just asking.

24               MR. GUNTHER:   You can ask him what he

25    remembers.   I don't think it's appropriate to say

```
 1    what somebody else said is correct or incorrect.

 2    Go ahead, answer it if you can.

 3              THE WITNESS:  To the best of my

 4    knowledge, I would have to say it's incorrect.

 5              MR. GUNTHER:  I don't want you

 6    commenting, just your own recollection.

 7    BY MR. DANIELS:

 8         Q.   Just the statement, yeah.

 9         A.   I didn't see the Defendant again until

10    I got to the hospital.

11         Q.   To the best of your knowledge, were the

12    only officers that apprehended Mr. Hodge officers

13    Officer Church and Officer Reed, or were there any

14    other officers that were involved?

15         A.   In the actual official apprehension?  I

16    would have to say, no, Officer Reed and Church.

17         Q.   How do you know that?

18         A.   Based on what they told me.

19         Q.   What did they tell you?

20         A.   They told me they were the two there

21    that took him into custody.

22         Q.   If there were any other officers there,

23    would they have told you something different?

24              MR. GUNTHER:  Let me object, what

25    somebody --
```

```
 1                    MR. GOLDSTEIN:  I object too, calls for
 2      speculation.
 3                    THE WITNESS:  Do you want me to answer
 4      it?
 5                    MR. GUNTHER:  No.
 6                    MR. DANIELS:  You don't want him to
 7      answer?
 8                    MR. GUNTHER:  If you understand.
 9                    THE WITNESS:  I don't know if I can
10      answer that question to be honest with you.  I
11      don't know if they would have told me or would not
12      have told me.
13      BY MR. DANIELS:
14           Q.   Okay.
15           A.   I can't say yes or no.
16           Q.   If another officer would have been
17      involved in this, I'm not saying there was, I'm
18      saying if there was another officer besides Church
19      and Reed involved in the apprehension of Mr.
20      Hodge, would that be documented somewhere?
21           A.   Yes, it would.
22           Q.   Where would it be documented?
23           A.   They would have done a supplement
24      report.
25           Q.   So the only reports of apprehending Mr.
```

```
 1        Hodge are the reports from Officer Church and

 2        Officer Reed and they would be the only ones

 3        involved in the apprehending of Mr. Hodge?

 4              A.    That's correct.

 5              Q.    What is a supplemental report, what is

 6        that?

 7              A.    To supplement or it's another report

 8        adding to the original.

 9              Q.    And the original report is prepared by

10        who?

11              A.    The person who takes the original call

12        from the victim.

13              Q.    And who is that in this case?

14              A.    I believe Defendant's last name was

15        Viola.

16              Q.    So the person who took the original

17        call from Viola would be the one that does the

18        original report?

19              A.    That's correct.

20              Q.    That officer?

21              A.    That's correct.

22              Q.    Do you know who that officer was?

23              A.    I believe it was Officer Ferring.

24              Q.    Every other report after that is called

25        a supplemental report?
```

CAPITAL REPORTING SERVICE, INC.
Fort Lauderdale, FL (954) 522-6401

1        A.    That's correct.

2        Q.    I'm learning.

3        A.    Okay.

4        Q.    As far as what happened at the scene

5   itself when Mr. Hodge was apprehended, do you have

6   any personal knowledge as to what happened at that

7   time, when Mr. Hodge was apprehended?

8        A.    Physically you mean?

9        Q.    Yeah.  Were you there at the time to

10  see what happened?

11       A.    No, I was not.

12       Q.    Do you know of any other person that

13  was there at the time that saw what happened other

14  than Officer Church and Officer Reed?

15       A.    No, I do not.

16       Q.    How tall are you?

17       A.    I'm approximately 5'9".

18       Q.    How much do you weigh?

19       A.    180.

20       Q.    As far as how you look now, with the

21  clean shaven and so forth, did you look any

22  different at the time of the incident?  Did you

23  have a mustache, beard, anything like or basically

24  the same?

25       A.    No, I did not.

```
 1            Q.    Any difference in your appearance at
 2       all?
 3            A.    Probably different hairstyle.
 4                  MR. GUNTHER:  Two years?
 5                  THE WITNESS:  Probably different
 6       hairstyle.  I couldn't tell you.
 7                  MR. DANIELS:  One more second and I
 8       think I'm done.  Okay.
 9                  MR. GUNTHER:  Anything from you?
10                  MR. GOLDSTEIN:  I don't have anything.
11                  MR. GUNTHER:  Just one or two.
12                         CROSS-EXAMINATION
13       BY MR. GUNTHER:
14            Q.    You did not physically arrest Mr. Hodge
15       that evening in any way, shape, or form until - is
16       that correct?
17            A.    That's correct.
18            Q.    I mean, if you took custody of him once
19       he was in the hospital, correct, he was already
20       under arrest then, correct?
21            A.    Correct.
22            Q.    Your educational background from FSU is
23       bachlor's degree in criminal justice?
24            A.    Criminology.
25            Q.    And you have a Master's degree as well?
```

```
 1          A.    That's correct.

 2                MR. GUNTHER:  That's all.

 3                MR. DANIELS:  That's it.

 4                MR. GUNTHER:  I don't know if we'll

 5     read, contact me.  We'll probably waive it.

 6                MR. DANIELS:  I want to add on --

 7                MR. GUNTHER:  Do you want to attach the

 8     report?

 9                MR. DANIELS:  This is the probable --

10                MR. GUNTHER:  Probable cause affidavit

11     and look at this.

12                THE WITNESS:  Yeah, that's mine.

13                     REDIRECT EXAMINATION

14     BY MR. DANIELS:

15          Q.    Is that in your handwriting?

16          A.    Yes, it is.

17          Q.    Your signature?

18          A.    Yes.

19          Q.    Let me also add that, and this over

20     here, let me give you this.  This is - we'll make

21     that Exhibit A.

22                MR. GUNTHER:  This is your offense

23     report?

24                THE WITNESS:  Yeah.

25     BY MR. DANIELS:
```

1          Q.    That's your handwriting?

2          A.    Yeah, that's mine.

3                MR. GUNTHER:  Correct, report and tow

4     slip.

5                MR. DANIELS:  We'll make that Exhibit

6     B.

7                MR. GUNTHER:  I'll take a copy if it's

8     ordered, obviously with the exhibits.

9                MR. DANIELS:  I'm not going to be

10    ordering it right now.

11                MR. GOLDSTEIN:  We'll take a copy if

12    it's ordered.

13                (The deposition concluded at 5:00 p.m.)

14

15                    **STIPULATION**

16        It is hereby stipulated and agreed by and

17    between counsel present at this deposition and by

18    the deponent that the reading and signing of this

19    deposition is waived.

20

21

22

23

24

25

1                    <u>CERTIFICATE OF OATH</u>

2

       STATE OF FLORIDA    )
3
       COUNTY OF BROWARD   )
4
                I, the undersigned authority, certify
5      that PATRICK HART personally appeared before me
       and was duly sworn.
6
                WITNESS my hand and official seal this
7      21st day of January, 2001.

8                                          JENNIFER D. DESHONG
                                           MY COMMISSION # CC 886626
                                           EXPIRES: March 7, 2004
                                           Bonded Thru Picnard Insurance Agency

9      _____
       JENNIFER D. DESHONG
10     Notary Public - State of Florida
       My Commission No. CC886626
11     Expires:  March 7, 2004

12              <u>REPORTER'S DEPOSITION CERTIFICATE</u>

13     STATE OF FLORIDA    )
       COUNTY OF BROWARD   )
14
                I, JENNIFER D. DESHONG, Certified
15     Reporter, certify that I was authorized to and did
       stenographically report the deposition of PATRICK
16     HART; that a review of the transcript was not
       requested; and that the transcript is a true and
17     complete record of my stenographic notes.

18              I further certify that I am not a
       relative, employee, attorney, or counsel of any of
19     the parties, nor am I a relative or employee of
       any of the parties' attorney or counsel connected
20     with the action, nor am I financially interested
       in the action.
21
                Dated this 21st day of January, 2001.
22

23     _____
       JENNIFER D. DESHONG,
24     Certified Reporter.

25


                CAPITAL REPORTING SERVICE, INC.
              Fort Lauderdale, FL (954) 522-6401

PLAINTIFF
EXHIBIT NO. A
FOR IDENTIFICATION
DATE 11/14/00   JD

## COMPLAINT/AFFIDAVIT
SHADED FIELDS MUST BE ANSWERED IF DEFENDANT NOT IN CUSTODY

BROWARD COUNTY ARREST # 98-10944                                        OBTS # 1132310   ARREST FOR

| Filing Agency FLPD | Offense Report 98-139628 | Local ID | | FDLE | FBI | SS# 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 |
|---|---|---|---|---|---|---|
| Defendant's Last Name Horde | First Hugh | Middle | SUF | | Alias/Street Name | Citizenship |

| | Sex M | Hgt 6'0 | Eyes Blue | Hair Brn | Wgt 210 | Comp McD | Age 31 | DOB 10-21-66 | Birthplace Miami FL | Scars, marks, TT Hugh & Hmrl | Citizenship US I ☑ Uank |

Permanent Address 799 W. Prospect Rd
Ft. Lauderdale, FL 3531    (954) 776-8036

Local Address: Same

| Residence Type: (1) City (2) County (3) Florida (4) Out of State | Place of Employment | Length |

| How long defendant in Broward County: | Breathalyzer by/CCN | Reading — | Place of arrest 1516 NW 15 PL | Date/time arrested 9-6-98 0321 | Arresting officer(s) CCN Hart 1326 |

| Officer injured Y ☐ N ☑ | Unit 1232 | Zone 208 | Beat 2C | Shift | Trans. Unit Same | PMD Y ☐ N ☒ | Transporting officer/CCN Same | Pick-up time: | Drug type: C |
| | | | | | | | | Time arrived at BSO: | |

| Type: H-N/A A-Amphetamine | B-Barbiturate C-Cocaine E-Heroin | H-Hallucinogen M-Marijuana O-Opium | P-Paraphernalia Equipment S-Synthetic | U-Unknown Z-Other | Activity: P | Activity: H-N/A P-Possess S-Sell | B-Buy T-Traffic A-Smuggle D-Deliver | E-Use M-Manufacture/ Produce/ Cultivate | K-Dispense/ Distribute Z-Other | Indication of: Alcohol influence: Drug influence: | Y ☐ ☐ | N ☐ ☐ | UK ☒ ☒ |

Defendant's Vehicle Make: Honda   Type: 4DR   Year: 90   Color: Blu   VIN #1HGED4660LA003789

Attach Defendant's Photo

Vehicle towed to: Mac's    Tag # TTY-84C   Other identifiers or remarks: Damage to Front of Vehicle

Name of victim(s) (if corporation, exact legal name and state of incorporation):
Josephine Viola   601 Pine Dr #210 Pompano Bch, FL   (954) 785-3338
Michael Viola

| Count # | Offenses Charged | Citation # if Applicable | FS or Caples/Warrant # |
|---|---|---|---|
| 1 | Auto theft | | 812.014 |
| 2 | Vandalism (Felony) | | 806.13 |
| 3 | Possession Cocaine | | 893.13 |
| 4 | Possession Drug Paraphernalia | | 893.147 |
| 5 | Resisting Arrest Without Violence | | 843.02 |

### Probable Cause Affidavit

Before me this date personally appeared ___Hart 1326___ who being first duly sworn depose and says that on ___06___ day of ___09___ , (year) ___98___ at ___1513 NW 15St Ft Lauderdale Ft. Broward___ County (crime location) the above named defendant committed the above offenses charged and the facts showing probable cause to believe the same are as follows:

Dispatch Belcad a Blue Honda Civic 4DR 1990 with a possible FL Tag TTY-64C As Stolen From the Ft. Lauderdale Beach area. While on Patrol Routine a short Time Later, I observed the Above vehicle traveling south Bound on NW 7 Ave in the 600 Blk. I Advised Dispatch and They Advised Check the Tag TTY-84C with Victim. Dispatch that this vehicle Belonged to this Victim and this was the Car Stolen. I requested BackUp. Upon BackUp arriving we attempted to perform a felony stop. The d.l. which was listed as a suspect in the Original, intentionally drove the vehicle

I swear the above statement is correct and true to the best of my knowledge and belief.

OFFICER/AFFIANT'S SIGNATURE        OFFICER'S NAME/CCN Hart 1326        OFFICER'S DIVISION Patrol

STATE OF Florida    COUNTY OF Broward

The foregoing instrument was acknowledged before me this ___06___ day of ___09___ , (year) ___98___ , who is personally known to me or who has produced (ID type) ___LEO___ as identification and who ___DID___ (did or did not) take an oath.    (SEAL OR STAMP IF APPLICABLE)

DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY        TITLE OR RANK/CCN Det Fiori

SEVENTEENTH JUDICIAL CIRCUIT
BROWARD COUNTY
STATE OF FLORIDA
BSO DB#2 (Revised 8/97)

FIRST APPEARANCE/ARREST FORM

(SHOULD ADDITIONAL SPACE BE NEEDED, USE THE PROBABLE CAUSE AFFIDAVIT CONTINUATION.)

Distribution:
Orig - Court
2nd - State Attorney
3rd - Filing Agency
4th - Arresting Agency

☐ COMPLAINT AFFIDAVIT  ☒ ARREST FORM

PROBABLE CAUSE AFFIDAVIT CONTINUATION

| DEFENDANT'S LAST NAME | FIRST | MIDDLE | SUF. | HGT. | WGT | RC | SEX | D.O.B. | OFFENSE REPORT # | ARRESTING OFFICER (S)/CCN |
|---|---|---|---|---|---|---|---|---|---|---|
| Hodge | Hugh | | | 6'0 | 210 | W | M | 10-21-66 | 98-139628 | Hart 1328 |

| NAME OF VICTIM (IF CORPORATION, EXACT LEGAL NAME AND STATE OF INCORP.) | ADDRESS | PHONE # |
|---|---|---|
| | | |

| COUNT NO. | OFFENSES CHARGED | CITATION #, IF APPLICABLE | F.S. # OR CAPIAS/WARRANT # |
|---|---|---|---|
| | See B & S | 662553-Z | 322.34 |
| 6 | No Drivers License | | |
| | | | |
| | | | |

Before me this date personally appeared ___Hart 1328___ who being first duly sworn deposes and says that on ___06___ day ___09___, 1998 at 1513 NW 15 CT Ft. Lauderdale FL (crime location) the above named defendant committed the above offenses charged and the facts showing probable cause to believe same are as follows: Broward County.

into the chain link fence at 1513 NW 15 CT and fled in a northwesterly direction on foot. Note we were all in marked Police units and in full police Uniforms. We established a Perimeter and had K-9 begin a track. The def was taken into custody at 1516 NW 15 PL. See Hallandale P.D. case # 98-30739 and K9-4 Ofc Reed Cima 1198 Supplemental.

I made contact with Jerome Singleton, landlord, at 1513 NW 15 CT and he advised he did not give anyone permission to damage his fence. He also stated it was against his will and he wishes to prosecute. Singleton signed the affidavit of Complaint and advised the damage would cost between $1200 $1500 dollars.

The def was transported to BGH for Injuries. Where the subject was taken into custody a search of his person revealed a 4" clear glass tube commonly used for smoking crack cocaine. The pipe (tube) Valtox tested positive for the presence of cocaine. The tube and pictures of the vandalism were placed into evidence.

After the subject was released from the hospital I read him his miranda rights the def refused to talk to me. I contacted reporter of the stolen car Michael Viola and he stated subject took his vehicle without his permission and he does wish to prosecute. Subject was TOT to FLPD Jail and vehicle was towed to MAC's. The def has DL on file with State of Florida. Issued Citation.

I swear the above statement is correct and true to the best of my knowledge and belief.

_____ ___P. Hart 1328___ ___Patrol___
OFFICER/AFFIANT'S SIGNATURE     OFFICER'S NAME/CCN     OFFICER'S DIVISION

STATE OF Florida  COUNTY OF Broward

The foregoing instrument was acknowledged before me this 6 day of Sept, 1998, who is personally known to me or who has produced (ID Type) __LEO__ as identification and who DID OR DID NOT take an oath.

___R.B. Sanders___      ___Det. Finn___
DEPUTY CLERK OF THE COURT, NOTARY PUBLIC, OR ASSISTANT STATE ATTORNEY    TITLE OR RANK CCN

FIRST APPEARANCE ARREST FORM

(SEAL OR STAMP)

Orig - Court
2nd - State Atty
3rd - Filing Agency
4th - Arresting Agency

SEVENTEENTH JUDICIAL CIRCUIT

8056

Case 0:00-cv-06228-PAS   Document 91   Entered on FLSD Docket 03/01/2001   Page 49 of 53

# FORT LAUDERDALE POLICE DEPARTMENT
## OFFENSE INCIDENT REPORT

**Reported:** Day Sun  **Date** 9.6.98  **Time (mil)** 0600  **Related Report Number(s)**

**Incident Type:** 1. Felony  2. Traffic Misdemeanor  3. Ordinance  4. Other
**Incident Day** From Sun  9.6.98  0332  To

**Operation:** Auto theft (Rec.)

**Hate Crime:** YES / NO

**Incident Location (Street, Apt. Number):** 1513 N₩ 15 CT  **City** Ft Lauderdale  **Zip**  **Rear** 208

**Business Name/Area Identifier:**  **Called In:** YES / NO  By  **CCN**  **Forced Entry:** NO  **Occupancy:** NO

### CODES

**# Offenses** 2  **# Victims** 2  **# Offenders** 01  **# Prem. Ent.** 01

### VICTIM/WITNESS

**V/W Code** V 1 3  **Name (Last, First, Middle):** Viola, Michael  (954) 785-3338
**Address (Street, Apt. Number):** 601 Pine Dr #210  Pompano Bch FL
**Other Contact Info:** Josephine Viola (Registered owner + Michael's mother)
Race W  Sex M  DOB 03/15/61  **W/W Code** V 1 3

**V/W Code** V 2 3  **Name (Last, First, Middle):** Singleton, Jerome  (954) 525-3936
**Address (Street, Apt. Number):** 1513 N₩ 15 CT  Ft Lauderdale FL 33311
Race B  Sex M  DOB 05/05/41  02  02  **Domestic Violence:** YES / NO

### SUSPECT

**Suspect Code** 1A  **Name (Last, First, Middle):** Hodge, Hugh
**Place of Birth:** Miami FL  **Residence Phone** (954) 776-8036
**Last Known Address (Street, Apt. Number):** 999 W. Prospect Rd  Ft Lauderdale FL 33311
**Occupation:**  **Social Security Number:** 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
**Driver's License State/Number:** None
**Clothing (Describe):**  **Scars/Marks/Tattoos:** Hugh Lt Hand.  Lt ankle  Lt shoulder
Race W  Sex M  DOB 01/31/63  Height 6'0  Weight 190  Eye Color BRN  Hair BRN

### SUSPECT INFO. UNKNOWN ID

Hair Lgth/Type 03  Hair Style 09  Complexion 060  Build  Teeth  Facial Hair  Speech 08  Voice  Appearance 04  Unique I.D.

### ADMINISTRATIVE

**Officer(s) Reporting:** Hart  **I.D. Number(s):** 1328  **Unit:** 1C202  **Date:** 9.6.98
**Officer Reviewing (if Applicable):** Sgt. Black

**Arrest Number:** 98-10944  **Page:** 1 of 1

FORM 7-498 Rev 12/91

HODG 0000007

O.R.# 9 1 8 1 1 3 1 9 1 6 1 2 1 8 1

| SUSPECT | Suspect Code S-Suspect E-Escapee A-Arrestee Z-Other | Code | # | Juvenile | Name (Last, First, Middle) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Maiden Name | | | Nickname/Street Name | | | Place of Birth | | Residence Phone ( ) |
| | Last Known Address (Street, Apt. Number) | | | | | City | State | Zip | Business Phone ( ) |
| | Occupation | | | Employer/School | | Address | | | Social Security Number |
| | Driver's License State/Number | | Immigration and Naturalization Number | | Other I.D. Number | FL/OBTS Number (Arrested) | | | FCIC/NCIC |
| | Clothing (Describe) | | | | | | Scars/Marks/Tattoos (Location/Describe) | | |
| | Race | Sex | Date of Birth or Age | | Height | Weight | Eye Color | Hair Color | Other |

| CODES | Activity P-Possess S-Sell B-Buy T-Traffic R-Smuggle | D-Deliver E-Use K-Dispense/Distribute M-Manufacture/Produce/Cultivate | Z-Other | Type A-Amphetamine B-Barbiturate C-Cocaine E-Heroin H-Hallucinogen | M-Marijuana O-Opium/Derivative P-Paraphernalia/Equipment S-Synthetic | U-Unknown Z-Other | Unit 1 Gram 2 Milligram 3 Kilogram 4 Ounce 5 Pound | 6 Ton 7 Liter 8 Mililiter 9 Dose Unit/Item |

| DRUGS | Activity P | Type C | Description 4" Clear glass Tube (Valtox Positive Presence Cocain) | Quantity 1 | Unit | Estimated Street Value |
|---|---|---|---|---|---|---|
| | Activity | Type | Description | Quantity | Unit | Estimated Street Value |
| | Activity | Type | Description | Quantity | Unit | Estimated Street Value |

### NARRATIVE

On 9.10.98 at appox 0300 dispatch Boloed a 1990 Blue Honda Civic 4DR with a possible FL Tag TTY-64C. The Bolo was in ref to this vehicle being stolen from 2616 Middle River Dr. The Bolo also advised a possible Suspect as a white male with a name of Hugh Hodge and has the Keys to the vehicle. While on Routine Patrol, a short time later, I observed the above vehicle traveling southbound on NW M Ave in the 600 Blk. I then advised dispatch and requested they verify the FL Tag TTY-54C to make sure this was the vehicle. Dispatch confirmed the Tag and the vehicle as stolen At this point I requested backup. Upon backup arriving we attempted to perform a felony stop. The def made a right onto NW 15 CT and intentionally turned the vehicle into the chain link fence at 1513 NW 15 CT. The def then exited the vehicle, fled on foot in a northwesterly direction, and failed to obey our commands to stop. Note we were all in full police uniform and in marked police units. At this point I established a perimeter and had K-9 begin a track. The def was taken into custody at 1516 NW 15 PL. See Hallandale P.D. case# 98-30939 and K9-44 Ofc. T. Reed Lima 1198 Supplemental.

I then made contact with Jerome Singleton, landlord, 1513 NW 15 CT and he

| PROPERTY | ☐ NONE INVOLVED | ☐ STOLEN-LOST | ☒ EVIDENCE RECEIPT | ☐ TO BE FORWARDED |
|---|---|---|---|---|

OFFICER AFFIDAVIT: SWORN AND SUBSCRIBED BEFORE ME THIS _____ DAY OF _____ 19____

TITLE _____ PRINT NAME _____

SIGNATURE _____ CCN _____

AFFIDAVIT OF COMPLAINT: I hereby swear that the above described acts were committed without my permission against my will, as reported by me, by person or persons unknown/known to me as _____ and further that I DO _X_ DO NOT _____ desire to prosecute.

Sworn and subscribed by me this ___ do ___

day of ___ 09 ___ 19 _98_    Victims Signature _Jerome Singlet_

Victims Signature _____

FORM Z-496 Rev 12/91

| Original Date Reported | Case Title |
|---|---|
| 09 06 98 | Auto theft (Rec.) |

| Reported Day | Date | Time (mil) | Related Report Numbers |
|---|---|---|---|
| Sun | 09.06.98 | 0332 | 98 30 9 39 |

**OFFENSE CHANGED TO** ☒ N/A

Incident Type: 1. Felony  3. Misdemeanor  5. Ordinance  4. Traffic Misdemeanor  8. Other

| | Type | Title | A-Attempted C-Committed | Statute Violation Number | Municipal Ordinance |
|---|---|---|---|---|---|
| OFFENSE #1 | | | | I I -I I | I I -I I I |
| OFFENSE #2 | | | | I I -I I | I I -I I I |

Incident Location (Street, Apt. Number): 1513 NW 15 CT    City: Ft. Lauderdale    Zip:

advised he did not give anyone permission to damage his fence. He also stated it was against his will and he wishes to prosecute. Singleton signed the affidavit of complaint and advised the damage would cost between $1,200.00 - 1,500.00 dollars to repair. 16206 (Ofc. Shields 1308 and Ofc. Smith 1305) transported the def to BGH for treatment of injuries. Ofc. Reed advised that when the def was taken into custody a search revealed a 4" clear glass tube commonly used for smoking crack cocaine. The tube (pipe) valtox test positive for the presence of cocaine. The tube and pictures of the vandalism were placed into evidence.

After the subject was released from the hospital I read him his miranda rights and the def refused to talk to me. I contacted the victim Michael Viola. Mr. Viola advised the subject took his vehicle without consent, against his will, and he does wish to prosecute. I then performed a check on Teletype for any active capias and a DL check. No active capias and no valid DL on file with the State of Florida. The def was TOT to FLPD Jail and the vehicle was towed to Mac's

Ofc. G. Ferrt Lima 1329 took the original report for the stolen car and advised that the victim Michael Viola did sign the affidavit of complaint. I forwarded the report to Auto theft.

The def is charged with: 1. Auto theft FSS 812.04
2. Vandalism (Felony) FSS 806.13
3. Possession Cocaine FSS 893.13
4. Possession Drug Paraphernalia FSS 893.147
5. Resisting Arrest Without Violence FSS 843.02
6. No Drivers License FSS 322.03(1) Citation # 602553-7

| Report Contains | Related Report Number(s) |
|---|---|

| Officer(s) Reporting | I.D. Number(s) | Unit | Date |
|---|---|---|---|
| HART | 1328 | 1C202 | 9.06.98 |

Officer Reviewing (If Applicable): ___  I.D. Number: ___  Router To: ___  Returned To: ___  Assigned To: ___  By: ___  Date: ___

Case Status: ___

Clearance Type: 1. Arrest  2. Exceptional  3. Unfounded  A-Adult  J-Juvenile  Date Cleared: ___  Arrest Number: ___  Number Arrest: ___

Exception Type: 1. Extradition Declined  2. Arrest on Primary Offense Secondary Offenses Without Prosecution  3. Death of Offender  4. V/W Refused to Cooperate  5. Prosecution Declined  6. Juvenile/No Custody    OBTS Number: ___  Page: ___

FORM Z-248A   Rev 6/88

HODG 0000009

# FORT LAUDERDALE POLICE DEPARTMENT
## VEHICLE REPORT

O.R. # G 8 1 1 3 9 6 2 8
Related Report Numbers 9 8 3 0 9 3 9

**Original Date Reported:** 2 9 0 6 9 8  
**Case Reference:** Auto theft (Rec)

**CODES**

| Person Code | Status Code | Damage Code | Type | Recovery Location | Recovery Code |
|---|---|---|---|---|---|
| V-Victim  R-Recovered | 1. Stolen | 1. Impounded | 4. Stripped Theft | 1. Auto  6. Trailer | 1. Family Residence  5. Park/Playground | Status / Recovered |
| S-Suspect  Missing | 2. Recovered | 2. Abandoned | From | 2. Truck/Van  7. Boat | 2. Apt. Complex  6. Shopping Mall | 1. Local / Local |
| M-Missing  Z-Other | 3. Station | 3. Fell Return | 5. Other | 3. Motorcycle  8. Aircraft | 3. Housing Project  7. Woods | 2. Local / Other |
| A-Arrested | Recovered | 3. Seized | | 4. Camper/RV  9. Other | 4. Commercial/  8. Water | 3. Other / Local |
| E-Escapee | 4. Suspicious | 8. Other | | 5. Bus | Industrial  9. Other | |

| Pers. Code | # | Veh. # | Status | Damage | Type | Year | Make | Model | Style |
|---|---|---|---|---|---|---|---|---|---|
| V | 1 | 1 | 3 | 3 | 1 | 90 | Honda | Civic | 4DR |

| Tag. Reg./Dec. # | Reg. State | Reg. Year | Decal Number | Tag Type |
|---|---|---|---|---|
| TTV 84C | FL | 98 | 09605353 | |

**VIN/Hull/FAA:** 1 H B E D 4 6 6 0 L A 0 0 3 9 2 9   Estimated Value $

**Condition:** ☐ 1. Window Closed  ☑ Keys in ignition  ☐ 2. Locked  Insurance Company  Lien Holder

**Color (Top/Bottom):** Blue  
**Description (Identifying Characteristics, Noticeable Damage, Interior Color, etc.):** Front End Damage

| Vessel Name | Length | Hull Material | Propulsion | Boat Type |
|---|---|---|---|---|

| Recovery Address/Geographic Indicator | Date Recovered | Value Recovered $ |
|---|---|---|

| Recovery Loc. | Recovery Code | Original Reporting Agency | Report Number | Hold Y-Yes N-No | Reason/Authority |
|---|---|---|---|---|---|
| | | FLPD | Same | | |

**Method of Theft:** ☐ 6. N/A  ☐ 2. Tow Truck  ☐ 4. Steering Column  ☐ 6. Ignition Punch  ☐ 8. Unknown  ☐ 1. Keys  ☐ 3. Hot Wire

**Components Stripped:** ☐ 6. N/A  ☐ 1. VIN Plate  ☐ 2. Tires/Wheels  ☐ 3. Radio/CB  ☐ 4. Battery  ☐ 5. Interior  ☐ 6. Transmission  ☐ 7. Engine Parts  ☐ 8. Major Body Parts  ☐ 9. Tag/Decal Stolen  ☐ 10. Other - Specify

**Towed By:** Mac's  **Storage Location:** Mac's  **FCIC/NCIC** ☑ YES  ☐ NO

---

**ADM**

**Original Date Reported:**  **Case Reference:**

**CODES**

| Person Code | Status Code | Damage Code | Type | Recovery Location |
|---|---|---|---|---|
| V-Victim  R-Recovered | 4. Suspicious | 6. N/A | 8. Other | 1. Auto  6. Trailer | 1. Family Residence  5. Park/Playground |
| S-Suspect  Missing | | 1. Impounded | | 2. Truck/Van  7. Boat | 2. Apt. Complex  6. Shopping Mall |
| M-Missing  Z-Other | | 2. Abandoned | | 3. Motorcycle  8. Aircraft | 3. Housing Project  7. Woods |
| A-Arrested | | 3. Seized | | 4. Camper/RV  9. Other | 4. Commercial/  8. Water |
| E-Escapee | | 8. Other | | 5. Bus | Industrial  9. Other |
| | | 3. During Other Offense | | | |
| | | 2. Criminal Mischief | | | |

| Pers. Code | # | Veh. # | Status | Damage | Type | Year | Make | Model | Style |
|---|---|---|---|---|---|---|---|---|---|

| Tag. Reg./Dec. # | Reg. State | Reg. Year | Decal Number | Tag Type |
|---|---|---|---|---|

**VIN/Hull/FAA:**   Estimated Value $

**Condition:** ☐ 1. Window Closed  ☐ 3. Keys in ignition  ☐ 2. Locked  Insurance Company  Lien Holder

**Color (Top/Bottom):**  **Description (Identifying Characteristics, Noticeable Damage, Interior Color, etc.):**

| Vessel Name | Length | Hull Material | Propulsion | Boat Type |
|---|---|---|---|---|

| Recovery Address/Geographic Indicator | Date Recovered | Value Recovered $ |
|---|---|---|

| Original Reporting Agency | Report Number | Hold Y-Yes N-No | Reason/Authority |
|---|---|---|---|

**Towed By:**  **Storage Location:**  **FCIC/NCIC** ☐ YES  ☐ NO

---

**ADMINISTRATIVE**

| Officer(s) Reporting | ID. Number(s) | Unit | Date |
|---|---|---|---|
| Hart | 1328 | IC202 | 9.6.98 |

| Officer Reviewing (If Applicable) | ID. Number | Routed To | Referred To | Assigned To | By | Date |
|---|---|---|---|---|---|---|

HODG 0000010

| Field | Value |
|---|---|
| OFFENSE | Auto Theft (Recovered) (by Sun.) |
| DATE | 09-06-98 |
| N/MAKE/MODEL | 90 Honda Civic |

UNUSUAL ACCESSORIES

OTHER PROPERTY

EVIDENCE (ITEMS RETAINED BY POLICE)

GENERAL CONDITION OF VEHICLE: Poor

HOLD: ☐ DET DIV   ☐ VICE   ☐ PATROL   ☐ O.J.

RELEASE ON PROOF OF OWNERSHIP: YES

REGISTERED OWNER OF VEHICLE: Josephine Viola

KEY WITH VEHICLE: ☒ Y  ☐ N

NAME OF PERSON ARRESTED (IF ANY): Hugh Hodg

PERSON REPORTING EVENT: Dr. P. Haber

ADDRESS: 1308 W. Broward Blvd.

LOCATION: 1513 NW 15th Ct.

TIME OF OCCURRENCE

**VEHICLE**

| LIC | STATE | YEAR | COLOR(S) | VIN |
|---|---|---|---|---|
| TTY-28C | FL | R98 | Blue | 1HGED4660LA033839 |

TOWED BY: Macs   HOLD

OJ OR NBR

TOWED TO: Macs

REASON FOR TOW: Recovered Stolen Auto

OFFICE AUTH HOLD

REASON FOR HOLD

ADDRESS: 601 Pine Dr. #210 Pompano Bch, FL

NARRATIVE

999 W. Prospect Rd Ft. Lud. FL 33341

Large Bags of Clothing, Box of 4 White Jugs

| OFFICER MAKING INVENTORY | CCN | WITNESS | DATE & TIME | INVESTIGATOR | CCN |
|---|---|---|---|---|---|
| Dr. P. Haber | 1325 | | 09-06-98 | Dr. P. Haber | 1325 |

HOLD RELEASED BY

DATE & TIME

PHONE: 954-761-5700

OWNER REQUEST PVT TOW

TOW DRIVER: 109

VEHICLE CLAIMED BY: 1

ADDRESS

SIGN RELEASE OF RESPONSIBILITY

PHONE

DATE & TIME

FORM Z 1013 Rev 7 93 (10M)

| UNIT | ZONE | RA |
|---|---|---|
| 10202 | 208 | |

| TIME DISP | ARRIVE | CLR | FCIC CHECK |
|---|---|---|---|
| | | | ☒ Y  ☐ N |

98-151008

WHITE - Records.   CANARY - Towing Copy

HODG 0000011