```
 1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
 2                 DIVISION:  MIAMI

 3  HUGH HODGE,                  )
                                 )        ORIGINAL
 4           Plaintiff,          )
                                 )
 5    v.                         )   Case No.  00-6228 CIV-
                                 )             SEITZ/GARBER
 6  TIMOTHY M. CHURCH, THOMAS    )
    REED, PATRICK HART, DAVID    )
 7  WHEELER, CITY OF FORT        )
    LAUDERDALE, and CITY OF      )
 8  HALLANDALE,                  )
                                 )
 9           Defendants.         )
    _____x
10                                   888 South Andrews Avenue
                                     Suite 304
11                                   Fort Lauderdale, Florida
                                     Thursday, November 16, 2000
12                                   10:15 a.m.
    APPEARANCES:
13
            DANIELS & DANIELS, P.A.,
14          BY:  GORDON S. DANIELS, ESQ.,
            appearing on behalf of the Plaintiff.
15
            ADORNO & ZEDER, P.A.,
16          BY:  TAMATHA ALVAREZ, ESQ.,
            appearing on behalf of City/Ft. Laud.,
17          Reed, Hart and Wheeler.

18          CITY ATTORNEY - HALLANDALE BEACH,
            CARLA CODY, ESQ.,
19          appearing on behalf of City/Hallandale Bch.

20          ALSO PRESENT:  SERGEANT DAVID WHEELER.

21               - - - - - - - - - -

22
                    DEPOSITION
23
                        OF
24
              OFFICER THOMAS REED
25
```

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1                            I N D E X

2

3    WITNESS              DIRECT     CROSS      REDIRECT     RECROSS

4    OFF. THOMAS REED       3                     46
              (By Ms. Cody)        46
5             (BY Ms. Alvarez)     50

6

7                          E X H I B I T S

8

9    PLAINTIFF'S                           FOR IDENTIFICATION

10     No. 1  - K-9 Suplement by Officer Reed -     46

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Deposition of OFFICER THOMAS REED, a witness

 2  of lawful age, taken by the Plaintiff for the purpose of

 3  discovery and for use as evidence in the above-entitled

 4  cause, wherein HUGH HODGE is the Plaintiff and TIMOTHY M.

 5  CHURCH, etc. et al., are the Defendants, pending in the

 6  United States District Court, Southern District of

 7  Florida, pursuant to notice heretofore filed, before

 8  JACKQULYN G. HOLLAND, a Registered Professional Reporter

 9  and Notary Public in and for the State of Florida at

10  Large, at Capital Reporting Service, 888 South Andrews

11  Avenue, Suite 304, Fort Lauderdale, Broward County,

12  Florida, on the 16th day of November, 2000, commencing at

13  10:15 o'clock a.m.

14

15                    - - - - - - - - - - - - - -

16

17  Thereupon,

18                    OFFICER THOMAS REED

19  having been first duly sworn to tell the truth, the whole

20  truth, and nothing but the truth, testified as follows:

21                    DIRECT EXAMINATION

22  BY MR. DANIELS:

23       Q.    Please state your name for the record.

24       A.    Thomas K. Reed, R-e-e-d.

25       Q.    Okay.  And who are you employed by?
```

1         A.    The City of Fort Lauderdale Police
2 Department?

3         Q.    Are you assigned to any specific unit?

4         A.    The K-9 unit.

5         Q.    Okay.  And when did you start with the City
6 of Fort Lauderdale Police Department?

7         A.    October 29th, of 1990.

8         Q.    What did you start out as?

9         A.    A police officer.

10         Q.    Okay --

11         A.    Went to the academy.

12         Q.    Went to the?

13         A.    No, I went on the police academy as a road
14 patrolman for I think two years, two and a half years.

15         Q.    And then you joined the K-9 unit?

16         A.    Yes.

17         Q.    Around 1992 or 1993?

18         A.    Right around there; I'm not exactly sure.

19         Q.    That's fine.

20               Have you been with the K-9 unit since then?

21         A.    Yes.

22         Q.    Have you ever had your deposition taken
23 before?

24         A.    Yes.

25         Q.    Approximately how many times?

1         A.    Well.

2         Q.    Approximately.  More than ten times?

3         A.    Yes.  I have probably given maybe 75 to a

4  hundred depos.

5         Q.    Okay.  Anything in a civil matter, or just

6  all criminal matters?

7         A.    Just criminal, I believe.

8         Q.    What we are here today on is a civil matter

9  as opposed to a criminal matter.

10        A.    Right.  No, I don't remember giving any civil

11 depos.

12        Q.    Okay.

13              Now, to become a K-9 unit officer, what do

14 you have to go through?

15              You have to go through the academy,

16 obviously, to become a police officer.

17              Is there any kind of training to become a K-9

18 officer?

19        A.    First you put in for the selection process,

20 which is just a letter of intent.  Then they make a

21 determination based on the amount of people that put in

22 and the amount of positions available.

23              If you are selected, then you go to a K-9

24 school, which is between 1600 -- about 480 hours, about 16

25 weeks.

```
1          Q.    Who gives that school?

2          A.    Our city puts on a K-9 school.

3          Q.    Is there any additional training after that

4  ongoing?

5          A.    We do some sort of training every day; we do

6  formal training once a week on a Wednesday night.

7  Training is ongoing.

8          Q.    Is there any particular manual regarding K-9?

9          A.    There's a standard operating procedure.

10         Q.    Okay.  Is that located where?

11         A.    I'm sure the City has a copy.

12         Q.    I mean, what is it called?

13         A.    SOP.

14         Q.    SOP?

15         A.    Yes, K-9 SOP.

16         Q.    So if I wanted to get a copy of that, what

17 would I ask for, the K-9 SOPs?

18         A.    Correct.

19         Q.    Okay.

20               What kind of dog do you have?

21         A.    Currently I have a Belgian Merol (phonetic).

22         A.    Does it speak Belgian?

23         A.    Actually, it was trained in Holland, so it

24 has Dutch commands.

25         Q.    Dutch commands, okay.
```

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

```
 1                    In 1998, did you have the same dog?

 2        A.     No.  I had a German Shepherd.

 3        Q.     Okay.  What type of commands was it?  English

 4 commands?

 5        A.     Czechoslovakia.

 6        Q.     You want an English dog?

 7        A.     Most of my purchases are from overseas, so

 8 they come with some kind of training.

 9        Q.     How come they come from over there?

10        A.     Over there it is strictly a commodity; they

11 are strictly trained for police work.  And we sent a

12 vendor over there, and we purchase through our vendor.

13        Q.     Okay.  All right.

14               I understand on September 6, 1998 you were

15 training another officer at that time in the K-9 unit.

16        A.     Yes.

17        Q.     What was the name of that officer?

18        A.     Timothy Church.

19        Q.     Okay.  And was this the first time that you

20 were training him or you had trained him before this?

21        A.     He was currently attending the K-9 school.

22        Q.     Right.

23        A.     And part of the ending of the school is a

24 field training, where he goes out and works actual calls.

25        Q.     Right.  And was this the first day that you
```

1  had met him or you had met him before?

2          A.    I had been with him, with the group

3  throughout the whole school.

4          Q.    oh, I see.  Are you a training officer at

5  that school?

6          A.    I'm not a training officer, at that time, no;

7  I was just helping out.

8          Q.    Okay.  When did you become a training

9  officer?

10         A.    About two years ago, went through an FDLE

11 certification course.

12         Q.    Have you had any other position with the Fort

13 Lauderdale Police Department other than as a patrol

14 officer and as a K-9 unit officer?

15         A.    No, sir.

16         Q.    Okay.  Let me just go briefly into your

17 employment background and then I will come back to this.

18               Before you became an officer with Fort

19 Lauderdale, did you have any other jobs?

20         A.    Yes.

21         Q.    What jobs did you have before that?

22         A.    I was a stock boy and a receiving clerk at a

23 local drug store in New York.

24         Q.    Okay.  And from when to when?  Just the

25 years, basically.

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1        A.    I got hired probably at 16, 16 or almost 17.

2        Q.    Okay.

3        A.    And I worked there until I got hired at the

4  police department.  And I did other side jobs in between.

5        Q.    Okay.  How old were you when you were hired

6  by the police department?

7        A.    21, I think.

8        Q.    How about your educational background.  You

9  go to college?

10        A.    I am one class away from my Bachelor's in

11  criminal investigation.

12        Q.    Are you going to college now?

13        A.    Correct.  Most of my college was taken at

14  State University College at Buffalo; I'm currently taking

15  classes now to finish it, and transferring back.

16        Q.    Where are you taking classes now?

17        A.    Right now, I'm going to Florida Gulf Course

18  University.

19        Q.    Any other type of education or training other

20  than what we discussed?

21        A.    In what specific area?

22        Q.    I know you have told me you have had training

23  as a K-9 officer, you are currently undergoing weekly, you

24  are having training, and you also told me you became a

25  training officer with FDLE, and you are getting your

10

1  Bachelor degree.

2             Any other type of training?

3        A.    I'm a firearms instructor, and I have gone

4  through instructor technique with the FDLE also.

5        Q.    Instructor technique in firearms?

6        A.    Instructor technique is the general program

7  to teach you to be an instructor, and then you can branch

8  out in different categories.  Which is firearms

9  instructor, which is another 80-hour course, or 40 hours,

10 I think.  And then K-9 instructor, which is another 40

11 hours.

12       Q.    Okay.  Now go back to this training with

13 Officer Church.  You told me that you were part of this

14 school, he was going to school to become a K-9 officer.

15 And that school is given by Fort Lauderdale?

16       A.    Yes.

17       Q.    And you said that you were assigned to that

18 school?

19             How does that work?

20       A.    There's two head instructors.

21       Q.    Okay.

22       A.    And then I was assisting to help them because

23 I wanted to go further.

24       Q.    I see.

25       A.    And while handling calls for service on the

1  road.

2      Q.   I see.

3           What are the names of the head instructors at

4  that time?  Or what were their names?

5      A.   Phil Seguin.

6      Q.   How do you spell his last name?

7      A.   S-e-g-u-i-n.

8      Q.   And the other person?

9      A.   Kenneth Kelley, K-e-l-l-e-y.

10     Q.   Okay.  So they are the two head instructors,

11 and then you were assisting them.

12     A.   Correct.

13     Q.   And you were there the entire time that

14 Officer Church was training.

15     A.   Not the entire time.  I was also handling, if

16 a call came in, I would leave the school and go to handle

17 the call.

18     Q.   I see.  What were the hours of the school?

19     A.   They varied.

20     Q.   Okay.

21     A.   There's a set schedule they have, but it

22 varied.  The first portion of the school starts, you do a

23 lot of daylight stuff, and then we move into later in the

24 night.

25     Q.   I see.  Is there a school every day of the

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1 week, or how does that work?

2      A.    Primarily it was Tuesday through Saturday,

3 Sunday -- I'm sorry.  Wednesday through Saturday; Sunday,

4 Monday and Tuesday off.

5      Q.    All right.  Were there any other assistant

6 instructors other than yourself?

7      A.    I don't know if anybody else came out there

8 in that school; I don't recall.

9      Q.    How many people are training at that time?

10      A.    I don't know.

11      Q.    Approximately?  A lot, or just --

12      A.    No, I think there might have been maybe four

13 in that school, three or four.

14      Q.    I know that Officer Church was from the City

15 of Hallandale.

16      A.    Right.

17      Q.    Were there any other cities over there other

18 than Fort -- was Fort Lauderdale there?

19      A.    We had one Fort Lauderdale K-9 dog, their

20 K-9, there was an Aventura K-9 dog.

21           Wait a minute.  Yes.  Oh, no, there was.

22 North Miami Beach had a dog in there also.

23      Q.    All right.  Now this was the end of the

24 school, or the end of the training period on September 6,

25 1998, or approximately on that date.

```
 1                The end; right?

 2        A.     Right.

 3        Q.     Okay.  And as part of that training, they go

 4   out on field calls?

 5        A.     Correct.

 6        Q.     How does that work?  As far as going out on

 7   field calls?  Do you drive around, waiting for somebody to

 8   call you?  How does that work?

 9        A.     We do training in between service calls.

10               So if we are not receiving any calls to

11   assist other officers, then we are out running training

12   calls or training problems or scenarios.

13        Q.     I see.  What do you do?  Go to a field and

14   practice it?  Or is there a specific location?  How does

15   that work?

16        A.     No.  We make calls up and we go from there.

17        Q.     I see.  Okay.  And then if you get a call,

18   then you go and respond to that call if they need you?

19        A.     Correct.

20        Q.     Okay.  This is yours; right?

21               If you need to refer to your -- is it called

22   a K-9 supplement?

23        A.     Yes, sir.

24        Q.     Now I see over here it says this incident

25   happened on September 6, 1998.  And on the right-hand side
```

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

14

```
 1  it says, 4:00 o'clock in the morning.

 2              Is that when the incident happened or when

 3  you wrote that report up?

 4       A.    Probably when I'm writing the report.

 5       Q.    Do you know what time this incident happened?

 6       A.    I can refer to the initiating officer's

 7  report.

 8       Q.    Okay.

 9       A.    The actual theft took place at 2:25.  And

10  then the location of the car started at 3:32.

11       Q.    That's when the police officers located the

12  car and started following it?

13       A.    That's what his report is; I don't know, I

14  wasn't there.

15       Q.    That's what it says.

16       A.    Correct.

17       Q.    Okay.  Tell me what happened.

18              When did you first become involved?  Where

19  were you?

20       A.    I don't know exactly where I was.

21       Q.    Okay.

22       A.    They requested a K-9 to 1513 Northwest 15th

23  Court.

24       Q.    Okay.  And at this time, you were with

25  Officer Church?
```

15

```
 1          A.    Yes.

 2          Q.    And he had his dog with him.  Which I

 3 understand speaks Dutch.

 4          A.    Correct.

 5          Q.    Okay.  And its name is Geiro?

 6          A.    Gero.

 7          Q.    Gero, G-e-r-o?

 8          A.    G-e-r-o.

 9          Q.    Did you know the commands of that dog at that

10 time?  Did you know how to command that dog?

11          A.    I knew him, yes, but would the dog listen to

12 me, I don't know.

13          Q.    You knew him because you were training with

14 him?

15          A.    Correct.

16          Q.    Okay.  When you are training with Officer

17 Church, are you commanding the dog yourself?  Are you

18 telling the dog what to do?

19          A.    No.

20          Q.    No.  You are just letting him do it?

21          A.    We evaluate what he does and we instruct him

22 how to do it either properly or what might help better, or

23 we monitor what the dog is doing as far as his progress.

24          Q.    You don't say, look, this is the way we do

25 it, let me show you, and take his dog and try to go
```

1 through it with his dog?

2        A.    No.

3        Q.    No.  Okay.

4              All right.  So did you ever have occasion to

5 control his dog in any way?  In other words, tell commands

6 to his dog and his dog would follow your commands?

7        A.    I don't recall.  The dog might and it might

8 not.  I mean, he's pretty much been trained by that

9 officer, so he's going to respond to him.  I mean, I might

10 tell him to sit and he might sit.

11        Q.    Okay.

12        A.    It is pretty much up to the dog at that

13 point.

14        Q.    All right.  So you knew the words that were

15 needed to command the dog but you never really took any

16 action commanding the dog yourself.

17              MS. ALVAREZ:  Object --

18 BY MR. DANIELS:

19        Q.    That you can remember.

20              MS. ALVAREZ:  Object to form.

21              MR. DANIELS:  Okay.

22              MS. ALVAREZ:  You can answer.

23 BY MR. DANIELS:

24        Q.    You can answer if you understand my question,

25 if it makes sense to you.

1        A.    I didn't understand the question.

2        Q.    Okay.  Am I correct in saying that you

3 understood how to command that dog, you understood the

4 words that were needed to command the dog?

5        A.    Correct.

6        Q.    Okay.  But what you are telling me is that

7 you never yourself ever commanded that dog that you can

8 remember.

9        A.    Correct.

10        Q.    Okay.

11              At the time of this incident you did not have

12 your dog with you?

13        A.    Correct.

14        Q.    Your purpose was to train him with his dog?

15        A.    Correct.

16        Q.    Okay.  So now you get a call to respond to

17 1513 Northwest 15th Court regarding a bail-out of a stolen

18 vehicle, which somebody left a stolen vehicle.

19              Tell me what happened after that.

20        A.    We respond there and I met with the

21 initiating officer, along with Officer Church.

22        Q.    The initiating officer, is that Officer Hart?

23        A.    Yes.

24        Q.    Okay.

25        A.    He shows us, tells us what happened briefly.

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

18

1  They tried to stop the car, that it was an auto theft car,

2  he tried to stop it; he crashed in the fence, and the

3  culprit fled.

4       Q.     Right.

5       A.     He had set up a perimeter.  The perimeter is

6  already established, which is just a box around the area

7  keeping people from coming in and people from leaving.

8  All the overheads are eliminated and he directs us to the

9  last location that he had seen the culprit flee.

10      Q.     When you say the overheads are eliminated,

11 what do you mean by that?

12      A.     The red and blue spinners.

13      Q.     On the vehicles, you are talking about?

14      A.     Yes, the police cars.  The spinning lights

15 are gone and the flashing red and blues are gone.

16      Q.     Okay.  Then you and Officer Church go out to

17 find this person?

18      A.     Correct.

19      Q.     Was there anyone else that went with you, or

20 just you and Officer Church?

21      A.     And his K-9 partner.

22      Q.     Okay.

23      A.     That's it.

24      Q.     All right.  Now I understand from Officer

25 Church they pick up the freshest scent.

1     A.    They pick up the freshest scent.   That's how

2 they are trained.   That's why we set up a perimeter and

3 the initiating officer doesn't let anybody go in where he

4 has seen the culprit go.

5     Q.    Tell me what happened after that.

6     A.    Officer Hart directed us to where he had last

7 seen Mr. Hodge run.   Officer Church got K-9 Gero, deployed

8 him in that location, and he started to track.

9     Q.    Okay.  And did you stay with Officer Church

10 at that time or did you stay with him throughout the time?

11     A.    I walked with him through the whole search.

12     Q.    Okay.  So tell me what happened after that.

13     A.    We followed the search through the front yard

14 of where the car actually had crashed, then through the

15 back yard and through the back yard of the next residence,

16 into the front yard and then westerly along the front face

17 of the next resident, which is 1516 15 Place.

18          The dog starts giving what is an alert, which

19 is just an increase in his excitement or behavior.

20     Q.    Does it bark or --

21     A.    No.  It is a physical, like the dog gets

22 excited like when you have a cat you are about to feed

23 them, they get excited.  His body shows signs he is

24 getting excited.

25          Through the whole search Officer Church is

20

```
 1  using his flashlight.  As the dog starts to show alert, he

 2  illuminates along the front face and the north side of the

 3  house.  Mr. Hodge is hiding in the bushes between the

 4  house and a shrub.

 5          Q.    Okay.

 6                Now, this is a residential area; right?

 7          A.    Yes.

 8          Q.    Did you notice any civilians at all in that

 9  area?

10          A.    There were no civilians out.

11          Q.    Okay.  Now, Mr. Church had a flashlight.  Did

12  you have a flashlight also?

13          A.    Yes.

14          Q.    Was it also illuminated?

15          A.    No.

16          Q.    Okay.

17                How come you didn't have yours illuminated?

18          A.    I'm walking behind Officer Church and if my

19  flashlight is illuminated, it would almost like paint a

20  bull's eye on him if the culprit -- it will make a big

21  shadow if the culprit is armed, it creates a target for

22  him to shoot at.

23          Q.    Okay.

24                I understand Officer Church had a flashlight

25  he said about a foot long.
```

1          Is that about right?

2          A.    Approximately.  It is a Stream Light SLR 20

3    flashlight.  I don't know the exact dimensions.

4          Q.    You have the same type of flashlight?

5          A.    I have the same type of flashlight.

6          Q.    You keep that on your belt?  Where do you

7    keep that?

8          A.    Some people have a loop that they put them

9    in; I just keep it in the front of my gun belt, just wedge

10   it between my belt and my stomach.

11         Q.    Do you have anything else, like a baton or

12   anything like that?

13         A.    No.

14         Q.    When Officer Church illuminates the

15   flashlight on Mr. Hodge, where were you at that time?

16         A.    Behind him, probably less than two feet, and

17   off to his right-hand side.

18         Q.    What happened after that?

19         A.    He identified him as the same culprit we were

20   looking for, still in the white T shirt and blue shorts.

21   He gave two warnings, identifying announcement, identified

22   himself as Hallandale K-9 officer, advised your client

23   that he was under arrest and to come out.

24         Q.    Okay.

25         A.    He waited a couple of seconds.  He didn't get

1  any response.  He didn't move or he didn't make any verbal

2  response.

3            He then identified himself again and told him

4  if he didn't come out he was going to send the dog in.

5       Q.   Okay.  And, again, did Mr. Hodge do anything?

6       A.   No.

7       Q.   So what happened after that?

8       A.   He commanded his dog take Mr. Hodge into

9  custody.

10           The dog did as he was trained to do, went in

11 and contacted him in the right arm.

12       Q.   Okay.  How far away was Officer Church from

13 Mr. Hodge at that time?

14       A.   I guess, or estimate around six feet.

15       Q.   Okay.  Would there have been any problem with

16 Mr. Hodge hearing what Officer Church was saying?

17       A.   No.

18           MS. ALVAREZ:  Object to form.

19 BY MR. DANIELS:

20       Q.   Okay.

21       A.   No.

22       Q.   So the dog went in.

23           Now, is this dog on a leash at that time?

24       A.   Yes.

25       Q.   Okay.  And I understand, what, there is a

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1  chain collar around the dog?

2        A.    Correct.

3        Q.    Officer Church lets the leash go, and this

4  gives more slack for the dog to go --

5        A.    He is not attached to the collar at this

6  point; he is attached to the harness that the dog wears.

7        Q.    A harness?

8        A.    The dog is wearing a choke chain, a chain

9  that you described.  But he is attached to the harness

10  which goes across his chest, and there is a buckle around

11  his chest and along the spine that he is attached to.

12        Q.    I see.  Okay.

13              So he let's go of the slack on the leash.

14  Then he gives the command in Dutch to the dog to apprehend

15  Mr. Hodge.

16        A.    Right.

17        Q.    And what happened?

18        A.    The dog went in and did as he was commanded

19  and contacted him in like the right arm area.

20        Q.    Okay.  Did you see this, by the way?

21        A.    Yes.

22        Q.    You were able to see this.

23        A.    Yes.

24        Q.    Okay.  And what happened?

25        A.    As soon as the dog made contact, Mr. Hodge

1  became very violent, he started fighting with the dog, and

2  he tried to go away from us.

3         As soon as the dog went in, the dog made

4  contact.  First Officer Church started telling your client

5  to put his hand behind his back so that he could be

6  handcuffed.

7         Q.    Let me ask you.  Mr. Hodge, at that time, how

8  is he positioned?  Was he laying on the ground?  Was he

9  standing?  Was he crouching?

10        A.    Kind of crouching like almost in a catcher's

11 position and facing, I guess it would be like

12 northwesterly.  So he is kind of in like a catcher's

13 position.

14        Q.    He is on two feet bending down with his

15 knees?

16        A.    Right.  Almost like sitting on his ankles but

17 his feet are still flat.

18        Q.    Is he facing you; away from you?

19        A.    He is facing kind of away from us, in like a

20 45-degree angle away from us.

21        Q.    Okay.  And the dog grabs his right arm.

22              Am I correct?

23        A.    Yes.

24        Q.    The idea is to pull Mr. Hodge towards you?

25        A.    Well, once the dog makes contact, he will

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1 hold on.  And then he will, either the dog is going to

2 pull him out or Mr. Hodge is going to come out, follows

3 instructions.  And then he is going to be handcuffed.

4      Q.      Okay.  During that time period, Mr. Hodge was

5 fighting with the dog, you said?

6      A.      Correct.

7      Q.      What was he actually doing?  Was he hitting

8 the dog?

9      A.      He started striking him with his other arm,

10 and he was trying to pull away, pull his arm free from the

11 dog's mouth.

12      Q.      Was he saying anything at that time?

13      A.      No.  I don't recall if he said anything.

14      Q.      During that time, Officer Church was saying

15 what?

16      A.      To tell him to stop fighting with the dog and

17 to place his hands behind his back.

18      Q.      What happened after that?

19      A.      Mr. Hodge wasn't complying with anything that

20 Officer Church was saying.  I then started yelling the

21 same thing to him, maybe not the exact same words, quit

22 fighting the dog, put your hands behind your back.

23          Both of us were pretty much yelling at the

24 same time.  Then as the struggle got more combative,

25 Officer Church moved in and he, you know, he struck Mr.

1  Hodge I believe twice.

2      Q.    Okay.  All right.  Let me ask you this.  Did

3  Mr. Hodge pull the dog off his arm at any point?  If you

4  remember?

5      A.    I don't know if he pulled the dog off his arm

6  or he pulled free of the dog.

7      Q.    He got free?

8      A.    Correct.

9      Q.    So Mr. Hodge, somehow he was fighting the

10 dog --

11     A.    Correct.

12     Q.    -- and either he pulled his arm away from the

13 dog or pulled the dog off him or a combination of both,

14 and his arm got free of the dog at one point?

15     A.    Right.

16     Q.    And during that time period, Officer Church

17 is telling him to stop resisting?

18     A.    Correct.

19     Q.    And you are telling him to stop resisting.

20     A.    Correct.

21     Q.    Correct?

22          And what happened after that, after Mr. Hodge

23 freed himself from the dog?

24     A.    The way he was sitting, once the force was

25 released from the dog, he kind of moved, which would be

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1  away from us; the dog's feet hit the ground and he

2  recontacted him in the buttock.

3          Q.    Okay.  And how was Mr. Hodge, at that point?

4  What was his position?

5                Was he on the ground, was he still crouching,

6  was he on all fours?

7          A.    He was more, he was leaning away, I don't

8  know if he had completely made it to the ground.

9          Q.    Okay.

10         A.    I guess when the two parties were pulling,

11 the dog pulling one way, he the other, when the force was

12 released, he fell this way, and the dog, as soon as his

13 feet hit the ground, he went in --

14         Q.    So he fell forward, Mr. Hodge?

15         A.    Kind of.  Which would be his left-hand, like

16 off to his forward left.

17         Q.    Okay.

18         A.    That would be the easiest way to describe it.

19         Q.    All right.  And then the dog reconnected with

20 his buttock?

21         A.    Correct.

22         Q.    Okay.  And what happened after that?

23         A.    The dog contacted him on the buttocks, and

24 Mr. Hodge was still trying to get away and go away from

25 us.  Now his arms are free so he is kind of using them

1 like to pull away.  He even reached back a couple of times

2 to strike the dog.

3            We are still yelling to him to quit fighting

4 with the dog.  The dog is holding on to his pants and his

5 buttocks, but the material or just the struggle was

6 causing the dog to continue to try to hold on, but he is

7 not able to keep constant control.  So he is trying to

8 hold on and try to hold on.

9        Q.    What was Mr. Hodge wearing at that time?

10       A.    I believe he had blue jean shorts on.

11       Q.    Okay.  All right.  So what happened after

12 that?

13            Now, the dog, you are saying that the dog was

14 unable to maintain a grip?

15       A.    Correct.

16       Q.    Okay.

17       A.    The dogs are trained to bite and hold.  Once

18 they make contact, there is no struggle, they will hold on

19 and that will be it.

20       Q.    Okay.  So he bit him in the buttocks the

21 first time.  What happened after that?

22       A.    He is still struggling to try to get away.

23 And as he is pulling away, the dog is literally like

24 sliding down the pant, meaning the pants are resisting to

25 the dog's teeth actually, I would say that.

29

1          Then not only is finally the pants are

2  ripping, because the dog is trying to hold on and there is

3  just the force, something has to give.

4          Q.    Okay.

5          So the dog is grabbing on to the pants?

6          A.    And the buttocks, yes.

7          Q.    And the buttocks.  And the pant goes -- are

8  the pants getting off Mr. Hodge at that time, coming down?

9          A.    I don't know if they are -- the waistline is

10 coming down.  You know, the waistline.  You know what I

11 mean.  Somebody is pulling at the seat of your pants.

12         Q.    Okay.  And you are saying also the pants are

13 ripping?

14         A.    Yes.

15         Q.    Is the dog letting go, re-biting?

16         A.    No.  He is holding on constantly.  They are

17 trained to maintain steady contact.  So as soon as he

18 feels the lessening pressure, the dog will continue to

19 drive in.

20         When he pulled away and the dog drives in,

21 once he gets that distance, the dog --

22         Q.    As soon as the pressure decreases a little,

23 he will grab on a little tighter.

24         A.    Right.  To try to get back to the grip that

25 he was initially on.

1       Q.    And what happened after that?

2       A.    After, I don't know the exact timeframe,

3  finally he starts listening, either Mr. Hodge finally

4  realizes he can't get away or he's just tired of fighting.

5  And then I move in and handcuff him.

6       Q.    Okay.  Now, at one point you said that

7  Officer Church struck Mr. Hodge.

8       A.    Yes.

9       Q.    When was that?

10       A.    During the struggle.

11       Q.    Sometime during the struggle?

12             Was that between the time that the dog was

13  letting go of his arm and the time that the dog connected

14  with his buttocks?  Or you are not sure of the time?

15       A.    I'm not exactly sure of the time.  I would

16  say it was when the dog, I believe it was when it was on

17  his buttocks.

18       Q.    Okay.

19       A.    There's no time between the time of the arms

20  and the buttocks.  You know what I'm saying.  It is like

21  spontaneous.

22       Q.    Spontaneous.  In other words, he pushed the

23  dog away from his arm or somehow the dog disconnected from

24  his arm --

25       A.    Right.

1     Q.    -- and you say immediately the dog --

2     A.    As soon as his feet hit the ground, he went

3 back in and contacted him in the buttocks.

4     Q.    Okay.  And what did Officer Church hit Mr.

5 Hodge with?

6     A.    I believe it was his flashlight.

7     Q.    Is that the only thing that he used?

8     A.    Yes.

9     A.    Did he kick him at all?

10     A.    No.

11     Q.    Did he punch him at all?

12     A.    I don't recall.

13     Q.    His flashlight.

14     Do you know where he hit him and how many

15 times?

16     A.    I believe it was two, and it was up on the

17 top portion of his body, toward his back.

18     Q.    Okay.  And did you strike Mr. Hodge at any

19 time during that time period?

20     A.    I don't recall striking him.

21     Q.    What happened after that?

22     A.    I said earlier, either Mr. Hodge ran out of,

23 you know, ran out of energy or he finally decided to

24 comply with our instructions.  I moved in, and I still had

25 to pull his arms behind his back to handcuff him.  They

1 were still at his side.

2      Q.    Is the dog still connected to Mr. Hodge at

3 that time?

4      A.    Yes, in his buttocks.

5      Q.    So Mr. Hodge is on the ground at that time?

6      A.    The upper portion of his body is still a

7 little bit in the bushes.  And he is kind of a little bit

8 closer than he was earlier.  You know what I mean.

9      Q.    Okay.

10      A.    And I just moved in, between the house and

11 the bush area, and handcuffed him.

12      Q.    Okay.  Did Mr. Hodge say anything to anybody

13 during that time period?

14           From the time that you first made contact

15 with Mr. Hodge until the time he was handcuffed, did Mr.

16 Hodge say anything to you or to anybody?

17      A.    I don't recall him saying anything.

18      Q.    Okay.  And during that time period from the

19 time that you first located Mr. Hodge until you handcuffed

20 him, did you notice any civilians in the area at all?

21      A.    No.  There were no civilians when we

22 approached him.  And then I couldn't tell you once the

23 fight was on; there was no way I could -- I mean, I was

24 focused on Mr. Hodge.

25      Q.    Okay, so now after Mr. Hodge was handcuffed,

33

1  then what happened.   Did Officer Church order Geiro to --

2  am I pronouncing that right?

3       A.    Gero.

4       Q.    Gero.

5             Did he order him to let go of Mr. Hodge?

6       A.    We don't --

7       Q.    Oh.

8       A.    He physically removes the dog from Mr. Hodge.

9       Q.    He pulls him on his collar.   Is that how it

10 works?

11      A.    He brings the choke collar up underneath his

12 harness and just pushes upper pressure and reaches around

13 it and like pinches the larynx area, which limits the

14 dog's air intake, which causes him to open his mouth and

15 release.

16      Q.    All right.   What happened after that?

17      A.    The dog released.   Officer Church stepped

18 back.

19            I patted Mr. Hodge down, and I requested the

20 closest perimeter unit to come up to the front of the

21 residence.   And we secured him in the back of the car,

22 took him to Broward General.

23      Q.    All right.   Now, when you patted him down,

24 what did you find on him?

25      A.    I ended up finding a crack cocaine pipe.

34

```
 1          Q.    All right.  Anything else?

 2          A.    No.

 3          Q.    All right.  And then did Mr. Hodge get up?

 4                In other words, was he standing at that

 5  point?

 6          A.    No.  He did stand up and I helped him stand

 7  up, and he was handcuffed.  It might be a little

 8  difficult; I helped him to his feet and walked him to the

 9  roadway and secured him in a car.  And they took him to

10  Broward General.

11          Q.    So some other officers came up from the

12  perimeter?

13          A.    Yes.  I requested them to come up.

14          Q.    Do you remember the names of those officers?

15          A.    I believe it was Timothy Shields and I think

16  Jay Smith; they were a two-man car then.

17          Q.    And they took Mr. Hodge from you?

18          A.    Well, I put him in the back of the car.

19          Q.    You put him in the back of the car and then

20  they drove Mr. Hodge over to the hospital, which is

21  Broward General Medical Center.

22          A.    Yes.

23          Q.    And then you went back to the vehicle where

24  Officer Church was?

25          A.    Right.  Well, I called Sergeant Wheeler at
```

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1  home, notified him --

2        Q.    Okay.

3        A.    -- of the K-9 usage.

4        Q.    Okay.

5        A.    I woke him up.  He started to come out.

6              And then we went back to my car, which is

7  parked a block away where the initial track started, and

8  we waited for the sarge to show up.

9        Q.    Okay.  And what happened after that?

10       A.    The sergeant talks to us.  I brief him on the

11 incident, walk him through the search, and he takes

12 pictures of the apprehension scene, the vehicle crash

13 area, and walk him through the track.

14       Q.    Okay.  And then what happened?

15       A.    We call 10-8, in-service, handle any other

16 calls; didn't have any other calls; went back doing

17 training series.

18       Q.    Okay.  I understand that Officer Wheeler, he

19 went over to Broward General Medical Center after that.

20             Are you aware of that?

21       A.    Sergeant Wheeler, yes.

22       Q.    Sergeant Wheeler.  I'm sorry.

23             Did you also go to Broward General Medical

24 Center?

25       A.    No.

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

```
 1          Q.    No?

 2          A.    (Shakes head in the negative.)

 3          Q.    I'm sorry.  You have to answer verbally; she

 4 can't down the shake.

 5          A.    No.

 6          Q.    Okay.

 7                At any point did you go to Broward General

 8 Medical Center to meet with Sergeant Wheeler?

 9          A.    No.

10          Q.    Do you know whether Officer Church went to

11 Broward General Medical Center?

12          A.    I don't know.

13          Q.    Okay.  Now you say that after Sergeant

14 Wheeler came to the scene, okay, and then you went over

15 with him what happened, and then he took photographs of

16 the scene, and then Sergeant Wheeler left, and then you

17 went back in-service.

18                What does that mean?

19          A.    Went back to handle any calls that might come

20 out.  We call it in-service or for additional work,

21 anything that might happen from that point on.

22          Q.    Okay.  Was Officer Church with you at that

23 time?

24          A.    I believe he was for a little bit.  I don't

25 know what time he went home that night; and I stayed out
```

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1  and worked the rest of my shift.

2          Q.    Okay.  So immediately you and Officer Church

3  went out in-service.  And did you handle any other calls

4  that night?

5          A.    I don't know.

6          Q.    That you remember.

7          A.    I don't recall if we did or if we didn't.

8          Q.    So you and Officer Church are leaving to go

9  in-service.  And do you know how long or for what period

10 of time you and Officer Church were together?

11         A.    No.

12         Q.    Was it more than an hour?

13         A.    I have no idea.

14             MS. ALVAREZ:  From when are you talking

15         about?  From leaving?

16             MR. DANIELS:  No, I'm talking about from the

17         time they went back into service after they left

18         the scene.

19             MS. ALVAREZ:  Okay.

20 BY MR. DANIELS:

21         Q.    Do you remember?

22         A.    I have no idea.

23         Q.    The reason why I'm asking you this is that

24 when we took the deposition of Officer Church, he told us

25 that when Sergeant Wheeler went to Broward General Medical

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

38

1  Center, that thereafter you and he went over to Broward

2  General Medical Center, met with Officer Wheeler.

3          I'm just trying to figure this out.

4          MS. ALVAREZ:  Objection to form.

5          MR. DANIELS:  Let her make an objection.

6      That's fine.

7          MS. ALVAREZ:  Okay.

8          MR. DANIELS:  That's fine.  I'm just trying

9          to find out what happened.  Trying to see if this

10         may refresh his memory; maybe he doesn't

11         remember --

12         THE WITNESS:  I don't remember going to

13         Broward General at all.

14 BY MR. DANIELS:

15     Q.    Okay.

16     A.    It is not a practice for us to go there.  So

17 I don't remember going.

18     Q.    I'm not trying to trick you; I'm just --

19     A.    I don't remember being there.  I don't

20 remember, so I don't think I did.  I don't know.  I would

21 say no, I didn't go.

22     Q.    All right.

23         Did you ever come in contact with Mr. Hodge

24 after you had handcuffed him and placed him in the police

25 vehicle and he left the scene?

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1          Did you ever come in contact with Mr. Hodge

2     again in any way?

3          A.    No.

4               Well, I think I was there when they got his

5     name real quick I think at the scene.

6          Q.    At the scene?

7          A.    At the scene.

8               I think he gave his name because we asked him

9     what -- I think his name was tattooed on his hand or

10    something.  Something like, what is like Hodge, I think it

11    was written, like each letter was on a finger or

12    something.  And we said what is Hodge.  He said, my name,

13    Tim Hodge or something.

14         Q.    Right.  Okay.  Yeah.

15              Did he make any other comment to you?  Or did

16    you have any other conversation with him?

17         A.    No.  Not that I remember.  I mean, we could

18    have said something passive; I don't recall.

19         Q.    Okay.

20              Other than you getting his name at the scene,

21    okay, and I'm talking about now he is at the scene, did

22    you physically walk him from where you handcuffed him to

23    the police car?

24         A.    Yes.

25         Q.    Okay.  Were there any other officers that

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1 walked with him at that time, or just you?

2          A.    Just me.

3          Q.    Okay.  And when you got to the police car,

4 this was the police car of Timonthy Shields and Officer

5 Jay Smith?

6          A.    Yes.

7          Q.    And they were there.  You put Mr. Hodge in

8 the back of the vehicle --

9          A.    Right.

10          Q.    -- I assume.  And then these other officers,

11 Officer Shields and Officer Smith then drove Mr. Hodge

12 away?

13          A.    Yes.

14          Q.    Were there any other officers involved at

15 that time?

16          A.    Not that I recall, no.

17          Q.    All right.  Okay.  And then after Mr. Hodge

18 left the scene with Officer Shields and Officer Smith, did

19 you ever come in contact with Mr. Hodge again in any way?

20          A.    No.

21          Q.    Okay.  I'm just trying to find out --

22          A.    No, I'm trying to think.

23          Q.    Right.

24          A.    I don't remember talking to him at all.

25          Q.    Did you have anything else to do with this

41

1  matter, other than preparing this report, this K-9

2  supplemental report?

3      A.   No.

4      Q.   Okay.  Did you prepare this at the scene?  Or

5  where do you prepare this?

6      A.   I probably wrote this either at home or on

7  the laptop -- no, I don't think we had laptop at this

8  time.  Probably at home on my computer.

9      Q.   Okay.  And I see it was done, you say it was

10 done at 4:00 o'clock in the morning?

11     A.   That's probably the time that he was -- when

12 I asked for the numbers.  That is probably not the time it

13 was written.

14     Q.   Oh, this is the time when you asked for

15 the --

16     A.   For the information.

17     Q.   What numbers are you talking about?

18     A.   The case number.

19     Q.   The case number?

20     A.   Yes.

21     Q.   I see.  You call up, you get the case number?

22     A.   Yes.

23     Q.   So this is the time.  So this is after Mr.

24 Hodge has been arrested, everything is done?

25     A.   And we are clearing the scene.

42

1      Q.    You are clearing the scene.  You then call up

2  and get a case number?

3      A.    Well, I ask for a case number.

4      Q.    They give it to you.  And this is the time

5  that you would have asked for it, approximately?

6      A.    Approximately, yes.

7      Q.    From the time that you were called to come to

8  the scene until the time that Mr. Hodge left with Officer

9  Shields and Officer Smith, okay, till that time, did you

10 notice any civilian in the area?  You yourself?

11     A.    I did not notice anybody, no.

12     Q.    Okay.  Did any civilian ever come up to you

13 and Officer Church at any time?

14     A.    No.

15     Q.    Other than Officer Shields and Officer Smith,

16 who drove Mr. Hodge away, and Officer Hart, who you

17 initially went to when you came to the scene, he is the

18 one that gave you the information regarding where Mr.

19 Hodge had run to, or the direction that he ran, were there

20 any other officers that you came in contact with, other

21 than also Sergeant Wheeler?

22     A.    During the search or after --

23     Q.    I'm talking about at the scene.

24     A.    Once I cleared the perimeter, other officers

25 I know pulled up to see if Officer Hart needs any

1 assistance.  But that's when we went back to my car.  They

2 weren't doing any police function other than the call was

3 over and kind of just asking to help.

4        Q.    That's when you came back to your car after

5 Mr. Hodge was taken away?

6        A.    Right.

7        Q.    Okay.  I'm talking before Mr. Hodge was taken

8 away.

9              Did you come into contact with any other

10 police officers other than Officer Hart, Officer Shields,

11 Officer Smith, before Mr. Hodge was taken away?

12        A.    No.

13        Q.    Did Officer Church ever pull his gun for any

14 reason, take his gun out of his holster for any reason?

15        A.    No, he wouldn't have a free hand to do so.

16        Q.    Did you ever take your gun out of your

17 holster for any reason?

18              MS. ALVAREZ:  What timeframe?

19              MR. DANIELS:  Good.

20 BY MR. DANIELS:

21        Q.    From the time you were initially called to

22 the scene until Mr. Hodge left the scene, did you take

23 your gun out of the holster for any reason?

24        A.    No.

25        Q.    And did Officer Church take his gun out of

1  the holster for any reason?

2       A.    No.

3       Q.    From the time that you came to the scene

4  until the time that Mr. Hodge left, did you ever hit Mr.

5  Hodge at all?

6       A.    I don't recall striking him at all.

7       Q.    Okay.  And when I say, and you said striking,

8  when I say strike, I mean with your hands, your feet or

9  any part of your body.

10      A.    I don't recall hitting, my hands, feet,

11 anything.

12      Q.    Was Mr. Hodge bleeding at all from any part

13 of his body?

14      A.    Yes.

15      Q.    Where was he bleeding from?

16      A.    From the arm and the buttock.

17      Q.    Did you have to pull up his pants at all?

18 Were the shorts pulled down at all, exposing his buttock,

19 do you know?

20      A.    I believe they were drooped but not

21 completely down.  I mean, they weren't around his ankles.

22      Q.    Right.

23      A.    I think he was having -- if I remember

24 correctly, maybe they were down low enough so that he was

25 having trouble walking to the car.  So I remember kind of

CAPITAL REPORTING SERVICE INC. FORT LAUDERDALE (954) 522-6401

1  (indicating), like pulling them up for him.

2        Q.    Were they ripped?

3        A.    I believe so, yes.

4        Q.    Other than this supplemental report, have you

5  prepared any other report regarding it?

6              MS. ALVAREZ:  Object to form.  Asked and

7          answered.

8              You can answer.

9  BY MR. DANIELS:

10        Q.    You can answer.  It is only an objection.

11        A.    No, that's it.

12        Q.    Okay.  Is that your signature on the

13  supplemental report?

14        A.    That's my name printed; the signature is the

15  sergeant's.

16        Q.    Oh, I see.  Okay.

17              Is this your printing of your name?

18        A.    Yes, I'm T. K. Reed, Thomas K. Reed.

19        Q.    You print your name?

20        A.    Yes.

21        Q.    Okay.

22              MR. DANIELS:  I would just make this an

23          exhibit.

24              Can you think of there's anything else?

25              I'm done.

1              (Whereupon, said document was marked as

2         Plaintiff's Exhibit No. 1 for identification.)

3              MS. CODY:  I have a quick question, actually.

4              MR. DANIELS:  Go ahead.

5                   CROSS EXAMINATION

6  BY MS. CODY:

7         Q.    I just want to know based on what you

8  observed with all of the officers involved in the case, do

9  you think anyone acted improper?

10             MS. ALVAREZ:  Object to form.

11             MR. DANIELS:  I would object to form also.

12 BY MS. CODY:

13        Q.    Do you think anyone did anything wrong?

14             MR. DANIELS:  Object to form.

15             MS. ALVAREZ:  Same objection.

16             MR. DANIELS:  You can answer it.

17             THE WITNESS:  No.

18             MS. CODY:  Okay.

19             THE WITNESS:  That's it?

20                  REDIRECT EXAMINATION

21 BY MR. DANIELS:

22        Q.    Other than Sergeant Wheeler and other than

23 your attorneys, have you discussed this matter with

24 anybody else?

25        A.    I probably reviewed the incident with Tim

47

1 Church after the, you know, the incident took place as

2 part of the training, but I don't recall.  I mean, I might

3 have talked to somebody about it, but other than that, I

4 doubt -- I mean just in general conversation.

5        Q.    Right.  But I mean in an official manner,

6 anything like that?

7        A.    No.

8        Q.    Did Officer Church continue to train with you

9 after this incident?

10        A.    He still trains with us through this day.  He

11 comes out and we just train with him -- Hallandale sends

12 out a K-9 dog, I think they rotate every third week or

13 something.

14        Q.    Okay.  So now after this incident, he was

15 still finishing up his schooling, I take it.

16        A.    Correct.

17        Q.    Right.  And you were still the assistant

18 instructor over there?

19        A.    Correct.

20        Q.    And he continued to train with you for how

21 long after that?

22        A.    I don't know when the final date of the

23 school was.

24        Q.    You don't know.  Okay.  But for some period.

25 And you are saying that still he comes out to train with

1  you every so often?

2       A.    Right.  They have a rotating roster at

3  Hallandale.  Our unit trains formally every Wednesday, and

4  they have three dogs, one of the three dogs.

5       Q.    I see.  With the people they will send them?

6       A.    Correct.

7       Q.    The dogs don't just come out there and train.

8       A.    No.

9       Q.    Okay.  So every third time you get to see

10 Officer Church.

11      A.    Yeah, I believe so.  I don't know how they

12 set --

13      Q.    Approximately.

14      A.    Right.  They send the dog to train with us.

15      Q.    All right.  And now are you a head instructor

16 there?

17      A.    No.

18      Q.    What is your position over there?

19      A.    I'm still a handler and a helper.

20      Q.    Assistant instructor?

21      A.    I don't know what they -- we don't have --

22            SERGEANT WHEELER:  (Shakes head in the

23         negative.)

24            MR. DANIELS:  They don't have assistant

25         instructors.  No.  So he's a handler.

1  BY MR. DANIELS:

2        Q.    Other than being an assistant instructor, you

3  are on the road also?

4        A.    Yes, I'm still working the police dog.

5        Q.    When you have a police dog, is it like any

6  road officer, you go and drive around with the dog and

7  when they need you they call you.  Otherwise you do --

8        A.    We will train throughout the night, we will

9  handle calls for service.  We won't handle a call that

10 will tie us up for a long period of time because our

11 primary responsibility is utilization of the dog.

12       Q.    I see.

13       A.    So we will go to maybe backup or domestics.

14 Or say a homicide happens or traffic fatality, we don't

15 handle that.  We can assist but we have to be in a

16 position that we can clear if the assistance of the dog is

17 needed.

18       Q.    Okay, makes sense.

19             Let me ask you this.  I have to ask this

20 question.  Have you ever been disciplined at all regarding

21 Fort Lauderdale Police Department?

22       A.    No.

23             MR. DANIELS:  I don't have any further

24        questions.

25             MS. ALVAREZ:  I have a quick question.

```
 1                    CROSS-EXAMINATION

 2  BY MS. ALVAREZ:

 3        Q.    Officer Reed, when Sergeant Wheeler responded

 4  to the scene, had Mr. Hodge been taken from the scene

 5  already?

 6        A.    Yes.

 7              MS. ALVAREZ:  Thank you.  That's it.

 8              We'll read.

 9              Thank you.

10              (Thereupon, the deposition adjourned at 11:05

11  a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>CERTIFICATE OF OATH</u>

STATE OF FLORIDA        )

COUNTY   OF   BROWARD   )

        I, the undersigned authority, certify that OFFICER THOMAS REED personally appeared before me and was duly sworn.

        WITNESS my hand and official seal this 23rd day of January, 2001.

*Jackqulyn G Holland*

_____

JACKQULYN G. HOLLAND
Notary Public - State of Florida
My commission No.  CC927587
Expires:  May 21, 2004.

<u>REPORTER'S DEPOSITION CERTIFICATE</u>

STATE OF FLORIDA       )
COUNTY   OF   BROWARD   )

        I, JACKQULYN GIPSON HOLLAND, Registered Professional Reporter, certify that I was authorized to and did stenographically report the deposition of OFFICER THOMAS REED; that a review of the transcript was requested; and that the transcript is a true and correct record of my stenographic notes.

        I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

        Dated this 23rd day of January, 2001.

*Jackqulyn G Holland*

_____

JACKQULYN G. HOLLAND
Registered Professional Reporter.

1              CORRECTION SHEET

2

RE:      HUGH HODGE V. TIMOTHY M. CHURCH, etc. et al.

3

         Case No:  00-6228
4        Deposition of:  OFFICER THOMAS REED
         Date Taken:  November 16, 2000

5

PAGE NO.          LINE NO.            CORRECTION OR CHANGE

6

7    _____    _____    _____

8    _____    _____    _____

9    _____    _____    _____

     _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

     _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

     _____    _____    _____

17   _____    _____    _____

Under penalties of perjury, I declare that I have read my
18  deposition and that it is true and correct subject to any
changes in form or substance entered here.

19

20  _____

Date
21

22

23  _____

OFFICER THOMAS REED, Deponent
24

25

```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
 2                  DIVISION:  MIAMI

 3 HUGH HODGE,                      )
                                    )
 4          Plaintiff,              )
                                    )
 5   v.                             )    Case No.   00-6228 CIV-
                                    )               SEITZ/GARBER
 6 TIMOTHY M. CHURCH, THOMAS        )
   REED, PATRICK HART, DAVID        )
 7 WHEELER, CITY OF FORT            )
   LAUDERDALE, and CITY OF          )
 8 HALLANDALE,                      )
                                    )
 9          Defendants.             )
   _____x
10 To:  Dieter K. Gunther, Esq.
        Adorno & Zeder, P.A.
11      888 S.E. 3rd Avenue, Suite 500
        Fort Lauderdale, FL  33335
12
          Your client's deposition taken in the above-styled
13 case on November 16, 2000 is now ready for signature.

14        Since the deposition was ordered on an expedited
   basis, the original and one copy were delivered to Mr.
15 Gordon Daniels today, January 23, 2001.  Please have your
   client read your copy of the deposition.  An errata sheet
16 is attached to the end of the transcript for your
   convenience.
17
          Please contact our office if you have any
18 questions.

19                          Very Truly Yours,

20                          Jackqulyn G Holland

21                          JACKQULYN G. HOLLAND, RPR
                            Capital Reporting Service
22                          888 S. Andrews Ave., #304
                            Ft. Lauderdale, FL  33316
23                          (954) 522-6401

24 Date:  January 23, 2001
   cc:  Gordon S. Daniels, Esq.
25
```

# FORT LAUDERDALE POLICE DEPARTMENT
## K-9 SUPPLEMENT

| 1. Offense | | Juvenile | | Original | |
|---|---|---|---|---|---|
| 2. Arrest | | | ✓ | | 3 |
| OR# | 98 - 139628 | | | | |

| Date: 9-6-98 | Case Title: Auto theft REC | Time: 0400 |
|---|---|---|

On Sept. 6, 1998 this uniform K-9 Officer responded to 1513 NW 15 CT. in reference to a bailout of a stolen vehicle. While en route a perimeter was set up and manned by patrol.

Upon arrival, I met with Officer Hart. He advised me that he attempted to stop a 1990 Honda Civic, blue in color, the vehicle failed to stop and crashed in a fence at 1513 NW 15 CT. Officer Hart confirmed that the vehicle had just been stolen and provided a description of the driver that fled on foot. He advised that the driver was a white male in his late 20's or early 30's, wearing a white T-shirt and blue shorts. Officer Hart pointed to the last place he had seen the fleeing auto thief.

Officer T. Church of the Hallandale Police K-9 Unit deployed K-9 Gero in the same location that Officer Hart had last seen the fleeing culprit. K-9 Gero immediately located the track of the culprit. The track proceeded Northbound through the front and backyard of the residence at 1513 NW 15 CT. and then went West into the backyard of the adjacent residence. Once in that backyard the track went back Northbound into the backyard of the residence of 1516 NW 15 PL. As the track made a Westbound turn around the front of the residence and approached the Northwest corner, Officer Church illuminated the bushes on the corner of the house. Once the bushes were illuminated, I could see the culprit attempting to conceal himself. The white male fit the description of the auto theft culprit. Officer Church gave two loud and clear announcements. He first advised that he was a Hallandale Police K-9 Officer and that the culprit was under arrest. He advised him to expose his hands and come out from his place of hiding. After his first announcement Officer Church waited for a response but did not receive one. He once again identified himself as a Hallandale Police K-9 Officer and advised the culprit if he did not come out he would release his police K-9 to take him into custody. Again Officer Church waited for a response but did not receive one. He then deployed his K-9 partner to take the culprit into custody.

Once K-9 Gero went into the bushes he contacted the culprit in the right bicep and began to pull him out of his place of hiding. The culprit became very violent and began to fight with K-9 Gero. Due to the violent and combative nature of the culprit, he was able to get loose from K-9 Gero's hold. As soon as the culprit broke free, K-9 Gero immediately went in and re-contacted the culprit in the Buttocks. K-9 Gero continued to pull the culprit from his place of hiding.

PLAINTIFF'S EXHIBIT NO. (T.R.) FOR IDENTIFICATION DATE 11/16/00 RPTR. JH

| Report Contains | | | | Related Report Number(s) | |
|---|---|---|---|---|---|
| K-9 Supp | | | | | |

| Officer(s) Reporting | | | | I.D. Number | Unit | Date |
|---|---|---|---|---|---|---|
| T.K. Reed | | | | 1198 | K-9 99 | 9-6-98 |

| Officer Reviewing (if Applicable) | | Revised To | Returned To | Assigned To | By | Date |
|---|---|---|---|---|---|---|
| JH | | | | | | |

| Case Status | Clearance Type 1. Arrest 3. Unfounded 2. Exceptional | A-Adult J-Juvenile | Date Cleared | Arrest Number | Number Arrested |
|---|---|---|---|---|---|
| A | 1 | 1 | | | |

| Exception Type 1. Extradition Declined | 2. Arrest on Primary Offense Secondary Offense | 3. Death of Offender 4. VAW Refused to Cooperate | 5. Prosecution Declined 6. Juvenile/No Custody | OFBS Number | Page 1 of 2 |
|---|---|---|---|---|---|
| | | | 1 | | 1 |

FORM Z-561 New 8/9

## FORT LAUDERDALE POLICE DEPARTMENT

## SUPPLEMENTAL REPORT

**PAGE 1**                                    **OR# 98-139628**

| |
|---|
| **Offense:** Auto Theft |
| **Location:** 2616 Middle River Dr. |
| **Date:** 9-14-98    **Time:** 0800    **Date of Report:** 9-6-98 |

The Defendant(s) listed below have been arrested for Auto Theft by Ft.Lauderdale Police Dept.

NAME OF DEFENDANT(S)       (1) Hodge, Hugh W/M 10-21-66

Summary Narrative: On 9-6-98 Michael Viola, and Hugh Hodges visited 2626 Middle River Dr. Ft.Lauderdale Fl. While at the residence the resident occupant Kim Hewins, returned home. Shortly after, Hewins and Hodges became involved in an argument. Hodges exited the residence, entered Violas car and then left the area, driving Viola car. Viola did not give Hodges permission to use or possess the vehicle. Viola reported the vehicle as stolen to FLPD. Approx. 2 1/2 hours later FLPD officers observed Violas stolen vehicle. Officer attempted to stop the vehicle, the vehicle was driven into a fence, causing approx. $1,200.00 worth of damage. The driver fled from the crash scene. Officer pursued the driver, and apprehended him. In a search incident to arrest of the driver, a glass tube commonly used to smoke crack cocaine was found in his possession.
On 9-10-98 this detective obtained a sworn statement from the victim Viola, he advised he did not give Hodges permision to use or possess the vehicle and he does wish to prosecute.
On 9-10-98 this detective obtained a sworn statement from witness Hewins, she advised she was in an disturbance with Hodges, she witnessed Hodges exit her residence, enter the victims vehicle and the drive the victims stolen vehicle away from the residence.
Hodges was charged with the following,
1)Grand Theft            2)Vandalism (felony)
3)Poss. of Cocaine       4)Poss. of Drug Paraphernalia
5)Resisting Arrest W/O Violence 6) No D.L.

This case was forwarded to the Broward Co. State Attorneys Office for case filing.

This case is **CLOSED BY ARREST.**

| Detective M. Arbit | FL1048 | K-23 |
|---|---|---|
| Officer Reviewing | CCN 809 | Date 9/17/98 |

| 1. Offense | | Juvenile | | Original | |
| 2. Arrest | | | | Supplement | 2 |
| | | | ORs | 98 - 139628 | |

| Date: 9-6-98 | Case Title: Autotheft (REC.) | Time: 04:00 |

As Gero was pulling the culprit out and as the culprit was pulling to get away, the pants that he was wearing began to tear. K-9 Gero again readjusted in the buttock. It should be noted that during this violent struggle this Officer along with Officer Church were yelling instruction for the culprit to stop fighting and striking the police dog and to place his hands behind his back. Once the culprit stopped his violent struggle and placed his hands behind his back, he was handcuffed by this Officer, and Officer Church remover K-9 Gero.

While I was performing a search incident to arrest on the auto theft, I located a Crack pipe in the culprit's right front pocket. The pipe was valtox tested positive and turned over to Officer Hart.

Sgt. Wheeler responded to the seen and took pictures of the vehicle and the location where the culprit was taken into custody. The culprit, who was positively ID'ed by Officer Hart, was transported to Broward General Hospital. He was treated and taken to F.L.P.D. Jail.

| Report Contains: K-9 SUPP | | | | Related Report Number(s) | |
| Officer(s) Reporting: T.K. REED | | | I.D. Number 1198 | Unit K-9 44 | Date 9-6-9 |
| Officer Reviewing (If Applicable): | I.D. Number | Routed To | Routed To | Assigned To | By | Date |

| Case Status | Clearance Type | | A-Adult | Date Cleared | Arrest Number | Number Arrested |
| | 1. Arrest   3. Unfounded | | J-Juvenile | | | |
| | 2. Exceptional | 1 | | 1 | | |

| Exemption Type | 2. Arrest on Primary | 3. Death of Offender | 5. Prosecution Declined | | CVSA Number | Page |
| 1. Extradition | Offense Secondary Offense | 4. VW Refused to | 6. Juvenile/No Custody | | | 2  1 of 2 |
| Declined | Without Prosecution | | Cooperate | 1 | | |

FORM Z-561 New 8/9* (Back)